PCA CASE NO. 2012-2

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH THE UNCITRAL ARBITRATION RULES 1976 PURSUANT TO THE AGREEMENT BETWEEN THE GOVERNMENT OF CANADA AND THE GOVERNMENT OF THE REPUBLIC OF ECUADOR FOR THE PROMOTION AND RECIPROCAL PROTECTION OF INVESTMENTS, SIGNED 29 APRIL 1996**

**BETWEEN:-**

**COPPER MESA MINING CORPORATION**

**(Canada)**

*The Claimant*

**- and -**

**THE REPUBLIC OF ECUADOR**

*The Respondent*

_____

**AWARD**

_____

**15 March 2016**

**THE ARBITRATION TRIBUNAL:**

**Dr. Bernardo Cremades**
**Judge Bruno Simma**
**V.V. Veeder QC (President)**

**Administrative Secretary: Mr. Martin Doe**

**EXHIBIT A-2**

**TABLE OF CONTENTS**

TABLE OF ABBREVIATIONS iii

DRAMATIS PERSONAE vi

TABLE OF LEGAL MATERIALS x

PART 1 – THE ARBITRATION 1.01

PART 2 – THE PRINCIPAL ISSUES 2.01

PART 3 – THE PRINCIPAL LEGAL TEXTS 3.01

PART 4 – THE PRINCIPAL FACTS – CHRONOLOGY 4.01

PART 5 – JURISDICTION AND ADMISSIBILITY 5.01

PART 6 – LIABILITY AND CAUSATION 6.01

PART 7 – COMPENSATION 7.01

PART 8 – INTEREST 8.01

PART 9 – LEGAL AND ARBITRATION COSTS 9.01

PART 10 – SUMMARY OF THE TRIBUNAL'S DECISIONS 10.01

PART 11 – THE OPERATIVE PART 11.01

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| 2000 Mining Law | Law No. 126 (*Ley de Minería*), published in the Supplementary Official Gazette No. 695 of 31 May 1991, and amended in the Supplementary Official Gazette No. 144 of 18 August 2000 (Exhibit C-32) |
| 2009 Mining Law | Mining Law (*Ley de Minería*), published in the Official Gazette (*Registro Oficial*) No. 517 of 29 January 2009 (Exhibit C-11) |
| AGCD | Belgian State Technical Assistance Mission |
| Ascendex | Ascendant Exploration S.A. Ascendex |
| Ascendant | Ascendant Holdings Ltd. |
| Ascendant Barbados | Ascendant Copper (Barbados) Corporation |
| Ascendant Copper | Ascendant Copper Corporation; former name of Copper Mesa Mining Corporation; the Claimant in this arbitration |
| Ascendant Ecuador or AE | Ascendant Copper S.A. Ascendcopper |
| Biotreat | Biotreat S.A. |
| Bishimetal | Bishimetal Exploration Co. Ltd., a subsidiary of Mitsubishi |
| CCCC | Commission for Civil Control of Corruption |
| CDC | Council for the Development of the Community (*Consejo de Desarrollo de las Comunidades*) |
| Chaucha Concession | Chaucha project, consisting of Chaucha (Janeth 1) concession in southern Ecuador |
| Claimant | Copper Mesa Mining Corporation; the Claimant in this arbitration |
| CODEGAM | García Moreno Development Council (*Consejo de Desarrollo de García Moreno*) |
| Copper Mesa | Copper Mesa Mining Corporation; the Claimant in this arbitration |
| DECOIN | Ecological Defence and Conservation of Intag |

| DGGM | General Direction for Geology and Mines of Ecuador |
|---|---|
| DosRios | Compañía Minera DosRíos S.A, Ecuadorian subsidiary of the Claimant |
| Ecuador | The Republic of Ecuador; the Respondent in this arbitration |
| Ecuadorgold | Ecuador Gold S.A. Ecuadorgold |
| Ecuadorian Subsidiaries | DosRios, Telimbela, and Compañía Ruta de Cobre S.A. |
| EIS | Environmental Impact Study |
| EMA | Environmental Management Law (*Ley de Gestión Ambiental*) |
| ENAMI | National Mining Enterprise (*Empresa Nacional Minera*) created by Article 12 of the 2009 Mining Law |
| H&L | Honor & Laurel |
| Hearing | Oral hearing held on 16-21 September 2013 at the World Bank in Washington, DC, USA |
| JICA | Japanese International Co-operation Agency |
| Junín Concessions | Junín project, consisting of the Golden 1 and Golden 2 concessions in northwestern Ecuador |
| LGA | Environmental Management Law (*Ley de Gestión Ambiental*) |
| MEM | Ministry of Energy and Mines of Ecuador |
| Mining Concessions | Junín, Chaucha, and Telimbela Concessions |
| Mining Mandate | Constituent Mandate No. 6 (*Mandato Constituyente No. 6*) passed by Ecuador's Constituent Assembly (*Asamblea Constituyente*) on 18 April 2008 (Exhibit C-60) |
| Nortec | Nortec Ventures Corp. |
| Nullification Resolutions | Resolutions of the Pichincha Regional Mining Office dated 25 January 2008 (Exhibit C-9) |
| ODI | Organization for the Development of the Intag |

| | |
|---|---|
| Project Companies | Ascendant Ecuador, DosRios, and Telimbela |
| RAAM | Environmental Regulation for Mining Activities (Executive Decree) |
| Respondent | The Republic of Ecuador; the Respondent in this arbitration |
| Suspension Resolution | Resolution of the Pichincha Regional Mining Office dated 25 September 2007 (Exhibit C-57) |
| Telimbela | Compañía Minera Telimbela S.A., Ecuadorian subsidiary of the Claimant |
| Telimbela Concession | Telimbela project, San Pablo 1 concession for the in Central Ecuador |
| Termination Resolutions | Resolutions of the National Mining Director dated 15 September 2008 (Exhibits C-58 and C-59) |
| Treaty | Agreement between the Government of Canada and the Government of the Republic of Ecuador for the Promotion and Reciprocal Protection of Investments, signed on 29 April 1996 |
| Tripartite Agreement | Commitment Contract Intag Region Cotacachi, entered into among Mr. Polibio Pérez on behalf of the Community Council of the Region of Intag and the Ecuadorian government represented by the Governor of the Province of Imbabura, and witnessed by the Ministry of Energy and Mines and the Commander of the Provincial Police, dated 20 March 2007 (Exhibit C-55), taken together with Commitment Contract Intag Region Cotacachi, entered into among Ascendant Ecuador and the Ecuadorian government represented by the Governor of the Province of Imbabura, and witnessed by the Ministry of Energy and Mines and the Commander of the Provincial Police, dated 20 March 2007 (Exhibit C-56) |
| TULAS | Unified Environmental Rules of the Ministry of Environment of Ecuador |
| UNCITRAL Rules | UNCITRAL Arbitration Rules 1976 |

## DRAMATIS PERSONAE

| Family Name(s), First Name(s) | Description |
|---|---|
| Acosta, Alberto | Minister of Mining (15 January 2007 – 15 June 2007); President of the Constituent Assembly (30 November 2007 – 27 June 2008) |
| Alba, Fernando | Honor & Laurel employee |
| Albán, Jorge | Interim Minister of Mining (15 June 2007 – 23 July 2007) |
| Almeida Vaca, Juan | Governor of the Province of lmbabura (23 June 2005 – 17 January 2007) |
| Andrade, Ronald | President of CODEGAM (2005 – 2006) |
| Barragán Medina, Alfredo Enrique | Under-Secretary of Environmental  Protection (9 May 2005 – 22 November 2006) |
| Benalcázar, Ciro | One of Ascendant Ecuador's  "social promoters" in Intag in 2006 |
| Benalcázar, Leo | Honor & Laurel employee |
| Bermeo, Juan Carlos | Ascendant Ecuador General Manager (November 2005 – 5 October 2006) |
| Betancourt, Silvia | Intag resident, anti-mining activist |
| Bolaños, Patricio | Intag resident, anti-mining activist |
| Bustamante, Roque | First titleholder to the Junín Concessions |
| Carrasco, Milton | Engineer of the Ministry of Mining, Environmental Mining Unit (9 May 1988 – 6 March 2007) |
| Cazar, Edgar Alfonso | Ascendex's employee |
| Cedeño Garcia, Carlos Alonso | Ascendex's and then Ascendant Ecuador's employee until 2005 |
| Chaplin, Leslie Brooke | Plaintiff in a criminal complaint against Carlos Zorrilla in 2006 which was found to have been filed in bad faith |
| Chiriboga, Galo | Minister of Mining (23 July 2007 – 8 October 2008) |
| Cordero Heredia, David | DECOIN's legal coordinator (2007) (Respondent's position, based on evidence: e.g. Exhibit R-338) |
| Correa, Rafael | President of the Republic of Ecuador (15 January 2007 – present) |
| Cousin, Guido | President of the Parish of Garcia Moreno (2000 – 2004) |

| Family Name(s), First Name(s) | Description |
| --- | --- |
| Cueva, José | Former DECOIN employee; Intag resident from January 2006 onwards, anti-mining activist; Respondent's witness in the arbitration |
| Dávalos, Dario | Ascendant Ecuador's employee (2005 – 2007) |
| Davis, Gerald E. | Copper Mesa's shareholder, President and Chief Executive Officer (November 2004 – present); Claimant's witness in the arbitration |
| Enriquez, Diego | Ascendant Ecuador's employee in 2006 – 2007 |
| Falconi, Diego | At Ministry of Government (29 January 2007 – 29 July 2008) |
| Fieweger, Mary Ellen | Intag resident, anti-mining activist; Director of Intag Newspaper |
| Figueroa, Isabela | DECOIN's attorney (2006 – 2007) |
| Flores, Hector | Intag resident, anti-mining activist |
| Flores, Magdalena | One of Ascendant Ecuador's "social promoters" in Intag |
| Fuertes, Wilmer | Honor & Laurel employee |
| Gammon, John | Member of the Board of Directors of Copper Mesa; defendant in *Ramirez Piedra et at v Copper Mesa, TSX et al.* |
| García Pozo, Diego | Governor of Imbabura (17 January 2007 – 4 February 2009) |
| Garzón, José | President of the Association of Intag Parishes (2006 – 2007) |
| Grist, Paul | Co-Founder and General Manager of Ascendex (1999 – 2004) |
| Guevara, Kléber | Geological engineer of the Ministry of Mining (National Directorate of Mining and Environmental Mining Unit, 1984 – 2008); Respondent's witness in arbitration |
| Haigh, John | Copper Mesa's Manager of Investor Relations (2007 – 2009) |
| Herrera, Fausto | Ascendant Ecuador employee (company driver) (2005 – 2007) |
| Jacomé, Milton | Political Lieutenant of the Parish of Garcia Moreno (23 February 2007 – at least 2010) |
| Jimenez Ruiz, Esvar | Police Provincial Chief for the Imbabura rural area (including Junín) (9 May 2006 – 20 November 2007) |
| Jurado, Jorge | Under-Secretary of Mining (18 January 2007 – 27 July 2007) |

| Family Name(s), First Name(s) | Description |
| --- | --- |
| Jurika, Dana | Co-Founder and General Manager of Ascendex (1999 – 2002); Executive Vice-President of Ascendex holdings Ltd. (2002 – 2004) Copper Mesa's Vice President (June 2006 – July 2009); Copper Mesa's director (December 2010 – present); Claimant's witness in the arbitration |
| Jurika, William | Former shareholder, former member of the Board of Directors and former Chairman of Copper Mesa (2004 – 2007). Resigned from the Board of Directors and was succeeded as Chairman by Robert Pevenstein from 2008 onwards |
| King, John | Former Copper Mesa employee, geologist (2006 – 2009). Retained by Claimant in 2012 as an expert witness on the resources at Chaucha |
| Kuecker, Glen | Member of the Intag Solidarity Network (2005 – 2007); Associate Professor of Latin American History at DePauw University |
| Larrea, Gustavo | Minister of Government and Police (15 January 2007 – 29 November 2007) |
| León, Gustavo | President of the Parish of Peñaherrera (2005 – present) |
| León, Sixta | Intag resident, anti-mining activist |
| López Molina, Santiago | Biotreat's shareholder |
| Mantilla, Jorge | General Manager of Falericorp (29 October 2006 – January 2007). |
| Monge, Elsie (sister) | Executive Director of CEDHU |
| Morales, Shisela | President of the Parish of García Moreno (5 January 2005 – present) |
| Murriagui, Carlos | Under-Secretary of Mining (I July 2005 – 12 December 2006) |
| Palacio, Alfredo | President of the Republic of Ecuador (20 April 2005 – 15 January 2007) |
| Pazmiño, Santiago | Regional Mining Director for Pichincha (4 January 2008 – 11 November 2008) |
| Pérez, Israel | Intag resident, anti-mining activist; Respondent's witness in the arbitration |
| Pérez, Polibio | Intag resident, anti-mining activist; President of the CDC (1997 – present) |
| Pinto, Germánico | Minister of Mining (8 June 2009 – 22 April 2010) |
| Rodriguez Ramos, Iván | Minister of Mining (16 June 2005 – 13 January 2007) |
| Rogge, Malcolm | Documentary film director of *Under Rich Earth* |
| Rosanía, Giovanni | Ascendant Ecuador's General Manager (April 2005 – November 2005) |

| Family Name(s),<br>First Name(s) | Description |
| --- | --- |
| Ruiz, Lucía | Under-Secretary of Environmental Protection (16 January 2007 – 8 October 2008); Respondent's witness in the arbitration |
| Sandoval, Janeth | Ascendex's and then Ascendant Ecuador's employee (2005 to at least 2008) |
| Sandoya Sanchez, Eduardo | Regional Mining Director for Pichincha (issued 12 November 2008 Resolutions) |
| Serrano, José | Under-Secretary of Mining (27 July 2007 – 13 August 2009). Lawyer for DECOIN (2004 – 2005) |
| Serrano, Roberto | Minister of Mining and Under-Secretary of Environmental Protection (30 March 2006 – 11 July 2006) |
| Stonehouse, James | Copper Mesa's Vice President; General Manager of DosRios and Minera Telimbela (11 January 2007 – mid 2009); Claimant's witness in the arbitration |
| Tituaña, Auki | Cotacachi Canton's Mayor (10 August 1996 – 4 January 2009) |
| Usuay, Angél | Police First Sergeant in Intag |
| Vaughan, William ("Steve") | Member of the Board of Directors of Copper Mesa; defendant in *Ramirez Piedra et at v Copper Mesa, TSX et al.* |
| Veintimilla, Francisco | Ascendant Ecuador employee from mid-2006; Ascendant Ecuador General Manager (6 October 2006 – mid-2009) |
| Villacís, Cesar (General) | Ascendex and Ascendant Ecuador's community relations manager in 2004/2005 |
| Viteri, Yolanda | Under-Secretary of Environmental Protection (6 September 2006 – 15 January 2007) |
| Vulimiri, Mohan | Chief Executive Officer of Nortec (2001 – present) |
| Yánez, Dani | National Directorate of Environmental Mining Protection (7 December 2004 – 1 April 2009) |
| Zambrano, Mauro | Under-Secretary of Mining (11 May 2005 – 29 June 2005) |
| Zorrilla, Carlos | Intag resident, anti-mining activist; executive director of DECOIN; Respondent's witness in the arbitration |

## TABLE OF LEGAL MATERIALS

**Treaties**

| | |
|---|---|
| Treaty | Agreement between the Government of Canada and the Government of the Republic of Ecuador for the Promotion and Reciprocal Protection of Investments (signed on 29 April 1996) (Exhibits C-1, C-2, C-3) |
| VCLT | Vienna Convention on the Law of Treaties, 23 May 1969 (Exhibit RLA-165) |

**Case Materials**

| | |
|---|---|
| *AAPL v Sri Lanka* | *Asian Agricultural Products Ltd (AAPL) v Sri Lanka*, ICSID Case No ARB/87/3, Award, 27 June 1990 (Exhibit CLA-84) |
| *ADC v Hungary* | *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary, ICSID Case No. ARB/03/16,* Award, 2 October 2006 (Exhibit CLA-19) |
| *ADM v Mexico* | *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. The United Mexican States,* ICSID Case No. ARB (AF)/04/5 (NAFTA), Award (Redacted Version), 21 November 2007 (Exhibit CLA-43) |
| *AES v Hungary* | *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 |
| *Anderson et al. v Costa Rica* | *Alasdair Ross Anderson et al. v. Costa Rica,* ICSID Case No. ARB(AF)/07/3, Award, 19 May 2010 (Exhibit RLA-44) |
| *Al-Bahloul v Tajikistan* | *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan,* SCC Case No. V 064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009 (Exhibit CLA-41) |
| *Al-Warraq v Indonesia* | *Hesham Talaat M. Al-Warraq v. Republic of Indonesia*, UNCITRAL, Final Award, 15 December 2014 |
| *AMT v Zaire* | *American Manufacturing & Trading Inc (AMT) v Zaire*, ICSID Case No ARB/93/1, Award, 21 February 1997 |

| | |
|---|---|
| *Arif v Moldova* | *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 (Knieper, Cremades, Hanotiau) (RLA-162) |
| *Azurix v Argentina* | *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (Exhibit CLA-61) |
| | *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment, 1 September 2009 (Exhibit CLA-7) |
| *Burlington v Ecuador* | *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No ARB/08/5, 14 December 2012, Decision on Liability (Exhibit RLA-160) |
| *Chemtura v Canada* | *Chemtura Corporation v. Government of Canada*, UNCITRAL, 2 August 2010, Award, 2 August 2010 (Exhibit RLA-87) |
| *Chorzów Factory* | *Case concerning the Factory at Chorzów (Germany v. Poland)*, Judgment on the Merits, 13 September 1928, PCIJ Reports, Series A, No. 17 (Exhibit CLA-48) |
| *CME v Czech Republic* | *CME Czech Republic B.V. v. Czech Republic,* UNCITRAL, Partial Award, 13 September 2001 (Exhibit CLA-37) |
| *CMS v Argentina* | *CMS Gas Transmission Co v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (Exhibit RLA-97) |
| *Commerce Group Corp. et al v El Salvador* | *Commerce Group Corp. et al v. The Republic of El Salvador*, ICSID Case No. ARB/09/17, Award, 14 March 2011 (Exhibit RLA-132) |
| *Continental Casualty v Argentina* | *Continental Casualty Company v. The Argentine Republic,* ICSID Case No.ARB/03/9, Decision on Jurisdiction, 22 February 2006 (Exhibit CLA-36) |
| | *Continental Casualty Company v. The Argentine Republic,* ICSID Case No.ARB/03/9, Award, 5 September 2008 (Exhibit CLA-57) |
| *Delagoa Bay Railway Arbitration* | *Delagoa Bay Railway Arbitration (Etats-Unis d'Amérique, Grande Bretagne, Portugal)*, Award, 29 March 1900 in H. Lafontaine, *Pasicrisie Internationale 1794-1900 – Histoire documentaire des arbitrages internationaux*, p. 397 (Exhibit RLA-104); Moore, *International Arbitrations*, Vol II, p. 1865 |

| | |
|---|---|
| *Duke Energy v Ecuador* | *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador,* ICSID Case No. ARB/04/19, Award, 18 August 2008 (Exhibit RLA-80) |
| *El Paso v Argentina* | *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No ARB/03/15, Award, 31 October 2011 (Exhibit CLA-59) |
| *ELSI Case* | *Elettronica Sicula S.p.A. (Elsi) (United States v. Italy),* Judgment of 20 July 1989, I.C.J. Reports 1989, p. 15 (Exhibit CLA-42) |
| *Encana Corporation v Ecuador* | *EnCana Corporation v. Republic of Ecuador,* LCIA Case No. UN3481, UNCITRAL, Partial Award on Jurisdiction, 27 February 2004 (Exhibit CLA-3) |
| *Enron v Argentina* | *Enron Corporation and Ponderosa Assets, LP v. The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007 (Exhibit RLA-99) |
| *Feldman v Mexico* | *Marvin Feldman v. Mexico,* ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002 (Exhibit CLA-45) |
| *Franck Charles Arif v Republic of Moldova* | *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 (Exhibit RLA-162) |
| *Fraport v Philippines I* | *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Award and Dissenting Opinion of Mr. Bernardo M. Cremades, 16 August 2007 (Exhibit CLA-25) |
| | *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines,* ICSID Case No. ARB/03/25, Decision on the Application for Annulment, 23 December 2010 (Exhibit CLA-26) |
| *Fraport v Philippines II* | *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/11/12, Award, 10 December 2014 |
| *GEA v Ukraine* | *GEA Group Aktiengesellschaft v. Ukraine,* ICSID Case No. ARB/08/16, Award, 31 March 2011 (Exhibit CLA-13) |
| *Generation Ukraine v Ukraine* | *Generation Ukraine, Inc. v. Ukraine,* ICSID Case No. ARB/00/9, Award 16 September 2003 (Exhibit RLA-91) |

| | |
|---|---|
| *Goetz v Burundi* | *Goetz and others v. Burundi*, ICSID Case No. ARB/95/3, Award, 10 February 1999 (Exhibit CLA-8) |
| *Hamester v Ghana* | *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICISD Case No. ARB/07/24, Award, 18 June 2010 (Exhibit RLA-45) |
| *International Technical Products v Iran* | *International Technical Products Corporation and ITP Export Corporation v. The Government of the Islamic Republic of Iran et al.*, Iran Award 196-302-3, 9 Iran-U.S.C.T.R. 206, 1985 WL 324064 (Iran-U.S.Cl.Trib.) (Exhibit RLA-118) |
| *Inveysa v El Salvador* | *Inceysa v. El Salvador,* ICSID Case No. ARB/03/26, Award, 2 August 2006 (Exhibit RLA-5) |
| *Kardassopoulos v Georgia* | *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007 (Exhibit CLA-20) |
| *La Grand* | *LaGrand (Germany v. United States of America)*, ICJ, Merits, Judgement, 27 June 2001, ICJ Reports 2001 (Exhibit RLA-107) |
| *LESI S.p.A. et ASTALDIS S.p.A. v Algeria* | *LESI S.p.A. et ASTALDI S.p.A. v. République Algérienne Démocratique et Populaire,* ICSID Case No. ARB/05/3, Award, 12 November 2008 (Exhibit CLA-39) |
| *Lillie Kling v Mexico* | *Lillie S. Kling (USA) v. Mexico*, Award. 8 October 1930, reprinted in Reports on International Arbitral Awards (2006), Vol IV, 575 |
| *MCI Power v Ecuador* | *M.C.I. Power Group L.C and New Turbine Inc. v. Republic of Ecuador,* ICSID Case No. ARB/03/6, Award, 31 July 2007 (Exhibit RLA-95) |
| *Metalclad v Mexico* | *Metalclad Corporation v. The United Mexican States,* ICSID Case No. ARB(AF)/97/1, Award, 30 August 2000 (Exhibit CLA-30) |
| *Methanex v USA* | *Methanex Corporation v. United States of America*, UNCITRAL, Final Award on Jurisdiction and Merits, 3 August 2005 (Exhibit RLA-86) |
| *Middle East Cement v Egypt* | *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt,* ICSID Case No. ARB/99/6, Award, 12 April 2002 (Exhibit CLA-27) |

| | |
|---|---|
| *MTD v Chile* | *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 (Exhibit CLA-60) |
| | *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 |
| *Niko Resources v Bangladesh* | *Niko Resources (Bangladesh) Ltd. v. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangla")*, ICSID Case Nos. ARB/10/11 and ARB/10/18, Decision on Jurisdiction, 19 August 2013 (Exhibit CLA-88) |
| *Noble Ventures v Romania* | *Noble Ventures, Inc. v. Romania*, ICSID Case No. ARB/01/11, Award, 12 October 2005 (Böckstiegel, Lever, Dupuy) (Exhibit RLA-151) |
| *Nykomb v Latvia* | *Nykomb Synergetics Technology Holdings AB v. v. The Republic of Latvia,* SCC Case No. 118/2001, Award, 16 December 2003 (Exhibit RLA-22) |
| *Occidental v Ecuador* | *Occidental Petroleum Corp, Occidental Exploration and Production Company v. Ecuador*, ICSID Case No. ARB/06/11, ICSID ARB/06/11, Award, 5 October 2012 (Fortier, Williams and Stern, dissenting in part) (Exhibits CLA-87, RLA-108) |
| | *Occidental Petroleum Corp, Occidental Exploration and Production Company v. Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 Noveber 2015 |
| *Parkerings v Lithuania* | *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 (Exhibit RLA-92) |
| *Plama v Bulgaria* | *Plama Consortium Limited v. Republic of Bulgaria,* ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (Exhibit RLA-82) |

| | |
|---|---|
| *Pope & Talbot v Canada* | *Pope & Talbot Inc v. Government of Canada,* UNCITRAL, Interim Award, 26 June 2000 (Exhibit RLA-96) |
| | *Pope & Talbot Inc. v. Government of Canada*, UNCITRAL, Award on the Merits of Phase 2, 10 April 2001 (Exhibit CLA-44) |
| | *Pope & Talbot Inc. v. Government of Canada,* UNCITRAL, Award on Damages, 31 May 2002 (Exhibit CLA-5) |
| *RDC v Guatemala* | *Railroad Development Corporation (RDC) v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Award, 29 June 2012 (Exhibit CLA-68) |
| *Rumeli v Kazakhstan* | *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Award, 29 July 2008 (Exhibit CLA-23) |
| | *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the Ad Hoc Committee, 25 March 2010 |
| *Saghi v Iran* | *James M. Saghi and others v. The Islamic Republic of Iran and others,* Iran-US Case No. 298 (544-298-2) 29 Iran-US C.T.R. 20, Award, 22 January 1993 (Exhibit CLA-33) |
| *Saluka Investments BV v Czech Republic* | *Saluka Investments B. V. v. The Czech Republic,* UNCITRAL, Partial Award, 17 March 2006 (Exhibit RLA-88) |
| *SAUR v Argentina* | *SAUR International S.A. v. Argentina, ICSID Case No. ARB/04/4,* Decision on Jurisdiction and Liability (Exhibit RLA-141) |
| *SD Myers v Canada* | *S.D. Myers Inc. v. Government of Canada,* UNCITRAL, First Partial Award, 13 November 2000 (Exhibit CLA-31) |
| | *S.D. Myers Inc. v. Government of Canada*, UNCITRAL, Final Award on Costs, 30 December 2002 (Exhibit CLA-63) |
| *Siemens v Argentina* | *Siemens A.G. v. The Argentine Republic,* ICSID Case No. ARB/02/8, Award, 6 February 2007 (Exhibit CLA-38) |
| *SPP v Egypt* | *Southern Pacific Properties (Middle East) Ltd. v. The Arab Republic of Egypt*, ICSID Case No ARB/84/3, Award, 20 May 1992 |

| | |
|---|---|
| *SS Wimbledon* | *The S.S. "Wimbledon"*, 1923, PCIJ, Judgment, Series A, No. 1, p. 31 |
| *Starrett Housing Corp. v Iran* | *Starrett Housing Corp. v. Iran*, 4 Iran-US C.T.R. 122 (1983) (Exhibit CLA-29) |
| *Suez et al. v Argentina* | *Suez, Sociedad General de Aguas de Barcelona S.A., and InterAgua Servicios Integrales del Agua S.A. v. The Argentine Republic*, ICSID Case No. ARB/03/07, Decision on Liability, 30 July 2010 (Exhibit RLA-90) |
| *Tecmed v Mexico* | *Técnicas Medioambientales TECMED SA v. The United Mexican States,* ICSID Case No ARB(AF)/00/2, Award, 29 May 2003 (Exhibit CLA-28) |
| *Teinver v Argentina* | *Teinver SA et al. v. Argentine Republic,* ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012 (Exhibit CLA-70) |
| *UPS v Canada* | *United Parcel Service of America Inc. v. Canada*, UNCITRAL, Award on the Merits, 24 May 2007 (Exhibit CLA-4) |
| *Vannessa Ventures v Venezuela* | *Vannessa Ventures Ltd v. Venezuela*, ICSID Case No. ARB(AF)/04/6, Award, 16 January 2013 (Exhibit CLA-69) |
| *Vivendi v Argentina* | *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. The Argentine Republic*, ICSID Case No. ARB/97/3, Award, 20 August 2007 (Exhibit CLA-51) |
| *Waste Management II* | *Waste Management, Inc. v. The United Mexican States,* ICSID Case No. ARB(AF)/00/03, Award, 30 April 2004 (Exhibit CLA-40) |
| *Wena Hotels v Egypt* | *Wena Hotels Limited. v. Arab Republic of Egypt,* Award, 8 December 2000 (Exhibit CLA-32) |
| *World Duty Free v Kenya* | *World Duty Free Company Limited v. Kenya*, ICSID Case No. ARB/00/7, Award, 4 October 2006 (Exhibit RLA-37) |

| | |
|---|---|
| *Yukos v Russia* | *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226, UNCITRAL, Final Award of 18 July 2014 (Fortier, Poncet, Schwebel) |
| | *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, UNCITRAL, Final Award of 18 July 2014 (Fortier, Poncet, Schwebel) |
| | *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 228, UNCITRAL, Final Award of 18 July 2014 (Fortier, Poncet, Schwebel) |

**Other Materials**

| | |
|---|---|
| Crawford ILC Commentary | James Crawford, THE INTERNATIONAL LAW COMMISION'S ARTICLES ON STATE RESPONSIBILITY, INTRODUCTION, TEXT AND COMMENTARIES (Cambridge Univ. Press 2002) (Exhibits RLA-103, RLA-142) |
| Dolzer/Schreuer | Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (Oxford Univ. Press 2008) (Exhibit CLA-6) |
| ILC Articles | International Law Commission, "Draft ILC Articles of Responsibility of States for Intentionally Wrongful Acts, with commentaries, 2001 (Exhibit CLA-49) |
| ILC Second Report | International Law Commission, "Second Report on State Responsibility by James Crawfor, Special Rapporteur", 3 May-23 July 1999, A/CN.4/498/Add.2 (Exhibit RLA-73) |
| Stern | Brigitte Bollecker-Stern, *Le préjudice dans la théorie de la responsabilité international* (Paris, Pedone, 1973) |

# PART 1 – THE ARBITRATION

## A: The Parties and the Tribunal

1.1.    *The Claimant:* The Claimant is Copper Mesa Mining Corporation (the "Claimant" or "Copper Mesa"). It is a Canadian corporation established under the laws of the province of British Columbia, Canada, on 5 May 2004, under the name Ascendant Copper Corporation, which subsequently changed its name to its current name on 3 July 2008. Its address is 1503 Wharf Street, Summerland, British Columbia V0H 1Z9, Canada.

1.2.    *The Claimant's Legal Representatives:* The Claimant is legally represented in this arbitration by Messrs. Robert Wisner, Markus Koehnen and Andrei Pascu of McMillan LLP, Brookfield Place, Suite 4400, Bay Wellington Tower, 181 Bay Street, Toronto, Ontario M5J 2T3, Canada.

1.3.    *The Respondent:* The Respondent is the Republic of Ecuador (the "Respondent" or "Ecuador"), acting through the Procuraduría General del Estado, whose address is Avenida Amazonas No. 39-123 y Arízaga, Edif. Amazonas Plaza, Quito, Ecuador.

1.4.    *The Respondent's Legal Representatives:* The Respondent is legally represented in this arbitration by Mr Diego García Carrión (Procurador General del Estado), Dra. Blanca Gómez de la Torre (Directora de Asuntos Internacionales y Arbitraje), Ms Christel Gaibor, Ms Diana Moya, Ms Cristina Viteri of the Procuraduría General del Estado, and Mr Veijo Heiskanen, Ms Domitille Baizeau, Mr Jaime Gallego and Mr David Bonifacio of Lalive, Rue de la Mairie 35, P.O. Box 6569, 1211 Geneva 6, Switzerland.

1.5.    *The Tribunal:* The Tribunal is composed of Dr Bernardo Cremades, appointed by the Claimant, Judge Bruno Simma, appointed by the Respondent, and Mr V.V. Veeder, appointed as presiding arbitrator by the agreement of the Parties.

1.6.    *The Registry:* The PCA acts as registry in these proceedings (as confirmed in the Terms of Appointment dated 17 January 2012 agreed by the Tribunal, the Parties and the PCA).

*B: The Arbitration Agreement*

1.7.   The terms of the arbitration agreement invoked by the Claimant are contained in Article XIII of the "Agreement between the Government of Canada and the Government of the Republic of Ecuador for the Promotion and Reciprocal Protection of Investments" signed on 29 April 1996 (the "Treaty"), providing, in relevant part, as follows:

"Article XIII

Settlement of Disputes between an Investor and the Host Contracting Party

1.   Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contacting Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.

2.   If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach.

3.   An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if:

(a)   the investor has consented in writing thereto;

(b)   the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;

(c)   if the matter involves taxation, the conditions specified in paragraph 5 of Article XII have been fulfilled; and

(d)   not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.

4. The dispute may, at the election of the investor concerned, be submitted to arbitration under: […]

    (c) an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).

5. Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.

    […]

7. A tribunal established under this Article shall decide the issue in dispute in accordance with this Agreement and applicable rules of international law.

    […]

9. A tribunal may award, separately or in combination, only:

    (a) monetary damages and any applicable interests;

    (b) restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution.

A tribunal may also award costs in accordance with the applicable arbitration rules.

10. An award of arbitration shall be final and binding and shall be enforceable in the territory of each of the Contracting Parties.

11. Any proceedings under this Article are without prejudice to the rights of the Contracting Parties under Articles XIV and XV.

12. (a) A claim that a Contracting Party is in breach of this Agreement, and that an enterprise that is a juridical person incorporated or duly constituted in accordance with applicable laws of that Contracting Party has incurred loss or damage by reason of, or arising out of, that breach, may be brought by an investor of the other Contracting Party acting on behalf of an enterprise which the investor owns or controls directly or indirectly. In such a case:

    (i) any award shall be made to the affected enterprise;

    (ii) the consent to arbitration of both the investor and the enterprise shall be required;

    (iii) both the investor and enterprise must waive any right to initiate or continue any other proceedings in relation to the measure that is

alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind; and

(iv)   the investor may not make a claim if more than three years have elapsed from the date on which the enterprise first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that it has incurred such loss or damage.

Notwithstanding subparagraph 12(a), where a disputing Contracting Party has deprived a disputing investor of control of an enterprise, the following shall not be required:

(i)   a consent to arbitration by the enterprise under 12(a)(ii); and

(ii)   a waiver from the enterprise under 12(a)(iii).

## C: The Three Mining Concessions

1.8.   In summary, the Parties' dispute arises from three mining concessions at Junín, Chaucha and Telimbela in Ecuador granted by the Respondent to (as the Claimant claims) its associated Ecuadorian project companies that were subsequently revoked or terminated by the Respondent.

1.9.   The Claimant alleges that the Respondent unlawfully revoked or terminated the concessions, thereby depriving the Claimant of the entire value of its investments in its project companies and causing it to suffer substantial damages.[1] The Claimant contends that the Respondent's actions and omissions violated its obligations to the Claimant and the Claimant's investments under the Treaty and international law, as the applicable law.

## D: The Procedural History

1.10.   On 20 July 2010, invoking Article XIII(2) of the Treaty, the Claimant sent a written Notice of Dispute to Ecuador alleging that measures taken by Ecuador were in breach of the Treaty, that the Claimant had incurred loss or damage by reason of those breaches, and requesting monetary compensation.[2] In response, by letter dated 2

---

[1] Claimant's Statement of Claim, para 2.
[2] Notice of Dispute dated 20 July 2010 (C-6).

August 2010, Ecuador acknowledged receipt of the Claimant's Notice of Dispute on 23 July 2010.[3]

1.11.   By Notice of Arbitration dated 21 January 2011, the Claimant commenced arbitral proceedings against the Respondent under the UNCITRAL Arbitration Rules 1976 (the "UNCITRAL Rules") pursuant to Article XIII(4)(c) of the Treaty.

1.12.   The Respondent received Claimant's Notice of Arbitration on 24 January 2011, as acknowledged by its letter dated 10 February 2011.[4]

1.13.   In its Notice of Arbitration, the Claimant notified the Respondent of the appointment of Dr Bernardo Cremades as the first arbitrator.

1.14.   By letter dated 17 October 2011, the Respondent notified the Claimant of its appointment of Judge Bruno Simma as the second arbitrator.

1.15.   By letter dated 24 November 2011, the Claimant informed the PCA that the Parties had agreed that the Secretary-General of the PCA should act as the appointing authority. It requested that the Secretary-General of the PCA should appoint the presiding arbitrator. By letter dated 28 November 2011, the Respondent confirmed its agreement to the Claimant's request. By letter dated 29 November 2011, the PCA acknowledged receipt of the Parties' letters and invited them to submit any comments in relation to their request by 9 December 2011.

1.16.   By e-mail of 1 December 2011, the Claimant informed the PCA that the Parties had reached an agreement on the joint appointment of Mr V.V. Veeder as presiding arbitrator and withdrew their request for appointment by the PCA Secretary-General.

1.17.   On 24 December 2011, the Tribunal circulated a first draft of the Terms of Appointment and fixed a time for a first procedural meeting to be held by telephone conference-call.

1.18.   On 9 January 2012, the Respondent, on behalf of both Parties, informed the Tribunal of the procedural items on which both Parties were able to agree and indicated that each Party would write separately to the Tribunal regarding the issues in respect of

---

[3] Letter from Dr Diego García Carrión dated 2 August 2010 (C-7).
[4] Letter from Dr Diego García Carrión dated 10 February 2011 (C-74).

which they were unable to agree. The Claimant confirmed the Respondent's communication by separate correspondence of the same date.

1.19.   By letters dated 12 January 2012, each Party submitted to the Tribunal its respective submissions on the procedural issues on which the Parties were not able to reach any agreement.

1.20.   On 17 January 2012, the first procedural meeting was held by telephone conference-call, where the Terms of Appointment were agreed and adopted by the Tribunal and the Parties; and discussions were held regarding the procedural calendar for the Parties' initial written submissions. The Terms of Appointment were thereafter executed by the Parties and the members of the Tribunal, with the concurrence of the PCA.

1.21.   According to these Terms of Appointment, the Parties agreed that the PCA act as registry in these proceedings. The Terms of Appointment also established English as the sole language of the arbitration; The Hague, The Netherlands, as the legal place (or "arbitral seat") of the arbitration; and Washington DC, USA, or such other geographical venue as the Tribunal may determine in consultation with the Parties as the physical venue for oral hearings.

1.22.   On 25 January 2012, the Tribunal issued Procedural Order No. 1, ordering the submission of Statements of Claim and Defence by the Claimant and Respondent, respectively and fixing the time-table for these written submissions.

1.23.   By e-mail message of 31 January 2012, the Claimant submitted its Statement of Claim and accompanying documents.

1.24.   By letter dated 21 February 2012, the Respondent requested that the Tribunal extend the deadline for the filing of its Statement of Defence until 8 March 2012. The Claimant did not object. The Tribunal granted the requested extension on 22 February 2012.

1.25.   By letter dated 8 March 2012, the Respondent submitted its Statement of Defence and accompanying documents, raising several objections to the Tribunal's jurisdiction.

1.26.   On 21 March 2012, a second procedural meeting was held by telephone conference-call between the Tribunal and the Parties, where a further schedule for the proceedings was discussed.

1.27.   On 23 March 2012, the Respondent, on behalf of both Parties, communicated to the Tribunal the Parties' joint proposals on certain procedural issues, which was followed by the Claimant's confirmation by separate e-mail message.

1.28.   On 29 March 2012, the Tribunal circulated a draft Procedural Order No. 2 and invited the Parties to comment on the draft by 10 April 2012.

1.29.   On 10 April 2012, the Tribunal issued Procedural Order No. 2.

1.30.   On 23 April 2012, following certain additional comments by the Parties on Procedural Order No. 2, the Tribunal circulated a draft Amended Procedural Order No. 2 to the Parties inviting them to comment by 25 April 2012.

1.31.   On 26 April 2012, the Tribunal issued Amended Procedural Order No. 2, setting out a procedural time-table allowing for the possibility that the Respondent might submit a request for bifurcation (as between jurisdiction and the merits) and also setting out an alternative time-table in the event of no such bifurcation.

1.32.   By e-mail of 15 June 2012, the Claimant submitted its Memorial and accompanying documents.

1.33.   By letter dated 29 June 2012, the Respondent submitted its Request for Bifurcation and accompanying documents.

1.34.   By e-mail of 6 July 2012, the Claimant submitted its Response to the Respondent's Request for Bifurcation and accompanying documents.

1.35.   On 19 July 2012, the Tribunal invited the Respondent to submit a brief reply on bifurcation by no later than 26 July 2012.

1.36.   By letter dated 26 July 2012, the Respondent submitted its Reply on Bifurcation.

1.37.   On 3 August 2012, a third procedural meeting was held by telephone conference-call between the Tribunal and the Parties on the disputed issue of bifurcation.

1.38.   On 9 August 2012, the Tribunal issued Procedural Order No. 3, whereby the Tribunal decided to reject the Respondent's request for bifurcation and set a procedural calendar for the period up to the oral hearing to take place in Washington, DC, USA from 14 to 25 September 2013. The Tribunal also indicated the possibility of moving back the dates of the oral hearing subject to the written agreement of the Parties.

1.39.   On 10 September 2012, given no agreement between the Parties on new dates for the oral hearing, the Tribunal issued Procedural Order No. 4 confirming the dates of the oral hearing.

1.40.   By letter dated 27 November 2012, the Respondent informed the Tribunal of the Parties' agreement to extend the Respondent's deadline to submit its Counter-Memorial until 14 December 2012 and to adjust the deadlines for subsequent steps in the procedural calendar. The Claimant confirmed this agreement by e-mail message of the same date.

1.41.   By letter dated 11 December 2012, the Respondent informed the Tribunal of a further agreement between the Parties to extend the Respondent's deadline to submit its Counter-Memorial until 17 December 2012 and to make certain other modifications to the procedural calendar. The Claimant confirmed this agreement by separate e-mail message of the same date.

1.42.   On 17 December 2012, the Tribunal confirmed the amended procedural calendar agreed between the Parties.

1.43.   By letter of the same date, the Respondent filed its Counter-Memorial and accompanying documents.

1.44.   On 22 January 2013, following various document production requests made by both Parties in accordance with the procedural calendar, and responses and replies thereto, the Parties applied to the Tribunal to decide those requests which remained disputed between them.

1.45.   On 5 February 2013, the Tribunal issued Procedural Order No. 5 deciding on the Parties' disputed document production requests and ordering the production of such documentation by no later than 19 February 2013 for the Respondent and 1 April 2013 for the Claimant.

1.46.   On 12 March 2013, the Claimant informed the Tribunal of the Parties' agreement to extend the Claimant's deadline to file its Reply to 12 April 2013 and the Respondent's deadline to file its Rejoinder to 6 August 2013. The Tribunal confirmed these new deadlines on 14 March 2013. On 9 April 2013, the Claimant informed the Tribunal of the Parties' further agreement to extend these deadlines to 17 April 2013 and 16 August 2013, respectively, and to start the oral hearing on 16 September 2013. The Respondent confirmed this agreement by separate correspondence.

1.47.   By e-mail of 17 April 2013, the Claimant submitted its Reply and accompanying documents.

1.48.   Following the Parties' failure to agree on a mutual undertaking regarding the confidentiality of raw footage from the documentary film "*Under Rich Earth*" ████ ████████████████ the Respondent, by letter dated 12 August 2013, requested an urgent confidentiality order from the Tribunal in respect of these materials. The Claimant opposed this application by letter dated 13 August 2013. On 14 August 2013, the Tribunal issued an Urgent Procedural Order granting the Respondent's application in part. It also extended the deadline for the Respondent to file its Rejoinder to 19 August 2013.

1.49.   ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████ By e-mail messages exchanged on 16 August 2013, the Parties agreed to modify the text of the relevant undertaking; and the Claimant informed the Tribunal that it no longer required clarification of the Tribunal's order.

1.50.   By e-mail of 19 August 2013, the Respondent submitted its Rejoinder and accompanying documents.

1.51.   On 23 August 2013, the Tribunal issued Procedural Order No. 6, confirming its Urgent Procedural Order of 14 August 2013 and addressing certain other procedural matters relating to the oral hearing.

1.52.   On 6 September 2013, the Presiding Arbitrator, acting on behalf of the Tribunal, held a pre-hearing conference-call with the Parties.

1.53.   From 16-21 September 2013, an oral hearing (the "Hearing") was held at the World Bank in Washington, DC, USA.

1.54.   During the Hearing, the Parties agreed to make simultaneous submissions of post-hearing briefs by 29 November 2013, rebuttal post-hearing briefs (including costs submissions) by 24 January 2014, and responses on the reasonableness of the other side's costs submissions by 31 January 2014. In addition, the Tribunal requested that the Parties submit an agreed list of issues by 4 October 2013, as well as agreed chronologies and dramatis personae together with their post-hearing briefs.

1.55.   By respective e-mail messages of 4 October 2013, the Parties jointly requested that the Tribunal extend the deadline for the submission of the agreed list of issues to be addressed in the Parties' post-hearing briefs until 11 October 2013. The Tribunal granted such extension by e-mail message from the Presiding Arbitrator of 6 October 2013.

1.56.   By respective e-mail messages of 11 October 2013, the Parties jointly requested that the Tribunal again extend the deadline for the submission of their agreed list of issues until 22 October 2013. The Tribunal granted such extension by e-mail message from the Presiding Arbitrator of 13 October 2013.

1.57.   By e-mail message of 22 October 2013, the Claimant informed the Tribunal of the failure of the Parties to agree on a single joint list of issues. It proposed that the Parties submit to the Tribunal, by 24 October 2013, a list of the questions asked by the Tribunal at the end of the Hearing, a list of additional issues as described by the Claimant and a list of additional issues as described by the Respondent. By separate e-mail message of the same date, the Respondent confirmed its agreement to this request.

1.58.   By e-mail message of 24 October 2013, the Claimant submitted its list of issues consolidating the questions asked by the Tribunal at the end of the Hearing and the issues raised by each Party, whether agreed or not. By further e-mail message of 24 October 2013, the Respondent confirmed its agreement to the submission of this consolidated list. The Tribunal has modified this list for present purposes; and it is included in the list of principal issues in Part 2 of this Award.

1.59.   By separate e-mail messages of 21 November 2013, the Parties requested that the Tribunal extend the deadlines to submit their post-hearing briefs to 4 December 2013,

and the chronology and dramatis personae to 11 December 2013. The Tribunal confirmed both extensions by e-mail message from the Presiding Arbitrator of 22 November 2013.

1.60.   On 4 December 2013, the Claimant and the Respondent submitted their respective Post-Hearing Briefs.

1.61.   By separate e-mail messages of 10 December 2013, the Parties communicated to the Tribunal their agreement to extend the deadlines to submit the chronology and dramatis personae until 16 December 2013.

1.62.   On 16 December 2013, the Parties submitted their respective chronologies and requested a further extension to the deadline for the submission of the dramatis personae until the filing of the reply post-hearing briefs. The Tribunal granted such extension by e-mail message from the Presiding Arbitrator of 17 December 2013.

1.63.   By separate e-mail messages of 23 January 2014, the Parties requested the Tribunal's agreement to the filing of their cost submissions on 31 January 2014, followed by a simultaneous reply on costs a week later. The Tribunal approved the above by e-mail from the Presiding Arbitrator of 24 January 2014.

1.64.   On 24 January 2014, the Parties submitted their respective Reply Post-Hearing Briefs and dramatis personae. For present purposes, the Tribunal has modified the latter documents and the result appears earlier in this Award.

1.65.   By letter dated 6 February 2014, the Tribunal informed the Parties that the Tribunal was preparing to declare the proceedings closed in accordance with Article 29 of the UNCITRAL Rules and requested that the Parties confirm by 14 February 2014 that they did not have any "further proof to offer or witnesses to be heard or submissions to make" in the meaning of that article.

1.66.   On 7 February 2014, the Parties submitted their respective comments to the other Party's costs submissions. The Claimant also confirmed that the proceedings could be closed.

1.67.   By letter dated 13 February 2014, the Respondent confirmed that it had no "further proof to offer or witnesses to be heard or submissions to make" within the meaning of Article 29 of the UNCITRAL Rules.

1.68.   By letter dated 12 March 2014, the Tribunal declared the proceedings closed in accordance with Article 29 of the UNCITRAL Rules.

1.69.   By e-mail of 15 December 2014, the Presiding Arbitrator informed the Parties that there had been and would be a significant delay in the Tribunal's deliberations as a result of certain health issues affecting one of its members, for which that member apologises.

### E: The Parties' Dispute

1.70.   The Tribunal briefly summarizes below the Parties' respective cases, based on their written and oral submissions made in this arbitration. This summary, made to facilitate an understanding of this Award, is not intended to be complete or exhaustive, as to legal or factual issues. The fact that any submission has been omitted or truncated below should not be taken as an indication that such submission has not been considered by the Tribunal.

1.71.   The Claimant advances its claims under the Treaty, alleging violations by the Respondent of its international obligations under Article II (as to fair and equitable treatment ['FET'] and full protection and security ['FPS'] standards); Article IV (as to national treatment) and Article VIII (as to expropriation). In respect of all three concessions at Junín, Chaucha and Telimbela, the Claimant claims compensation for its losses in a total principal sum of US$ 70 million, together with compound interest and costs.

1.72.   The Respondent objects to the Tribunal's jurisdiction and, in regard to the Junín concessions, also to the admissibility of the Claimant's claims. As to the merits in regard to three concessions, the Respondent denies any liability to the Claimant, including causation, compensation, interest and costs.

1.73.   *The Claimant's Corporate Structure*: On 3 February 1999, Messrs. Paul Grist and Dana Jurika, nationals of the United States of America, incorporated Ascendant Exploration S.A. Ascendex ("Ascendex") in Ecuador. Subsequently, they incorporated Ascendant Holdings Ltd. ("Ascendant"), through which they managed and controlled Ascendex.[5]

---

[5] Claimant's Memorial, para 85; Respondent's Counter-Memorial, paras 88-89.

1.74.   On 5 May 2004, Ascendant established the Claimant under the name "Ascendant Copper Corporation" ("Ascendant Copper"), under the laws of the province of British Columbia, Canada.[6] By the end of 2004, Ascendant sold its shares in the Claimant to a small group of early investors. Following its initial public offering (IPO) on 14 October 2005, the Claimant's shares were listed for trading on the Toronto Stock Exchange on 22 November 2005. Since then, the Claimant submits that no one person has owned more than 20% of its shares, two Canadian firms being the largest shareholders: Sprott Asset Management and Pinetree Capital Limited.[7]

1.75.   In November 2004, the Claimant acquired from Ascendant, for US$ 250,000, 100% of the shares of Ascendant Copper (Barbados) Corporation ("Ascendant Barbados"), which in turn held 100% of the shares of Ascendant Copper Ascendcopper S.A. ("Ascendant Ecuador" or "AE"), a corporation established under Ecuadorian law in May 2001 under the name of "Maley Trade S.A."[8]

1.76.   The Respondent contests the validity of such transfer. It submits that Ascendant Barbados did not exist at the time of the transfer and that the acquisition was made through an unsigned deed which was allegedly accepted by Ascendant Barbados at an uncertain later date.[9] The Claimant contends that the transfer was validly made and contends for its continuous ownership of Ascendant Barbados up to the present date.[10]

1.77.   At the time of the acquisition of Ascendant Barbados by the Claimant, Ascendant Ecuador held concessions in two mining projects in Ecuador: (1) the Junín project, consisting of the Golden 1 and Golden 2 concessions (the "Junín concessions" later enlarged with the adjoining Magdalena concession); and (2) the Chaucha project, consisting of Chaucha (Janeth 1) concession in southern Ecuador (the "Chaucha concession").[11]

1.78.   The Claimant contends that, relying on these concessions, it obtained its initial seed capital of US$ 3 million from a Canadian investment bank; and that it launched its IPO

---

[6] Claimant's Memorial, paras 84-85; C-4. The Claimant changed its name to the current one on 3 July 2008 (C-4).
[7] Claimant's Memorial, paras 88-90.
[8] Claimant's Memorial, para 91; C-13, C-14, C-82, and C-114.
[9] Respondent's Statement of Defence, para 31; Respondent's Counter-Memorial, paras 109-110.
[10] Claimant's Memorial, para 94; Claimant's expert report of Ms Porchetta, pp. 2-3; Hyde Report, pp. 2-3; C-13, C-14, C-77, and C-204 to C-206; Claimant's Reply, paras 282-286.
[11] Claimant's Memorial, para 95.

and a subsequent offering in June 2007, raising approximately US$ 28 million.[12] The Claimant submits that it invested substantially all of these funds in the development of its Ecuadorian projects.[13]

1.79.    In 2006, the Claimant indirectly incorporated three subsidiaries in Ecuador: Compañía Minera DosRios S.A. ("DosRios"), Compañía Minera Telimbela S.A. ("Telimbela") and Compañía Ruta de Cobre S.A.[14]

1.80.    The Claimant submits that it was the indirect owner of these companies, as well as Ascendant Barbados at all material times. While Ascendant Ecuador continued to hold the Junín Concessions, the Chaucha Concession was transferred to DosRios. Telimbela held an option to acquire the San Pablo 1 concession for the Telimbela project in Ecuador (the "Telimbela Concession").[15]

1.81.    The Respondent contends that since 2009, Biotreat S.A. ("Biotreat") has been the sole shareholder of Ascendant Ecuador and Telimbela, as well as the majority owner of DosRios. The Respondent further contends that Biotreat has always been wholly owned by Ecuadorian nationals without any connection to the Claimant or its subsidiaries.[16]

1.82.    The Claimant submits, however, that at all material times it was and remained the continuous owner of its several subsidiaries, namely Ascendant Barbados, Ascendant Ecuador, Dos Rios and Telimbela.[17] According to the Claimant, in July 2009, the Claimant and Biotreat had agreed on the sale of the shares of Ascendant Barbados (itself the owner of Ascendant Ecuador, Dos Rios and Telimbela), It accepts that Biotreat expressed an interest in using the surface land at Junín for agricultural purposes; however, so the Claimant contends, Biotreat only paid a deposit on the purchase price; and due to its failure to pay the balance of the purchase price, the shares

---

[12] Claimant's Statement of Claim, para 27; Claimant's Memorial, para 131.
[13] Claimant's Statement of Claim, paras 2, 27.
[14] The respective share certificates show that Telimbela was incorporated in August 2006, DosRios in September 2006, and Compañía Ruta de Cobre S.A. in November 2006, each with a capital of US$ 5000 represented by 5000 shares of US$ 1 each, 4999 of which were issued to Ascendant Barbados and one to Ascendant Copper Corporation (USA), a 100% owned subsidiary of the Claimant. See C-25 (DosRios), C-27 (Telimbela) and C-29 (Compañía Ruta de Cobre S.A.).
[15] Claimant's Statement of Claim, paras 15-16; Claimant's Memorial, paras 96-98, 106.
[16] Respondent's Statement of Defence, para 38.
[17] Claimant's Memorial, paras 99-100.

of Ascendant Barbados were never transferred to Biotreat.[18] Nonetheless, the Claimant concedes that Biotreat's management has remained in control, de facto in Ecuador, of Ascendant Ecuador, Dos Rios and Telimbela since July 2009.[19]

1.83.   *The Concessions:* The Respondent submits that within three years of its incorporation, Ascendex, a company with no history in mining, had obtained by direct application 31 mining concessions and grown into "one of the largest concession holders within Ecuador".[20]

1.84.   The Claimant, for its part, submits that its concessions were first acquired by Ascendex with the assistance of a team of highly skilled geologists and engineers, who allowed Ascendex to identify highly valuable prospective mining projects in Ecuador.[21]

1.85.   According to the Claimant, in early 2003, Ascendex identified the Chaucha project as a potential acquisition.[22] On 7 November 2003, the Ministry of Mines granted the Chaucha Concession to Ascendex.[23] On 24 November 2003, Ascendex obtained title to the Telimbela concession.[24] The Claimant submits that in the autumn of 2003, Ascendex was approached by Dr Roque Bustamante (an Ecuadorian lawyer) about the sale of his interest as the concessionaire of the Junín concessions.[25]

1.86.   Dr Bustamante had obtained the Junín concessions on 20 December 2002.[26] The Respondent contends that the way in which Dr Bustamante acquired the Junín concessions was a "classic case of tender-rigging". According to the Respondent, the Claimant (in collusion with Dr Bustamante) took advantage of a lacuna in the applicable legal framework whereby in case of multiple applications submitted simultaneously, a tender was to be organised within 48 hours. When Dr Bustamante had filed an application for the Junín concessions, two other applicants requested two concessions each, all for the exact same area sought by Dr Bustamante. However, when the bidding process was organised, only Dr Bustamante submitted bids; and the

---

[18] The Claimant submits that the proposed sale prompted the filing with the Superintendent of Companies, on which the Respondent bases its argument, but the sale was not due to close until January 2010.
[19] Claimant's Memorial, paras 104-106, 233-237.
[20] Respondent's Counter-Memorial, para 90; R-10 (at p.2).
[21] Claimant's Memorial, paras 107-108.
[22] Claimant's Memorial, para 114; C-43 (at p. 9).
[23] Claimant's Memorial, para 115; C-22.
[24] Claimant's Memorial, paras 114-116; Respondent's Counter-Memorial, para 113; C-76.
[25] Claimant's Memorial, para 117.
[26] C-16, and C-17.

other applicants failed to submit any bid. This resulted in the rights to the Junín concessions being granted by the Respondent to Dr Bustamante. The Respondent alleges that the Claimant was behind this improper charade. Also, according to the Respondent, the Junín concessions represented a more ambitious more risky acquisition, given it had been a "reserved area" until 2001 due to environmental sensitivity. It adjoined to a biologically diverse area under close public and local scrutiny. All this, so the Respondent submits, suggests that Dr Bustamante obtained the Junín concessions for the Claimant and not for himself.[27]

1.87.   The Claimant denies the Respondent's allegations and contends that Dr Bustamante applied for the Junín concessions only for himself when he noticed they were available from the Ministry of Mines. The Ministry considered it an attractive business opportunity for development by a mining company.[28] The Claimant contends that no allegation of tender-rigging was ever made against the Claimant before the Respondent's Statement of Defence. The Claimant further contends that it would have made no sense for Ascendex to use Dr Bustamante, instead of applying for the concession in its own name.[29] The Claimant contends that the Respondent has presented no evidence why it decided to grant the Junín concessions with full knowledge that there was only one bidder, namely Dr Bustamante.[30] Moreover, the Claimant alleges that the Respondent has not pointed out to any aspect of the bidding rules which was violated by the offer made Dr Bustamante; and that, following their grant, the Ministry of Mines willingly received patent fees for these concessions from Dr Bustamante, Ascendex and the Claimant.[31]

1.88.   Ascendex purchased the Junín concessions from Dr Bustamante on 29 March 2004,[32] which, so the Claimant submits, was an arm's length transaction.[33] By two separate public deeds dated 17 September 2004, Ascendex assigned the Junín and Chaucha concessions to Ascendant Ecuador.[34] The Claimant submits that the Pichincha Regional Mining Director had expressly approved Dr Bustamante's assignment of the

---

[27] Respondent's Statement of Defence, paras 25-28; Respondent's Counter-Memorial, paras 93-108.
[28] Claimant's Reply, para 73.
[29] Claimant's Memorial, paras 117-123.
[30] Claimant's Post-Hearing Brief, paras 2, 24.
[31] Claimant's Reply, paras 60-61.
[32] C-20.
[33] Claimant's Reply, paras 67-72.
[34] C-21 (with respect to the Junín concessions); C-24 (with respect to the Chaucha concession).

Junín concessions to Ascendex in March 2004, as well as their subsequent assignment by Ascendex to Ascendant Ecuador.[35] On 29 November 2006, the Chaucha concession was assigned by Ascendant Ecuador to DosRios,[36] whilst Ascendant Ecuador kept the Junín concessions. In March 2006, Ascendex transferred its rights to the Telimbela concession to Ecuador Gold S.A. Ecuadorgold ("Ecuadorgold").[37] On 26 October 2006, the Claimant's subsidiary, Telimbela, acquired an option to acquire the Telimbela concession from Ecuadorgold.[38] The Respondent submits that the Telimbela concession was never owned or controlled by the Claimant: it was at most an unexercised option held by Telimbela.[39]

1.89.   According to the Claimant, the 1991 Mining Law (Ley de Minería), as amended in 2000 (the "2000 Mining Law"),[40] pursuant to which these concessions were granted by the Respondent, declared mining activity to be in the public interest and, while it recognised that the State held ownership of all natural resources, declared that the State could authorise the performance of mining activity by granting mining rights.[41]

1.90.   The 2000 Mining Law conferred upon the holder of a mining concession the universal and exclusive property right to explore, exploit, benefit, smelt, refine and trade all the mineral substances which exist and can be obtained within the concession area.[42] Mining concessions had a term of up to 30 years, subject to the payment of an annual patent fee based on the acreage of the concession; and failure to pay such fee was the only ground for termination of the concession.[43] According to the Claimant, while the 1991 Mining Law included both the inactivity by the concession holder and environmental damage as grounds for termination of concessions, the amendments of 2000 repealed these grounds for termination.[44]

---

[35] Claimant's Memorial, para 117; Claimant's Reply, para 61; C-34.
[36] C-26.
[37] Ecuadorgold was incorporated in May 2000 as Tena Resources S.A. by Messrs. Roque Bustamante and Mario Flor. By 2007, it was majority-owned by Ascension Gold (Barbados) Corp; see R-46 to R-51.
[38] Claimant's Memorial, paras 125-128; Respondent's Counter-Memorial, paras 111-116; C-28.
[39] Respondent's Counter-Memorial, paras 115-116.
[40] Law No. 126 published in the Supplementary Official Gazette No. 695 of 31 May 1991. The amendment was published in the Supplementary Official Gazette No. 144 of 18 August 2000 (C-32).
[41] Claimant's Statement of Claim, para 19; Mining Law, Articles 4 & 5 (C-32).
[42] Claimant's Statement of Claim, para 20; Mining Law, Article 7 (C-32).
[43] Claimant's Statement of Claim, para 21; Mining Law, Chapter II (C-32).
[44] Claimant's Reply, para 26.

1.91.    The Junín and Chaucha concessions each declared that their holders held the exclusive property right to the minerals in the concession areas for a term of 30 years.[45] The Claimant contends that Ecuadorian officials and courts confirmed the validity of Junín and Chaucha concessions and their assignments, thereby creating expectations on Claimant's part that its rights to these projects were secure.[46]

1.92.    In this regard, the Claimant contends that the State Attorney General's opinion relating to the Junín project (see below, para 4.149), which is legally binding on all public entities with respect to the subject matter that it addresses, concluded that a lack of local consultation does not result in the nullification of the title or the mining concession rights, but in the suspension of the exercise of such activities.[47] According to the Claimant, while mining activities were suspended pending the completion of local consultations and subsequent approval by the Respondent of an environmental impact study ("EIS"), this suspension would never result in the loss of the mining rights.[48]

1.93.    On the other hand, according to the Respondent, obtaining a mining concession under the 2000 Mining Law did not translate into immediately enforceable mining rights. Further steps were required for the concession holders to be permitted to undertake actual mining activities.[49] Among others, environmental regulations applicable to mining concessions included environmental impact studies and environmental management plans designed to prevent, mitigate, control, repair and compensate environmental and social impacts related to mining activities, as well as requirements of consultation of local communities that may be affected by the contemplated mining project.

1.94.    The Respondent contends that under the 2000 Mining Law, the presentation of the EIS to the affected local communities and their consultation was required before any mining activity could be undertaken by a concessionaire.[50] The Respondent contends that these requirements did not change with the 2008 Mining Mandate or the 2009

---

[45] Claimant's Statement of Claim, para 25. See also the Mining Concessions (C-16, C-17 and C-22).
[46] Claimant's Statement of Claim, para 26; Claimant's Memorial, paras 129-130.
[47] Claimant's Reply, paras 19-21; Letter from the Attorney General to Auki Tituaña dated 10 August 2005 (C-96).
[48] Claimant's Memorial, para 30; Zumarraga Report, para 29.
[49] Respondent's Statement of Defence, para 13.
[50] Respondent's Statement of Defence, para 14.

Mining Law.[51] As to the State Attorney General's opinion, the Respondent contends that the question regarding the nullity of the mining title was not truly answered by the legal opinion, which deferred the question to the Municipal Council.[52]

1.95. *The Claimant's Investments:* The Claimant submits that, in reliance on the rights to the Junín concessions, it made substantial investments in Ecuador. These included: the commissioning of a technical report by a leading geological consulting firm; the acquisition of the neighbouring Magdalena 1 concession;[53] the acquisition of surface land in and around the concession areas; the preparation and submission of an EIS for the exploration phase of mining activity; the employment and contracting of a team of Ecuadorian geologists, environmental and community relations experts, managers and administrative staff; and the commitment of substantial resources to the provision of social services and community development.[54]

1.96. As to these investments, the Respondent contends that the land purchase program in the Junín concession areas by Ascendant Ecuador, post-acquisition of the concessions, consisted of illegal "land trafficking", as reported in July 2007 by the Commission for Civil Control of Corruption ("CCCC").[55]

1.97. The Claimant denies that said report makes any such finding.[56] Instead, the Claimant contends that the CCCC found that persons with no relationship to Ascendant Ecuador had applied for grants of agricultural land from the Ecuadorian government and then re-sold those lands at a profit to Ascendant Ecuador. Hence, the Claimant, denying knowledge of any such activity, claims that, should that finding be true, Ascendant Ecuador would have been the victim of the land trafficking scheme instead of the

---

[51] Respondent's Statement of Defence, para 15.
[52] Respondent's Rejoinder, paras 203-204.
[53] The Magdalena 1 concession was obtained by Ascendex on 20 January 2005; and it was assigned to Ascendant Ecuador on 24 February 2005 (C-38 and C-39).
[54] Claimant's Statement of Claim, para 28; Claimant's Memorial, paras 149-153.
[55] Respondent's Statement of Defence, para 56.
[56] Claimant's Post-Hearing Brief, para 118, noting that Ascendant Ecuador was not the target of the investigation and that there is only one sentence regarding the award of 18 out of 57 plots of land that Ascendant Ecuador acquired, which simply notes that these purchases are evidence of land trafficking.

perpetrator.[57] In addition, the Claimant contends that the acquisition of surface rights is a standard industry practice.[58]

1.98.    The Respondent, however, claims that the CCCC found that the program was unlawful, linking the acquisitions with favours by public officials, and concluded that 18 of the land acquisitions by Ascendant Ecuador had been illegal.[59] The Respondent attributes the development and implementation of this "land-trafficking scheme" to the Claimant.[60]

1.99.    With respect to the Chaucha concession, the Claimant submits that, in reliance on the rights to said concession, it likewise made substantial investments in Ecuador. These included the commissioning of a technical report that compiled and interpreted existing exploration data and results, preparing and submitting an EIS to the Respondent for the exploration phase, upgrading the access road to the concession area, rehabilitating the existing exploration camp, carrying out an extensive drilling program, and funding employment and community development initiatives in the project area (including renovations to the town of San Antonio, two model farm projects, a reforestation project and a bakery cooperative).[61]

1.100.  On 26 September 2005, the Respondent's Under-Secretary of Environmental Protection approved the EIS for the Chaucha project. Following which, the Claimant submits that it completed a comprehensive drilling program, beginning in September 2006 through its subsidiary DosRios.[62]

1.101.  The Claimant submits that it also advanced the Telimbela project by conducting extensive technical studies of the Telimbela concession. It further submits that an EIS was completed and submitted to the Respondent's Under-Secretary of Environmental Protection on 22 May 2007. The Terms of Reference of the Telimbela EIS having been

---

[57] Claimant's Memorial, para 151. Claimant's Post-Hearing Brief, paras 116-117. The Claimant states: "Ecuador is therefore asking the Tribunal to believe that Ascendant Ecuador acted contrary to its own interest by knowingly overpaying for lands that it did not need." (para 117).
[58] Claimant's Post-Hearing Brief, para 115. See also C-343, and Mr Rosanía's testimony: Transcript, Day 2, 319:16, 320.
[59] Respondent's Counter-Memorial, paras 155-156; R-78, para 55.
[60] Respondent's Rejoinder, para 8;
[61] Claimant's Statement of Claim, para 30; Claimant's Memorial, paras 137-138.
[62] Claimant's Memorial, para 136; Respondent's Statement of Defence, para 65; R-89.

approved by the Under-Secretary, the Claimant submits that there was every indication that the Telimbela EIS would have been approved by the Respondent in due course.[63]

1.102.   *The Junín EIS:* As to the EIS for the Junín concessions, the Claimant obtained approval for its Terms of Reference from the Respondent's Under-Secretary of Environmental Protection on 16 June 2006.[64] The EIS for the exploration phase of the Junín project was completed; it concluded that mining exploration activities in the Junín area could be conducted in an environmentally sustainable manner; and it was submitted to the Ministry of Mines on 12 September 2006. According to the Claimant, Ascendant Ecuador (with the Claimant) engaged in an extensive local consultation process, obtaining largely favourable comments to the completion of the EIS and the development of the Junín project. The Claimant also submits that the Respondent never suggested that the proposed exploration work would create any material environmental impact.[65]

1.103.   The Respondent strongly disagrees that the local communities supported the Claimant's mining project and also that the Claimant's project would not create any material environmental impact in such an environmentally sensitive area.

1.104.   The Claimant contends that the Ministry of Mines did not raise any material technical objection to the EIS; and that it acknowledged that Ascendant Ecuador had completed consultations of the local inhabitants in all major communities in the Junín area. Nonetheless, on 8 December 2006, the Ministry of Mines rejected the EIS submitted by Ascendant Ecuador in September 2006, finding no evidence of consultation by Ascendant Ecuador of certain affected communities in the area.[66]

1.105.   According to the Claimant, a small anti-mining group based in some of the villages identified by the Ministry of Mines for further consultations opposed any further

---

[63] Claimant's Memorial, paras 140-141.
[64] C-41 (for the approval of the Terms of Reference). Edmundo Lucero initiated an *acción de amparo constitucional* before the local court in Imbabura against such approval. On 4 October 2006, the local court dismissed the case, and on 28 May 2008, the Constitutional Tribunal affirmed its decision. See Claimant's Statement of Claim, para 55; and the Decision of the Constitutional Tribunal dated 28 May 2008 (C-42).
[65] Claimant's Memorial, paras 155-156, 167-169, 171-172; C-112; WS Jurika para 77; C-125.
[66] Claimant's Statement of Claim, paras 37-38; Respondent's Statement of Defence, para 60; Claimant's Memorial, paras 197-198. The communities identified by MEM as located in the area of direct influence of the mining project but not having consulted included: Chalguayacu Bajo, Chalguayacu Alto, Junín, Cerro Pelado, Magnolia y Alto Mira, and Barcelona; all within the Parish of García Moreno (see C-53).

exploration and development in the Junín area.[67] Hence, following certain violent incidents described below, Ascendant Ecuador, the Ministry of Mines, the Governor of Imbabura, and the militant anti-mining groups in the villages identified for the consultation process entered into negotiations, which culminated in the signature of tripartite agreements on 20 March 2007 (the "Tripartite Agreements").[68] The Claimant submits that according to the Tripartite Agreement, the Ministry of Mines was to ensure that anti-mining groups would remove illegal roadblocks and surrender weapons.

1.106.   *The 2007 Suspension Resolution:* However, in July 2007, the Ministry of Mines demanded that the Claimant and Ascendant Ecuador halt all activities and informed them that security for their work on the Junín EIS would not be provided by the Respondent.[69] This demand was followed by a formal resolution of the Pichincha Regional Mining Director on 25 September 2007 (the "Suspension Resolution"), declaring the suspension of all mining activity (including the Claimant's community relation activities) in the Junín concession area until a report was obtained from the Mayor of Cotacachi on whether the Junín concessions were located within an urban perimeter, prohibited by Article 11(a) of the Mining Law.[70]

1.107.   The Claimant contends that, as the Junín EIS was never approved by the Respondent, there was never any "mining activity" at Junín or plans to carry out "mining activity" after the approval of the EIS anywhere near the limits of any city or populated centre.[71] According to the Claimant, Ascendant Ecuador made a formal appeal against the Suspension Resolution, but no decision on such appeal was ever issued by the Respondent.[72] Further, so the Claimant contends, the Respondent has not pointed to any legal provision that allowed the Ministry of Mines to suspend all of Ascendant Ecuador's activities in the Junín area, including its ability to re-submit an EIS, given that the Ministry had previously expressed the opinion that Article 11 of the Mining

---

[67] Claimant's Post-Hearing Brief, paras 138-140; Stonehouse, Transcript, Day 1, 159-161
[68] Claimant's Statement of Claim, paras 39-41; Claimant's Memorial, paras 200-207; C-55, and C-56.
[69] Claimant's Statement of Claim, paras 39-41; Claimant's Memorial, paras 200-207.
[70] Claimant's Statement of Claim, para 42; Resolution of the Pichincha Regional Mining Office dated 25 September 2007 (C-57); Claimant's Memorial, para 209.
[71] Claimant's Memorial, paras 181 & 211.
[72] Claimant's Reply, para 203.

Law (invoked by the Suspension Resolution) only applied to exploration work in urban areas and not to community relations work or work needed to complete an EIS.[73]

1.108.   According to the Respondent, however, the continuing social conflict caused by the Claimant and Ascendant Ecuador prompted the Suspension Resolution. It was issued after negotiations between the Regional Mining Director and Ascendant Ecuador and in accordance with the terms of the Tripartite Agreements. It was necessary, given that it had become increasingly clear that Ascendant Ecuador had no intention to comply with the Tripartite Agreements, particularly with its death threats and violence occurring during 2007.[74] The Respondent contends that the Tripartite Agreements specifically envisaged its right to exercise its authority to re-establish social peace in Intag.[75] Furthermore, the Respondent submits that the Suspension Order did not apply to the consultation process or the preparation of a new EIS.[76]

1.109.   *The 2008 Nullification Resolutions:* On 25 January 2008, the Pichincha Regional Mining Director passed resolutions nullifying the Junín concessions (the "Nullification Resolutions"), declaring them to be unconstitutional on the basis of the State's inalienable ownership of all natural resources granted by the Constitution of Ecuador.[77] Ascendant Ecuador appealed the Nullification Resolutions to the National Mining Director, who revoked the Nullification Resolutions on 15 September 2008.[78]

1.110.   *The 2008 Mining Mandate:* On 18 April 2008, the Respondent's Constituent Assembly (*Asamblea Constituyente*) passed Constituent Mandate No. 6 (*Mandato Constituyente No. 6*, the "Mining Mandate") declaring that mineral substances were "to be exploited to suit national interests" and provided for the termination (*extinción*) "without economic compensation" of mining concessions falling into a number of categories, including those "without any investment in project development having been made in their exploration stage by December 31, 2007 or without their environmental impact

---

[73] Claimant's Post-Hearing Brief, paras 148-151; C-121 and Dra. Fabara's testimony (Transcript, Day 4, 668 & 856).
[74] Respondent's Counter-Memorial, paras 196-199.
[75] Respondent's Counter-Memorial, para 199.
[76] Respondent's Counter-Memorial, para 200.
[77] Claimant's Statement of Claim, para 45; Resolution of the Pichincha Regional Mining Office dated 25 January 2008 (C-9); Respondent's Statement of Defence, para 63.
[78] Claimant's Statement of Claim, para 48; Resolutions of the National Mining Director dated 15 September 2008 (C-58 and C-59); Respondent's Statement of Defence, para 63.

study having been submitted or without a prior referendum process having been conducted, including those pending an administrative resolution" (Article 1).[79]

1.111.   *The 2008 Termination Resolutions:* On 7 October 2008, the Under-Secretary of Mines ordered the termination of the Junín concessions on the basis of the Mining Mandate stating that "no prior referendum process" had been conducted.[80] On 12 November 2008, the Pichincha Regional Mining Director issued two resolutions (the "Termination Resolutions") declaring the extinction of the mining rights with respect to the Junín concessions without any economic compensation pursuant to the Mining Mandate.[81] The Respondent contends that the extinction of the Junín concessions was a matter of legitimate public policy where the concession holder had failed to secure the approval of local communities in the years it held the concession.[82]

1.112.   Ascendant Ecuador appealed the Termination Resolutions to the National Mining Director with the Regional Mining Director's office in Pichincha, who ruled on 8 January 2009 that the appeal was inadmissible because the Regional Mining Direction was not competent to process appeals. Previously, the Ministry of Mines had determined that no review of the Termination Resolutions would be permitted, instructing the National Mining Director that Article 12 of the Mining Mandate precluded any such appeal.[83] Subsequently, Ascendant Ecuador applied for an extraordinary measure of protection to the Transitional Constitutional Court, but it was dismissed on the basis of failure to state any cause of action.[84]

1.113.   The Mining Mandate also suspended any other mining activity until a new mining legislation was passed; and it declared a moratorium on the granting of new concessions. As a result, the Claimant contends it suspended any further work on the Chaucha project on 18 April 2008. The Claimant also suspended the work it had begun in order to exercise its option on the Telimbela Project.[85]

---

[79] Claimant's Statement of Claim, paras 49-52; Mining Mandate (C-60).
[80] Claimant's Statement of Claim, para 54; Memorandum from Under-Secretary of Mines Serrano to the Pichincha Regional Mining Director dated 7 October 2008 (C-61).
[81] Claimant's Statement of Claim, para 57; Resolutions of the Pichincha Regional Mining Office dated 13 November 2008 (C-10).
[82] Respondent's Statement of Defence, para 67.
[83] Claimant's Statement of Claim, paras 58-61; C-62 and C-63.
[84] Claimant's Statement of Claim, para 62; Decision of the Transitional Constitutional Court dated 4 June 2009 (C-64); Respondent's Statement of Defence, para 68.
[85] Claimant's Statement of Claim, paras 63-64.

1.114.   *The 2009 Mining Law:* On 29 January 2009, a new mining law (the "2009 Mining Law") was enacted by the Respondent. Article 24 established that the mining areas and mining projects where the State of Ecuador conducted geological research, exploration or prefeasibility or feasibility studies shall be returned to the State.[86]

1.115.   According to this new Mining Law, the Ministry of Mines had 90 days to issue a Ministerial Order (*acuerdo*) containing the terms, conditions and periods for the reversion of the projects under Article 24.[87] The Order was issued on 30 April 2009 giving the Under-Secretary of Mines a term of 45 days to prepare a report identifying the relevant projects.[88] The technical report, dated 19 June 2009, identified all three of the Claimant's projects as ones in which the State had conducted geological investigations.[89]

1.116.   *Attempted Sales:* The Claimant contends that the combined effect of the these measures taken by the Respondent deprived it of the ability to seek any further public financing in Canadian capital markets, and therefore, that it was forced to search for a buyer of its remaining interests in Ecuador as its cash reserves were being depleted. From the autumn of 2008, the Claimant claims that it pursued such a sale, but each attempt failed due to uncertainties surrounding its rights to develop its projects.

1.117.   Facing imminent insolvency, the Claimant claims it was forced to accept a "fire sale" price offer from Nortec Ventures Corp. ("Nortec"). However, Nortec withdrew from its proposed acquisition of Ascendant Barbados finding a "serious title defect with the [Chaucha] Concession". Such defect in title referred to the Chaucha concession being included, together with the Junín and the Telimbela concessions, in the list of projects where the Respondent had performed geological research and being therefore subject to reversion to the State under Article 24 of the new Mining Law.[90]

1.118.   Nortec then made a filing under Canadian securities law disclosing that: "Nortec withheld payment as a result of its due diligence review which indicated that the Chaucha Property was to revert to the State of Ecuador. […] Nortec's due diligence

---

[86] Pursuant to the Mining Mandate, in early 2009 the Respondent enacted the new Mining Law (Ley de Minería), which was published in the Official Gazette (Registro Oficial) No. 517 of 29 January 2009 (C-11).
[87] Claimant's Memorial, para 64.
[88] C-66.
[89] Claimant's Memorial, para 75; C-12.
[90] Claimant's Statement of Claim, paras 68-74; Claimant's Memorial, paras 76-78, 218-232; C-65.

review confirmed that the Ecuadorian Government had identified the Chaucha Property for reversion to the State. In the circumstances, Nortec decided not to make any further payments until such time as it received confirmation that the Chaucha Property would not be reverted to the State. Nortec still has not received a definitive pronouncement from the Ecuadoran State in this respect".[91]

1.119.   The Claimant states that all further attempts to complete a sale of the shares of Ascendant Barbados failed and, given the Claimant's inability to maintain the listing requirement of the Toronto Stock Exchange due to lack of financing, all trading of the Claimant's Copper shares ceased by July 2010.[92]

1.120.   Contrary to the Claimant's assertions, the Respondent alleges that the Claimant terminated the Nortec agreement to pursue negotiations with other buyers.[93] According to the Respondent, the list referred to by the Claimant containing the Chaucha and Telimbela concessions did not purport to apply Article 24 and was an internal confidential document to avoid speculations about any steps to be taken pursuant to Article 24.[94]

1.121.   According to the Claimant, the existence of this report was no secret.[95] According to the Respondent, however, Nortec could not have obtained a copy of this document lawfully.[96] Moreover, the Respondent contends that any uncertainty about the Respondent's position with respect to the Chaucha concession was cleared up on 23 April 2010 when the Respondent re-issued the mining title to the Chaucha concession to DosRios, with approval to carry out mining activities in the area granted in August 2012.[97]

1.122.   *ENAMI & CODELCO:* The Claimant contends that the Respondent is now developing the Junín and Chaucha projects, through its National Mining Enterprise or Empresa

---

[91] Claimant's Statement of Claim, para 72; Claimant's Memorial, paras 76, 228; C-65 and C-67.
[92] Claimant's Statement of Claim, paras 68-74; Claimant's Memorial, paras 230-232.
[93] Respondent's Statement of Defence, paras 72-74; Respondent's Rejoinder, para 241-244.
[94] Respondent's Statement of Defence, paras 72-74.
[95] Claimant's Reply, para 77.
[96] Respondent's Rejoinder, para 230.
[97] Respondent's Rejoinder, para 236; R-94.

Nacional Minera ("ENAMI") created by the 2009 Mining Law (Article 12), in partnership with CODELCO (Chile's state owned mining company).[98]

1.123.   The Respondent denies such allegations and contends that no person holds a concession in the areas that were covered by the Junín concessions (although it accepts that ENAMI was granted a mining concession). The Respondent states further that the same requirement to consult the local population and present an acceptable EIS would apply for new concessions.[99] As to the Chaucha concession, the Respondent contends that DosRios was issued a new mining title in 2010 and continues to operate said concession.[100] As for Telimbela, the Respondent contends that Ecuadorgold, the holder of the Telimbela concession, chose not to seek to renew its title to the concession under the new legal regime; and it was accordingly relinquished in February 2011.[101]

### E: Formal Relief Sought by the Parties

1.124.   *The Claimant:* The Claimant requested that the Tribunal render an award in its favour:

"(a)   dismissing Ecuador's preliminary objections;

(b)   declaring that it has jurisdiction to hear Copper Mesa's claim under the Treaty;

(c)   declaring that Ecuador breached its obligations under the Treaty;

(d)   ordering Ecuador to pay monetary compensation to Copper Mesa in an amount of US$69.7 million plus compound interest thereon from April 30, 2013; and

(e)   granting Copper Mesa its costs of this arbitration and costs of legal representation and assistance in an amount to be determined in a final award".[102]

1.125.   *The Respondent:* The Respondent requested that the Tribunal dismiss the Claimant's claims for lack of jurisdiction, or in the alternative, dismiss the claims as inadmissible, or in the further alternative, dismiss the claims as unfounded, and award the costs of

---

[98] Claimant's Statement of Claim, paras 75-77; Claimant's Memorial, paras 79-83; Claimant's Reply, paras 217-220.
[99] Respondent's Statement of Defence, para 69.
[100] Respondent's Statement of Defence, para 71.
[101] Respondent's Statement of Defence, para 76; Respondent's Counter-Memorial, para 213.
[102] Claimant's Statement of Claim, para 110; Claimant's Memorial, para 419; Claimant's Reply, para 480.

this arbitration, including attorney's fees and all other fees and expenses incurred in participating in this arbitration, including internal costs.[103]

---

[103] Respondent's Statement of Defence, para 119; Respondent's Counter-Memorial, para 516; Respondent's Rejoinder, para 444.

## PART 2 – THE PRINCIPAL ISSUES

*A: Introduction*

2.1.     This list of issues is largely derived from the consolidated list originally prepared by the Parties, as modified substantially by the Tribunal for present purposes. It should be read as an incomplete checklist of the principal issues arising in the arbitration, rather than a comprehensive description of all the issues arising from the Parties' many written and oral submissions.

2.2.     Moreover, as will be evident from later parts of this Award, the Tribunal did not think it necessary to address and decide specifically all issues listed in this checklist, still less all issues arising from the Parties' respective submissions. Moreover, the Tribunal considers that many of the decisive issues turn on the specific facts of this case. Having determined those facts, other issues become irrelevant or otiose.

*B: Evidentiary Issues*

2.3.     What is the relevance of missing or potential witnesses, and if so, what evidential inferences, if any, should be drawn against a Party not calling such available witnesses?

2.4.     What is the relevance of the evidence of witnesses who were called by one Party, but which was not challenged on cross-examination by the other Party?

2.5.     How should the Tribunal reconcile the conflicting testimony, both written and oral, of, in particular, Mr. Davis, Mr. Jurika ███████████?

*C: Jurisdiction and Admissibility Issues*

2.6.     What is the correct interpretation and application of Article XIII(12) of the Treaty?

2.7.     Is the Respondent estopped or otherwise precluded from alleging any breach of Ecuadorian law or any breaches of the doctrines of international public policy and unclean hands?

2.8.     Regarding Article 1(g) of the Treaty, is there a distinction between the operation and the acquisition of an investment in accordance with Ecuadorian law under the Treaty?

2.9.     Regarding Article 1(g) of Treaty again, whether the Claimant "owned and controlled" its investments in accordance with Ecuadorian law, including international human rights law as incorporated in Ecuadorian law, so that the Tribunal has jurisdiction pursuant to Article 1(g) of the Treaty, and whether this obligation of legality extends beyond the acquisition or making of an investment?

2.10.    After the making of an investment, what is the scope of the application of the doctrine of unclean hands?

### D: Liability Issues – The Junín Concessions

2.11.    What were the Claimant's legitimate expectations, and their source, at the time of its investment in the Junín concessions?

2.12.    What is the relevance and what was the extent of the anti-mining sentiment in the Junín area at the time of the Claimant's acquisition of its investment in those concessions?

2.13.    What is the Claimant's responsibility (if any) for alleged acts of Ascendant Ecuador or its alleged agents and the consequences of such acts?

2.14.    Whether the social conflict in the Junín area was the cause for the Claimant's loss of the Junín concessions, and, if so, whether it was Ascendant Ecuador and the Claimant who were responsible for the social conflict because of their community relations programme and/or their conduct towards the opponents of their mining project and/or their involvement in the violent incidents of 1 November and early December 2006?

2.15.    Whether Ascendant Ecuador (as the Claimant's agent) and the Claimant, committed human rights violations in 2006 and 2007; and what is the legal standard applicable to such determination (prima facie or otherwise)?

2.16.    Whether Ascendant Ecuador and the Claimant failed to obtain the required social licence to operate the Junín concessions; and whether such failure was wholly attributable to the Claimant?

2.17.    If the events in 2006 and 2007 allegedly attributable to the Claimant ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are to be attributed to the Claimant, to what extent was

the Claimant's project in Junín irretrievably harmed or even doomed by 31 December 2007, before the 2008 Mining Mandate and the Termination Resolutions of 12 November 2008? And, if that were so, what effect would this situation have on issues of liability, causation and compensation?

2.18.   How could Ascendant Ecuador and the Claimant consult the local inhabitants of villages in the Junín area if there were physical barriers across access roads impeding their ingress?

2.19.   Whether from August 2006 to 2007, Ascendant Ecuador and the Claimant failed to comply with the legal requirement to consult the seven communities directly affected by the mining project (including Barcelona); and whether such failure was attributable to the Claimant?

2.20.   Did Ascendant Ecuador ever carry out a local consultation process?

2.21.   Prior to the Mining Mandate, was there a deadline for Ascendant Ecuador and the Claimant to complete a local consultation process?

2.22.   What were the consequences, if any, of the finding that Ascendant Ecuador's EIS could not be processed?

2.23.   Whether Ascendant Ecuador's EIS was declared inadmissible or rejected on the merits, and if the former, whether the EIS was so deficient that it would have been rejected on the merits in any event and, if so, what effect would this situation have of this on issues of liability and causation of loss?

2.24.   Did the Respondent's Ministry of Mines (MEM) have the legal authority to suspend Ascendant Ecuador's non-mining activities in the Junín area? If so, what was the source of that authority?

2.25.   Whether the Respondent's 2007 Suspension Resolution was justified on the facts, and legitimate and justified under the Treaty and international law, regardless of the legal basis for the suspension under Ecuadorian law?

2.26.   Did the Respondent's 2008 Nullification and Termination Resolutions directed at the Junín concessions pursuant to the Mining Mandate constitute an expropriation or a breach of the fair and equitable treatment standard under the Treaty?

2.27.  Whether the Nullification Resolutions of January 2008 deprived the Claimant of any right of enjoyment of its investments in the Junín concessions, in view of their suspension in February 2008 and their reversal in September 2008?

2.28.  Whether the 2008 Nullification Resolutions were justified on the facts, and legitimate and justified under the Treaty and international law, regardless of the legal basis for these under Ecuadorian law?

2.29.  Did the Ecuadorian legal regime in force prior to the enactment of the Mining Mandate enable the termination of mining concessions for failure to consult local communities, in particular by relying on Article 28 of the LGA?

2.30.  Was the denial of rights to challenge the Mining Mandate and the rejection of Ascendant Ecuador's appeal against the termination of the Junín concessions in November 2008 a breach of the fair and equitable treatment standard under the Treaty? If so, what losses were caused by that breach?

2.31.  Whether the Mining Mandate was based on legitimate public policy, so that the Termination Resolutions of November 2008, based on Article 1 of the Mining Mandate, were justified and legitimate under international law?

2.32.  Whether the Claimant was denied any right of appeal against the Termination Resolutions of November 2008?

2.33.  Whether an appeal against the Termination Resolutions would likely have been successful on the merits?

2.34.  What is the impact (if any) of the rights acquired by ENAMI in 2011 and the current situation in Junín?

2.35.  Did the termination of the Junín concessions, followed by the grant of a right of first refusal thereto to ENAMI and the exercise of that right by ENAMI, constitute a breach of the national treatment obligation under the Treaty?

2.36.  What is the current situation with respect to the development of the concessions covering the Junín project by ENAMI and/or CODELCO?

*E: Liability Issues: The Chaucha Concession*

2.37.     Whether ownership of the Chaucha Concession was affected by the termination of the Junín concessions?

2.38.     Whether there was a "cloud" over the Claimant's title as a result of Article 24 of the 2009 Mining Law (or otherwise); and, if so, whether this was wrongful under the Treaty?

2.39.     What steps could the Claimant or its subsidiaries take to clarify the legal status of the Chaucha concession; and were any such steps taken?

2.40.     Whether any cloud on title disappeared after the request by the Respondent to submit information for the renewal of title to the Chaucha Concession in 2010?

2.41.     Whether the attempted sale to Nortec and the sale to Biotreat were "fire sales" or below market value?

*F: Liability Issues: The Telimbela Concession (i.e. Option)*

2.42.     Whether there is any act attributable to the Respondent that led to the expiry of the Claimant's option to acquire the Telimbela Concession from Ecuadorgold?

2.43.     Whether there was a "cloud" over the Telimbela concession as a result of Article 24 of the 2009 Mining Law (or otherwise); and, if so, whether that was a breach of Respondent's obligations under the Treaty towards the Claimant?

*G: Compensation Issues*

2.44.      If there is a finding of liability, what are the alleged breaches of the Treaty and how are these to be qualified from a quantum standpoint?

2.45.     What is the appropriate valuation date for each of the three mining projects?

2.46.     What distinctions (if any) should be drawn in applying valuation dates for any of the three projects?

2.47.     What is the impact on valuation when from the IPO until the secondary offering the Claimant's share price fell by 50 to 70%, whereas the market price of copper rose?

2.48.    Whether it is appropriate to apply a mix of several valuation methods to determine the fair market value of the Junín concessions, the Chaucha concession and the Telimbela option, when the application of each of such valuation methods produces such very different results?

2.49.    Whether any valuation based on a method other than the market capitalisation of the Claimant provides reliable results concerning the value of the Claimant's mining project?

2.50.    Should comparable transactions be considered in quantifying damages claimed by the Claimant? If so, what weight should they be given, along with measures of market value?

2.51.    What is the impact on quantum of the cash held by the Claimant on the valuation date it has chosen?

2.52.    How should the Claimant's lost market value be quantified? In particular, should the market value based on the Claimant's secondary public offering be considered? Should its market capitalization in the thirty days prior to 24 January 2008 be considered? Should an event study be used to quantify lost market value? If so, what weight should be given to each of these methods?

2.53.    Should the Claimant's market capitalisation be adjusted to consider control or liquidity premia? If so, how should it be adjusted?

2.54.    Should compensation be based on costs invested by the Claimant? If so, how should those costs be measured?

### H: Interest Issues

2.55.    Should interest be simple or compounded on any principal sum of damages awarded by the Tribunal? If so, what is the appropriate interest rate?

### I: Costs Issues

2.56.    What order should the Tribunal make as to the Parties' own legal costs and the separate costs of the arbitration?

## PART 3 – THE PRINCIPAL LEGAL TEXTS

*A: The Treaty*[1]

ARTICLE I. Definitions.

*For the purpose of this Agreement:*

[…]

(b)   *"enterprise" means*

    (i)  *any entity constituted or organized under applicable law, whether or not for profit, whether privately-owned or governmentally-owned, including any corporation, trust, partnership, sole proprietorship, joint venture or other association; and*

    (ii)  *a branch of any such entity;*

[…]

(g)   *"investment" means any kind of assets owned or controlled either directly, or indirectly through an investor of a third State, by an investor of one Contracting Party in the territory of the other Contracting Party in accordance with the latter's laws and, in particular, though not exclusively, includes:*

    (i)  *movable and immovable property and any related property rights, such as mortgages, liens or pledges;*

    (ii)  *shares, stock, bonds and debentures or any other form of participation in a company, business enterprise or joint venture;*

    (iii)  *money, claims to money, and claims to performance under contract having a financial value;*

---

[1] Exhibit C-1.

(iv)  goodwill;

(v)  intellectual property rights;

(vi)  rights, conferred by law or under contract, to undertake any economic and commercial activity, including any rights to search for, cultivate, extract or exploit natural resources.

but does not mean real estate or other property, tangible or intangible, not acquired in the expectation or used for the purpose of economic benefit or other business purposes.

Any change in the form of an investment does not affect its character as an investment.

(h)  "investor" means

in the case of Canada:

(i)  any natural person possessing the citizenship of or permanently residing in Canada in accordance with its laws; or

(ii)  any enterprise incorporated or duly constituted in accordance with applicable laws of Canada, who makes the investment in the territory of the Republic of Ecuador; and

in the case of the Republic of Ecuador:

(i)  any natural person who is a national of Ecuador pursuant to its legislation; or

(ii)  any enterprise organized in accordance with the laws and regulations of Ecuador, with domicile in the territory of Ecuador who makes the investment in the territory of Canada and who does not possess the citizenship of Canada;

(i)  "measure" includes any law, regulation, procedure, requirement, or practice;

(j)     *"returns" means all amounts yielded by an investment and in particular, though not exclusively, includes profits, interest, capital gains, dividends, royalties, fees or other current income;*

[…]

ARTICLE II. Establishment, Acquisition and Protection of Investments

[…]

2.   *Each Contracting Party shall accord investments or returns of investors of the other Contracting Party:*

(a)   *fair and equitable treatment in accordance with principles of international law, and*

(b)   *full protection and security.*

[…]

ARTICLE IV. National Treatment after Establishment and Exceptions to National Treatment

1.   *Each Contracting Party shall grant to investments or returns of investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to investments or returns of its own investors with respect to the expansion, management, conduct, operation and sale or disposition of investments.*

2.   *Subparagraph (3)(a) of Article II, paragraph (1) of this Article, and paragraphs (1) and (2) of Article V do not apply to:*

[…]

(c)   *an amendment to any non-conforming measure referred to in subparagraph (a), to the extent that the amendment does not decrease the conformity of the measure, as it existed immediately before the amendment, with those obligations;*

[…]

ARTICLE VIII. Expropriation

1. *Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subject to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation at a normal commercial rate of interest, shall be paid without delay and shall be effectively realizable and freely transferable.*

2. *The investor affected shall have a right, under the law of the Contracting Party making the expropriation, to prompt review, by a judicial or other independent authority of that Party, of its case and of the valuation of its investment or returns in accordance with the principles set out in this Article.*

ARTICLE XIII. Settlement of Disputes between an Investor and the Host Contracting Party

1. *Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contacting Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.*

2. *If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4). For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting*

*Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach.*

3.  *An investor may submit a dispute as referred to in paragraph (1) to arbitration in accordance with paragraph (4) only if:*

   (a)  *the investor has consented in writing thereto;*

   (b)  *the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;*

   (c)  *if the matter involves taxation, the conditions specified in paragraph 5 of Article XII have been fulfilled; and*

   (d)  *not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.*

4.  *The dispute may, at the election of the investor concerned, be submitted to arbitration under:*

   (a)  *The International Centre for the Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington 18 March, 1965 (ICSID Convention), provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention; or*

   (b)  *the Additional Facility Rules of ICSID, provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or*

   (c)  *an international arbitrator or ad hoc arbitration tribunal established under the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).*

5.  *Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.*

6.  (a)  *The consent given under paragraph (5), together with either the consent given under paragraph (3), or the consent given under paragraph (12) shall satisfy the requirements for:*

    (i)  *written consent of the parties to a dispute for purposes of Chapter 11 (Jurisdiction of the Centre) of the ICSID Convention and for purposes of the Additional Facility Rules; and*

    (ii)  *an "agreement in writing" for purposes of Article II of the United Nations Convention for the Recognition and Enforcement of Foreign Arbitral Awards, done at New York, June 10, 1058 ("New York Convention").*

    (b)  *Any arbitration under this Article shall be held in a State that is a party to the New York Convention, and claims submitted to arbitration shall be considered to arise out of a commercial relationship or transaction for the purposes of Article 1 of that Convention.*

7.  *A tribunal established under this Article shall decide the issue in dispute in accordance with this Agreement and applicable rules of international law.*

8.  *A tribunal may order an interim measure of protection to preserve the rights of a disputing party, or to ensure that the tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the tribunal's jurisdiction. A tribunal may not order attachment or enjoin the application of the measure alleged to constitute a breach of this Agreement. For purposes of this paragraph, an order includes a recommendation.*

9.  *A tribunal may award, separately or in combination, only:*

    (a)  *monetary damages and any applicable interests;*

(b)  *restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution.*

*A tribunal may also award costs in accordance with the applicable arbitration rules.*

10.  *An award of arbitration shall be final and binding and shall be enforceable in the territory of each of the Contracting Parties.*

11.  *Any proceedings under this Article are without prejudice to the rights of the Contracting Parties under Articles XIV and XV.*

12.  (a)  *A claim that a Contracting Party is in breach of this Agreement, and that an enterprise that is a juridical person incorporated or duly constituted in accordance with applicable laws of that Contracting Party has incurred loss or damage by reason of, or arising out of, that breach, may be brought by an investor of the other Contracting Party acting on behalf of an enterprise which the investor owns or controls directly or indirectly. In such a case:*

(i)  *any award shall be made to the affected enterprise;*

(ii)  *the consent to arbitration of both the investor and the enterprise shall be required;*

(iii)  *both the investor and enterprise must waive any right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind; and*

(iv)  *the investor may not make a claim if more than three years have elapsed from the date on which the enterprise first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that it has incurred such loss or damage.*

(b) *Notwithstanding subparagraph 12(a), where a disputing Contracting Party has deprived a disputing investor of control of an enterprise, the following shall not be required:*

(i) *a consent to arbitration by the enterprise under 12(a)(ii);*

(ii) *a waiver from the enterprise under 12(a)(iii).*

ARTICLE XVII. Application and General Exceptions

1. *This Agreement shall apply to any investment made by an investor of one Contracting Party in the territory of the other Contracting Party before or after the entry into force of this Agreement.*

2. *Nothing in this Agreement shall be construed to prevent a Contracting Party from adopting, maintaining or enforcing any measure otherwise consistent with this Agreement that it considers appropriate to ensure that investment activity in its territory is undertaken in a manner sensitive to environmental concerns.*

3. *Provided that such measures are not applied in an arbitrary or unjustifiable manner, or do not constitute a disguised restriction on international trade or investment, nothing in this Agreement shall be construed to prevent a Contracting Party from adopting or maintaining measures, including environmental measures:*

(a) *necessary to ensure compliance with laws and regulations that are not inconsistent with the provisions of this Agreement;*

(b) *necessary to protect human, animal or plant life or health; or*

(c) *relating to the conservation of living or non-living exhaustible natural resources.*

*B:  The Three Concessions*

**i.)**     **Golden 1 & 2 Concessions: the Junín Concessions**[2]

[…]

**1.**     ***GRANTING OF RIGHT*** *– The Ecuadorian State, by way of the Regional Office of Mining of PICHINCHA, grants this mining concession title to BUSTAMANTE ESPINOSA ROQUE BERNARDO, on his own behalf, legally and duly conferring the real and exclusive right to prospect, explore, exploit, smelt, cast, refine and commercialize all of the mineral substances that could exist and are obtained in the area [*"**GOLDEN 1.**"*] [*"**GOLDEN 2.**"*]*

[…]

**3.**     ***DURATION OF CONCESSION*** *– The duration of this concession is thirty (30) years, starting from the date of inscription in the Mining Record held by the Property Registrar of the respective canton.*

**4.**     ***PATENT PAYMENTS*** *– While this title is valid, the concessionaire will be required to pay the conservation or production patents, or both at the same time, when necessary, according to the manner and amounts established for this purpose in the current Mining Law and the General Substitutive Regulation to the General Regulation to the Mining Law.*

**5.**     ***OBSERVANCE OF ENVIRONMENTAL NORMS*** *– The concessionaire is required to strictly observe environmental norms, particularly the pertinent norms of the Environmental Management Law, in addition to those that are contained in the Environmental Regulation for Mining activities in the Republic of Ecuador.*

**6.**     ***MINING-INDUSTRIAL SAFETY AND HYGIENE*** *– The titleholder of this concession will be required to preserve the health and lives of its technical personnel and employees, applying the mining-industrial safety and hygiene norms, according to what is established in Art. 66 of the Mining Law. Consequently, the titleholder will be required to observe and comply with both the provisions contained in the Mining Safety Regulation and those included*

---

[2] Exhibits C-16 (Golden 1) and C-17 (Golden 2).

*in the Regulation on the Safety and Health of Workers and Improvements to the Working Environment.*

7.    ***ADMINISTRATIVE PROTECTION*** *– The State, through the National Office of Mining, will grant the titleholder of this concession administrative protection with regards to claims of admission, dispossession, invasion or any other form of disturbance that impedes the performance of mining activities. This protection will also apply to disturbances by authorities acting outside of their jurisdiction and responsibility.*

[…]

9.    ****EXPIRY OF RIGHTS*** *– The rights resulting from this concession will expire for any of the causes determined in the Mining Law and its General Regulation.*

[…]

*Regarding anything not expressly established in this title, the concessionaire will be subject to what is established in the Mining Law and its Regulations, and the other provisions of positive legislation, as corresponds, regarding anything not expressly regulated by said Law.-*

[…]

**ii.) The Chaucha (Janeth 1) Concession**[3]

[…]

1.    ***GRANTING OF RIGHT*** *– The Ecuadorian State, through the Regional Office of Mining of AZUAY, hereby grants this mining concession title to GRIST PAUL, as Legal Representative of ASCENDANT EXPLORATION S.A. ASCENDEX, on his own behalf, legally and duly conferring the real and exclusive right to prospect, explore, exploit, smelt, cast, refine and commercialize all of the mineral substances that could exist and are obtained in the area. The exploitation and commercialization of construction materials related to Art. 50 of the General Substitutive Regulation to the General Regulation to the Mining Law is expressly prohibited.*

---

[3] Exhibit C-22.

*In order to perform mining activities in places established in Art. 11 of the Mining Law, the concessionaire must obtain the respective reports issued by the authorities and institutions that refer to the mentioned article.*

[…]

3.      ***DURATION OF CONCESSION*** *– The duration of this concession is thirty (30) years, starting from the date of inscription in the Mining Record held by the Property Registrar of the respective canton.*

4.      ***PATENT PAYMENTS*** *– While this title is valid, the concessionaire will be required to pay the conservation or production patents, or both at the same time, when necessary, according to the manner and amounts established for this purpose in the current Mining Law and the General Substitutive Regulation to the General Regulation to the Mining Law.*

5.      ***OBSERVANCE OF ENVIRONMENTAL NORMS*** *– The concessionaire is required to strictly observe environmental norms, particularly the pertinent norms of the Environmental Management Law, in addition to those that are contained in the Environmental Regulation for Mining activities in the Republic of Ecuador.*

6.      ***MINING-INDUSTRIAL SAFETY AND HYGIENE*** *– The titleholder of this concession will be required to preserve the health and lives of its technical personnel and employees, applying the mining-industrial safety and hygiene norms, according to what is established in Art. 66 of the Mining Law. Consequently, the titleholder will be required to observe and comply with both the provisions contained in the Mining Safety Regulation and those included in the Regulation on the Safety and Health of Workers and Improvements to the Working Environment.*

7.      ***ADMINISTRATIVE PROTECTION*** *– The State, through the National Office of Mining, will grant the titleholder of this concession administrative protection with regards to claims of admission, dispossession, invasion or any other form of disturbance that impedes the performance of mining activities. This protection will also apply to disturbances by authorities acting outside of their jurisdiction and responsibility.*

[…]

9.    **EXPIRY OF MINING CONCESSION** – *In addition to complying with the time period of the concession, the reduction or renouncement and nullification of the concession does not recognize any other cause for expiry of the mining concession other than the lack of payment of conservation or production patents, depending on the case.*

[…]

*Regarding anything not expressly established in this title, the concessionaire will be subject to what is established in the Mining Law and its Regulations, and the other provisions of applicable legislation, as it corresponds, regarding anything not expressly regulated by said Law.-*

[…]

### iii.) The Telimbela (San Pablo 1) Concession[4]

[…]

1.    **GRANTING OF RIGHT** – *The Ecuadorian State, through the Regional Office of Mining of CHIMBORAZO, grants this mining concession title to ASCENDANT EXPLORATION S.A. ASCENDEX, legally represented by Mr. GRIST PAUL JOHN, legally and duly conferring the real and exclusive right to prospect, explore, exploit, smelt, cast, refine and commercialize all of the mineral substances that could exist and are obtained in the area. It is expressly prohibited the ability [sic] to explore and commercialize construction materials and those referred to in Art. 50 of the General Substitutive Regulation to the General Regulation to the Mining Law.*

*In order to perform mining activities in areas that are established in Art. 11 of the Mining Law, the concessionaire must previously obtain reports issued by the authorities and institutions referenced in the aforementioned article.*

[…]

3.    **DURATION OF CONCESSION** – *The duration of this concession is thirty (30) years, starting from the date of inscription in the Mining Record held by the Property Registrar of the respective canton.*

---

[4] Exhibit C-76.

4.   ***PATENT PAYMENTS*** – *While this title is valid, the concessionaire will be required to pay the conservation or production patents, or both at the same time, when necessary, according to the manner and amounts established for this purpose in the current Mining Law and the General Substitutive Regulation to the General Regulation to the Mining Law.*

5.   ***OBSERVANCE OF ENVIRONMENTAL NORMS*** – *The concessionaire is required to strictly observe environmental norms, particularly the pertinent norms of the Environmental Management Law, in addition to those that are contained in the Environmental Regulation for Mining activities in the Republic of Ecuador.*

6.   ***MINING-INDUSTRIAL SAFETY AND HYGIENE*** – *The titleholder of this concession will be required to preserve the health and lives of its technical personnel and employees, applying the mining-industrial safety and hygiene norms, according to what is established in Art. 66 of the Mining Law.*

7.   ***ADMINISTRATIVE PROTECTION*** – *The State, through the National Office of Mining, will grant the titleholder of this concession administrative protection with regards to claims of admission, dispossession, invasion or any other form of disturbance that impedes the performance of mining activities. This protection will also apply to disturbances by authorities acting outside of their jurisdiction and responsibility.*

[…]

9.   ***EXTINCTION OF MINING CONCESSION*** – *In addition to the expiration of the time period for the concession, the reduction or renouncement and nullification of it, no other cause for expiry is recognized for the mining concession, other than the lack of conservation or production patent payments, as correspond.*

[…]

*Regarding anything not expressly established in this title, the concessionaire will be subject to what is established in the Mining Law and its Regulations, and the other provisions of positive legislation, as corresponds, regarding anything not expressly regulated by said Law.-* […]

*C: The Mining Laws (1991/2000/2009)*

i.)   **The 1991 Mining Law**[5]

> *Art. 7. **Mining Concessions.** […] A mining concession is not eligible for physical division, but may be divided into percentage parts represented by rights or actions.*

> *Art. 8. **Special Mining Areas.** The President of the Republic may declare as Special Mining Areas any areas that have mining development potential so that the Ministry of Energy and Mines may, directly or through the Geologic/Mining/Metallurgical Research Division, undertake surveys, geologic/mining research or another type of mining activities under their respective jurisdictions. Such declaration may be issued for free development purposes. No mining concessions may be granted in special mining areas. […]*

ii.)  **The 2000 Mining Law**[6]

> *Art. 4. **Public Interest** – Mining activity in all its phases, on or outside concessions, is declared to be in the public interest. Consequently, it is proper to constitute easements as necessary, in accordance with this Law.*

> *Art. 5. **State Authority Over Mines and Deposits** – All mineral substances existing in the national territory belong to the inalienable and inextinguishable ownership of the State, whatever their origin, form or physical state, and whether they are under the ground, on the surface, on the seabed or in marine waters. And, the exploitation shall agree with the lineaments of sustainable development and of environment protection and conservation.*

> *As provided in the last sub-section of section 1 of Article 46 (actual Art. 247) of the Constitution of the Republic, the State may authorize the performance of mining activity for the rational exploitation of mineral resources by natural or legal persons, local or foreign, granting them mining rights, in accordance with this Law.*

> *Art. 6. **Mining Rights** – Mining rights are those which derive from mining concessions, as well as permits to install and operate plants for treatment, smelting*

---

[5] Exhibit C-433.
[6] Exhibit C-32.

*and refining, and also from trading permits. Priority in presenting petitions for mining concessions gives preferential rights to receiving them.*

*Art. 7. **Mining Concessions** – A mining concession is a universally valid and property related right, distinct and independent from the ownership of land on which it is located, even when both belong to the same person. The universally valid right which derives from the mining concession is defensible as against third parties, transferable and transmittable, susceptible to mortgage and, in general, to any act or contract except to form part of the common property of a family.*

*Constructions, installations and other articles permanently linked to the operation are considered real property accessory to the concession.*

*The Mining concession is susceptible of material division and accumulation within the limit of one mining hectare as a minimum and 5,000 mining hectares as a maximum, by concession.*

### iii.) The 2009 Mining Law[7]

*Art. 24: **Special Mining Areas**: The President of the Republic may declare Special Mining Areas, subject to article 407 of the Constitution of the Republic, when an area has potential mining development but has not been granted under concession, in order for the Sectorial Ministry, through its agencies, to map out the area, conduct geological-mining research or undertake any other kind of activity of scientific interest, within its respective competences. The declaration of a Special Mining Area shall expressly establish the term thereof, which shall not be greater than four years; once that term expires, the declaration shall be lifted without the need of any ruling so declaring. In any case, the declaration shall respect legally established rights or the rights derived therefrom. Mining concessions shall not be granted in said areas during the term thereof.*

*During the next four years after the term of a Special Mining Area, the National Mining Company shall have preferential rights to request mining concessions in said area. Furthermore, if during the same four-year period referred to above, a third party requests a mining concession that embraces all or part of the land inside such Special Mining Area, the National Mining Company shall have right of first*

---

[7] Exhibit C-11.

*refusal of a mining concession in that area. The Regulation and Mining Oversight Agency shall initiate the procedure for exercising the right of first refusal in the terms, conditions and time periods established in the General Regulation of this law.*

*The mining areas and mining projects where the State of Ecuador conducted geological research, exploration or prefeasibility or feasibility studies shall be returned to the State.*

### D: The Environmental Management Law[8]

**Article 26.** *In any contracts required by Law to have an environmental impact study, preliminary documents shall contain the specifications, parameters, variables and characteristics of those studies, and shall establish the contractors' obligation to prevent or mitigate environmental impact. In case of concessions, the contract shall include the applicable environmental assessment describing prevailing environmental conditions, the mechanisms to mitigate any potential impact, if applicable, and the specific environmental regulations applicable to the activities subject matter of the concession.*

**Article 28.** *Every natural or legal person is entitled to participate in environmental management, through the mechanisms established in the Rules for such purpose, including consultation, public hearings, initiatives, proposals or any form of association between the public and the private sector. Popular action shall be available to denounce anyone in breach of this warranty, without prejudice to the civil and criminal liability for reckless or malicious accusations.*

*The non-compliance with the consultation procedure referred to in Article 88 of the Political Constitution of the Republic renders unenforceable the activity to which it refers and renders null the respective contracts.*

---

[8] Exhibit R-158.

***E:  The Mining Mandate of 18 April 2008[9]***

[…] *In exercise of its powers, the Constituent Assembly resolves to issue the following:*

***CONSTITUENT MANDATE***

*Art. 1: Termination, without economic compensation, is declared for all mining concessions without any investment in project development having been made in their exploration stage by December 31, 2007 or without their environmental impact study having been submitted or without a prior referendum process having been conducted, including those pending an administrative resolution.* […]

*Art. 8: The activities of all metallic mineral mining concessions that do not fall under the cases described in articles 1, 2, 3, 4 and 5 are suspended until the new legal framework is approved for regulating the industry and redefining the conditions for the operation thereof.* […]

*Art. 9: The new legal framework mentioned in this mandate shall be issued within a term of 180 days from the date of enactment hereof.* […]

*Art. 12: Compliance with the provisions contained in this constituent mandate is mandatory. Therefore, this mandate shall not be subject to complaints, disputes, protection actions, demands, claims, recourses or any administrative or judicial actions. Furthermore, there shall be no rise to any indemnification.* […]

***F:  The Nullification Resolutions of 25 January 2008[10]***

[…]

*I* **RESOLVE: a)** *Through the express mandate of Articles 272, 273, and 274 of the Political Constitution of the Republic of Ecuador, Article 7 of the Mining Law does not apply to this case, as it is contrary to the constitutional precept established in Article 247 of the Political Constitution of the State, given that, as detailed previously in this document, the Constitution establishes that it is the State that has inalienable and perpetual ownership of non-renewable natural resources and, in*

---

[9] Exhibit C-60.
[10] Exhibit C-9.

*general terms, all subterranean products, minerals, and substances whose nature is different from that of the soil, including those that are found in areas covered by territorial seas. Therefore, the real right that Article 7 of the Mining Law grants to mining concessions is contrary to the aforementioned constitutional provision.- **b)** Revoke the Resolution issued by the Regional Director of Mining of Pichincha on December 20, 2002, through which the mining concession to the area known as Golden 1, Code 401447, was granted, and archive all of the documents referring to the file on the aforementioned area.- **c)** Declare the extinguishment of all of the mining rights, which, by law, means their nonexistence.- **d)** Send this file to the Constitutional Court according to Article 274 of the Political Constitution, as well as the report on the declaration of unconstitutionality, so that a general and obligatory ruling can be issued.- **e)** Grant the authority necessary to the Property Registrar of the Cotacachi canton so that he can proceed to cancel the respective inscription.- **f)** Notify the Mining Land Registry Unit that the concession to the aforementioned area must be deleted, and the Mining Environmental Unit for pertinent purposes.- **g)** Notify the extitleholder for all respective purposes.- **LET IT BE KNOWN.-** Santiago Pazmiño T. REGIONAL DIRECTOR OF MINING OF PICHINCHA.-*

[Note: The corresponding excerpt of the second resolution contained within Exhibit C-9 is identical in substance, save that where the first resolution refers to "Golden 1 Code 401447", the second resolution refers to "Golden 2 Code 401448". The Tribunal considers this difference immaterial.]

### G: The Resolutions of the National Mining Director of 15 September 2008 (*Revoking the Nullification Resolutions*)[11]

[…]

**FOURTH.-** *The challenged public authority act is Resolution of January 25th 2008, issued by the Regional Mining Director of Pichincha that, among other issues, resolves to: do not apply in this case Article 7 of the Mining Law because this bylaw is contrary to the constitutional precept consecrated in Article 247 of the Political*

---
[11] Exhibits C-58 and C-59.

*Constitution of the Country: to revoke the Resolution dictated by the Regional Mining Director of Pichincha on December 20th 2002; to declare the nullity of the mining rights that according to the law mean the non-existence of what has been dictated; and, Send to the Constitutional Court the file according to Art. 274 of the Political Constitution and the report about the declaration of unconstitutionality in order to take a general and mandatory resolution; for these reasons the appellant requests that such administrative act be declared null and left without effect because it was issued with evident fact and law mistakes breaking express constitutional and legal dispositions; and to suspend the execution of the challenged act.- […] **IT IS RESOLVED** to: **a**) Grant the remedy of Appeal filed by Mr. Francisco Veintimilla Cevallos.- **b**) Revoke the resolution of January 25th 2008 in letters a), b), C), e) and f).- **c**) About letter d), it was timely accomplished by the Regional Mining Director of Pichincha, based on which resolution issued by the Commission of Reception and Qualification of the Tribunal Court this resolution is issued.- **c**) the Regional Mining Director of Pichincha is warned to apply the legal bylaws in force in order to prevent more relevant conflicts in the future.- **d**) Send a copy of this Resolution to the Regional Mining Direction of Pichincha, to the Public Register of Property of Cotacachi Canton, Office of Regional Mining Land Property; and to the National direction of Mining Environmental Protection for the corresponding legal purposes.- Give notice to the appellant in the judicial mailbox designated for this purpose.- **GIVE NOTICE AND MAKE IT EFFECTIVE.- signed by Doctor Santiago Correa Toscano.- National Mining Director.-***

[Note: The corresponding excerpts from the first resolution (Exhibit C-58) and the second resolution (Exhibit C-59) are identical.]


*H: The Termination Resolutions of 13 November 2008*[12]

**PICHINCHA REGIONAL MINING OFFICE: Quito, November 12, 2008, at 10:00 hours. WHEREAS:** *As the Pichincha Regional Mining Director, appointed through personnel action No. 073147 of November 11, 2008, I hereby notify Constituent Mandate No. 6 approved by the Constituent Assembly in the City of Montecristi on April 18, 2008, published in Official Gazette No. 321 of April 22,*

---

[12] Exhibit C-10.

*2008. Based on a review and analysis of the case file for the GOLDEN 1 area code 401447, the following are noted: I. The mining concession title was granted by the Pichincha Regional Mining Office on December 20, 2002 to Mr. Roque Bernardo Bustamante Espinosa, for a term of 30 years, covering an area of 2,461.52 hectares, and registered with the Mining Register of the Property Registrar of the Canton of Cotacachi on January 9, 2003. 2. The deed of assignment of mining rights by which Dr. Roque Bernardo Bustamante assigned all of the mining rights under the mining title for the GOLDEN 1 area, code 401447, to ASCENDANT EXPLORATIONS.A. ASCENDEX. 3. The deed of assignment of mining rights granted by ASCENDANT EXPLORATION S.A. ASCENDEX by which it fully and definitely assigns and transfers the GOLDEN 1 area code 401447 to ASCENDANT COPPER S.A. ASCENDCOPPER. The following were considered for issuing a resolution: **ONE:** The Constituent Assembly issued Constituent Mandate No. 6. Article 1 thereof stipulates that: "Extinction without any economic compensation is declared for all mining concessions which during their exploration stage did not make investments by December 31, 2007 to develop the project or have not submitted the corresponding environmental impact study or have not conducted a prior referendum process, including those concessions pending an administrative resolution." **TWO:** Memorandum No. 2253-DINAPAM of October 02, 2008, issued by the National Mining Environmental Protection Director, which states: (…) "based on a review of the physical file at this ministerial office, it has been verified (…) GOLDEN 1 AREA code 401447: A joint environmental impact evaluation study was submitted for Golden I, Golden 2, and the Magdalena areas. On December 8, 2006, it was declared that the study Can Not be Processed [sic] because the invitation to a prior referendum and public dissemination process, made to at least seven community leaders of the project's area of influence, was not documented." (…) **THREE:** Memorandum No. 292-SM-2008 of October 7, 2008, signed by Dr. Jose Serrano Salgado, Mining Undersecretariat, establishes the following: "In view of memorandum No. 2253-DINAPAM, signed by the (acting) National Environmental Protection Director, informs that: I. The areas: No prior referendum process was conducted for GOLDEN 1 code 401447 and GOLDEN 2 code No. 401448 (…) Therefore, and in accordance with Article 1 of Constituent Mandate No. 6, the extinction of the concessions mentioned above, without any compensation, is hereby declared. **FOUR:** Article 12 of Constituent Mandate No. 6 states:*

*"Compliance with the provisions contained in this constituent mandate is mandatory. Therefore, it shall not be the subject of any complaint, dispute, protection action, claim, remedy or any other administrative or court action. Furthermore, no kind of compensation shall be paid."* In light of the foregoing, and because the Constituent Assembly declared the extinction of all mining concessions falling under the situation described in Article 1 of Constituent Mandate No. 6, without any economic compensation whatsoever, and based on the order issued by the Mining Undersecretariat, as the Pichincha Regional Mining Director **I RESOLVE:** *a) To declare the extinction of mining rights with respect to the GOLDEN 1 area code 401447, located in the parishes of PENAHERRERA, GARCIA MORENO (LLURIMAGUA), Canton of Cotacachi, Province of Imbabura. b) This resolution is subject to Article 12 of Constituent Mandate No. 6. c) To order the Mining Cadastre Unit to eliminate the area from the maps included in the cadaster system. d) To forward a copy of this resolution to the National Mining Environmental Protection Office and to the Economic Technical Control Unit for the corresponding purposes. e) To serve notice of this resolution to the Property Register of the Canton of Cotacachi in order to cancel the registration and to insert accordingly a legend in the mining title for the GOLDEN 1 area code 401447. t) To serve notice hereof on the former titleholder, for the corresponding purposes. TO BE NOTIFIED.*

*(STAMP)*

*Ministry of Mines and Petroleum*

*Pichincha Regional Mining Office*

*(signature)*

*Dr. Eduardo Sandoya Sanchez*

*PICHINCHA REGIONAL MINING DIRECTOR*

[Note: The corresponding excerpt of the second resolution contained within Exhibit C-10 is identical in substance, save that where the first resolution refers to "Golden 1 Code 401447", the second resolution refers to "Golden 2 Code 401448" The Tribunal considers this difference immaterial.]

# PART 4 – THE PRINCIPAL FACTS

*A: Introduction*

4.1.  The relevant factual chronology to the Parties' dispute is long, complicated and, in many material respects, highly disputed between the Parties. In these circumstances, the Tribunal has had to consider at length the voluminous documentary evidence submitted by the Parties, together with the written and oral testimony of their respective factual witnesses and several hours of film and video-recordings. The Tribunal's principal findings of fact are recorded below in the form of a chronology, insofar as relevant to its other decisions in this Award. Despite its length, this chronology reflects only a portion of the full history of the mining controversies, particularly in the area of Junín.

4.2.  For this purpose, the Tribunal has generally placed primary importance on contemporary documentation, as being usually the most reliable factual evidence. Where appropriate, it has accepted the testimony of certain of the Parties' factual witnesses, but only where such testimony is corroborated by contemporary documentation or other reliable testimony. It has not relied on contemporary documentation that appears to have been forged or falsified by third persons. It has also guarded against apparent corroboration from duplicated evidence traceable to an earlier single source. It has taken no account of statements made by persons under duress or in a state of fear. As regards facts derived from films, video-recordings and photographs, the Tribunal has taken no account of accompanying text or commentary from unknown persons; and it has guarded against what might be regarded as editorial selection in the production of such materials.

4.3.  For ease of reference in the chronology, the Tribunal does not always seek to distinguish between the Claimant ("Ascendant Copper" or "Copper Mesa") and Ascendant Ecuador ("AE"),  the local project company for the Junín concessions and (at first) also for the Chaucha concession. It is unnecessary do so: at all material times AE acted as the agent of the Claimant in Ecuador. Similarly, the Tribunal does not always seek to distinguish between the Claimant, AE and the other project companies, DosRios ("Compañía Minera DosRíos S.A.") and Telimbela ("Compañía Minera Telimbela S.A."), for the Chaucha and Telimbela concessions respectively. Again, AE acted as the agent of the Claimant; and both acted for these two project companies. Again for ease of reference,

the Tribunal refers to the Claimant's Telimbela concession; but it was, ultimately, only an option to acquire the Telimbela concession which was owned by Telimbela.

4.4.     It is necessary at the outset to identify three particular sources of evidence used by the Tribunal: (i) Mr Davis█████████ and (iii) Mr Zorrilla.

4.5.     Mr Davis testified in writing and orally at the Hearing, called as a factual witness by the Claimant. He made two written witness statements; and he was cross-examined by the Respondent at the Hearing. Mr Davis has been the President, Chief Executive Officer and a board director of the Claimant since the end of 2004. He was not previously involved in the Claimant's concessions in Ecuador. He does not speak Spanish; and he had not previously worked in Ecuador. Mr Davis, however, has more than thirty years' management experience in mining and mineral resources all over the world. The Tribunal found him generally to be a reliable factual witness, as to facts of which he had direct knowledge at the time. He was obviously, as defined below, a 'pro-miner'.

4.6.     ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

4.7.     Mr Zorrilla testified only in writing, also called as a factual witness by the Respondent. He made two written witness statements. He was not required for cross-examination by the Claimant at the Hearing; and, accordingly, he did not testify at the Hearing. He is a citizen of the USA, of Cuban origin, living in the Junín area since 1978. The Claimant contends that material parts of his evidence are no more than hearsay or conjecture, motivated by his resolute anti-mining views expressed over many years. The Tribunal, as will also appear below, found him to be a useful factual witness in several respects, to the extent that his testimony, based on his own knowledge over a long period of time, was corroborated by or corroborating other testimony. He was, as defined below, an 'anti-miner'.

4.8.     It is regrettable that several persons, with highly relevant testimony, did not testify during this arbitration. These persons include, in particular: Mr Francisco Veintimilla, General Cesar Villacís and Mr Ronald Andrade. The latter is a fugitive from justice, on suspicion of drug-dealing and murder (both unrelated to the Parties' dispute); and his absence was readily understandable. The other two persons might have been called as witnesses by the Claimant, as their former employer. Given the usual difficulties in requiring a private person to testify as a witness in an international arbitration, the Tribunal draws no adverse inference against the Claimant for not presenting their testimony in this arbitration. In the circumstances, the Tribunal can only do its best with these missing pieces of the jigsaw. However, whilst it suffers from no adverse inference, the Claimant can equally derive no advantage over the Respondent from the absence of these witnesses.

4.9.     The factual chronology set out below covers a period of thirty years, beginning in 1981 and ending in 2011. It should be read with the documentation in the footnoted references, including the recitation of the Parties' respective cases in Part 1 above. It would lengthen unduly an already long document to include full summaries of the footnoted documentation. Hence, the facts are often only briefly described in the main text. Where the footnoted reference is made to a Party's pleading, it refers to the evidence there cited. Where the original document is in Spanish, the English translation is used.

4.10.    The Claimant's principal concessions were situated in the Junín area, known as Golden 1, Golden 2 and (later) Magdalena. The area of the concessions extended over 12,900 hectares. The Junín area lies within the larger "Intag area". It is situated approximately 80 kilometres north of Quito, in a remote part of Ecuador located in the western part of the Province of Imbabura in the Canton of Cotacachi. The southern boundary of the Junín area is the Intag River. Its northern and western boundaries partly adjoin the Protected Forest of Chontal Intag, the Cotacachi-Cayapas Ecological Reserve and the near-by Protected Forest of Pajas de Oro. The area's topography is rugged, with steep-sided mountains, hills and tropical forest, only part of which is cleared for farming. At the material time, there was little industrial activity; about 70% of the population worked as farmers (full time or part time); the mountain roads were largely dirt tracks; there were limited medical facilities (with only one permanent doctor in Peñaherrera); and there was a permanent police force only in Apuela. In short, it was an area where the forces of the State, particularly of law and order, had long been only thinly present.

4.11.   The Intag area's principal communities are Cotacachi, Apuela, Peñaherrera and García Moreno. The smaller communities include Chontal Alto, Chontal Bajo, La Armenia, Chalguayacu Alto, Chalguayacu Bajo, Junín, Cuellaje, La Magnolia, Alto Mira, Barcelona, El Rosario, La Esperanza, La Libertad and Cerro Pelado. For ease of reference, these smaller communities are collectively described as the "Junín area". The last two-named were situated within the geographical area of the Claimant's Junín concessions, Golden 1 and Golden 2 respectively. As a matter of local government, the area formally comprised six parish councils, but within these bodies, there seems to have been evolutionary changes (both *de facto* and *de jure*).

4.12.   It is necessary to distinguish between these communities likely to be directly affected, adversely, by the mining concessions, where anti-mining opposition was strongest, and those communities more likely to benefit from the concessions. Opposition to the mining was concentrated in the Junín area, while strong support was expressed by local politicians in Cotacachi. Although, for ease of reference above and below, the simplistic terms 'pro-mining', 'pro-miner', 'anti-miner' and 'anti-mining' are used, there were many variations of both: neither formed strictly distinct and permanent groups.

4.13.   The Chaucha (Janeth 1) concession was situated in the south of Ecuador, namely 70 kilometres west of the town Cuenca in the Chaucha parish, in the Cuenca Canton of the Azuay Province in Southern Ecuador. The parish lies on the western flanks of the Andes in the Cordillera Occidental. The concession covered an area of approximately 3,000 hectares.

4.14.   The Telimbela concession was situated in the Canton of Chimbo in the Province of Bolivar, south of Quito, covering an area of approximately 4,200 hectares. As already explained, this was not a concession, but ultimately an option for a concession; and it is here described as a "concession" for ease of reference only.

4.15.   Several maps of the concession areas are appended overleaf: namely the Junín concessions (taken from the Respondent's Exhibit R-504); the Chaucha (Janeth 1) concession (taken from Exhibit C-23); and the location of the Junín, Chaucha and Telimbela concession areas within Ecuador (taken from Claimant's Exhibit C-19).



LALIVE

EXHIBIT No R-504

Cotacachi Canton

## PARROQUIAS DEL CANTÓN COTACACHI

1 Parroquia Imantag
2 Parroquia Apuela
3 Parroquia Seis de Julio de Cuellaje
4 Parroquia Peñaherrera
5 Parroquia García Moreno
6 Parroquia Vacas Galindo
7 Parroquia Plaza Gutiérrez (Calvario)
8 Parroquia Cotacachi
9 Parroquia Quiroga

### ESCALA GRÁFICA

0                    20 000 m

SISTEMA DE REFERENCIA GEOCÉNTRICO SIRGAS ECUADOR,
ZONA 17 SUR, PROYECCIÓN UTM
NOTA: Los sistemas WGS84 y SIRGAS, en términos prácticos, se los
puede considerar iguales y absolutamente compatibles.

ESMERALDAS

PICHINCHA

CANTÓN
COTACACHI

### SIGNOS CONVENCIONALES

| | | |
|---|---|---|
| CAPITAL DE LA REPÚBLICA | CARRETERA DE VERANO | LÍNEA DE ALTA TENSIÓN |
| CAPITAL DE PROVINCIA | CAMINO DE HERRADURA | RÍO DOBLE |
| CABECERA CANTONAL | LÍNEA DE FERROCARRIL | RÍO PERENNE, LAGO, LAGUNA |
| PARROQUIA | LÍMITE PROVINCIAL LEGAL | CURVA DE NIVEL |
| CASERÍO O RECINTO | LÍMITE PROVINCIAL REFERENCIAL | AEROPUERTO, PISTA |
| CARRETERA ASFALTADA | ZONAS EN ESTUDIO | PUNTO VÉRTICE GEODÉSICO |
| CARRETERA AFIRMADA | LÍMITE PARROQUIAL REFERENCIAL | |
| | LÍMITE INTERNACIONAL | |

COMPILADO POR EL INSTITUTO GEOGRÁFICO MILITAR
EN BASE AL MAPA GEOGRÁFICO DEL ECUADOR
ESCALA 1:500 000 EDICIÓN 2012
Caserío o Recinto Base Cartográfica Continua IGM escala 1:50 000

Límites cantonales y parroquiales son referenciales por lo tanto no
implica reconocimiento ofial alguno

NOTA:
En aquellas parroquias en las cuales el nombre de la cabecera parroquial
es diferente, consta tanto el nombre de la cabecera parroquial como el de
la parroquia, según ejemplo: Cuellaje (Seis de Julio).

LEY DE LA CARTOGRAFÍA NACIONAL:

Art. 2.- El Instituto Geográfico Militar realizará toda actividad
cartográfica referente a la elaboración de mapas y levantamiento de
cartas oficiales del territorio nacional

# ASCENDANT COPPER S. A.
## CHAUCHA PROJECT
## Janeth 1 Cod. 102290





**Area Janeth 1 (102290)**

| Puntos | Coordenadas UTM | |
|---|---|---|
| | X | Y |
| P.P. | 673000 | 9679000 |
| 1 | 678765 | 9679000 |
| 2 | 679000 | 9678730 |
| 3 | 679000 | 9677829 |
| 4 | 679000 | 9677436 |
| 5 | 679000 | 9675921 |
| 6 | 678170 | 9674000 |
| 7 | 678108 | 9674000 |
| 8 | 675477 | 9674000 |
| 9 | 673852 | 9674000 |
| 10 | 673595 | 9674000 |
| 11 | 673355 | 9674000 |
| 12 | 673000 | 9674331 |
| Area | | 2544 Ha |

*Zona 17 (Psad 56)*



**LEGEND**

PROTECTOR FOREST

NATIONAL PARK

CONCESSION

Escala 1:75,000

0     1     2 km

c:\ASC...\CHAUCHA\Figs\Figs_Ubic.rvc\Ubic_Conce

# ASCENDANT COPPER. S. A.
## Location map Projects





| Legend | | |
|---|---|---|
| —— International boundary | —— Ports access road | |
| —— Provincial boundary | —— Access road Chaucha project | |
| —— Coast line | —— Access road Junin project | |
| ▮ Ascendant projects | ∘ Province capital | |
| ⬤ Principal ports | ✈ Airport | |

Road distances (Km)
Quito - Otavalo - Junin = 204
Quito - Nanegalito = 57
Nanegalito - Junin = 78
Nanegalito - Esmeraldas = 260
Quito - Chaucha = 520
Chaucha - Machala = 120
Chaucha - Guayaquil = 160

### B: The Tribunal's Chronology 1981 to 2011

**1981-1985**

4.16.   *1981-82* – A study of the Junín area is made by the Respondent's General Direction for Geology and Mines of Ecuador ("DGGM").[1]

4.17.   *1984-85* – Additional geological, geochemical and geophysical investigations are conducted by DGGM and the Belgian State Technical Assistance Mission ("AGCD").[2]

4.18.   *31 May 1991* – The 1991 Mining Law is enacted by the Respondent.[3]

4.19.   *19 July 1991* – A Cooperation Agreement is made between Japan and Ecuador, which provides for mining studies in Ecuador, including the Junín area.[4]

4.20.   *1991-1997* – The Junín area is studied for a proposed mining project by the Japanese International Co-operation Agency ("JICA"), with the Metal Mining Agency of Japan. JICA subcontracted exploratory work to Bishimetal Exploration Company Limited (a subsidiary of Mitsubishi, also known as "Bishi Metals" or "Bishimetal").   The Respondent's CODIGEM (in English, the 'Corporation for Geological, Mining and Metallurgical Research and Development') was JICA's counterparty.[5] At that time, there was no history or experience of mining in the Junín area.

4.21.   *January 1995* – DECOIN (in English, the 'Ecological Defence and Conservation of Intag'), a private organisation, is founded by Carlos Zorrilla (who became its executive director) with the support of Father Giovanni Paz.[6] Its name speaks for itself: it was anti-mining in the Junín area, including JICA's proposed project.

**1996**

4.22.   *1996* – Auki Tituaña is elected as the Mayor of Cotacachi.[7] He introduces, as part of reforms in local government, participatory popular assemblies with representatives

---

[1] Respondent's Counter-Memorial para 24; C-37 (Micon technical report p.11).
[2] Respondent's Counter-Memorial para 24; C-37 p.12.
[3] C-32.
[4] Respondent's Counter-Memorial para 25; C-37 pp.12-13.
[5] Respondent's Counter-Memorial para 25; C-37 p.12.
[6] Zorrilla paras 2, 8, 9.
[7] Respondent's Counter-Memorial para 41.

from local communities, known as "Cantonal Unity Assemblies" (*Asambleas de Unidad Cantonal*). Mr Tituaña was to be re-elected in 2000 and 2004.

4.23.   *1996* – From July 1995 to January 1996, Bishimetal carries out a preliminary environmental impact study, together with representatives of CODIGEM. The Tribunal notes the Claimant's submission that this early study related to the exploitation phase of the project rather than the exploration phase (as were its Junín concessions).[8.] That distinction could bring little comfort to the communities likely to be affected by any mining project in the Junín area, then or later. Nor did it, as subsequent events demonstrate.

4.24.   *March 1996* – JICA submits to the Respondent its Final Report on the Technical Cooperation for Mineral Exploration in (inter alia) the Junín area.[9] It confirms the discovery of large deposits of copper. It also contains several passages on the environmental impact of the proposed mining project on the Junín area.

4.25.   For example, as regards adverse environmental impacts, the report states:

> [Part 1, Para 5.2.1]: "… the Junín area, which is adjacent to the area of the Cotacachi-Cayapas Ecological Reserve in the north and the Intag river in the south, is rich in natural beauty. Therefore, it was recognised that it would be necessary to carry out an environmental impact assessment there, based on a tentative development plan, prior to any mining development. The study was an assessment carried out at the preliminary research stage. The environmental research area is approximately 150 km$^2$ (Fig. 1-1-3)"

> [Part 2, Para 2.7.4(1)]: "The area of the mining installations consists of open-cast operations, roads, the area of the waste reservoirs, the area of tailing dams, grinding plants, mining offices, etc. It reaches 45.6 sq. km and the primary forest of the sub-tropical rainforest (1,100 ha), the very wet sub-tropical forest (1.56 ha), and the wet sub-tropical forest (1,900 ha) are felled. The cultivated area is also changed by the development area. The northern part of the split area is situated in another place 4 km from the Cotacachi-Cayapas Ecological Reserve area, so that the development area encroaches upon the buffer zone of

---

[8] Memorial para 162.
[9] R-107.

the area of reserve. It is assumed that massive deforestation will give rise to an increase in dry conditions (known as "Desertification"), effects on the local climate and alteration of the vegetation around the boundary of the split area. Furthermore, the direct effect on the Cotacachi-Cayapas Ecological Reserve area is not thought to be small. It will be necessary to change the development plan in accordance with the results of more detailed research of the fauna and flora. …"

[Part 2, Para 2.7.4(2)]: "It is assumed that effects on flora and fauna in the Cotacachi-Cayapas Ecological Reserve area due to the development area will not be small, due to encroachment into the buffer zone 5 km wide. It is necessary to carry out investigations outside the influence of the Cotacachi-Cayapas Ecological Reserve area on a continuous basis, together with investigations to monitor the flora and fauna. It is very important and necessary to change the development plan based on the results of the research and monitoring examinations. In the event that it is possible to obtain further access to the interior, there will be a very great impact on the very wet sub-tropical forest, very wet mountain forest or higher parts due to legal or illegal felling, accompanied by development. Therefore, it is necessary to restrict not only the construction of new access roads to the interior but also the splitting of the existing forest …"

[Para 2.7.6c]: "The resettlement of the inhabitants of the communities of Junín, El Pelado, Barcelona and part of La Libertad, a total of approximately 100 families, will be necessary for the open-cast mining development to take place. Resettlement of the inhabitants of the communities of Junín, a total of approximately 40 families, will be necessary for the underground mining development to take place. In the event that agreement cannot be reached to resettle the inhabitants, it will be necessary to change the development plan."

[Para 2.7.6d]: "In order to avoid misunderstandings among the local inhabitants with regard to the execution of a mining development plan, and to prevent the rapid occurrence of problems, it is hoped that good communications will be established with the local inhabitants and communities. Above all, it will be necessary to establish an advance process of dealing with problems, involving

explanations, excursions, etc., to prevent mining contamination, including water quality, air quality, etc."

4.26.     As to certain of the beneficial impacts from the proposed mining project, the report states:

> [Part 2, Para 2.7.6.2]: "In the event that the mining development takes place, the expansion of employment opportunities will improve living conditions, adequacy of sanitation and medical treatment, and the improvement of economic conditions and well-being will be promoted. It will be necessary to improve the roads, including resurfacing depending on the increase in traffic. In the event that the presence and value of ruins and cultural assets are clarified, it will be very important and necessary to change the development plan based on those conditions. It will be necessary to establish an advance process for dealing with problems, involving explanations, excursions, etc.; to prevent mining contamination, including water quality, air quality, etc. It will be necessary to give the inhabitants sufficient explanation of the progress of the resettlement process, to ensure the safety of the resettlement locations and to guarantee them with the consent of the inhabitants. In the event that agreement cannot be reached to resettle the inhabitants, it will be necessary to change the development plan. Industrial and domestic waste will not be transported outside the development area and will be treated within that area. Wastewater in the development area will be treated in wastewater treatment facilities, and the treated water will then be discharged into the rivers."

4.27.     The report's contents become publicly available, unofficially. Notwithstanding its guarded terms, its emphasis on consulting affected local communities and the potential benefits to the Junín area it described, the report leads to significant controversy within those communities likely to be adversely affected by the project. [10] The report's prescient tone and the hostile reactions to its contents lay the seeds for the difficulties that follow over the next decade.

4.28.     It is however correct, as Mr Davis testified, that the report's description of this early project applied to an exploitation phase and not an exploration phase. [11] According to

---

[10] Respondent's Statement of Defence para 45.
[11] Davis WS 1 paras 51-53.

Mr Davis, that early project was also different from Copper Mesa's later project; and the report had also become outdated by the time of Copper Mesa's project: it did not reflect improved mining technologies; and, for example, Copper Mesa anticipated building a 'zero discharge' facility that would have a very limited environmental impact.  As described below, to the opponents of both projects, all this was a distinction without a difference: they were anti-mining, whatever phase or form it might take. It is, however, important to bear in mind that, from the outset of this proposed project in Junín, a significant part of the local communities was pro-mining and that the Government of Quito was, at that time, also pro-mining.

4.29.  *29 April 1996* – Canada and Ecuador conclude their Agreement "for the Promotion and Reciprocal Protection of Investments" (the "Treaty").[12]

**1997**

4.30.  *Early 1997* – Bishimetal publishes its full report.[13]  Soon after its publication, the Council of the Communities (*Consejo de las Comunidades*) is created. Representatives from seven communities directly affected by the proposed project are elected to the Council.[14] It requests consultations with Bishimetal over the proposed project's environmental impact, without success.

4.31.  *1997* – The 1997 Cantonal Unity Assembly, attended by hundreds of delegates, proposes to declare Cotacachi an Ecological Canton. (The formal declaration was later made on 13 September 2000 with the "Cotacachi Ordinance": see below).[15]

4.32.  *12 May 1997* – Confrontations take place between Bishimetal, CODIGEM and members of the local communities.  At first, on 12 May 1997, a group of 50 from the latter occupy the mining camp of Bishimetal and CODIGEM in Junín, without overt violence on either side.[16]  It is reported that the reason for the occupation is the lack of consultation by Bishimetal and CODIGEM over the proposed project's adverse environmental impact, including the displacement of families, deforestation,

---

[12] C-1.
[13] Respondent's Statement of Defence para 44.
[14] Respondent's Counter-Memorial para 34; Zorrilla WS 1 para 19.
[15] Respondent's Counter-Memorial para 42.
[16] R-62 (press release dated 16/5/1997 of South and Meso American Indian Rights Center).

desertification, soil erosion, threats to endangered species and an increase in criminal activity from outsiders.[17]

4.33.   *15 May 1997* – Anti-mining members of the local communities, said to be 150 in number, deliberately burn down the mining camp of Bishimetal and CODIGEM.[18] The Respondent commences criminal proceedings against certain named individuals alleged to have taken part in the arson. These eventually lead nowhere.

4.34.   *16 May 1997* – A landowner in the Junín area (Mr Piedra), who had refused Bishimetal permission to enter his land, is shot dead. The date is unclear: it may have occurred earlier in 1997.[19] However, whilst an anti-mining NGO later attributed his murder to "a paramilitary squad presumably sent by [Bishimetal]", there is no evidence to support this allegation before the Tribunal.[20] As later events demonstrate, there were acts of violence committed by individual pro-miners without responsibility attributable to any mining concessionaire: there can, in such circumstances, be no "presumption" here against Bishimetal.

4.35.   *Summer 1997* – Bishimetal departs from the Junín area, abandoning the proposed mining project owing to local hostility.[21]

4.36.   These events were widely reported at the time, both within and without Ecuador. In particular, they became known to the Claimant before its active involvement in the Junín area. As Mr Jurika testified: "We knew that Bishi Metals had faced some local opposition to the development of the Junín project and that some opponents had resorted to violence by burning down one of its camps."[22]

4.37.   *12 September 1997* – The Environmental Regulation for Mining Activities (Executive Decree) ("RAAM") is promulgated by the Respondent.[23] In brief, the regulation provides that a 'preliminary evaluation of environmental impact' has to be submitted

---

[17] See also Zorrilla WS 1 para 20.
[18] Respondent's Counter-Memorial para 35; Zorrilla WS 1 para 21.
[19] Respondent's Statement of Defence para 45; Respondent's Counter-Memorial para 34; Zorrilla WS 1 para 17.
[20] R-144.
[21] Respondent's Statement of Defence para 45; see also R-76 para 21 of the Statement of Claim filed in 2009 by Ms Piedra (and others) against the Claimant (and others) in Ontario, Canada.
[22] Jurika WS 1 para 61.
[23] R-1.

prior to initial exploration activities and an environmental impact statement is to be submitted prior to 'advanced' exploration activities.

4.38.   *1997* – The Respondent's Ministry of Environment is established.  It is for the Ministry of Environment to assess compliance with environmental regulations through a division that is formally part of the Ministry of Mining (Under-Secretariat for Environmental Protection).[24]

**1998**

4.39.   *5 June 1998* – A new constitution is promulgated by the Respondent.[25]  In brief, it grants more extensive powers to local government.[26] In particular, Article 86 provides (inter alia) that the State shall protect the right of its people to live in a healthy and ecologically balanced environment to ensure sustainable development, ensure that this right is not affected and guarantee the preservation of nature. Article 88 obliges the State to consult in relation to decisions that may affect the environment.[27]

**1999**

4.40.   *1999* – The Association of Coffee Growers of Rio Intag is created.[28]  Several hundred local families are part of the association. It is or soon becomes anti-mining.

4.41.   *3 February 1999* – Ascendant Exploration SA Ascendex is incorporated as a legal person in Ecuador ("Ascendex"), founded by Mr Dana T. Jurika and Mr Paul John Grist.[29]  Mr Jurika is the General Manager and a shareholder (as to 20%); and Mr Grist is the remaining shareholder (as to 80%).[30] Mr Jurika testified that, from 1999 to November 2004, he was involved in the management of Ascendex.[31] (After November 2004, Mr Jurika testified that he was not involved in its management until July 2006, as described below).

---

[24] Respondent's Counter-Memorial para 59.
[25] R-157.
[26] Respondent's Counter-Memorial para 42.
[27] Article 86 provides, in the original Spanish: "El Estado protegerá el derecho de la población a vivir en un medio ambiente sano y ecológicamente equilibrado, que garantice un desarrollo sustentable. Velará para que este derecho no sea afectado y garantizará la preservación de la naturaleza." Article 88 provides, in the original Spanish: "Toda decisión estatal que pueda afectar al medio ambiente, deberá contar previamente con los criterios de la comunidad, para lo cual ésta será debidamente informada. La ley garantizará su participación.".
[28] Respondent's Counter-Memorial para 38; and R-145 (video).
[29] R-6; R-7.
[30] R-7.
[31] Jurika WS 1 paras 2, 6 & 8.

4.42.   *July 1999* – The Environmental Management Law 1999 is enacted in Ecuador.[32]

4.43.   *December 1999* – DECOIN and the Association of Coffee Growers request a review by the World Bank Inspection Panel regarding the World Bank's funding of PRODEMINCA (the Ecuador Mining Development and Environmental Control Technical Assistance Project), a mineralogical mapping exercise by the Respondent co-funded by the World Bank, the United Kingdom and Sweden.[33]  The World Bank Inspection Panel later reports, on 21 February 2001, that the World Bank was substantially compliant but also "in apparent violation of certain provisions of the [World Bank's] policies and procedures on Environmental Assessment", including local consultation. The Tribunal notes this emphasis on consulting local communities.

4.44.   In this regard, after meetings in Quito and the Junín (Intag) area, the World Bank Inspection Panel's report concludes:

> "[54]. During its investigation the Panel was confronted repeatedly with a strongly expressed fear that the Project's geo-information activities would lead to mining in the Region surrounding the Cotacachi-Cayapas Ecological Reserve. This fear was expressed not only by representatives of residents of the Intag Area, but also by the Mayor, councilors and residents of the town of Cotacachi and by leaders of several NGOs in Quito who met with the Panel. Although it is obviously hard to estimate the percentage of the population in the Intag Area and the town of Cotacachi who shared these fears and concerns, it was clearly a substantial number."

> "[55]. During its Town Hall meeting with the Mayor Auki Tituaña Males, Councillors and residents of Cotacachi, the Inspection Team heard representatives of different groups from civil society express their fear that the publication of maps and the CD-ROM would lead to mining around and even in the Cotacachi-Cayapas Ecological Reserve, with a range of negative consequences for their communities. The Mayor presented the Panel with copies of two documents related to this fear: a Municipal Resolution declaring the Cotacachi Canton an Ecological Zone [in 1997, see above], and Minutes containing the Resolutions of the Fifth Cantonal Unit Assembly of September

---

[32] R-158.
[33] Respondent's Counter-Memorial para 37; and R-108.

13-15, 2000 [see below]. Of significant relevance to this Project is Resolution 17 of the Minutes that states that: 'the Assembly demands from the Ministry of Environment and the Ministry of Energy and Mines that dissemination of PRODEMINCA's Mining information about the Cotacachi-Coyapas Ecological Reserve and the [Cotacachi] Canton in general be stopped.' A day later, at a meeting with the Inspection Team, in Apuela, a small town in the Intag Valley, about 40 representatives of different community based organizations expressed similar fears."

"[56]. During these meetings, it became evident that part of the information on which the local people based their opinions, was in fact misinformation. Some people, for example, had the impression that PRODEMINCA was a mining company. Some did not know that parts of the Intag Valley would not be mapped. Others were 'convinced' that PRODEMINCA was producing detailed maps that easily could lead to an 'invasion' of illegal or artisanal miners. No one, of course, had seen the maps, nor had the CD-ROMs been properly explained to them. People at these meetings spoke about their experience with exploration activities around a mine site in the Junín area, where a mining company was forcibly removed by elements of the community [i.e. Bishimetal in 1997, see above]. This traumatic event engendered fear and, the Panel was informed, caused severe problems in the community between those that were employed by the company and those that were against mining activities in the Valley."

4.45.   By the time the World Bank Inspection Panel report was published, it is clear that the local community was becoming increasingly divided between anti-miners and pro-miners. It is also clear that the Government in Quito, in contrast to local government, was seen, by the anti-miners as pro-mining and pro-mining concessions. The Tribunal also notes a regrettable feature of this controversy: a fear and mistrust by anti-miners of all mining, based in part on, in the World Bank Inspection Panel's phrase, "misinformation".

**2000**

4.46.    *2000* – Mr Auki Tituaña is re-elected the mayor of Cotacachi.[34]

4.47.    *18 August 2000* – An Amendment is made to the 1991 Mining Law, part of the 'Law on Investment Promotion and Citizen Participation'.[35]

4.48.    *13 September 2000* – The Cotacachi Ordinance is issued by the Municipal Council of Cotacachi. It declares Cotacachi to be an 'Ecological Canton'.[36] Article 32 of the Ordinance requires assessments of environmental impact to be divulged to potentially affected communities and the environmental authorities, with a procedure for approval.

**2001**

4.49.    *17 April 2001* – The General Regulation of the Mining Law is promulgated (Executive Decree no. 1415).[37]

4.50.    *May 2001* – Ascendant Ecuador ("AE") is established as a legal person in Ecuador (at that time under the name "Maley Trade S.A.").[38] As already indicated, for ease of reference below unless otherwise necessary, the Tribunal does not always seek to distinguish between AE and Ascendant Copper.

**2002**

4.51.    15 March 2002 – UNESCO issues its press release on "peace prizes 2000-2001".[39] Cotacachi receives the prize for Latin America and the Caribbean for undertaking a policy over the previous five years "of integrating the native Indians into running of the city" and "since the election of the first indigenous mayor in 1996 [Mayor Tituaña], the city has put in place a decentralised system of management - integrating researchers, NGOs, religious groups etc, - to develop basic services, such as access to drinking water, alongside policies of integration designed to revive social links."

---

[34] Respondent's Counter-Memorial para 42.
[35] C-32; R-159.
[36] R-63.
[37] R-2; R-160.
[38] R-25 to R-34.
[39] R-64.

4.52.   *3 August 2002* – The parish leaders in Apuela, Plaza Gutiérrez, Cuellaje, García Moreno, Peñaherrera and Vacas Galindo send a letter to the Respondent's Ministry of Energy and Mines ("MEM"),[40] voicing concern over the auction of concessions in Intag. The letter states (inter alia):

> "… It is worth mentioning that the Intag communities, along with local, national and international organizations, have voiced their opposition to the mining activities in an irrevocable manner. The company which tried to start mining operations in the area was forced to leave. Please be informed that these communities continue to be firmly opposed to the mine. More importantly, they are more determined than ever to prohibit such activity in their communities and are supported by the Presidents of other parishes, the Mayor of the Canton, the Ordinance declaring Cotacachi an Ecological canton and a network of national and international entities.  In light of the foregoing, we hereby request the immediate suspension of the award of all concessions and auction procedures relating to mining exploration studies and mining exploitation in the Cotacachi Canton. What you are aiming at is in violation of the Cotacachi Ecological Ordinance and is contrary to the goals and wishes of the communities. If, despite the foregoing, you decide to enter the Cotacachi Canton, in particular the Intag area, we will assume no responsibility for the communities' decisions and actions …"

4.53.   *20 December 2002* – Following an auction initiated by MEM on 15 August 2002, the "Golden 1" and "Golden 2" concessions in Intag, in the Junín area, are granted by the Respondent (MEM) to Dr Roque Bustamante.  He pays US$8,005.00 for Golden 1 and $10,000.00 for Golden 2.[41]

## 2003

4.54.   *March 2003* – Unified Environmental Rules of the Respondent's Ministry of Environment are enacted (the "TULAS").[42]

---

[40] R-109.
[41] R-20; R-21; R-22.
[42] R-3.

4.55.    *31 March 2003* – Executive Decree 3516 is promulgated on the evaluation of environmental impact studies and the participation of citizens.[43]

4.56.    *4 April 2003* – Resolution No 11 is adopted by MEM's Special Commission for Mining Concessions.[44]  It requires an amendment to the EIS to be submitted for the areas of Golden 1 and Golden 2.  There is to be consultation conducted with the participation of two delegates of the Special Commission, community representatives and one owner or person representing the protective forest.

4.57.    *May 2003* – On 12 May 2003, local communities in the Junín area (represented by Mayor Tituaña) seek urgent constitutional protection in the Court of Imbabura against the granting of the Junín concessions, in legal proceedings against MEM and Dr Bustamante.  The Imbabura Court, by its judgment of 27 May 2003, grants the following relief:[45]

> [Article 5]: "From the above, and having analysed the evidence adduced by the parties, it becomes apparent that the mining concession granted by the Pichincha Regional Mining Directorate to Mr Roque Bernardo Bustamante Espinoza, would have brought serious consequences and impacts such as on an environmental and ecological level in rivers and streams and to the flora and fauna, and social impacts, and others. Moreover, it is not apparent from proceedings that [by: sic] the Pichincha Regional Mining Directorate has taken into account the provisions of Article 88 of the National Constitution, i.e.: that the criteria of the community were not previously considered; because, as has previously been said, the inhabitants of the six parishes of Intag in this canton have resolutely objected to said mining concession occurring. Wherefore, above without requiring further analysis, and since this Judge estimates that constitutional provisions have been violated, such as Article 86 and 88 of the National Constitution; the Fundamental rights protection measure is accepted, submitted by the Attorney Generals and representatives of the Municipality of Cotacachi and it is resolved to rescind the mining Concession previously granted to the Pichincha Regional Mining Directorate in favour of Mr Roque Bernardo Bustamante Espinoza, namely in the areas known as Golden 1, of an

---

[43] R-3.
[44] R-67.
[45] R-19; Respondent's Statement of Defence paras 44, 45 and 50.

area of about four thousand hectares of mining and Golden 2, of an area of three thousand hectares of mining, located in the García Moreno parish, Cotacachi Canton, Imbabura province, for which purpose the representative of the Pichincha Regional Mining Directorate will be served, by means of a letter rogatory addressed to one of the Judges of the Civil Court of Pichincha with its seat in Quito Canton; the Commercial and Property Registrar of the canton will likewise be notified, to cancel the registration of the mining concession in the name of Mr Roque Bernardo Bustamante Espinoza, and, where that mining concession has not been registered, no such registration will be made for the aforementioned mining concession …".

4.58.    *29 July 2003* – Ascendex applies to the Respondent (MEM) for the Chaucha (Janeth 1) concession.[46]

4.59.    *October 2003* – The Junín concessions and the Chaucha project are mentioned on Ascendex's website.[47]

4.60.    *26 October 2003* – The Telimbela Concession Call Option and Irrevocable Pledge for Mining Rights Transfer is granted by Ecuador Gold SA in favour of Compañía Minera Telimbela SA. [48]

4.61.    *7 November 2003* – Ascendex is granted the Chaucha (Janeth 1) concession by MEM.[49]

4.62.    *28 November 2003* – Ascendex is granted the Telimbela concession (San Pablo 1) by MEM.[50]

4.63.    *9 December 2003* – Ecuador's Constitutional Court overturns by a majority (5-4) the judgment dated 27 May 2003 of the Imbabura Court.[51]   The Court also (in resolution 3) "urges the Ecuadorian State to respect the rights of nature and protect the families that inhabit the sites where the concession will have an effect."

---

[46] Jurika WS 1 para 25.
[47] R 24.
[48] C-28.
[49] Claimant's Statement of Claim para 24; C-22.
[50] C-76.
[51] C-33.

**2004**

4.64.    *29 March 2004* – Ascendex purchases the Golden 1 and 2 concessions from Dr Bustamante for US$ 25,000.00 and a 2.5% net smelter royalty.[52] Mr Jurika testified that Ascendex was to make indefinite annual payments of at least US$25,000 to Dr Bustamante, together with a net smelter royalty.[53] Mr Jurika also testified that Ascendex had no involvement in the bidding process for the Junín concessions;[54] and that Ascendex managed the Junín project between March 2004 until AE's commencement of activities.[55]

4.65.    *2004 ff* – Ascendex and its employees file several lawsuits and criminal complaints against those opposing mining, including a local newspaper "Intag" and Mr Zorrilla.[56]

4.66.    *2004* – ██████████████████████████████████████████

4.67.    *5 May 2004* – The Claimant (then named Ascendant Copper Corporation) is incorporated in British Columbia, Canada (the company's name was later changed to Copper Mesa Mining Corporation, i.e. the named Claimant, on 3 July 2008).[58] Its original sole shareholder is Ascendant Holdings Ltd, a company controlled by Mr Grist and Mr Jurika.[59]

4.68.    *14 May 2004* – At a meeting in Chalguayacu Alto, Ascendex officially announces to the local communities that it is now the owner of the Junín concessions.[60] For Ascendex, its representatives include Mr Andrade, a former member of Parliament and General Villacís, a retired military officer. It was a controversial meeting and, insofar as it aimed at establishing good relations between Ascendex and the local anti-miners, it was not successful. At the end of the meeting, according to representatives attending from the local communities, General Villacís "implied that it would be a simple task to send troops to protect the interests of the company."[61]

---

[52] Claimant's Statement of Claim para 24; C-20 (Assignment of Mining Rights).
[53] Jurika WS 1 paras 31 & 37.
[54] Jurika WS 1 para 33.
[55] Jurika WS 1 para 59.
[56] Respondent's Statement of Defence para 55, citing R-74 (Intag newspaper article) and R-75 (Press release from Ecumenical Human Rights Commission).
[57] ████████████
[58] C-4.
[59] Respondent's Counter-Memorial para 85; C-82 Clause 6.01(d).
[60] Respondent's Statement of Defence para 54; R-71; Zorrilla WS 1 para 38; and Zorrilla WS 2 para 38.
[61] R-71.

4.69.   *15 May 2004* – The Council for the Development of the Community ("CDC") is created by members of the communities in Intag affected by the Junín concessions. Its central board is composed of representatives from Junín, Chalguayacu Alto, Cerro Pelado and La Armenia. It was brought into existence as a direct result of the previous day's meeting with Ascendex. Its stated aim is the economic and social development of the communities of Intag and the permanent restraint of mining activities; i.e. it is resolutely anti-mining. [62] Jaime Polibio Pérez is elected as its leader. [63] Its first step is to send a letter regarding the meeting to Mayor Tituaña dated 17 May 2004. [64] Shortly afterwards, it organises a series of public protests against the Junín concessions. [65]

4.70.   *2 June 2004* – Ascendex states on its website that it intends, as part of its vision "to be a profitable mining company that will achieve the highest standards of social, environment and industrial philosophies", to create "a company administered foundation that will work with and finance existing foundations and development endeavors." [66]

4.71.   *July 2004* – Ascendant Ecuador ("AE") is acquired by Ascendant Copper (Barbados) Corporation. (The Respondent contends that Ascendant Barbados did not exist at this time.) [67]

4.72.   *11 July 2004* – An anti-mining event takes place in Peñaherra parish, attended by several hundred persons from several local communities protesting at a mining forum organised by Ascendex. [68]

4.73.   *17 July 2004* – At La Armenia, one of Mr Andrade's bodyguards (Carlos Alonso Cedeño) and others allegedly threaten to kill Francisco Quilca, an anti-miner. Mr Quilca said: "he told me he would kill me with a bullet or a machete." [69] (This allegation subsequently becomes part of local criminal proceedings, which are inconclusive).

---

[62] Respondent's Counter-Memorial para 140; Zorrilla WS 1 para 42.
[63] R-71.
[64] R-71 (letter from CDC, signed by Jaime Polibio Pérez, Victor Calvache, Marcia Ramírez and Edmundo Lucero).
[65] Respondent's Counter-Memorial para 141; R-71.
[66] Respondent's Counter-Memorial para 147; R-202.
[67] R-35 (the certificate of incorporation of Ascendant Copper (Barbados) Corporation shows it was incorporated on 28 September 2004).
[68] Respondent's Counter-Memorial para 142; Zorrilla WS 1 para 43.
[69] R-117. Zorrilla WS 2 para 41.

4.74.  *17 July 2004* – A "working agreement" is made between Ascendex and the García Moreno parish communities.[70] The community representatives undertake to establish CODEGAM (the García Moreno Development Council). Ascendex agrees to promote a local development plan; and CODEGAM (when established) is to follow up and implement the agreement. For Ascendex, the agreement is signed by General Villacís (as "Community Relations and Environmental Manager"). Mr Andrade signs as the "President of Chalguayacu Bajo" and Mr Tarquinio Vallejos as the "President of Chalguayacu Alto".[71] The leaders of the communities most closely affected by the Junín concessions are not represented, including the Mayor of Cotacachi and Mr Pérez of CDC. It appears that CODEGAM was formally created later, with its articles of association dated 28 November 2004.[72] Its chairman was to be Mr Andrade; and it was resolutely pro-mining.

4.75.  ███████████████████████████████████████████████
        ███████████████████████████████████████████████
        ███████████████████████████████████████████████
        ███████████████████████████████████████████████
        ███████████████████████████████████████████████
        ███████████████████████████████████████████████
        ███████████████████████████████████████████████
        ████████████████

4.76.  *23 July 2004* – The following and later incidents described below illustrate further the extent to which allegation and counter-allegation, whether true or not (but believed at the time by many to be true), greatly aggravated the situation between the pro-miners (including Ascendex) and the anti-miners. This first incident concerns Mr Andrade who is to play a central role for AE.

4.77.  Mr Andrade (by now the actual or putative chairman of CODEGAM), carrying a firearm, allegedly threatens to kill Mr Pérez (the CDC leader) on the road between

---

[70] R-111/C-383.
[71] R-111; Zorrilla WS para 47.
[72] R-112.
[73] Zorrilla WS para 52.
[74] T/26-28.
[75] T/28/18-24, 30/8-9.
[76] T/3/29.

Chalguayacu Bajo and Loma Negra.  One version has Mr Andrade's bodyguards push Mr Pérez against a vehicle.[77] Another version has Mr Pérez physically assaulted by Mr Andrade's bodyguards (Carlos Alonso Cedeño García and Edgar Alonso Cazar) and then Mr Andrade (who was holding a firearm) threatening to kill Mr Pérez.[78] It is also possible that this incident took place much later, when Mr Pérez was shoved against a car on 27 August 2007[79] (see below). It is equally possible that it took place in August 2004 when Mr Pérez was allegedly threatened by Mr Andrade who, gun in hand, told Mr Pérez that he could have him murdered any time and when, later that day, gunshots were heard near Mr Pérez's home within earshot of his wife and children.[80]

4.78.   *September 2004* – As already indicated above, Ascendex pursues a libel suit against the local newspaper Intag for US$1 million for reporting adverse anti-mining items.[81]

4.79.   *15 September 2004* – The Respondent's Pichincha Regional Mining Director approves the assignment of the Junín concession (Golden 2) by Dr Bustamante to Ascendex.[82] (It is assumed, from other undisputed evidence, that like approval was granted in respect of Golden 1).

4.80.   *17 September 2004* – Ascendex re-assigns the Golden 1 and 2 concessions, with the Chaucha (Janeth 1) concession, to AE.[83]

4.81.   *28 September 2004* – Ascendant Copper (Barbados) Corporation is incorporated as a legal person in Barbados, according to its Certificate of Incorporation.[84]

4.82.   *9 October 2004* – An anti-mining protest takes place in Barcelona, with more than 500 villagers, sponsored by DECOIN. It is addressed by Mayor Tituaña, who reportedly states: "Don't be misled by the offers of the miners, and do not fall into the trap of our ancestors, who changed gold for little mirrors. They are trying to change our lifestyle for a few jobs." The Government in Quito is attacked for lack of prior consultations

---

[77] R-117 (letter from CEDHU to District Prosecutor of Imbabura dated 23 May 2006).
[78] Zorrilla WS 1 para 59; WS 2 para 40.
[79] Zorrilla para 58.
[80] R-116 (letter dated 5 October 2004 from CEDHU to Dr Raul Baca, Minister of the Government and Police); R-117; Zorrilla WS 1 para 58.
[81] R-74 (article from the Intag newspaper).
[82] C-34.
[83] C-21 (Assignment of mining rights Golden 1 and 2), C-24 (Assignment – Chaucha); Respondent's Statement of Defence para 55.
[84] R-35 (certificate of incorporation).

over the Junín concessions; and it is announced that a complaint will be made to the Inter-American Commission on Human Rights.[85]

4.83. *17 October 2004* – Mayor Tituaña is re-elected in Cotacachi (for a third term).[86] He stands on an anti-mining policy; and he defeats (inter alios) Mr Andrade's party called "Todos por Intag" (All for Intag), which promotes a pro-mining policy.[87]

4.84. *13 November 2004* – A meeting of the García Moreno Parish Assembly takes place to form CODEGAM (the Corporation for the Development of the Communities of García Moreno). Mr Andrade is elected as President of CODEGAM; and Jorge Pasquel, Jose Yanouch, Ausimaro Chala, Leonardo Ayala and Tarquinio Vallejos are elected as Vice-Presidents. (As indicated above, CODEGAM appears to have come into existence earlier, in substance if not yet fully fledged in form).

4.85. Mr Jurika testified that CODEGAM was created by a number of community leaders who were not related to Ascendex (or AE):[88] it was to be an independent community organisation that gave a voice to the many members of the local community that saw mining as the only source of economic development; Ascendex agreed that CODEGAM could administer certain social services and community development programs that Ascendex wished to finance; but this "did not make CODEGAM an agent of Ascendex in any way."[89]

4.86. *13 November 2004*: A Spanish woman and a local man from El Rosal in García Moreno (anti-miner) were allegedly attacked by CODEGAM bodyguards of Mr Andrade, one of them carrying a firearm.[90]

4.87. *14 November 2004* – An extraordinary assembly of the Cotacachi Canton takes place. About 300 local community representatives express opposition to the mining project in Junín.[91]

---

[85] Respondent's Counter-Memorial para 142; R-110 (newspaper article); Zorrilla WS para 43.
[86] Respondent's Counter-Memorial para 143; R-115; and Zorrilla WS 1 para 44.
[87] Zorrilla WS 1 para 44.
[88] Jurika WS 1 para 68; R-72.
[89] R-117 (Letter from CEDHU to Prosecutor dated 23 May 2006).
[90] R-233; R-117; Zorrilla WS 2 para 41.
[91] Zorrilla WS 1 para 46.

4.88.   *28 November 2004* – CODEGAM is formally established, with its articles of association signed by its chairman, Mr Andrade.[92] Article 2 provides that it is to be "a private, non-for-profit, non-governmental organisation" which is "banned from participating in religious, political or partisan acts." Its objects (stated generally in Article 5) do not call for mining in García Moreno; and there is no ostensible link with Ascendex or AE. It is nonetheless resolutely pro-mining and in favour of the Junín concessions.

4.89.   *29/30 November 2004* – Pursuant to a Share Purchase Agreement dated 30 November 2004 Ascendant Holdings Ltd (of Bermuda) as vendor and Ascendant Copper Corporation (of Vancouver, later to be re-named Copper Mesa Mining Corporation, the named Claimant) as purchaser, Ascendant Copper Corporation acquires 100% of the shares in Ascendant Copper (Barbados) Corporation, which in turn owns all of the issued shares in Ascendant Ecuador (AE), being the owner of the Golden 1 and Golden 2 concessions in Junín and the Janeth 1 concession in Chaucha.[93]

4.90.   *End of November 2004* – Gary Davis is appointed to the board of Ascendant Copper and shortly thereafter its chief executive.[94] (As already indicated, Ascendant Copper is the Claimant's former name).[95]

4.91.   *November 2004* – There is an alleged violent incident in the Junín area involving persons associated with CODEGAM assaulting anti-mining participants attending a public meeting.[96] (This may be the same incident as the alleged incident on 13 November 2004, described above).

4.92.   *End 2004:* ██████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[92] R-112.
[93] C-13, C-14, C-82 (the SPA), C-205, 204, 206, C-77.
[94] Davis WS 1 paras 2 & 8.
[95] The change of name certificate is at C-4.
[96] Respondent's Statement of Defence para 55; and R-76 para 30.
[97] ████████████████████
[98] ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

4.93.   *8 December 2004* – A declaration of the Parish Government of García Moreno is promulgated. [99]   It is pro-mining. The declaration (inter alia) congratulates the "respectful and serious attitude of [AE] with which it is carrying out the socialization process, within the framework of a development plan of the sector, of the exploration project in the GOLDEN concessions." It also records that the majority of the parish communities, represented at the meeting, were in accord with the presence of AE in the parish and their "public support for Ronald Andrade, CODEGAM President, who has in a courageous form defended the development of the region and country and who is currently the victim of persecution, threats and attacks against his life on the part of DECOIN, since he has denounced publicly the existing corruption in these organisations, that handle money incorrectly, and petition him, in the name of our communities, to continue with his struggle and defense of the progress and development of our parish." It denounces foreigners (including Mr Zorrilla) said to be intervening in the internal politics of the country. It also denounces "arbitrary road controls" established by DECOIN and its supporters at La Armenia, Chalguayacu Alto and Bajo, San José de Magdalena and Junín. The declaration is signed by 25 persons, including Jorge Pasquel, José Yanouch, Melva Vallejos and Guido Cousin.

4.94.   ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ Similarly, the Tribunal's use of the terms "employee" and "employment" should not be understood as indicating actual employment in any legal sense, unless the context indicates otherwise.

4.95.   *2004 – Summary:* By the end of 2004, it is clear that the communities in the Junín remained sorely divided between pro-mining and anti-mining activists, with

---

[99] C-83.

[100] ████████████████

allegations of violent and other unlawful conduct freely made by each side, often with cause. It is equally clear that conduct by individual pro-miners cannot, without more, be attributed to AE (or Ascendant Copper). The hostilities between pro-miners and anti-miners pre-existed the granting of the Junín concessions; and certain anti-miners were not angels, as evidenced by the arson attack on Bishimetal. Nor can the conduct of the anti-miners be attributed to the Respondent. To the contrary, the Government in Quito supported AE and its Junín concessions; and it remained unequivocally pro-mining. However, as already indicated, governmental agencies, including the forces of law and order, were only thinly present in the Junín area.

4.96.   There were also new features that greatly aggravated the situation. First, the creation of CODEGAM, led by Mr Andrade with General Villacís and now well funded by AE, was to be a catalyst for much more serious events to come. It significantly contributed to the polarisation of local communities. Second, the unlawful road-blocks established by some anti-mining communities were soon to cause AE severe difficulties. These had to be overcome, somehow, if the Junín concessions were to enjoy any chance of success.

4.97.   At this point, AE was aware (with Ascendant Copper) that it faced severe troubles in the Junín area, sufficient to imperil the further development of its concessions. Whilst MEM and the Government in Quito as a whole were pro-mining, AE knew that the Government's powers in the Junín area were weak, if not (for most practical purposes) non-existent, and therefore easily exploited by both pro-miners and anti-miners with an increasing risk of social conflict. For AE and Ascendant Copper, all this required a new strategy: increased efforts, particularly with social funding, to gain genuine support for the Junín project amongst the local communities (with CODEGAM's involvement); and a program of land acquisition both to secure such support and also to gain ready access to the Junín concessions.

**2005**

4.98.   From 2005 onwards (until 2007), Mr Cousin, Mr Andrade, Mr Pasquel, Mr Yanouch
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[101] ████████████████████



4.99.



4.100.  In 2005, AE begins its program of land acquisition.[104]  AE purchases surface rights.[105] These purchases were made at fair market values from local residents; and AE denies that it participated in or had any knowledge of unlawful land trafficking.[106] The program started with the acquisition of La Florida farm.[107] AE bought over 50 plots of land.[108]  Several of those who sold their land became employees of AE. The program was initiated by Mr Rosanía (a senior officer of AE based in Quito).[109]

4.101.  *January 2005 –*

4.102.  *First months of 2005 –*

4.103.  *Around 10 January 2005 –* AE issues legal proceedings for libel against the local newspaper, 'Periódico Intag'.[112]  AE settles the lawsuit in return for an opportunity to

---

[102]

[103]

[104] Respondent's Statement of Defence para 56; R-70; R-78.

[105] Mr Davis WS para 54.

[106] Mr Davis para 56.

[107]

[108]

[109]

[110]

[111]

[112] R-71 – news item about lawsuit; Zorrilla WS1 para 69.

respond to the adverse anti-mining allegations.[113] AE does not seek any further compensation.

4.104. *20 January 2005* – A mining concession is granted by MEM to Ascendex in respect of the Magdalena 1 concession in the parish of García Moreno, in the canton of Cotacachi in the province of Imbabura.[114] It will later form part of AE's Junín concessions.

4.105. *1 February 2005* – A written contract is made in Quito between AE (for Ascendant Copper) and CODEGAM, entitled "Agreement of Work between [CODEGAM] and Ascendant Copper Corp." signed by Mr Andrade and Mr Bolaños (then the latter's general manager). Ascendant Copper agrees to make monthly payments to CODEGAM in return for CODEGAM planning and executing community development initiatives, at the rate of US$9,000 per month.[115] Mr Davis acknowledged that, in Ecuador, this was a "sizable amount" and that CODEGAM "had a fairly free rein as to what they actually invested in".[116]

4.106. *2 February 2005* – The MEM's Regional Director of Mining approves the transfer of the Junín concession Golden 2 from Ascendex to AE.[117] (It is assumed, from other undisputed evidence, that like approval was granted in respect of Golden 1).

4.107. *5 February 2005* – An anti-mining demonstration of over 300 people takes place in Junín.[118]

4.108. *22 February 2005* – By letter, responding to an inquiry of 27 December 2004, the Under-Secretary of Mines confirms to the office of the President of Ecuador that the Junín concessions have been legally granted by the Respondent; and that the concessionaire's presence in the parish of García Moreno was "in line with the rights granted by the Ecuadorian state, with whose backing it will carry out tasks that are specifically allowed by the mining/environmental laws …".[119] The letter also refers to the concessionaire's obligation to carry out an EIS. It is clear that MEM was here

---

[113] Jurika WS 1 para 65.
[114] C-39.
[115] Davis WS 2 paras 61-64; C-346.
[116] T/2/399/9-12 (The Tribunal heard evidence that minimum monthly salaries in Intag were then US$228 Stonehouse: T/1/233).
[117] C-34.
[118] Respondent's Counter-Memorial para 144; Zorrilla WS 1 para 46.
[119] C-35.

expressing, unequivocally, support for AE and Ascendant Copper, including its own confirmation of the legal validity of the Junín concessions.[120]

4.109.   *24 February 2005* – Ascendex assigns to AE the Magdalena 1 concession in Junín (adjoining Golden 1 and 2).[121] It now forms part of the Junín concessions.

4.110.   *5 March 2005* – A meeting takes place of the General Assembly of García Moreno, attended by representatives of MEM.  It approves AE's preparations for the EIS relating to the Junín concessions, Golden 1 and 2.[122]

4.111.   *6 March 2005* – Representatives of Cerro Pelado, Junín, El Triunfo and Barcelona issue a declaration addressed to AE and its associated companies confirming their communities' opposition to the mining project in the Junín area.[123]

4.112.   *7 March 2005* – Representatives of Cerro Pelado, Junín, Chalguayacu Bajo, El Rosal, Armenia, Chontal Bajo, Barcelona and Magdalena Bajo issue a declaration confirming that their communities are opposed to the mining project in the Junín area.[124]  It also states that CODEGAM "does not represent the aspirations, interests and even less the decisions of our communities".

4.113.   *9 March 2005* – AE (then the concessionaire) submits to MEM an EIS in respect of the Chaucha (Janeth 1) concession. (In this arbitration, the Respondent accepts that the EIS was declared valid by the MEM on 16 August 2005 and was approved by MEM on 26 September 2005).[125]

4.114.   *16 March 2005* – A Memorandum of Understanding is agreed by AE with Dr Bustamante and Leslie Smith.[126]  Mr Davis testified that he and Mr Grist met Dr Bustamante and Mr Smith in Quito to offer him and his assignee shares in the Claimant in exchange for a reduction in their remaining royalty interests in the Junín concessions; and that the MoU had "nothing to do with the circumstances surrounding Dr Bustamante's original acquisition of the Junín Concessions."[127]  It was a

---

[120] Memorial para 129 and C-36, 121, 115, 135, 142, 106, 105, 112 and 113.
[121] C-38.
[122] See MEM's letter of 9 May 2005 C-89; Jurika WS1 para 73.
[123] R-118; Zorrilla WS 1 para 63.
[124] R-119.
[125] Respondent's Statement of Defence para 65; C-44; R-89.
[126] R-182.
[127] Davis WS 2 paras 2-7.

complicated transaction. It was fully explained by Mr Davis in his testimony; and the Tribunal accepts his evidence as to the legitimacy of this transaction.

4.115.    *1 April 2005* – A Resolution is made by the Cantonal Unity Assembly of Cotacachi and the Development and Action Council.[128]  It is entitled 'With a single voice: NO TO MINING'; and it is signed by Mayor Tituaña and representatives of the Council. It merits here citing at length, as one of several turning points during this period:

> "… The citizens, legitimate representatives of the communities, organizations and public entities of Cotacachi Canton, Imbabura Province, Ecuador, that subscribe the present document do it to make it known to the world, and particularly to national and transnational mining companies, that it is our insurmountable decision to PREVENT MINING in the Cotacachi Canton.
>
> The mining companies which intend to sack our natural resources and destroy our communities, violate our rights, social peace and environment should know that we will always support the Intag communities in their rejection of mining activities.
>
> Organized civil society and the Intag and Cotacachi authorities have chosen sustainable development, framed in solidarity, reciprocity, democratic principles and involvement, respecting human rights, both individual and collective and the right of the communities to create and enjoy their own forms of development and to say NO to projects that may endanger their natural and socio-cultural wellbeing.
>
> We, therefore, ask Ascendant Exploration S.A., Ascendant Holdings Limited and subsidiaries and representatives to leave our Canton, within 30 days. Ascendant Exploration S.A. has never consulted or asked the potentially affected communities' consent to develop its projects.
>
> Equally, it has not consulted or informed the Cotacachi Municipality of its plans and activities nor requested the corresponding municipal authorization. It has created, however, a vile setting in which the violation of our rights

---

[128] R-77; Zorrilla WS 1 para 64.

commands, it has tried to divide us, threaten us, [with] intimidations and law suits against the villagers and a community newspaper.

To avoid more problems of this kind, we request the Central Government, through the Ministry of Energy and Mines to:

1) Respect the independence and autonomy of Cotacachi Canton's local governments.

2) Abstain from violating human rights recognized in the Political Constitution of Ecuador and especially those that guarantee the right to prior consultations in connection with the exploitation of non-renewable natural resources and that may affect our environmental and social rights.

3) Respect the rights of citizens to live in a contamination-free and ecologically balanced environment as guaranteed by Article 86 of the Constitution.

4) Once and for all, refrain from granting mining concessions in Cotacachi Canton and revoke those that have not been authorized by the Cotacachi Municipality nor have obtained consent by the communities which would be affected by mining activities, including exploration."

The Tribunal notes that the address to the Ascendant companies to leave the Junín area within thirty days is phrased as a request; but the anti-mining policy is uncompromisingly expressed. The Tribunal also notes that those signing this resolution perceive the Government in Quito (including MEM) as pro-mining.

4.116. *Around 1 April 2005* – Mr Giovanni Rosanía is appointed as the general manager of AE.[129] He had previous experience as the head of another copper project. In the Tribunal's view, as later events would demonstrate, his appointment was another turning point.

4.117. *4 April 2005* – By hand-delivered letter to General Luis Aguas, the Ground Force General Commander,[130] CODEGAM requests military intervention in the area of

---

[129] C-335.
[130] R-79.

Cotacachi "in the most restrained form". The letter is signed by (*inter alios*) Mr Andrade.

4.118.  *4 April 2005* – By letter to Mr Andrade (as President of CODEGAM), Mr Sixto Erazo (as "trustee of the La Armenia Community") denounces Mr Muñoz (the President of La Armenia) for signing the declaration of 7 March 2005 (see above) because it goes "against the interest and wishes of the majority of the Armenia community, constituted by ten families of which seven want development [i.e. mining]". [131]   Similar documents are sent by persons in Magdalena (6 April) and Chalguayacu Bajo (6 April).

███████████████████████████████████████████████

████████████████████████████████████████

**The 11 April 2005 Incident**

4.119.  *11 April 2005* – A violent incident takes place in Cotacachi involving Mayor Tituaña and CODEGAM. It is necessary to recite in turn the different accounts of this incident.

4.120.  ██████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

---

[131] C-347.

[132] ████████████████

4.121.

[133] T/3/40-41.
[134] R-99.
[135] Respondent's Counter-Memorial para 159.

4.122.   ███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████

4.123.   According to Mr Zorilla's account, Mr Andrade, General Villacís and AE's new general manager (Mr Rosanía) gathered some 150 people to take them to the Cotacachi municipality in buses rented by AE.[143] The demonstrators were deployed in front of the town hall to show fierce opposition to Mayor Tituaña's disapproval of AE's mining projects.  They forced an entry to the town hall and held the Mayor hostage for several hours.

4.124.   Mr Davis testified differently as to this incident.[144] He was not present. He was informed by Mr Rosanía that none of the disorderly conduct was organized or sanctioned by AE itself. He also testified the manner in which CODEGAM's members conducted themselves was not consistent with the behaviour that Ascendant Copper expected from its contractors. He also learned that some of AE's funds had not been used properly. As a result, Mr Davis decided to terminate General Villacís' employment with AE.[145]

---

[136] ██████████████
[137] T/3/37.
[138] T/3/37.
[139] T/3/39.
[140] T/3/40.
[141] T/3/41.
[142] T/3/44-46.
[143] Zorrilla WS para 52.
[144] Davis WS 2 paras 65ff.
[145] WS 2 para 68.

4.125.   There is no doubt that this incident can be attributed to the Claimant, albeit to AE and its local agents in Ecuador, particularly Mr Rosanía and General Villacís with Mr Andrade. There is equally no doubt that Mr Davis' horrified reaction was sincere: it was, on any view, a negative development for Ascendant Copper's mining project in in the Junín area, if not also elsewhere in Ecuador.

4.126.   *23 April 2005* – Representatives of AE meet with Mayor Tituaña of Cotacachi.[146] Mr Davis referred to two meetings in April 2005, including a meeting on 23 April 2005. He testified that thereafter the Mayor refused to meet or enter into dialogue with them personally. That was, perhaps, hardly surprising.

4.127.   *23 April 2005* – A Resolution is passed by the General Assembly of CODEGAM.[147] It resolves to ask Ascendant Copper to suspend discussions with the Municipality of Cotacachi and that it should negotiate with CODEGAM and the Intag communities as the lawful representatives of the region. CODEGAM denies the authority of Mayor Tituaña of Cotacachi and demands that he refrains from acting in a manner contrary to the development of the mining project in Junín. It also demands that Mr Pérez (of DECOIN) and Mr German Flores be declared persona non grata; and that Mr Zorrilla and others be expelled from the country. The declaration is signed by a large number of persons, including Mr Andrade, Ms Morales, Mr Pasquel, Mr Yamouch and Mr Cousin.

4.128.   ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

4.129.   Mr Davis testified that the content of the resolution was one of the things he would not tolerate.[149] Yet CODEGAM's resolution was published on Ascendant Copper's website on 29 April 2005.[150] Mr Davis took no action at the time to indicate his strong disapproval of the resolution.[151]   Mr Davis was an experienced manager; and the Tribunal does not doubt his sincerity. It is therefore driven to the conclusion that Mr

---

[146] Davis WS 2 para 42; C-92.
[147] R-113/C-318.
[148] ██████████████
[149] T/2/404/24-405/4.
[150] T/2/403/15-16 and T/2/406/4.
[151] T/2/405.

Davis cannot have then fully understood the worsening gravity of the situation in Junín, to which his company's money and local personnel had substantially contributed.

4.130.   *29 April 2005* – An employee of AE allegedly delivers a notice from CODEGAM to an aid worker at Magdalena Bajo which says: "you're not welcome here; people is ready, and you are warned."[152]  It is also alleged that CODEGAM personnel seek to assault and kidnap a French citizen working on a development project in the Junín area. [153] (These may be the same incident).

4.131.   *4 May 2005* – A group from Whistler Consultants (EIS experts to Ascendant Copper), with Mr Rosanía, try and fail to gain access to Junín for the purpose of undertaking preparatory work for the EIS required for the Golden 1 and Golden 2 concessions.[154] After Magnolia, before Junín, their car is stopped by a barrier across the road, a wooden pole with a counterweight locked with a padlock. Villagers come, with two aggressive young foreigners probably alerted by DECOIN. The group is eventually asked to leave. Mr Davis testified that Whistler Consultants had expected to have a draft EIS prepared by mid-July 2005 and to submit it by the end of July 2005. (Whistler Consultants were later replaced by Terrambiente Consultants in September 2005).[155]

4.132.   *9 May 2005* – MEM sends a letter to Ascendant Copper recording that MEM supports the preparation of the EIS for the Golden 1 and 2 concessions.[156]  The letter also refers to the local communities approving the performance of these studies at the meeting on 5 March 2005 in García Moreno, attended by MEM (see above). Its terms are unambiguously supportive of the Junín project; and the letter was doubtless drafted for local publication in Junín. Thus, the Government in Quito remains pro-mining.

4.133.   *12 May 2005* – Mayor Tituaña of Cotacachi files an extraordinary administrative claim with MEM requesting the nullification of the Junín concessions.[157]

---

[152] R-117 (Letter from CEDHU to Prosecutor); R-233.
[153] R-233.
[154] C-333 (report from Whistler); C-303 (DECOIN website on the removal of Whistler personnel by force).
[155] Mr Davis WS 2 paras 13-15.
[156] C-89; Mr Jurika WS 1 para 74.
[157] R-80.

4.134.   *19 May 2005* – Mr Rosanía sends a conciliatory letter to Mayor Tituaña regarding the incident of 11 April 2005.[158]  Mr Rosanía writes that he had no participation in the declaration of support for Ascendant Copper that was organized by CODEGAM.  It is not possible to square his explanation with the other evidence adduced before the Tribunal. It is however probable that the contents of his letter influenced Mr Davis favourably as regards Mr Rosanía's dealings in the Junín area (Mr Davis being absent in Canada).

4.135.   *22 May 2005*: A violent incident involving Mr Andrade takes place at Cuellaje. ███



4.136.   *28 May 2005* – Following the latter incident, a community meeting takes place in Cuellaje.  A majority of the 300 persons present express opposition to the mining project in Junín.[160]

4.137.   *30 May 2005* – An agreement is made between MEM and AE regarding the drilling landmarks for the mining projects in Junín and Telimbela.[161]

4.138.   *June 2005* – ████████████████████████████████████████

---

[158] C-335.
[159] ████████████ R-207; Zorrilla WS 2 para 41.
[160] Respondent's Counter-Memorial para 145; Zorrilla WS para 64.
[161] C-91.
[162] ████████████████



4.139.   *June 2005* – Mr Rosanía (of AE) sends an email message to Mr Davis, stating that six landowners had been threatened by DECOIN: they would be "beaten" if they sold their land to AE under its program for land acquisition. However, they were still willing to sell their land to AE, which would facilitate AE's access to the concession area using the road to Barcelona and Cerro Pelado.[166]

4.140.   *June 2005* – AE formally terminates the employment of General Villacís; and ostensibly it suspends its relationship with CODEGAM.[167] Mr Davis testified that in a good faith effort to respond to the allegations of intimidation against AE, he replaced General Villacís as manager of community relations.[168] Mr Davis also testified that CODEGAM was not created by AE and did not act as AE's agent: it was an independent organisation that gave voice to members of the community that supported mining; whilst AE at first relied on CODEGAM to direct its financing for social services and community development initiatives, by June 2005 Mr Davis had imposed strict limits and conditions on such financing to ensure that its funding was not used for political activities.[169] Mr Davis at first testified that he believed that CODEGAM was fully authorized to act on behalf of the local governments in the Junín area.[170] Later, in his oral testimony, Mr Davis withdrew that statement.[171] He was right to do so.

163

164

165 WS para 33.

166 C-94.

167 Claimant's Memorial para 188; C-116 (letter from Mr Davis to Mr Zorrilla).

168 Davis WS 1 para 71.

169 WS 1 para 72.

170 Davis WS 2 para 64.

171 T2/407/16.

4.141.   *4 June 2005* – The populations of Cerro Pelado, Junín, El Triunfo, Villaflora, Cuaravi, La Armenia, Cazarpamba and Barcelona express opposition to Ascendant Copper's mining plans for Junín.[172]

4.142.   *23 June 2005* – Ascendant Copper issues its preliminary prospectus for an Initial Public Offering.[173]  It states (inter alia): "In 2004 Ascendant began a socialization program to introduce Ascendant and its plans for the Junín project, to determine what support existed for the Junín project, and to determine the priorities of local communities … CODEGAM is thought to be comprised of the majority of García Moreno Parish communities, being 34 of a total of 38 recognized communities that could be most significantly impacted by exploration and development activities on the Junín property."[174]  Also: "To date, Ascendant's community relations programs have been met with mixed results. CODEGAM has advised Ascendant that 34 of the approximate 38 communities that could be locally impacted by development of the Junín property support and are in favour of Ascendant's plans for proceeding with exploration of the property.  There exists, however, within the Imbabura Province a vocal faction opposing any exploration or development of the Junín project."[175]

4.143.   *25 June 2005* – Mr Davis travels to Junín and meets Mr Pérez and others.[176]  The meeting was filmed, apparently by DECOIN. It shows Mr Davis taking a conciliatory approach. Mr Davis states there is no doubt in his mind that the company had made mistakes to this point; and he expresses his apologies if there had been threats and abuses.[177]  He accepts that Ascendant Copper had funded CODEGAM and that the latter had done things with its money which Ascendant Copper would not tolerate. He refuses to identify the amount of funding provided by Ascendant Copper, as being an internal company matter. He says CODEGAM was originally set up as a clearing house for community input. The meeting lasts for about one hour; but none of Mr Davis' explanations of the proposed development are shown in the video made by DECOIN.[178]  During his oral evidence, Mr Davis testified: "The [video] footage, if it says that what is stated, that I apologized for wrong doing, that is incorrect. I said if

---

[172] Respondent's Counter-Memorial para 145; Zorrilla WS para 64.
[173] R-120.
[174] At p. 8.
[175] At p.48.
[176] Respondent's Counter-Memorial paras 152 and footnote 250; R-105.
[177] Video – R-105: summary.
[178] WS 2 para 44.

there had been any wrongdoing or any abuses, for that I was sorry. I had no knowledge whatsoever that there had been [any wrongdoing]".[179]  Mr Davis went on to say that CODEGAM had been trying to divide the community – that was something which his company did not stand for and was not in the interest of the company.[180]

4.144.   In the Tribunal's view, having seen and heard Mr Davis as an oral witness in this arbitration, it is highly unlikely that Mr Davis was seeking at this meeting to deceive Mr Pérez and his colleagues. It is also highly likely that Mr Davis was not fully informed as to what had actually taken place in the Junín area, attributed (rightly or wrongly) to his company and its predecessors-in-title. Mr Davis, so the Tribunal decides on the evidence available, was genuinely trying at this meeting to calm down what had become a difficult situation for his company, with the sincere intention of starting anew its relations with the affected communities of the Junín area. He also genuinely believed that the Junín project could benefit these communities as a whole. Unfortunately, given the events that had already transpired, members of those communities did not believe or trust him or the company and remained resolutely anti-mining.

4.145.   *July 2005* – A technical report on the Chaucha (Janeth 1) concession by Micon International (UK) is prepared for Ascendant Copper.[181]

4.146.   *12 July 2005* – MEM decides that it lacks jurisdiction to hear the nullification claim made by Mayor Tituaña on 12 May 2005 (see above).

4.147.   *21 July 2005* – Mr Davis (for Ascendant Copper) writes a letter to CODEGAM referring to his meeting with its executive council on 24 June 2015 (during his visit to Ecuador). He states that any future projects using company funds would be carefully reviewed in advance; and he sets out a list of approved and prohibited activities for which funds, respectively, could and could not be used by CODEGAM. Ascendant Copper's monthly payments are now to be limited to US$1,000 for "general administrative expenses", with further funding to be justified and approved by Ascendant Copper in advance.

---

[179] T/2/400/9-13.
[180] T/2/401/8-17.
[181] C-43. Jurika WS 1 paras 23 - 24.

4.148.   Mr Davis also gives an example of his company's funds having been previously mis-used by CODEGAM:[182] "We would like to again remind CODEGAM's members that we contracted to rebuild 11.5 kilometers road from Loma Negra-La Magnolia-García Moreno. It disturbs us greatly that we paid over $250,000 for its completion, but less than 5.5 kilometers was finished and even the portion that was completed did not meet the technical specifications under the contract. Payment was made in full under the contract and we can make available all receipts for audit if CODEGAM wants to pursue completion of this road. We now understand that the road should not have cost more than $ 150,000 to complete. This is a perfect example of a project where a few people benefited at the expense of the communities. It is our understanding that the contracting company was introduced to us by General Villacís and is either owned by his son or he is a partner in it. Furthermore, General Villacís later demanded more funds from the Company to complete the road. Our question is, if the road should only have cost approximately $150,000, why wasn't it completed and where did the money go? The Company would appreciate receiving assistance from CODEGAM's Council in investigating this road and putting pressure on the road contractor to make it right with the communities by finishing the road according to the specifications of the contract. At this point, we do not expect the road will survive the rainy season. We will not allow this kind of conflict of interest in the future …"

4.149.   *10 August 2005* – A legal opinion of the State Attorney General in Quito is addressed to Mayor Tituaña of Cotacachi.[183] It states that a breach of the consultation obligations established by the State would not serve as grounds for nullification of a mining title or concession rights, but only for a suspension in the exercise of such activities.

4.150.   *16 August 2005* – MEM approves AE's EIS in respect of the Chaucha (Janeth 1) concession.[184] After receiving AE's financial guarantee, MEM sends a similar letter confirming approval on 26 September 2005. [185]

4.151.   *12 October 2005* – Micon International (UK) submits to Ascendant Copper a technical report for the Junín concessions. [186]   It indicates a high level of copper and

---

[182] C-390 ; Davis WS 2 para 68; T/2/208-209.
[183] C-96.
[184] C-44.
[185] R-89.
[186] C-37.

molybdenum deposits at Junín, with molybdenum, gold and silver.[187]   Mr Davis testified that the report indicated that the Junín project was potentially one of the world's largest undeveloped copper deposits.[188]

4.152.   *14 October 2005* – Ascendant Copper's IPO Prospectus is published.[189]   It raises US$9.2 million. Ascendant Copper raises an additional US$19 million in private placements of securities on 26 April 2005 and 15 November 2006 and in a second public offering on 22 June 2007.[190]

4.153.   *22 November 2005* – Ascendant Copper's shares are listed for trading on the Toronto stock exchange.[191] (Mr Jurika testified that his father, Mr William Jurika, continued to serve as chairman of the company until the end of 2007, holding approximately 13% of the shares in Ascendant Copper until September 2009.[192] Mr Davis continued as the company's chief executive.)

4.154.   *December 2005* – There is increasing conflict between anti-miners and pro-miners in the Junín area.  At a community meeting, over 300 local residents vote "to burn down a mining camp building after ensuring that it was empty of people as a reaction to the aggressive tactics employed by [Ascendant Copper/AE]".[193]

4.155.   *10 December 2005* – The medical clinic at Chalguayacu Bajo, funded by Ascendant Copper, is looted and then burnt down by anti-miners.[194]  Approximately 70 people break into the clinic, and forcibly evict Ascendant Copper employees and visitors. In the film, "Curse of Copper", the commentary states that 24 anti-miners were subject to criminal charges.[195] Mr Davis testified that the clinic was burned to the ground, together with Ascendant Copper's farmhouse "by Polibio Pérez and his supporters" and that the local communities later requested that the medical clinic be rebuilt. [196]

---

[187] Claimant's Memorial para 146; and Davis WS 1 paras 42 to 44.
[188] Claimant's Memorial para 146; and Davis WS 1 paras 42 to 44.
[189] Claimant's Statement of Claim para 27; R-76 (Ontario lawsuit para 36).
[190] Davis WS 1 para 37.
[191] Claimant's Statement of Claim para 9, C-98 (press release); Davis WS 1 para 11.
[192] Jurika WS 1 para 56.
[193] R-76 (para 42 of Ontario law suit).
[194] C-99.
[195] R-100 (video) at 12:00.
[196] Davis WS 1 para 68.

4.156.   *25 December 2005* – A Payment and Receipt Agreement is made between Ascendant Copper and Dr Bustamante.[197]

4.157.   ***2005 – Summary****:* At some stage towards the end of 2005 and early 2006, it appears that Ascendant Copper (with AE) decided upon a different strategy to solve its difficulties in Junín. Conciliation had failed to achieve what Mr Davis had sought earlier in 2005. Ascendant Copper's conciliatory approach to DECOIN had been met with an increased and more active opposition from the anti-miners in the Junín area and DECOIN itself. Even more serious was the new threat of violence to Ascendant Copper's personnel and properties in the Junín area, which (as all knew) had an ugly precedent in the forced departure of Bishimetal in 1997, only eight years earlier. As to reliance upon assistance from CODEGAM to gain more local support, that risked only more trouble for Ascendant Copper and AE: CODEGAM, particularly with Mr Andrade, was directly responsible for increasing, not decreasing, the conflict between pro-miners and anti-miners for which Ascendant Copper was being held responsible amongst the divided communities in Junín. As for the Government in Quito, it remained pro-mining and supportive of Ascendant Copper and its concessions in Junín. For Ascendant Copper and AE, however, that was not enough.

## 2006

4.158.   *3 January 2006* – Between 3 January 2006 and 5 October 2006, 18 individuals sell land in García Moreno and Peñaherrera to Ascendant Copper.[198] These individuals had been granted the land by the National Institute for Agricultural Development ("INDIA"). Accordingly an issue arose as to the legality of their onward sales to Ascendant Copper which was later investigated for unlawful land trafficking by the Respondent's Civic Corruption Control Commission. In its report of 18 July 2007, the Commission also listed 56 purchases by Ascendant Copper and its predecessors-in-title between 2005 and 2006 in La Florida, Las Palmas, Chalguayacu Alto, Junín, Alto Mira, Cerro Pelado, Barcelona, Chontal Alto, San Edmundo, San Juan, Mirador and Monopamba, totalling 2,752.4 hectares with additional rights over 166 hectares.[199] As

---

[197] C 379; Davis WS 2 para 8.
[198] R-78 paras 8ff.
[199] R-78 para 17.

to the 18 sales, the Commission recommended their reversal on the ground of unlawful speculation.

4.159.   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

4.160.   *March 2006* – Mr Davis is informed by an attaché to the Canadian Embassy in Quito that the Under-Secretary of Mines, Carlos Murriagui, had expressed strong support for the Junín project during a meeting with community leaders in March 2006, indicated that he was fully behind Ascendant Copper and intended to approve the Junín EIS once it was completed and reviewed by MEM.[202]

4.161.   *March 2006* – Mr Zorrilla meets Mr Andrade. Mr Andrade proposes that CODEGAM supporters join the local anti-mining organisations opposing AE. Mr Zorrilla turns down the proposal. During this meeting Mr Andrade allegedly gave to Mr Zorrilla a bag containing confidential AE documents. ████████████████████████ ████████████████████████ Mr Andrade was here acting dishonestly in his own self-interest and not acting for AE.

4.162.   *2 March 2006* – Two AE sub-contracted technicians are attacked and held captive at the property of Mr Pérez, by Mr Pérez, Alirio Ramírez, Maura Nicolaide, Victor Lucero, Edmundo Lucero, Victor Hugo Ramírez and Marcia Ramírez. Local police officers intervene to prevent the two being taken to the community of Junín.[204]

---

[200] C-116 (letter from Mr Davis to Mr Zorrilla).
[201] ████████████
[202] Davis WS 1 para 48.
[203] Zorrilla WS 2 paras 60, 61 ████████████
[204] C-99; Davis WS 1 para 68.

4.163.   *9 March 2006* – Ascendex transfers its rights in the Telimbela option to Ecuadorgold.[205]

4.164.   *9 March 2006* – Ascendant Copper issues a news release to the Toronto Stock Exchange.[206] It records the reclogging of core samples at the Junín concessions, confirming the presence of a large porphyry copper, hydrothermal system; the appointment of an expert geologist (Mr King); the completion of "the initial draft of the [EIS]"; and the commencement of "the process of obtaining comments from representatives of the community and the local governments, prior to submitting the EIS to the Ecuadorian Ministry of Energy and Mines for final approval".

4.165.   As to such consultation, the news release states:

> "Unfortunately, this consultation process is being contested by a small but vocal faction of the community that does not want mineral exploration or development of any kind in the area. Last week, in two separate incidents, five persons -- four of whom are contracted to the Company, as well as one government official -- were detained for up to eight hours. 'It is believed that several of the people who may have been responsible for these actions were also involved in the destruction of the Company's medical clinic and demonstration farm in December 2005,' said Davis. In response to these activities, five arrest orders have been issued by the local authorities and should be served within the next few days. The Ecuadorian Ministry of Energy and Mines has promised its full support in seeing that law and order is restored and maintained in the region. 'While these acts are unfortunate, they are acts of a small and distinct minority in the region,' said Davis. 'We will continue to finish the EIS and submit it to the Ministry in order to obtain the drilling permits necessary to take advantage of the upcoming summer season. The vast majority of the people in these communities want this project - which is committed to adhering to best industry practices on environmental and social matters -- to move forward, and they recognize the many economic, as well as environmental, benefits to the region that will result from it,' concluded Davis."

---

[205] C-28 (the assignment, clause 2.2).
[206] R-168.

4.166.   *23 March 2006* – By letter, Ascendant Copper informs MEM that the modified terms of reference for EIS regarding the Junín concessions had been published on the internet and enclose a CD containing its terms.[207]

4.167.   *5 April 2006* – By letter, MEM informs AE that it is insufficient to disseminate the terms of reference for the EIS on the Internet.[208] Mr Guevara testified that he drafted that letter (albeit that it was signed by the Under-Secretary).[209] In his testimony, he explained that the local population had little or no access to the internet. Accordingly, as the law required, AE was to arrange for information centres to be opened onsite to provide the information to the local communities. (Between the end of March 2006 and 30 April 2006, Ascendant Copper opens two public information centres in García Moreno to disseminate the terms of reference for the EIS).[210]

4.168.   *17 April 2006* – MEM prepares an internal analysis of the terms of reference for the Junín EIS, copied to Ascendant Copper.[211]

4.169.   *22 April 2006* – Mr Guevara visits AE's office at García Moreno.[212] He inspects the terms of reference at the office and sees that AE personnel are available to respond to questions. He tells AE's contractor (Terrambiente) that the local population in the affected areas should be notified by courier or through a notary. Only one office had been used to disseminate the terms of reference; and this had been considered sufficient.[213] Mr Jurika testified that AE had to close the first of the two offices because it was under threat of violent attack from local anti-miners.[214]

4.170.   MEM writes several letters to DECOIN and associated organisations during this period, supporting AE's development of the EIS.[215] Mr Jurika relies on these documents to show that the consultation process satisfied the applicable regulations.[216] Mr Guevara likewise testified that: "it seemed the process was being carried out appropriately".[217] In MEM's letter dated 9 May 2006 to DECOIN, the MEM Under-

---

[207] R-341.
[208] R-342.
[209] Guevara WS para 6.
[210] C-112; C-36.
[211] Claimant's Memorial para 166; and C-111.
[212] Guevara WS para 7; and R-343 (his report).
[213] Guevara WS para 10.
[214] Jurika WS 1 para 76; C-112; see also C-105 (MEM).
[215] C-105 and C-106.
[216] C-112, C-36; C-105 and C-106.
[217] Guevara WS para 11.

Secretary for Environmental Protection writes, having referred to threats from "ecologists" forcing the closure one information office, as already cited above: "… Likewise, I support ASCENDANT COPPER in regards to attacks on personnel and private property (burning of the camp, kidnapping of personnel, car theft) that are being performed by people that claim to protect the environment and its surroundings, but that use processes contrary to the norms and laws of the Republic of Ecuador to carry this out." The Government thus remains pro-mining and supportive of Ascendant Copper and its concessions in Junín.

4.171.   *May 2006* – Ascendant Copper begins speaking to drilling companies to supply rigs for the Junín concessions.[218]

4.172.   *The Incident of May 2006*: As regards this incident in Quito involving Mr Zorrilla and a woman from the USA (Ms Chaplin)███████████████

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

4.173.   From this and other accounts (including the film "Under Rich Earth")[220] it is clear that some form of staged incident certainly took place; and the criminal complaint undoubtedly became a matter of grave concern for Mr Zorrilla, as it was intended to do. However, the evidence is inconclusive as to whether this incident can be attributed to Ascendant Copper███████████████████████ As later events show, H&L was to rival CODEGAM in its capacity for embarrassing Ascendant Copper; and what

[218] Davis WS 1 para 48.
[219] ██████████████
[220] R-97.

such people say does not necessarily make it true███████████████████ Moreover, it is most unlikely that Mr Davis would have approved of such a manoeuvre, even if he had known of it in advance. However, at the time, there is no doubt that anti-miners attributed this provocative incident to Ascendant Copper, rightly or wrongly.

4.174.   *3 May 2006* – Ascendant Copper workers are physically attacked by anti-miners whilst taking water samples from a river on the property of Luis Vallejos; and their equipment is stolen. Ascendant Copper identifies the perpetrators as Edmundo Lucero, Julio Espinoza, Victor Hugo Ramírez, Elsa Piedra and Carmen Ramírez.[221]

4.175.   *20 May 2006* – A meeting takes place of the Area Assembly in García Moreno.[222] Mr Andrade, ostensibly, speaks out *against* mining in the Junín area. ███████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

4.176.   *Mid 2006* – AE creates a parallel coffee seller's association, "APCI", to rival the existing anti-mining Association of Coffee Producers of Rio Intag (which had been established in 1998: see above).[224] Mr Cueva (the latter's technical director) testified that APCI was run by Ciro Benalcázar and Magdalena Flores, both employees of AE, and that it was buying coffee from producers at enhanced prices funded by AE.[225]

4.177.   *Summer 2006* – Mr Veintimilla becomes the general manager of AE in Quito.[226] Beforehand, he had been in charge of community relations since 2005. In the Tribunal's view, his appointment was another significant watershed in the development of AE's strategy towards the anti-miners.

---

[221] C-99; Davis WS 1 para 68(e).
[222] R-97 (at 10:55).
[223] T/3/62.
[224] Cueva WS para 18.
[225] Cueva WS paras 20-21.
[226] ███████████████

4.178.   *June 2006* – Mr Jurika becomes Ascendant Copper's Vice-President of Corporate Development.[227]  (For the year and a half before June 2006 Mr Jurika had no role in the management of the company;[228] and Mr Grist was to be no longer involved after leaving his position as a director in June 2006).[229] Mr Jurika is to spend much of his time in Ecuador and works with Mr Veintimilla, the general manager of AE.[230]

4.179.   *Summer 2006*: Mr Davis testified that, because of the attacks on AE's workers, he decided that AE should retain the services of, in his words, an internationally recognized and respected security provider – Honour & Laurel ("H&L"):

> "Initially, the company looked to local police authorities for protection. However, over time, we discovered that the Ecuadorian government did not give the local police sufficient resources to adequately protect our employees and contractors. As we did not permit any of our own employees to carry any weapons, Ascendant Ecuador eventually concluded that it had no alternative but to retain professional security guards. These security guards were retained solely to protect Ascendant Ecuador's legal property and the physical security of its employees and contractors."[231]

4.180.   To Mr Davis' knowledge, guards employed by H&L would be armed; but he trusted in H&L's judgment and discipline. However, although AE retained H&L, it had no direct contractual relationship with Segurivital (engaged by H&L) whose armed guards were involved in the subsequent altercations with anti-mining groups, as described below.

4.181.   ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

---

[227] Davis 1 para 47.
[228] T/2/483/1.
[229] Jurika WS 1 para 57.
[230] Jurika WS 1 para 70.
[231] Davis WS 2 paras 81-82.
[232] ████████████████████

███████████████████████████████████████████████

███████████████████████████████████

4.182.   ████████████████████████████████████████████

Again, the question arises whether Mr Davis in Canada was kept fully informed of actual events in Ecuador.  It is highly improbable, if he had been fully informed, that he would have approved of the steps now being planned by AE in Quito, with H&L.

4.183.   *June 2006* – In an internal document, Ascendant Copper summarises its "activities" as at June 2006.[234] It merits citing here in full:

> "*The Company*:
>
> Acquired the 9,500 hectares within the Golden 1, Golden 2, and Magdalena Concessions in 2004.
>
> Purchased an additional 3,400 hectares of private at a cost of $2 million.
>
> *Social Effort to date:*
>
> 1-hired two doctors and have seen over 1,000 patients (two thirds children)
>
> 2-hired a dentist and have done over 800 dental examinations
>
> 3-hired a veterinarian and have vaccinated over 2,500 cattle
>
> 4-built three nurseries and are raising a variety of plants, crops and seeds
>
> 5-planted over 6,000 trees for reforestation efforts
>
> 6-Hired over 70 people to do road work, farm experiments, and environmental monitoring
>
> *Exploration Activities to date:*
>
> None
>
> Access is denied to our properties by radical NGO groups
>
> Farm house with medical clinic inside – burned to the ground in Dec 2005
>
> Chain across the road at Junín
>
> *Current Efforts:*
>
> Get the EIS process finished for Junín Project
>
> Gain Access to properties

---

[233] Mr Davis WS 2 para 81.
[234] C-109.

Work with Government Agencies, Nat'l and Local to continue to improve living standards

Abide by Voluntary principles and UN Global Project

Hope to begin drilling by September, 2006

*Result:*

Effort by NGO groups to keep the population of the Intag Valley in a perpetual state of poverty

Current deforestation is wiping out 10% of forest per year

95% of population in the region live below Ecuador's poverty level

Need Government intervention and support both National and local."

4.184.   Accordingly, as at June 2006, Ascendant Copper was 'hoping' to begin drilling in September 2006; and both for that operation and to complete the "EIS process", AE required access to the Junín concessions – but that essential access was, so it considered, "denied … by radical NGO groups."

4.185.   *3 June 2006* – A violent incident occurs in the García Moreno Assembly, attributed to Ascendant Copper (see below).[235]

4.186.   *6 June 2006* – By letter to Mr Davis (with attachments), MEM deplores the escalation of violence in Junín, for which it holds Ascendant Copper "exclusively responsible".[236]   MEM also refers to the incident on 3 June 2006 in the García Moreno Assembly. It states that once Ascendant Copper complies with all its commitments, as well as social and environmental agreements concluded with the local communities, and only then, will MEM deal with any request for intervention. To the Tribunal's understanding, this is the first suggestion to Ascendant Copper that MEM was not fully supporting Ascendant Copper against anti-miners in the Junín area.

4.187.   *14 June 2006* – MEM's Co-ordinator of Mining Environmental Department recommends that the terms of reference for the Junín EIS be accepted by MEM.[237]

---

[235] R-84 (see below).
[236] R-84.
[237] C-111.

4.188.   *16 June 2006* – AE's terms of reference for the EIS for Golden 1, Golden 2 and Magdalena 1 are approved by MEM.[238]

4.189.   *July/August 2006* – Mr Davis testified that he had by now reached the conclusion that Ascendant Copper could no longer continue to work with CODEGAM;[239] and that he also objected to its association with Mr Andrade: he did not like Mr Andrade; and he did not think Mr Andrade was behaving correctly in the Junín area.[240]

4.190.   *July 2006* – ████████████████████████████████████████████
█████████████████████████████████████

4.191.   *July 2006* – Mr Jurika moves to Ecuador.[242]

4.192.   *July 2006* – There are several alleged threats made against Mr Pérez (of DECOIN). On 3 July, four people on motorbikes utter death threats against Mr Pérez;[243] on 6 July, an individual on a motorbike draws a gun, tells Mr Pérez that his opposition to mining was causing too much trouble and makes a death threat;[244] and a few days after 8 July, Mr Pérez' house is surrounded by pro-mining individuals on motorbikes.[245]

4.193.   *12 July 2006* – By letter, various community representatives from the Junín area state that they are willing to talk and work with the management of Ascendant Copper to make the project an example of social development and responsible mining.[246]

4.194.   *12 July 2006* – An anti-mining demonstration takes place in Cotacachi, addressed by Mayor Tituaña of Cotacachi Canton.[247]

4.195.   *13 July 2006* – An anti-mining demonstration takes place outside MEM in Quito.[248]

4.196.   *August 2006* – AE opens an information office in García Moreno from 31 July to 24 August 2006, in Apuela from 4 August to 14 August 2006 and in Cotacachi from 8

---

[238] Claimant's Statement of Claim para 28(d), C-41 (letter to Ascendant Copper from MEM); R-344.
[239] T/2/412/6-7.
[240] T/2/413/17-23.
[241] ████████████   R-306 (handwritten partial employee list).
[242] T/2/489/16.
[243] Respondent's Counter-Memorial para 160; Zorrilla para 75.
[244] Respondent's Counter-Memorial para 160; Zorrilla para 75.
[245] Mr Zorrilla WS para 75.
[246] See MEM letter dated 13 July 2006 at C-36.
[247] R-97.
[248] R-97.

August to 12 August 2006 for public dissemination of the EIS.[249] Mr Guevara (of MEM) visits all three offices.[250] He requests to see letters of invitation to the local communities directly affected (in particular Barcelona).[251] These invitations were not provided to him, save only documents showing an invitation to representatives of Apuela.[252]

4.197.   Mr Jurika testified that he attended meetings at these offices on a regular basis where he and others presented the EIS. He says a total of 368 people attended the office in García Moreno and 261 people the office in Apuela. Of these, 104 were from the smaller villages of Chalguayacu Bajo, Chalguayacu Alto, Cerro Pelado, Magnolia, Alta Mira and Barcelona.[253] Only 16 people attended from Cotacachi. He discussed the consultation process with Mr Guevara, who never suggested to him at the time that there were any deficiencies in the EIS consultations. To the contrary, Mr Guevara told him on several occasions that he was very pleased with how AE was carrying out the process and felt that the company was exceeding its legal obligations. Mr Guevara also told him that AE were doing an excellent job; and that Mr Guevara never mentioned any inadequacy of notices given to local communities in García Moreno. [254]

4.198.   Later, Mr Stonehouse was to join Ascendant Copper in January 2007, as its Vice-President, Exploration. Although relating to a later period (after the incidents of December 2006 described below), Mr Stonehouse also testified on AE's consultation process in the Junín area:[255] AE had carried out consultations in Apuela and García Moreno, but MEM had asked that individuals from seven or so smaller communities be addressed particularly or individually, either in García Moreno or in their own communities. Mr Stonehouse testified: "We couldn't do the consultation work until we addressed the technical difficulties in the EIS. We couldn't address the technical difficulties in the EIS because of the security situation … People who either worked with the company or contracted to the company were being beaten, assaulted, pushed, shoved, had guns held to their head … I watched at Polibio Pérez' house a gentleman

---

[249] Guevara WS para 16 CM; Claimant's Memorial para 172; and the EIS at C-125 section 8.
[250] Report at R-345.
[251] WS paras 16-23.
[252] Guevara WS para 24 ; Jurika WS 1 para 85.
[253] Jurika WS 1 para 86.
[254] Jurika WS 2 paras 16 and 17; see also T/2/485/6-12.
[255] T/1/159.

named Walter Cultid put a gun to my wife's head." (Mr Stonehouse's wife is from Intag and is related to Mr Pérez's wife).[256]

4.199.   *2 August* 2006 – By letter complaining of DECOIN's misleading statements on its website, Mr Davis confirms to Mr Zorrilla that Ascendant Copper does not have any relationship with CODEGAM, which had been suspended in June 2005 and "fully and formally" terminated in February 2006.[257]  Mr Davis also confirms that Ascendant Copper was committed to coordination with local law enforcement forces and to promote the rule of law.

4.200.   *23 August 2006* – Ms Chaplin initiates criminal proceedings for theft and injury against Mr Zorrilla,[258] accusing him of having stolen her video camera and US $500 in cash and having organised a group of people to assault her during the anti-mining demonstration outside MEM on 13 July 2006. These proceedings led to a court order for Mr Zorrilla's detention, a search of Mr Zorrilla's home where illegal drugs were "found"; and his temporary exile from Ecuador.[259] The proceedings were eventually dismissed by the Ecuadorian courts in June 2008, which described the complaint as "malicious and reckless".[260]  It was indeed malicious and clearly intended to side-line Mr Zorrilla from his anti-mining activities in the Junín area, together with certain of his anti-mining colleagues accused as co-conspirators in the (staged) theft and assault.

4.201.   Mr Davis testified that he had never met Ms Chaplin; and that she did not work for Ascendant Copper.[261] However, Ms Chaplin was working for H&L in Quito. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

4.202.   *25 August 2006* – By letter, MEM responds to the findings of unlawful land trafficking made by the Committee of Civic Control of Corruption.[263]

---

[256] T/1/164 & 176.
[257] C-116.
[258] R-75.
[259] Mr Zorrilla WS 1 paras 78-79:
[260] R-123.
[261] T/2/434/15-19.
[262] ████████████████
[263] C-121.

4.203. *Summer of 2006* – CODEGAM is by now practically defunct; and Ascendant Copper's relations with Mr Andrade are formally at an end.[264] However, certain evidence suggests that the situation may have been more complicated. ████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████

4.204. ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████ By this point in time, none of Mr Andrade's statements can be given any credence. Mr Andrade was by now, more than ever, pursuing his own self-interests (distinct from Ascendant Copper/AE). This charade had no chance whatever of fooling any of the anti-mining groups, such was Mr Andrade's bad reputation amongst them. Nor did it.

4.205. *17 August 2006* – Compañía Telimbela SA is incorporated in Ecuador. This company becomes Compañía Minera Telimbela SA.[270] Its shareholders are Ascendant Copper (Barbados) Corporation (4,999 shares) and Ascendant Copper (1 share).

4.206. *September 2006* – DosRios starts a drilling program for the Chaucha (Janeth 1) concession.[271]

---

[264] █████████████████████
[265] T/3/51.
[266] T/3/49-50.
[267] T/3/50.
[268] T/3/52.
[269] T/3/54.
[270] Respondent's Statement of Defence para 37; R52 to R-54.
[271] Claimant's Memorial para 138; Stonehouse WS paras 50-51.

4.207.   *12 September 2006* – Ascendant Copper (by its consultants, Terrambiente) submits its EIS to MEM for the Junín concessions.[272]

4.208.   *Mid-September to December 2006:* From this point onwards, the evidence of certain events is unclear (including precise dates and times), given the different accounts given its several participants, only a few of which testified before the Tribunal. It is manifest that the full story of these events has not been made available to the Tribunal, for one reason or another. Yet, it is equally manifest that certain of these events affected critically the fate of the concessions in Junín.

4.209.   *12 September 2006* – This incident is alleged by Ascendant Copper to have taken place on 12 September 2006, when seven of Ascendant Copper's employees and contractors, working on Ascendant Copper's lands, were kidnapped and taken hostage by 20-30 anti-mining activists.[273]   Two employees escaped and three were released the following day. The remaining two were released on [Saturday] 16 September 2006, in Ascendant Copper's words at the time: "thanks to the overwhelming support and intervention of the [Ecuadorian] Federal Government, state and local police, and the communities: By Saturday, over 60 police officers from the Province of Imbabura along with over 300 local community representatives pressured the 30 or so radicals to unilaterally release the final two hostages." Ascendant Copper also reports that, by 19 September 2006, two of the kidnappers had been arrested, arraigned and were in prison awaiting sentencing. (This appears to be the same incident as that reported by Ascendant Copper in a later document as taking place on 13 September 2006: see below. The exact date is not material).

4.210.   *13 September 2006* – According to Ascendant Copper, its employees were forced at knifepoint and machete to stay the night at Cerro Pelado and then taken to Junín.[274] These employees had been working on Ascendant Copper's land taking coordinates. Some of the employees were released the following day; but two were kept in captivity and released only on 16 September 2006. Mr Davis testified that these employees were severely beaten by Mr Pérez and his anti-mining supporters, identified by name.[275]

---

[272] Claimant's Statement of Claim para 28(d), R-85 (letter) and EIS at C-125.
[273] C-287.
[274] C-99.
[275] Davis WS 1 para 68(f), citing C-99.

4.211.   *14 September 2006* – According to Ascendant Copper, Mr Pérez and Julio Espinoza inflict injuries on Ascendant Copper employees who were trying to find their missing co-workers.[276]   Ascendant Copper refers to photographs showing violent scuffles, a man (Arcesio Panama) with a bloodied face and a man lying on the ground (Pedro Vallejos).

4.212.   *20 September 2006* – Compañía Minera DosRíos SA is incorporated in Ecuador.  Its shareholders are Ascendant Copper (Barbados) Corporation (4999 shares) and Ascendant Copper (1 share).[277]

4.213.   

4.214.   *October 2006*: The date for Ascendant Copper's drilling intended for September 2006 now lies in the past. Essential access for that operation to the Junín concession remains effectively blocked by anti-miners; and Ascendant Copper's situation is becoming more, not less, difficult. Ascendant Copper decides upon a new policy of confrontation with the anti-mining communities in the Junín area, so as to force the issue once and for all. There is also an imminent presidential election (in November 2006) where the new president (taking office in January 2007) might be significantly less supportive of private mining concessions in Ecuador. Much of what is described below, until

---

[276] C-99; with photographs C-99 (Spanish original).
[277] R-38 to R-42.
[278] ████████████████
[279] ████████
[280] ████
[281] T/2/305/14.
[282] T/2/305/7-9.
[283] T/2/486/25.

December 2006, comes from contemporary documents, film ███████████ ██

4.215.   The first contemporary account comes from Ascendant Copper's internal report, written (or updated) in Quito after the events described in the report:[284]

> "BACKGROUND.-
>
> The entry into and physical occupation of the lands that are property of ASCENDANT COPPER, is planned in two phases:
>
> The first phase, under the responsibility of Fernando Alba, contemplated the entry onto the company's lands in the sector of Junín, utilising the Chalguayacu Alto-Junín road, along with personnel from the sector. Additionally, through Falericorp, the private security company Segurivital is hired, which had the specific function of discouraging any attempt at forced entry onto private property once the lands were taken over.
>
> The second phase, under the responsibility of Wilmer Fuertes, consisted of seizing the lands, which are property of the company in the sector of Cerro Pelado, utilising a helicopter in order to mobilize workers of the agricultural company, Falericorp, and a group of Segurivital's (private security company) personnel.
>
> DEVELOPMENT.-
>
> Saturday December 2.
>
> 02:00 a.m.: Entry into Junín by a group of 30 locals and 20 private security guards.
>
> 04:00 a.m.: Upon passing through the community of Junín there was strong opposition to the entry by anti-mining groups, which results in a light confrontation with the group marching towards the properties, ending with the detention of 30 people, among employees and security guards of the company.

---

[284] C-361. (The original is in Spanish: it bears no author's name; but it was probably prepared in Quito by Mr Veintimilla).

05:00 a.m.: A group of 6 people reach the company's lands (old properties belonging to Mr Garzon), where they remain for the next 6 days.

08:00 a.m.: In a second attempt to enter onto the lands, a group of approximately 30 people, made up of locals and security guards, reorganizes itself.

Upon reaching the sector of Junín, the opposition was no longer conformed by only local residents, but there was a well organised group of opponents from Junín, Cotacachi, and Manabí, as well as foreigners with Colombian accents and other foreigners who spoke English. (The latter were the ones carrying video cameras who caught the confrontation on tape.)

On the network of public roads in the sector of Junín there was a brief dialogue between the opposition and security guard personnel, which was interrupted by gunfire of the opposition. This in turn triggered a response by the guards, which was to fire shots in the air.

This confrontation, which was considered as one of the possible scenarios, and for which clear and precise NON AGRESSION guidelines were rendered, occurs as a result of inevitable circumstances, in which the guards had no choice but to react using firearms. It is worth noting that there were no wounded or fatalities during this confrontation, which demonstrates that even though the use of force was inevitable, the guidelines for preserving people's integrity, established by Falericorp, were not ignored, regardless of whether those involved were either pro- or anti-mining.

06:00 pm: The opposition frees the 30 people detained in Junín during the early morning hours.

Second Phase:

Saturday December 2.

10:00 a.m.: A helicopter flies over the sector of Cerro Pelado, due to adverse weather conditions air entry into the company's properties was not achievable that day.

08:00 p.m.: The march to reach the company's properties in the sector of Cerro Pelado begins with a group of 57 people; 40 Falericorp workers and 17 security guards.

Sunday December 3.

02:00 a.m.: The company's properties are reached (old properties belonging to Mr Vasquez), and the group remains on-site for the next 48 hours.

During this time, basic infrastructure tasks were carried out, such as enclosing the area with barbed wire and the use of a perimeter security device.

Tuesday December 5:

08:30 a.m.: A group of approximately 150 people, armed with shotguns, 9mm pistols, .38 caliber revolvers and sophisticated communications equipment, headed up by Polibio Pérez, surround the precarious encampment, and in a show of force in terms of personnel and armament, threaten Falericorp personnel, whom after various struggles and threats by members of the opposition, back down and peacefully surrender their weapons.

It is worth noting that they followed the non-aggression guidelines. We must remember that the presence of the guards was meant as a deterrent to any attempt at forced entry onto private property, once the lands were taken over.

Following this peaceful surrender, they were then taken hostage and led to Junín, where they were held at the church until Sunday December 10.

Sunday December 10.

08:00 p.m.: The hostages are freed by the Under-Secretary of the Environment, and National Police forces."

4.216.   In the Tribunal's view, this contemporary account broadly establishes the general plan intended by AE, with H&L and Falericorp, in its several phases. It also describes the total failure of that plan. The account is otherwise a sanitised, self-serving and materially incomplete version of the relevant events. It is therefore necessary to describe in some detail other available evidence, resuming the chronology as at mid-October 2006.

4.217.   *16-17 October 2006* – On 16 October 2006, as a result of the criminal complaint by Ms Chaplin, the Pichincha Court orders Mr Zorrilla's detention and issues a search warrant for his house.[285] On 17 October 2006, 19 armed policeman break into Mr Zorrilla's house and "find" drugs and a gun (Mr Zorrilla, forewarned, has already fled the scene).[286] ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

4.218.   █████████████████████████████████████████████

████████████████████████████████

4.219.   *26 October 2006*: Telimbela acquires an option from Ecuadorgold to acquire the Telimbela concession.[289]

4.220.   *27 October 2006* – A "usufruct agreement" is made between Faleriocorp S.A. (as the beneficiary) and Ascendant Copper (as the landowner),[290] by Mr Veintimilla for Ascendant Copper and Mr Jorge Mantilla German (Captain Mantilla) for Falericorp. It provides (inter alia) that Ascendant Copper "voluntarily assumes all of the costs of the initial implementation activities, the research activities and the first agricultural labors" and will pay Falericorp US$ 39,298 per month "in the form of a non-reimbursable loan". The contractual term runs to 30 November 2008, subject to the Parties' further agreement to extend the term; but Ascendant Copper has the right to terminate the agreement at any time. It records that the usufruct agreement "is given for free, because it suits the mutual interests of the contracting parties."

4.221.   Mr Davis testified that Ascendant Copper wanted to put its farmlands to productive use and therefore granted Falericorp a usufruct on its lands.[291] In the Tribunal's view, given the terms of the agreement and the circumstances in which it was made, the agreement was not a genuine agreement intended only for farming. Rather, it was part of the charade upon which Ascendant Copper was now engaged in seeking access to its Junín concessions. Why else, in particular, would Ascendant Copper as the

---

[285] Zorrilla WS para 79.
[286] R-97: Mr Zorrilla speaking on "Under Rich Earth" via Radio Intag [at 27.35].
[287] ████
[288] ██████████
[289] C-28.
[290] C-345.
[291] C-345.

landowner, as opposed to Falericorp as the beneficiary, bear the financial burden under the usufruct agreement? Mr Mantilla appears to have been appointed to his post at Falericorp on the same day as he made the agreement; and at that time, Falericorp had no farmworkers.[292] Falericorp had been formed on 8 February 2006 as a registered business "dedicated to activities involved in the transmission of sound, images and other data for cable information."[293] Mr Davis testified that Falericorp might have used Ascendant Copper's money to pay for security guards; but he acknowledged that was only his speculation;[294] he did not know that at the company registry Falericorp's activities were so described;[295] and he was not aware that Falericorp had no employees at the time the usufruct contract was concluded.[296] The question again arises as to the extent to which Mr Davis was kept fully informed of exactly what AE was planning in the Junín area, with H&L.

4.222.   For all practical purposes, the Tribunal concludes that Falericorp was acting as AE's creature, to do AE's bidding as it sought to gain access to the Junín concessions. AE's attempt to disguise the true facts was to fool none of the anti-miners; and, indeed, the failure of that attempted deception made the situation worse for AE and Ascendant Copper.

4.223.   *29 October 2006* – Mr Jurika leaves Ecuador to return to Denver, USA for a family holiday.[297]

4.224.   *29 October 2006* – A local newspaper reports the suspension of the parish assembly of García Moreno when Mr Andrade storms the assembly with 50-60 supporters, shouting 'we are the people' as 'the voice of God', despite apparent efforts by the police to keep order.[298] Mr Andrade's demands (directed at Ascendant Copper as a condition of its mining project) apparently include: "15 percent of global investments, 25 percent of the income tax and one percent of the company's profits to be destined for the García Moreno parish, the area and the province; 80 percent of the company's workforce to be made up of area residents and to establish a 'school of careers related

---

[292] R-403 (extract from Falericorp company register).
[293] R-403.
[294] T/2/371/4-6.
[295] T/2/361/15 – 362/3; R-403.
[296] T/2/362/10.
[297] R-405; T/2/528/2, 529/2-4 and T/3/549/19-22.
[298] R-367.

to the project' and 'university extension' to train professionals; and the company to be dedicated to the conservation of biodiversity through 'forest management and care of protective forest El Chontal,' the conservation of Ecological Reserve Cotacachi Cayapas and reforestation of the area." The Tribunal does not accept that Mr Andrade was here acting, directly or indirectly, at the behest of Ascendant Copper. His strange conduct, however devious or deceptive, could not assist but only harm Ascendant Copper's interests; and, indeed, Mr Davis testified that he would not tolerate this kind of incident.[299]

4.225. ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████

4.226. Mr Jurika denied attending the meeting on 30 October 2006. He testified that he had left Ecuador the previous day. Moreover, he testified that his objective was to ensure that there were no confrontations with the anti-miners because the EIS was then under review by the authorities and any confrontation would be perceived by them negatively.[302] The Tribunal accepts that Mr Jurika did not attend the meeting of 30 October; nor could he play any active part in the incidents that followed.

4.227. *31 October 2006* – Falericorp enters into employment contracts with 77 persons for "farm labor".[303] Its standard term is 90 days, for a flat payment of US$300.

---

[299] T/2/410/19.
[300] ███████████████████████
[301] █████████████████
[302] T/2/487/1-10, 259/6/20.
[303] R-308.

4.228.   *The Incident of 1 November 2006:* The description of this incident is largely based on ████████████████ the film "Under Rich Earth". [304] ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[304] ████████████████ R-95 (at 00:28:38).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████

4.229.  ███████████████████████████████████████████████████

████████ It evidences a large group of men, said to be 75, carrying rucksacks and accompanied by dogs walking into Barcelona, forcing their way past the road-barrier.[305] One eye-witness (Piedad Fuel) says the men worked for Falericorp; and that they fired tear gas. Another eye-witness (Elena Pantoja) says two gas canisters hit her, one on the head. There is film of tear gas canisters; and of canisters being given by villagers to the police.

4.230.  This incident was later described in a UN Working Group report, as the reports of an allegation:[306] "On 1 November 2006, about 40 plain-clothed persons connected with Ascendant Copper would have made a violent entry into the community of Barcelona carrying tear gas bombs, 40 machetes, 1 dagger, and 4 dogs, to threaten the inhabitants. Eight tear gas bombs would have directly affected five children and four women, among them one who was pregnant, and an elderly woman. One community member would have been hit and wounded by a company van. In the presence of the police, the inhabitants found in the backpacks of the attackers sleeping bags, tents, canned food, a set of dishes, Ascendant Copper uniforms and other belongings."

4.231.  Mr Mantilla spoke to the local press as the 'Falericorp manager'. ████████████ ██████████████████████████████████ As reported, Mr Mantilla said that his agricultural workers were attacked and that they did not belong to the mining company [Ascendant Copper]." [308] This was materially untrue. Mr Davis testified that Ascendant Copper had no involvement with this incident.[309] Mr Davis had no first-

---

[305] R-97 (at 28:41).
[306] R-233.
[307] ████████████████
[308] R-310.
[309] Mr Davis WS 1 para 74.

hand knowledge of the incident; and, in the light of all the direct evidence, his denial is not accepted as accurate by the Tribunal.

4.232.   *1 November 2006* – MEM notifies Ascendant Copper of deficiencies in its EIS for the Junín concessions (submitted by Ascendant Copper on 12 September 2008): the EIS did not attach documents showing that public consultations with all of the affected communities had taken place.[310] The draft of this letter had already been prepared within MEM on 30 October 2006, hence its sending had nothing to do with the incident of 1 November 2006).

4.233.   *10 November 2006* – By letter, Ascendant Copper responds to MEM's criticisms of its EIS for insufficient consultation.[311] Ascendant Copper explains that it had tried to approach the community in Barcelona and sent two employees to deliver invitations, but that they were prevented from entering the area. Further, Ascendant Copper states that a leader of the Barcelona community had attended Ascendant Copper's Apuela office to ask questions about the project, but had refused to sign the record of his attendance.

4.234.   *20 November 2006*: An agreement is made between Ascendant Copper, ODI, the Parish Assembly of García Moreno and others. It is signed for Ascendant Copper by Mr Davis, Mr Jurika and Mr Veintimilla.[312] Ascendant Copper is to contribute US$1 million for the development of García Moreno over four years, as Mr Davis confirmed in his testimony.[313] Mr Jurika likewise testified: "It was a collective idea of myself and Francisco [Veintimilla] and Gary [Davis] to work with ODI", which was using CODEGAM's shell but was not CODEGAM:[314] Ascendant Copper's idea was to create a representative body for the development of the community.

4.235.   

---

[310] R-86.
[311] C-132.
[312] C-139/R-307.
[313] WS 1 para 61.
[314] T/2/513/6-7 T/2/514/4-7; T/2/516.
[315] ▮▮▮▮▮▮▮▮
[316] Para 96.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████

4.236.   *Late November 2006* – MEM's Environmental Mining Unit decides to recommend to the Under-Secretary of Environmental Protection to declare inadmissible Ascendant Copper's EIS for the Junín concessions and, therefore, to reject it.[317]

4.237.   *26 November 2006* – In the national election, Rafael Correa stands as a candidate to be President of Ecuador.[318] Mr Davis testified that, as a result of Mr. Correa's successful campaign and later appointment, Ecuador's policies towards natural resources and mining changed radically.[319] After his appointment (on 12 January 2007), President Correa and his officials soon made statements that the Government was considering the revocation of privately-held mining concessions and placing them in the hands of the State.[320]

4.238.   *29 November 2006* – The Chaucha (Janeth 1) Concession is transferred from AE to its associated company, DosRios, for $15,000.[321]

4.239.   *1 December 2006* – Radio Intag is attacked by persons unknown: its antenna cable is cut; and three of its reporters are allegedly attacked by pro-miners, with their equipment stolen.[322]

4.240.   *1 December 2006* – Mr Pérez (of DECOIN) says that at about 6:30 pm he received a call from a friend who told him that it was likely that the pro-miners were to try to invade the Junín area in the morning. So he organized people to guard the road-block at Chalguayacu Bajo. (The next day, he and others captured some 30 men by 6.30 a.m.

---

[317] Mr Guevara WS para 28.
[318] C-124.
[319] Mr Davis WS para 79; contrast C-385.
[320] See C-49 -52, C-122, C-127 and C-130.
[321] C-26.; C-25.
[322] R-97, "Under Rich Earth" (at 33.14); R-209; R-264; Mr Zorrilla WS 1 para 69.

and took them to Junín; some of them had guns: see the second incident of 2 December 2006 below).[323]

4.241.   *The Incidents of 2 December 2006*: The description of these incidents is largely based on ████████████ testimony from Mr Cueva and Mr Israel Pérez; the film "Under Rich Earth" (R-97: at 00:39:25ff) and other film and materials: R-407, R-408, R-409, R-410, R-411, R-412, R-413, R-414, R-415, R-416, R-41, R-87 & R-381ff.

4.242.   As to the first incident at Chalguayacu Alto ████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████

---

[323] Israel Pérez WS paras 5 and 6.

4.243.   As to the second incident at Barcelona ████████████

███████████████████████████████████████████
███████████████████████████████

4.244.    As to the third incident at Chalguayacu Alto ███████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████

4.245.    ███████████████████████████████████████████ As
regards  the  third  incident,  the  film  shows  pick-up  trucks  with  more  than  20  green

uniformed men in bulletproof vests approach a make-shift checkpoint (a chain).[324] It is on a dirt road where a number of local people are standing, including women and children. Some of the local people appear to be holding sticks; but there are no guns visible. Some of the men in uniform appear to be carrying guns. The local people say that they will wait there until the police arrive. Suddenly one armed man (with black moustache and black baseball cap on backwards) sprays something into the eyes of one of the local people. That action does not appear to have been provoked by anyone. Two other armed men to each side of him do the same. The man in the middle then reaches for a pistol and fires into the air. The film then shows several of the armed men firing pistols. The footage then shows women and children leaving the area where the chain was; and the armed men appear to leave in their trucks.

4.246.   There is other video footage of the same incident taken from a high vantage point. It looks down on a group of local people to the left of the chain and a group of uniformed men to the right of the chain. It also shows one man in uniform spraying something into the faces of the local people: the man wears his baseball cap backwards and has a black moustache. There is no obvious provocation by any of the local people. The video records tens of shots being fired; but only the sound is recorded as the camera is held facing the ground. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Neither were agricultural workers.

4.247.   An Ecuadorian army helicopter is seen flying over the area (it did not land). It had been hired from the army under a service agreement with Falericorp SA, for seven flights.[327]  Falericorp had requested the helicopter to transport personnel, supplies and construction material to Junín "as the company was going to erect a camp on land that it owned."[328]

4.248.   *2 December 2006* – The Parish Assembly of García Moreno resolves to disregard the agreement made on 16 November 2006 with Ascendant Copper, ODI and others (see

---

[324] R-97 [at 33.57].
[325] R-407 (video at 1m 30s).
[326] At T/3/12/9-21-T3/11/12.
[327] R-128.
[328] R-128.

above).[329] It also requests that "the Company [Ascendant Copper] does not arbitrarily and, using violence, enter Junín, as previously occurred and on 2 December of this year, as these are events that threaten the integrity of community residents and alter the peace and order of the Parish."

4.249.   *The Incidents of 3 to 6 December 2006:* The description of these incidents is largely taken from ███████████████████████████ R-97 - the film "Under Rich Earth" (at 00:39:25, 00:45:10 & 00:54:39), R-102, R-103, R-381 and C-312.

4.250.   As to the incidents of 3 and 4 December 2006████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

---

[329] R-328; Mr Zorrilla WS 2 para 28.

4.251.   *3-4 December 2006:* The film "Under Rich Earth" shows armed men on the upper slopes of the hill firing down onto persons on the road below. The film also shows that certain men captured by local villagers in the forest (about 56 in number) also carried weapons. The armed man who had sprayed tear gas at the chain on 2 December 2008 is shown handing over his bullet proof vest to the villagers.[330]  The younger man to his left who also sprayed the local people with tear gas is shown captured.[331] The men are disarmed in the forest by the villagers (led by Mr Pérez) and taken to the church in Junín where they are held captive.[332]  There is no violence shown on the video, but the captured men are clearly very frightened. It would here be inappropriate to use their filmed statements (or "confessions") procured in such circumstances; and the Tribunal places no reliance on such statements.

4.252.   *5 December 2006*: The film shows that the captured men are still detained in the church at Junín. There are also pictures of a tree across a road preventing buses from going further; and a ditch dug into the road to prevent further access. Mayor Tituaña, the Governor of Imbabura Province and other officials are in the buses, trying unsuccessfully to reach Junín.[333]

4.253.   *Around 6 December 2006:* From the hillside above the buses, the film "Under Rich Earth" shows pro-miners throwing rocks and burning objects down to the people below.[334]  There is also film footage of some of the pro-miners firing pistols towards people below (albeit out of range). There are police accompanying those in the buses; and policemen climb up the hillside to talk to the pro-miners.

4.254.   At about this date (or shortly thereafter), Mr Veintimilla of AE is interviewed in Quito by the producers of the film "Under Rich Earth", apparently in his office. Speaking to the camera, he flatly denies that Ascendant Copper had sent any armed men or any weapons into the Junín area, stating that the men were only agricultural workers.[335] This was untrue.

---

[330] R-97 [at 47:11].
[331] R-97 [at 47:37]
[332] R-97 [at 47:46].
[333] R-97 [at 54:00].
[334] R-97 [at 55:31]; R-103.
[335] R-97 [at 1:14:08].

4.255.   *7 December 2006* – By letter to Mr Veintimilla (for AE and Ascendant Copper), MEM (by its newly appointed Under-Secretary for Environmental Protection, Ms Yolanda Viteri) refers to the grave confrontations taking place in Junín.[336]  MEM's letter reads in full:

> "As is publicly known, in the last few days grave confrontations have taken place in the communities within the area of influence of the Junín Mining project, which is under the responsibility of the company you represent, putting at risk the security and integrity of the inhabitants of the area.
>
> I remind you that before undertaking any mining activity in the concession areas, an approved Environmental Impact Study shall be in place, in accordance with the applicable rules.
>
> Therefore, as the environmental authority in charge in the mining sector, this Subsecretary requires that the company you represent refrain from carrying out activities until this requirement is fulfilled."[337]

4.256.   Mr Davis testified that he understood that, without an EIS approved by MEM, Ascendant Copper was only being precluded from undertaking "mining activities"; and that MEM was not here indicating that Ascendant Copper was restrained from carrying other activities, including its community relations program.[338] Without an approved EIS, even before this letter, Ascendant Copper was already precluded from undertaking mining activities. It was thus a misreading of MEM's letter, as other events soon confirmed: MEM was here requiring Ascendant Copper to refrain from carrying out activities beyond mining activities until its EIS was approved, as the original Spanish version makes clear ("… se abstenga de realizar actividades …"). This was a direct result of the "grave confrontations" taking place in the Junín area.

---

[336] R-237.

[337] The original Spanish reads: "Como es de conocimiento público, en los últimos días se han suscitado graves enfrentamientos en las comunidades del área de influencia directa del proyecto Minero Junín, a cargo de su representada, poniendo en riesgo la seguridad e integridad de los habitantes de la zona.
Le recuerdo que previo al inicio de cualquier actividad minera en las áreas concesionadas, se debe contar con un Estudio de Impacto Ambiental aprobado por la autoridad competente, de acuerdo a las normas vigentes.
Por lo expuesto. esta Subsecretaria, como autoridad ambiental en el sector minero, requiere que su representada se abstenga de realizar actividades, hasta que se cumpla con este requisito indispensable."

[338] T/2/443-445; see also Mr Stonehouse T/1/185/1-10.

4.257.   *8 December 2006* – By now, some 60 men have been held captive in the church in Junín for five days.[339]

4.258.   *8 December 2006* – MEM (by its Under-Secretary for Environmental Protection, Ms Viteri) responds to Ascendant Copper's letter of 10 November 2006 regarding its EIS for the Junín concessions. [340] The letter reads (in material part):

> " … In this regard, and after reviewing the submitted documentation, it is evidenced that invitations to the Process to Inform the Public of said project were made and the Executive Summary delivered to the central authorities of Quito; invitations were made to sectional authorities and local key players of the County of Ibarra to the opening of the consultation offices; invitations were made to the opening of the consultation processes and opening and closing of the consultation offices in the County of Cotacachi and the Parishes of García Moreno and Apuela. Nevertheless, once again, there is no record of invitations to the following communities which, according to the study, are inside the direct area of influence of the project: Chalguayacu Bajo, Chalguayacu Alto, Junín, Cerro Pelado, Magnolia and Alta Mira, and the community of Barcelona which, according to the maps, the social conflict in that area, and the criteria of the Mining Environmental unit, belong to the direct area of influence.
>
> Therefore, and in accordance with Art. 6.g of the Substitute Instructions for submitting mining environmental impact studies, contained in Ministerial Decree 410, published in Official Gazette No. 724 of December 13, 2002, and the information, required in Official Letter No. 2838 SPA-DINAMI-UAM of November 1, 2006, was not completed, the Undersecretariat of this Ministry considers that the study cannot be processed and, therefore, the submitted documentation must be returned. The holder of the mining rights may initiate a new process for submitting the study, complying with the applicable requirements and procedure, in accordance with the instructions and other applicable regulations …"

---

[339] C-99 (Ascendant Copper note).
[340] C-53. (This letter may have sent a day or two later).

Accordingly, Ascendant Copper could not have its EIS approved by MEM unless and until it invited appropriate consultations with the communities of Chalguayacu Bajo, Chalguayacu Alto, Junín, Cerro Pelado, Magnolia, Alta Mira and Barcelona.

4.259.   Mr Davis and Mr Jurika testified that Ascendant Copper did not consider that any further consultations were required because residents from these smaller communities had in fact attended Ascendant Copper's information centres in the larger communities of García Moreno and Apuela. [341] However, Ascendant Copper now decided to accede to MEM's request and to send invitations to these smaller communities.[342]

4.260.   *9 December 2006*. MEM's Environmental Under-Secretary (Ms Viteri) reaches Junín by helicopter from Quito. She is accompanied by Mr Guevara (of MEM). Mayor Tituaña and Mr Pérez take her to the church in Junín, where the captured men are still held. Her principal purpose, as a senior Government official, is to calm the situation and have the men released. She informs the villagers that MEM had decided that Ascendant Copper's EIS was inadmissible for review.[343] The captured men are then handed over by the villagers to the police, unharmed.

4.261.   *9 December 2006* – According to the film "Under Rich Earth", a few hours after Ms Viteri left Junín, Robinson Guachagmira and his father are attacked by 25 pro-miners. The film shows a man with blood on his face.[344] There are other allegations against pro-miners which the anti-miners attribute to Ascendant Copper. Also on 9 December 2006,[345] when officials were returning from Junín, an armed group attacked the vehicle carrying Gustavo León, the President of the Peñaherrera Parish Assembly. This happened close to García Moreno, between 5.30 pm and 6.00 pm, minutes after an Ascendant Copper vehicle had passed in the direction of García Moreno, from where the attackers came. At about this time, Mr Pérez (of CDC) receives a death threat whilst participating in an anti-mining protest.[346]

---

[341] Davis WS 1 paras 22-24 ; Jurika WS 1 para 93.
[342] Davis WS 2 para 23.
[343] WS para 30.
[344] R-97 [at 1:12:46]; Zorrilla WS 1 para 92; Zorrilla WS 2 para 45.
[345] R-216.
[346] Respondent's Counter-Memorial para 188; R-234 (Amnesty International report).

4.262.   *13 December 2006* – It is announced that Mr Correa has won the Presidential election.[347]

4.263.   *End December 2006:* The film "Under Rich Earth" records local villagers saying that Ascendant Copper is still carrying out activities in Junín, trying to get agricultural workers on to its farmland.[348] Don Edmundo Lucero (President of the village of Junín) says that Ascendant Copper is hiring people from other communities and putting them on one of its farms. He says that the people (on the farm) have weapons.[349]

4.264.   ***2006 – Summary***: It is appropriate here to take stock of Ascendant Copper's position as at the end of 2006. In brief, the situation for Ascendant Copper in the Junín area, difficult from the outset, had become significantly worse: Ascendant Copper's successive attempts (with AE) at conciliation and confrontation with the anti-miners had all failed to meet Ascendant Copper's objectives. The hostility to mining from anti-miners was now greater in the Junín area than at any time since the forced departure of Bishimetal almost ten years earlier. The divisions within the local communities and the social conflicts between anti-miners and pro-miners (with the latter actively supported by AE and Ascendant Copper) were becoming increasingly strident, for which Ascendant Copper was being held responsible. MEM, for the first time, was no longer supporting Ascendant Copper unequivocally: MEM's rejection of AE's EIS for the Junín concessions was problematic: it was not entirely clear how AE and Ascendant Copper were now to meet successfully MEM's criticisms regarding further attempts at consultation with the local communities; and such consultations were of paramount importance for the EIS. As a result, MEM's acceptance of AE's EIS remained in abeyance; and without such acceptance, the Junín concessions could not move forward.

4.265.   Worse than any of this, however, was the reckless escalation of violence which AE (by itself and by its contractors and sub-contractors) had introduced into the Junín area in its own name and also that of Ascendant Copper, particularly with the employment of organised armed men in uniform using tear gas canisters and firing weapons at local villagers and officials. It was miraculous that no-one had been killed during one or more of these violent incidents. Certain of the anti-miners were certainly not angels,

---

[347] C 124.
[348] R-97 "Under Rich Earth" [at 1:17:13].
[349] R-97 "Under Rich Earth" [at 1:17:42].

as already noted; but Mr Pérez (with CDC) appears to have done his best to restrain his supporters during these incidents. That could not be said of AE. As a result, AE and Ascendant Copper had now acquired, irrevocably, a malign reputation for intimidation, threats, deception, mendacity and violence amongst members of the local communities in the Junín area. It was a place from which there could be no easy return; and there was soon to be an important change in the country's political administration in Quito, unfavourable to mining concessions.

**2007**

4.266.    *Early 20*07 – AE has now some 240 employees in the Junín area;[350] and AE is responsible for the subsistence of some 700 families.[351]

4.267.    *January 2007* – Ascendant Copper recruits James Stonehouse as Vice-President, Exploration;[352] who holds the position until July 2009.  Mr Stonehouse knows the Junín area well and speaks Spanish. He suspected that he was brought in by Ascendant Copper "to calm things down".[353] He reported to Mr Davis weekly.[354] Mr Pérez' wife was Mr Stonehouse's wife's favourite cousin.[355] With Mr Veintimilla, Mr Stonehouse met Lucía Ruiz (MEM's Under-Secretary for Environmental Protection from 16 January 2007 onwards) soon after he joined Ascendant Copper.[356] From that meeting, it appeared to him that the completion of the additional consultations in the communities identified by MEM was the last remaining barrier to the approval of the EIS by MEM. Although there were certain technical requests, in his view, these were minor (i.e. the taking of additional soil and water samples; and identifying a mysterious primate in the Junín area).

4.268.    *January 2007* – Compañía Minera Telimbela conducts extensive technical studies of the Telimbela concession.[357]

---

[350] ███████████████████

[351] █████████████████ R-303.

[352] Jurika WS 1 para 94; T/1/155/12.

[353] T/1/165/24-15.

[354] T/1/167/22.

[355] T/1/170/13-14.

[356] Stonehouse WS 1 para 14.

[357] Memorial para 140, C-134, 137, 138, 140 and 147.

4.269.   *5 January 2007* – By letter from MEM (Ms Viteri), the Commander of the National Police is requested to provide the protection sought by the local population of the Junín area.[358]

4.270.   *6 January 2007* – An inspection is carried out by MEM (Mr Guevara and Milton Carrasco) from its Environmental Mining Unit on Ascendant Copper's activities in the Junín area, following complaints that armed men were employed by Ascendant Copper.[359] Their report records the presence of personnel (in civilian clothes) on a farm operated by Ascendant Copper: 4 older persons and 14 youths one of whom (an outsider) was carrying a concealed weapon. It recommends notifying the police authorities, together with a copy of the report.

4.271.   *9 January 2007* – By letter from MEM (Ms Viteri) to AE (Mr Veintimilla) enclosing the report,[360] MEM reminds Ascendant Copper of its restriction on Ascendant Copper's activities in the Junín area: "… I reiterate my decision to remind you that your principal cannot perform any type of activity derived from its Mining Concession until it overcomes the existing social problems and the approval of the corresponding Environmental Impact Study …" Mr Davis testified that he did not recall seeing this letter from MEM.[361] Having been shown it, he thought the restriction was limited to mining activities.[362] To the contrary, the restriction applies expressly to all activities (including agriculture), excepting only the new consultations required by MEM for Ascendant Copper's EIS.

4.272.   *11 January 2007* – There is a second inspection carried out by MEM in the Junín area of Ascendant Copper's activities on farmland. Its report describes some 25 persons present at Junín who said they were working for Falericorp on agriculture and transport, without any specific contract; and also that the unnamed youth with the gun had left the day before. The report concludes with the need for Ascendant Copper to be responsible for a more constructive dialogue for all those involved.[363]

---

[358] R-333.
[359] R-347.
[360] R-347.
[361] T/2/446/24.
[362] T/2/449/2-3.
[363] R-348.

4.273.   *15 January 2007* – As a result of the election, Rafael Correa is appointed the new President of Ecuador.

4.274.   *29 January 2007* – Ascendant Copper terminates its relationship with Falericorp.[364] As to its reason for doing so, Mr Davis testified that it would have had to do with the aggressive nature of their security guards "something that I simply would not tolerate."[365] Mr Davis also testified that he had had no direct knowledge of the violent incidents in November and December 2006.[366]

4.275.   *22 February 2007* – 'Anti-miners' place a chain barrier across the road at Chalguayacu Bajo.[367]

4.276.   *14 March 2007:* About 40-50 anti-miners from Junín and Chalguayacu Alto occupy the farm "La Florida" in Chalguayacu Bajo owned by Ascendant Copper.[368] A group led by Mr Pérez (later joined by Mr Cueva) arrives at about 8.45 am; and the police arrive at about 4 pm. Ascendant Copper's personnel are required to leave the farm.[369]

4.277.   *16 March 2007* – Negotiations between anti-mining representatives (including Mr Pérez and Mr Cueva), pro-mining representatives, Ascendant Copper and MEM take place at the La Florida farm. Ms Ruiz (MEM's Under-Secretary for Environmental Protection) testified that, although she did not attend the negotiations, it was there agreed that Ascendant Copper would evaluate the list of company personnel and would propose a substantial reduction; the communities would hand over weapons they had taken from the armed men in December 2006; they would no longer block access to the concession area; they would vacate Ascendant Copper's land; and both sides were to act peacefully thereafter.[370]

4.278.   *20 March 2007* – This agreement is recorded in the "tri-partite commitment agreements" agreed between (i) the national and regional governmental authorities (including MEM and the Provincial Police) and CDC (represented by Mr Pérez); and (ii) those same authorities and Ascendant Copper (represented by Mr Veintimilla).[371]

---

[364] C-148.
[365] T/2/368/8-11.
[366] T/2/370/10.
[367] C-99.
[368] C-136.
[369] Cueva WS paras 38-40.
[370] Ruiz WS paras 14, 15 & 39; R-135.
[371] C-55; C-56; R-335.

The local community thereby agrees to release weapons seized on 4 December 2006 and to allow free transit; and Ascendant Copper agrees to decrease the number of its personnel in Junín and García Moreno (consisting of agricultural workers, environmental monitors and health promoters) from 159 to 48.

4.279.   The operative part of the agreement made by CDC included the following:

"… the parties making an appearance agree, once the mining company complies with the orders given by the authorities:

- In accordance with the law, the competent Authority to hear and resolve aspects related to the issue that this agreement is based on, is the Ministry of Energy and Mining; in such virtue, all action will be channeled through the said Ministry.

- The parties, aware of their mutual responsibilities, will definitely act and develop their actions in the framework of peace and concurrence at that location and out of it.

- The Community Council of the Region of Intag, from Canton Cotacachi ["CDC"], is committed to guarantee the free transit, given that it is a Constitutional guarantee and a right for all citizens, to which it will eliminate the obstacles that impede the free transit. To do the contrary will be judged a criminal infraction.

- The Community Council of the Region of Intag, from Canton Cotacachi ["CDC"], agrees to release the farm property of the Company.

- The members of the Community Council of the Region of Intag, from Canton Cotacachi ["CDC"] commit themselves to delivering before the Authorities, all the weapons seized on 4 December 2006, [from] the armed groups hired by the Company.

- The Governor of Imbabura, representing the Government, demands and will be very vigilant of the compliance of these agreements, and in equal manner will coordinate the creation of citizens' inspectorships in the region, as guarantee of the [agreements]. Inspectorships that will be integrated immediately in the following manner: Jose Garzón, in representation of the

Parish Council; Milton Jacomé, Political Lieutenant from the García Moreno Parish; Polibio Pérez, Edmundo Lucero, Pedro Vallejos and Ivan Benavídez, representing the communities in the Region of Intag."

4.280.  The operative part of the agreement made by Ascendant Copper included the following:

"[Ascendant Copper] agree[s] to the following:

- In accordance with the law, the competent Authority to hear and resolve aspects related to the issue that this agreement is based on, is the Ministry of Energy and Mining; in such virtue, all action will be channeled through the said Ministry.

- The parties, aware of their mutual responsibilities, will definitely act and develop their actions in the framework of peace and concurrence at that location and out of it.

- The company Ascendant Cooper S.A. agrees to decrease the amount of personnel it has maintained in the Region of Junín, located at the parish of García Moreno Canton Cotacachi, [consisting] of agricultural workers, environmental monitors and health promoters, in a number of 48 from the 159 it originally maintains.

- The Governor of Imbabura, in representation of the Government, demands and will be very vigilant of the compliance of these agreements, and in equal manner will coordinate the creation of citizens' inspectorships in the region, as guarantee of the [agreements]. Inspectorships that will be integrated immediately in the following manner: Jose Garzón, in representation of the Parish Council; Milton Jacomé, Political Lieutenant from the García Moreno Parish; Polibio Pérez, Edmundo Lucero, Pedro Vallejos and Ivan Benavídez, representing the communities in the Region of Intag."

4.281.  It will be noted that the two agreements, albeit separate, are linked, with CDC's obligations stated to be conditional upon Ascendant Copper's prior compliance with orders made by the governmental authorities, i.e. MEM.

4.282.   *26 March 2007* – Mr Pérez and Mr León write to MEM (Ms Ruiz) to complain that Ascendant Copper is not complying with the tripartite agreements, alleging that Ascendant Copper was provoking confrontations, maintained an office in García Moreno where it coordinated its activities, that its vehicles still circulated; and that it provided health facilities that competed with the facilities provided by the State.[372]

4.283.   MEM (Ms Ruiz) writes to Ascendant Copper on the same day. The letter, in material part, reads as follows:[373]

> "With regard to the decision made by this Under-Secretary of Environmental Protection, communicated via Letter No. 01012 – 0616037 dated 7 December 2006, to suspend the activities of your company in the Intag region and, in light of the socio-environmental conflict present in the area and the failure to observe express provisions of the environmental mining regulations, I allow myself to remind you that the referenced suspension of activities will be kept until the entirety of originating causes have been overcome.
>
> Reestablishing the citizen peace and tranquility in the region will surely contribute to performing the processes of consultation and participation with absolutely transparency and the full participation of all citizen sectors and communities involved, to guarantee individual environmental and collective rights enshrined by the Political Constitution and the domestic legal framework.
>
> With certainty that this recommendation will be heard to the full satisfaction of this Under-Secretary, preserving the conditions of citizen calm and contributing to decreasing the tensions existing in the area where your company operates, I hereby sign."[374]

---

[372] Ruiz WS para 25 and R-317.

[373] R-354.

[374] In the original Spanish: "Con relación a la decisión tomada por esta Subsecretaría de Protección Ambiental comunicada con Oficio No. 01012 - 0616037 del 7 de diciembre de 2006, de suspender las actividades de su representada en la región de Íntag y en atención a la conflictividad socio ambiental presente en la zona y a la inobservancia de expresas disposiciones del reglamento ambiental minero, por la presente me permito recordarle que la referida suspensión de actividades se mantendrá hasta tanto se superen en su totalidad las causas que la originaron.

El restablecer las condiciones de tranquilidad y paz ciudadanas en la región, sin duda contribuirá a que los procesos de consulta y participación, se realicen con la más absoluta transparencia y con la plena participación de todos los sectores ciudadanos y comunitarios involucrados, en garantía de los derechos ambientales individuales y colectivos consagrados en la Constitución Política y en el ordenamiento jurídico nacional.

4.284.  Mr Davis testified that he discussed MEM's letter with Mr Veintimilla and took action consequent upon it, such as terminating the employment of Ascendant Copper's personnel and scaling back its social programs.[375]

4.285.  Mr Stonehouse testified that the roadblock on the road to Junín from Chalguayacu Alto was taken down after the tripartite agreements. However, the roadblock on the road to Junín remained in place, made up of rocks and logs.[376] He recounted an incident when (10 or 12 days after the agreements were signed) he travelled by vehicle to test whether that road was open. He and his companions came to the chain in the road where there was a group of 50 people armed with so-called "Intag clubs" (made from heavy electrical cable) and machetes. The group threatened to kill Mr Stonehouse and his companions. After some hours, the police arrived and procured their release.[377] Mr Stonehouse concluded that Ascendant Copper could not get into Barcelona to perform the individual consultations required for the EIS, even if other people were allowed to pass through.[378]

4.286.  *27 March 2007* – MEM (Ms Ruiz) travels to the Junín area to supervise the delivering-up of weapons captured by the local communities under the tripartite agreement with CDC.[379] As described by Ms Ruiz in her testimony, these comprised "a substantial amount of arms as well as ammunition … various tear-gas bombs, military style uniforms and bullet proof vests."

4.287.  *5 April 2007* – CODEGAM formally changes its name to 'the Organization for the Development of Intag' ("ODI").[380] ████████████████████████
████████████████████████████████████████████████████

4.288.  *Post April 2007*: Thereafter further incidents take place between anti-miners and pro-miners over the next several months, together with further complaints by the former that Ascendant Copper was maintaining an improperly high level of personnel and

En la seguridad de que esta recomendación será atendida a entera satisfacción de esta Subsecretaría, preservando las condiciones de tranquilidad ciudadana y contribuyendo a bajar las tensiones existentes en la zona en que su representada ha operado, me suscribo."
[375] T/2/450-451.
[376] T/1/218.
[377] T/1/220; Stonehouse WS 1 para 23.
[378] T/1/222/9-10 ; T/1/223.
[379] Ruiz WS para 23.
[380] R-238.
[381] ████████████

continuing its activities in the Junín area in conflict with the instructions from MEM and Ascendant Copper's own commitments in its tripartite agreement.  It is unnecessary to relate them all here. The tension in the Junín area remains acute, with demonstrations, threats of violence and actual violence by both pro-miners and anti-miner, despite monitoring by MEM (with the police) and visits by national officials in efforts to calm the situation.

4.289.   *22 May 2007* – Minera Telimbela submits its EIS to MEM.[382]

4.290.   *14 June 2007* – Ascendant Copper's second public offering takes place in Canada.[383]

4.291.   *12 July 2007* – By letter from the Ministry of Mines and Petroleum (MEM''s successor ministry), the Ministry notifies Ascendant Copper (Mr Veintimilla) of breaches of Ascendant Copper's commitments made in its tripartite agreement of 20 March 2007.[384]  The letter concludes: "With this background, the Ministry of Mines and Petroleum requires the concessionaire Ascendant Copper to fully comply with the signed commitment and immediately suspend all activities oriented to divide the community and breach the peace, such as the activities to promote community engagement currently being undertaken by the company, including those of agricultural nature in the area of the concession."[385]

4.292.   *13 July 2007* – By letter, the Ministry of Mines (Ms Ruiz) confirms to Mr Pérez (of DECOIN) that Ascendant Copper "has not been authorized by the Under-Secretariat for Environmental Protection to conduct any kind of community relations activity"; and that Ascendant Copper's "current activities are generating division in the community and contributing to generate a climate of instability and insecurity, the effects of which on the population may become unbearable."[386]

---

[382] Claimant's Memorial para 141.

[383] Claimant's Statement of Claim para 27.

[384] R-242; Ruiz WS para 32.

[385] In the original Spanish: "Con estos antecedentes, el ministerio de Minas y Petróleos exige a la concesionaria Ascendant Copper el cabal cumplimiento del acta de compromiso, y la inmediata suspensión de todas las actividades orientadas a dividir a la comunidad y quebrantan la paz ciudadana, como son las actividades de promoción y relacionamiento comunitario que se encuentra ejecutando la empresa, incluidas aquellas de carácter agrícola en el área concesionada."

[386] R-243. In the original Spanish: "Las actuales actividades de la empresa están generando división en la comunidad y coadyuvando a generar un clima de inestabilidad e inseguridad cuyos efectos sobre la población pueden llegar a ser insostenibles."

4.293.   *20 July 2007* – Ascendant Copper is instructed at a meeting with the Ministry of Mines to halt all activities in the Junín area.[387] The meeting is attended by (inter alios) Mr Stonehouse for Ascendant Copper and several representatives from the Ministry. Mr Stonehouse testified that he was informed that all activities carried out by Ascendant Copper should be suspended and that no protection would be granted to carry out the additional work needed to complete the EIS. [388] Ms Ruiz testified that she does not remember attending this meeting and, in any event, that any such instructions would have been communicated to Ascendant Copper in writing.[389] Whilst there is no doubt that Ascendant Copper had been and was still being required to cease all its activities in the Junín area (except for the further consultations required for its EIS), the Tribunal does not accept Mr Stonehouse's uncorroborated evidence that no protection was to be given to Ascendant Copper by the Respondent.

4.294.   *3 July 2007* – Mr Chiriboga is appointed as Minister of Mines.[390]

4.295.   *30 July 2007*- Dr Jose Serrano is appointed Under-Secretary of Mines.

4.296.   *2 August 2007* – By letter from Mr Veintimilla (for Ascendant Copper) to the Minister of Mines (Mr Chiriboga), Ascendant Copper defends itself against current criticisms, and states (inter alia):[391]

> "… At this time, our main interest to is to be able to perform an Environmental Impact Assessment with the highest technical standards, subject to all legal and regulatory guidelines and inform the community of said company studies and projects, in order to obtain their preliminary opinion of the approval established by law. Thus, we would satisfy, not only the above requirements, but also the guidelines issued by former Minister Alberto Acosta via Ministerial Agreements numbers 62 and 76, issued on 22 May and 13 June of this year [2007]. We consider that we can implement these mandates in coordination with the State authorities.

---

[387] Claimant's Statement of Claim para 41.
[388] Stonehouse WS 1 paras 32-33; Stonehouse WS 2 para 8; C-146.
[389] Ruiz WS para 33.
[390] Ruiz WS para 2.
[391] R-351.

Until now, we have not been able to perform these activities [for the EIS] due to the constant opposition and factual steps taken by certain opposition to the Junín mining project. We have been unfairly accused of performing mining activities, when the only thing that we have performed is corporate responsibility activities and community assistance. Art. 18 of the Mining Law expressly defines the mining activity stages, without us having performed any activities defined therein. The community diffusion is not a mining activity, on the contrary, it is a preliminary obligation to performing mining activities.

[Ascendant Copper] has certain community assistance projects that are current as of today, even before performing any mining activity in the area, and it also creates jobs for agricultural and forest activities in its properties. Unfortunately, we have had to decrease these jobs with the sole purpose of satisfying the demands of opposition groups and enabling a dialogue and discussion between the parties.

Neither the Mining Law nor any legal body in the country contemplates any restriction for the above referenced social responsibility activities …"[392]

Ascendant Copper was thereby challenging the Government's instructions, of more than nine months' standing, to cease *all* activities in the Junín area (apart from the EIS) and not only "mining activities" (which had not in fact begun and could not begin until its EIS was accepted by the Ministry).

---

[392] In the original Spanish: "Al momento es nuestro primordial interés poder realizar un estudio de impacto ambiental con los más altos estándares técnicos, sujetándonos a todos los lineamientos legales y reglamentarios, e informar de tales estudios y proyectos de la compañía a la comunidad para poder contar con sus criterios previa la aprobación prevista en la Ley, cumpliendo así no solo requerimientos anteriores sino las directrices emanadas por el ex Ministro Alberto Acosta en los Acuerdos Ministeriales números 62 y 76 emitidos el 22 de mayo y 13 de junio del presente año, consideramos en coordinación con las Autoridades del Estado poder ejecutar estos mandatos.
Hasta ahora hemos sido impedidos de realizar tales actividades por la constante oposición y medidas de hecho tomadas por ciertos opositores al proyecto minero Junín. Injustamente se nos ha acusado de realizar actividades mineras cuando lo único que hemos realizado es actividades de responsabilidad corporativa y apoyo comunitario. Las fases de la actividad minera están expresamente definidas en el Art. 18 de la Ley de Minería sin que hayamos realizado ninguna de las actividades ahí definidas. La difusión comunitaria no es una actividad minera por el contrario es una obligación previa a la realización de actividades mineras.
ASCENDCOPPER tiene algunos proyectos de apoyo comunitario que están en vigencia desde ahora, aún antes de realizar cualquier actividad minera en la zona, y también genera empleos para actividades agrícolas y forestales en sus propiedades. Lamentablemente hemos debido disminuir tales empleos con el único propósito de satisfacer las demandas de los grupos opositores y procurar un diálogo y acercamiento entre las partes.
La Ley de Minería ni ningún cuerpo jurídico del país no contempla ninguna restricción para las actividades de responsabilidad social antes mencionadas."

4.297.   *8 August 2007* – At a meeting between the Minister for Mines (Mr Chiriboga) and his officers (including Ms Ruiz), anti-mining and pro-mining representatives (the latter including Mr Veintimilla), Ascendant Copper is asked to suspend all forms of activity in the Junín area.[393]  As Ms Ruiz testified: "what the minister asked the company was to act in an environment of peace for the EIS to be prepared; it must be stated that 10 months almost had elapsed where the activities and the relationship had permanently deteriorated. This, because of the fact that there was no peace."[394]

4.298.   *20 September 2007* – By letter from Mr Veintimilla (of Ascendant Copper) to the Minister for Mines (Mr Chiriboga), Ascendant Copper states that Ascendant Copper and its associated agricultural company have only had 48 workers in the Junín area to guard Ascendant Copper's property and for agriculture; and that Ascendant Copper had suspended its activities (including social responsibility projects) in the Junín area.[395]  As Ms Ruiz testified, Ascendant Copper's use of agricultural workers "was in direct violation of the Minister's order contained in the 12 July 2007 letter demanding the suspension of all agricultural work." [396]

4.299.   *24 September 2007* – The Under-Secretary of Mines approves the Terms of Reference for the Telimbela EIS.[397]

4.300.   *25 September 2007* – The Pichincha Regional Mining Director in Quito declares by formal resolution the suspension by Ascendant Copper of all mining activity in the Junín concessions and of Ascendant Copper's community relations activities in the Junín area (the "Suspension Resolution").[398] As appears from the Attorney-General's letter to Mayor Tituaña also of 25 September 2007,[399] the Suspension Resolution was to have the force of criminal law; and, as such, the police could provide support to enforce the suspension of all activities by Ascendant Copper. As Ms Ruiz testified, the intended effect of this formal resolution was to suspend *all* activity by Ascendant Copper, including the consultation required for the EIS.[400]

---

[393] Ruiz para 40.
[394] T/4/678/13-17.
[395] R-353.
[396] Ms Ruiz para 42.
[397] Claimant's Memorial para 141.
[398] C-57.
[399] R-255.
[400] Ms Ruiz WS para 43.

4.301.   *28 September 2007* – Ascendant Copper appeals the Suspension Resolution to MEM.[401]

4.302.   *Early October 2007* – MEM's representatives and the police travel to Chalguayacu Bajo and García Moreno to seal off Ascendant Copper's farm and office.[402] Some days later, Ms Ruiz finds that the seals are not stopping people from entering the premises; and that the office had clearly been used.

4.303.   *24 October 2007* – By letter, Ascendant Copper (Mr Veintimilla) informs the Under-Secretary of Mines (Mr Serrano) that, in compliance with the Director's Suspension Resolution, Ascendant Copper "does not maintain any activity, not even agricultural or that of any other nature, in the area of Junín".[403]

4.304.   *2007 – Summary*: By the end of 2007, there is no EIS approved for the Junín concessions. There is also no concluded consultation by AE with certain of the local communities in the Junín area, as required by MEM. However, with the Suspension Resolution enforced by the Respondent, AE and Ascendant Copper are now precluded by the Respondent from conducting any activity in the Junín area, thereby making it impossible to conclude the required consultations and to submit an appropriate EIS to MEM. The situation with the Chaucha and Telimbela concessions is more equivocal.

## 2008

4.305.   *January 2008* – Ascendant Copper has a cash reserve of US$6.9 million.[404]

4.306.   *8 January 2008* – Ascendant Copper prepares to commission a further technical report for the Chaucha (Janeth 1) concession from Tetra Tech.[405]

4.307.   *25 January 2008 – Nullification Resolutions*: The newly appointed Regional Director of Mining of Pichincha (Santiago Pazmiño) nullifies by resolutions Ascendant Copper's concessions at Junín.[406] These "Nullification Resolutions" are issued without any prior notice to Ascendant Copper.

---

[401] C-150.
[402] Ms Ruiz WS paras 44, 45.
[403] C-157.
[404] Davis WS 1 para 97.
[405] C-48 (letter from Tetra Tech).
[406] C-9.

4.308.   *1 February 2008* – Ascendant Copper appeals the Regional Director's Nullification Resolutions to the National Mining Director.[407]

4.309.   *11 February 2008* – The Regional Mining Director applies to the Constitutional Court requesting a declaration that the Mining Law is unconstitutional.[408] (The application is declared inadmissible on 12 June 2008).[409]

4.310.   *18 April 2008* – The "Mining Mandate" (Constituent Mandate No 6) is promulgated by the Respondent's Constituent Assembly. By Article 1, "Termination, without economic compensation, is declared for all mining concessions without any investment in project development having been made in their exploration stage by December 31, 2007 or without their [EIS] having been submitted or without a prior referendum process having been conducted, including those pending an administrative resolution."[410]

4.311.   *18 April 2008* – Ascendant Copper suspends work on the Chaucha (Janeth 1) concession.[411]

4.312.   *July 2008* – Ascendant Copper receives an unsolicited offer from a hedge fund based in New York, Platinum Partners.[412]  It decides to pursue the negotiations; but no agreement is reached.

4.313.   *30 July 2008* – Ascendant Copper changes its name to Copper Mesa Mining Corporation.[413]

4.314.   *15 September 2008* – The Junín concessions (Golden 1 and 2) are restored to Ascendant Copper (now Copper Mesa) by the Ministry of Mining's National Mining Director upon Ascendant Copper's appeal. [414]  Accordingly, the Nullification

---

[407] C-153.
[408] C-154; Davis WS 1 para 84.
[409] C-156.
[410] C-60. In the original Spanish, Article 1 provides: "Se declara la extinción sin compensación económica alguna de todas las concesiones mineras que en la fase de exploración no hayan realizado ninguna inversión en el desarrollo del proyecto al 31 de diciembre del 2007 o que no hayan presnetado su respectivo estudio de impacto ambiental o que no hayan realizado los procesos de consulta previa, inclusive las que estén pendientes de resolución administrativa."
[411] Claimant's Statement of Claim para 63.
[412] Davis WS 1 para 101; C-158, C-159.
[413] C-4.
[414] C-58, 59.

Resolutions of 25 January 2008 by the Regional Mining Director of Pichincha are revoked.[415]

4.315. *2 October 2008* – The Under-Secretary of Mines (Mr Serrano) makes an oral request to the National Office for Mining Environmental Protection for information on the Junín concessions (Golden 1 and 2).[416] The written answer reports (inter alia) that Ascendant Copper's EIS had not been processed (by the Ministry) because "there was no invitation of at least seven community leaders in the impact zone of the project for the process of previous consultation and public discussion."

4.316. *7 October 2008* – The Under-Secretary of Mines (Mr Serrano) orders the Regional Director of Pichincha to declare the termination of the Junín concessions (Golden 1 and 2) "without any compensation whatsoever" on the basis of Article 1 of the Mining Mandate.[417]  The reasons stated are that consultations have not been carried out by the concessionaire.

4.317. *12 November 2008 – Termination Resolutions:* By resolutions of the new Regional Mining Director of Pichincha (Eduardo Sandoya Sánchez), Copper Mesa's Junín concessions are terminated without any economic compensation (the "Termination Resolutions").[418] No prior notice is given to Copper Mesa. These resolutions address Golden 1 and 2; but their effect extends to Magdalena, as Mr Davis testified.[419]

4.318. *15 November 2008* – Copper Mesa conducts negotiations with China Railway in China for the sale of the Junín concessions. A memorandum of understanding is made; but further negotiations lapse owing to the effect of the Termination Resolutions.[420]

4.319. *18 November 2008* – Copper Mesa appeals against the Termination Resolutions to the National Mining Director.

---

[415] Davis WS 1 para 84.
[416] R-90.
[417] C-61. In the original Spanish, the relevant wording states: "sin compensación alguna".
[418] C-10.
[419] Davis WS 1 para 91.
[420] C-164; Davis WS 1 para 103.

4.320.  *1 December 2008* – The Ministry of Mines take the position, on the basis of Article 12 of the Mining Mandate, that no appeal against the Termination Resolutions is possible.[421]

4.321.  ***2008 Summary****:* For all practical purposes, following the Termination Resolutions, AE and Copper Mesa have lost the Junín concessions, unless the Termination Resolutions can be annulled in Ecuadorian legal or administrative proceedings.

## 2009

4.322.  *January 2009* – Copper Mesa begins to negotiate a binding letter of intent with a Canadian company, G&G Mining Corporation, for the sale of the Junín and Chaucha concessions.[422] No final transaction is ever completed.

4.323.  *9 January 2009* – The Regional Mining Director (Mr Sánchez) declines to accept the appeal initiated by Copper Mesa because the Regional Mining Office is not the competent authority to process appeals.[423]

4.324.  *15 January 2009* – Copper Mesa applies to the Constitutional Court for an 'extraordinary measure of protection'.[424]

4.325.  *29 January 2009* – The 2009 Mining Law is enacted. Article 24 provides: "The mining areas and mining projects where the State of Ecuador conducted geological research, exploration or prefeasibility study or feasibility studies shall be returned to the State." [425]

4.326.  *20 March 2009* – Copper Mesa receives an offer from Entrée Gold – it is withdrawn three days later.[426]

---

[421] C-62. In the original Spanish, the relevant text states: "En virtud de lo dispuesto en el citado artículo 12, la Dirección Nacional de Minería, debería rechazar por improcedente el recurso interpuesto, argumentando que conforme la indicada norma jurídica, la Resolución Impugnada por el administrado no es susceptible de reclamo ni recurso alguno en vía administrativa."

[422] Davis WS 1 para 104.

[423] C-63.

[424] C-167.

[425] C-11. Article 24 provides, in the original Spanish: "Las áreas mineras y proyectos mineros en los cuales el Estado ecuatoriano haya realizado investigacíósn geológica, realizó exploración o haya establecido estudios de prefactibilidad, serán restituidos al mismo."

[426] C-175, C-176, C-178; Mr Davis WS 1 para 105.

4.327.   *30 March 2009* – An agreement is made between Copper Mesa and Nortec Ventures Corp, a Canadian company in Vancouver ("Nortec"), whereby Nortec offers to purchase Ascendant Barbados.[427]

4.328.   *4 June 2009* – Copper Mesa's application to the Constitutional Court for an extraordinary measure of protection is rejected as being inadmissible.[428]

4.329.   *19 June 2009* – Within the Ministry of Mines, a memorandum to the Under-Secretary of Mines (Dr Serrano Salgado) lists the Junín, Chaucha and Telimbela concessions amongst those in which the State has carried out investigation, prospecting, exploration and/or exploitation (i.e. within the meaning of Article 24 of the Mining Law).[429]

4.330.   *23 June 2009* – By letter, Nortec notifies Copper Mesa of a serious defect in Copper Mesa's title to the Chaucha (Janeth 1) concession and that it would make no further payments until the issue was resolved.[430]  The letter states that Copper Mesa's Chaucha (Janeth 1) concession is included on the list of concessions that satisfies the criteria of Article 24 of the 2009 Mining Law. This was a reference to the Ministry's memorandum of 19 June 2009 (supra). Mr Davis is told by Nortec's President that an Ecuadorian national on Nortec's board was informed of the memorandum by one of his contacts.[431] Mr Davis testified that Nortec's President told him that Nortec was not prepared to close the transaction while this 'cloud on title' remained and was prepared to forfeit its deposit paid to Copper Mesa rather than make any further payments under the agreement.[432] Mr Davis testified that Copper Mesa had no choice but to terminate the agreement with Nortec.

4.331.   *24 June 2009* – Copper Mesa issues a press release (repeated in its later financial statements), as required by Canadian securities laws, reporting the cloud on its title to the Chaucha (Janeth 1) concession. Mr Davis testified that Copper Mesa was now insolvent: "… with the Junín Concessions expropriated and the Chaucha and Telimbela projects publicly designated for reversion to the State, there was no longer

---

[427] C-65, C-179, C-18; Mr Davis WS 1 paras 107-108.
[428] C-64.
[429] C-12.
[430] C-65.
[431] Mr Davis WS 1 para 111; Claimant's Memorial para 77.
[432] Para 113.

any prospect of raising any additional financing from a public offering of securities or a sale of its Ecuadorian assets. Nortec's withdrawal from its proposed acquisition of Ascendant Barbados had confirmed that no mining company would be interested in Copper Mesa's Ecuadorian projects and no investors would provide any significant amounts of financing in these circumstances."[433]

4.332.   *25 June 2009* – Nortec issues a material change report, as required by Canadian securities laws, to the effect that its due diligence had confirmed that the Chaucha concession was to revert to the State of Ecuador: It concluded: "… In the circumstances, Nortec decided not to make any further payments until such time as it received confirmation that the Chaucha Property would not be reverted to the State. Nortec still has not received a definitive pronouncement from the Ecuadoran State in this respect." [434] There is here an implication that Nortec initiated an inquiry of the Respondent, but that no response came to it from such inquiry.

4.333.   *July 2009* – Mr Davis is introduced (by Mr Stonehouse) to Biotreat SA ("Biotreat"), an Ecuadorian environmental services company. [435] Mr Davis agrees to appoint Biotreat employees as managers of the project companies while negotiating the terms of the sale of Copper Mesa's interests in Ascendant Barbados.

4.334.   *2009* – Biotreat becomes the sole shareholder of Ascendant Copper.[436]

4.335.   *10 September 2009* – A newspaper article indicates that the Chaucha concession is to be run by MEM and Codelco, the Chilean state mining company.[437]

4.336.   *30 October 2009* – Copper Mesa and Biotreat agree on the sale of Ascendant Barbados.[438] The price is US$200,000, with an assumption of liabilities of the project companies. [439] Biotreat defaults on the payment and only pays the deposit of US$50,000.[440]

---

[433] C-186; C-218 ; Mr Davis WS 1 paras 115-116.
[434] C-67.
[435] Davis WS 1 para 120.
[436] R-56.
[437] C-283.
[438] C-190.
[439] Davis WS 1 para 121.
[440] Davis WS 1 para 122.

4.337. *2009 - Summary:* For all practical purposes, subject to further legal proceedings in Ecuador, the Claimant has lost (for one reason or another) its beneficial interests in the Junín and Chaucha concessions, save for the possibility of a fire-sale of its legal interests in the project companies to one or more third parties.

## 2010

4.338. *28 January 2010* – A new contract of sale of shares in Ascendant Barbados is agreed between Copper Mesa and Biotreat.[441] The shares are not transferred as Biotreat fails to pay the balance of the purchase price.[442] Hence, as a matter of Ecuadorian law, the Claimant has not lost its legal interests in the three project companies.

4.339. *8 February 2010* – The Ministry of Mining advises DosRios to renew its mining title to the Chaucha (Janeth 1) concession in accordance with the Mining Law 2009.[443]

4.340. *17 February 2010* – DosRios applies for a new mining title to the Chaucha concession (Janeth 1) under the Mining Law 2009.[444]

4.341. *29 March 2010* – DosRios presents a yearly investment plan and schedule of works.[445] It also refers to difficulties caused by the suspension of its activities.

4.342. *23 April 2010* – A new (substituted) mining title is issued by MEM to DosRios for the Chaucha (Janeth 1) concession.[446]

4.343. *July 2010* – Copper Mesa's shares cease to trade in Canada.[447]

4.344. *24 August 2010* – The Constitutional Court rejects Copper Mesa's appeal from the dismissal of its application for extraordinary protection.[448]

---

[441] C-192.
[442] Claimant's Memorial para 106, C-194, C-201, C-195, Davis WS 1 para 124.
[443] R-91.
[444] R-92.
[445] R-93.
[446] R-94.
[447] Claimant's Statement of Case para 74, Davis WS 1 para 118.
[448] C-64.

**2011**

4.345.   *24 February 2011* – The Telimbela concession is terminated (archived) by MEM – no renewal of title had been sought by the project company.[449]

4.346.   *22 May 201*1 – Empresa Nacional Minera Enami EP (ENAMI), the Respondent's national mining company, applies for concessions in Junín, including Golden 1 and Golden 2.[450]

4.347.   *13 June 2011* – The Mining and Control Agency (ARCOM) informs ENAMI that the Junín concessions (Golden 1 and 2) are "free and available, so that ENAMI EP can exercise the preferential right identified in the Law".[451]

4.348.   *21 July 2011* – The Ministry of Non-Renewable resources names the Junín and Chaucha concessions as potential projects for ENAMI.[452]

4.349.   *19 September 2011* – A newspaper article quotes the Deputy Minister of Mines, (Federico Auquilla) as saying that the state mining company of Chile would begin exploration activities in Junín and is also interested in Chaucha.[453] The National Mining Sector Development Plan 2011-2015 refers to Junín, as its largest resource.[454]

4.350.   The interests shown by ENAMI and the Chilean state mining company in Junín take place in 2011 long after Copper Mesa's loss of its Junín and Chaucha concessions, i.e. with the Termination Resolutions of 12 November 2008 and the events of June 2009 respectively.

4.351.   By this time, Copper Mesa had begun these arbitration proceedings, by its Notice of Arbitration dated 21 January 2011.

4.352.   *Checklist:* Accordingly, the Tribunal has here decided, in substance, the principal issues listed in Part 2 above, under Paragraphs 2.3 to 2.5.

---

[449] R-96.
[450] C-141.
[451] C-71.
[452] C-197.
[453] C-200.
[454] C 199.

## PART 5 – JURISDICTION AND ADMISSIBILITY

*A: Introduction*

5.1.    It is necessary briefly to summarise the Parties' respective submissions before setting out the Tribunal's analyses and decisions on the issues of jurisdiction and admissibility. In addition, as an international tribunal, the Tribunal is required to check and, if applicable, confirm its jurisdiction to decide the Parties' dispute.

5.2.    In brief, the Claimant submits that the Respondent has given its unconditional consent to the submission of this dispute to international arbitration in accordance with Article XIII(5) of the Treaty, and that, in initiating this arbitration, the Claimant has fully complied with the relevant requirements of Article XIII of the Treaty.

5.3.    On 20 July 2010, invoking Article XIII(2) of the Treaty, the Claimant sent a written Notice of Dispute to Ecuador as the named Respondent which alleged that measures taken or not taken by Ecuador were in breach of the Treaty; that the Claimant had incurred loss or damage by reason of those breaches; and that the Claimant was therefore requesting monetary compensation from Ecuador. In response, by letter dated 2 August 2010, Ecuador acknowledged receipt of the Claimant's Notice of Dispute on 23 July 2010. The Claimant submits that more than six months passed before it commenced arbitral proceedings against the Respondent by its Notice of Arbitration dated 21 January 2011 pursuant to Article XIII(4)(c) of the Treaty.[1]

5.4.    In brief, the Respondent does not dispute these factors. However, the Respondent has challenged the jurisdiction of this Tribunal, contending that: (i) the Claimant failed to comply with Article XIII(12) of the Treaty by not obtaining the consents and waiver of other remedies from the Ecuadorian project companies that the Claimant contends sustained damage, and (ii) the Claimant failed to establish that it had made any investments in Ecuador that would qualify for protection under the Treaty.[2] The Respondent contends that the claims of the Claimant relating to the Junín concessions fall outside the Tribunal's jurisdiction because: (i) these were not investments made

---

[1] Claimant's Statement of Claim paras 89-92; Claimant's Memorial paras 244-247.
[2] Respondent's Statement of Defence para 77; Respondent's Counter-Memorial para 273.

and operated in accordance with the applicable law (Ecuadorian law); and (ii) the Claimant is approaching this Tribunal with "unclean hands" (under international law). The Respondent further contends that the Claimant has not proven ownership of the Ecuadorian project companies at critical dates.[3]

5.5.   The Claimant, on the contrary, submits that this Tribunal has jurisdiction and that it has met all the requirements for the Tribunal's jurisdiction under the Treaty: *ratione temporis, ratione personae* and *ratione materiae*.

5.6.   As to *ratione temporis*, the Claimant contends that the measures at issue relate to events subsequent to the entry into force of the Treaty on 6 June 1997.[4] As to *ratione personae*, the Claimant contends that it (Copper Mesa) is an enterprise incorporated or duly constituted in accordance with applicable laws of Canada and therefore a Canadian "investor" as defined in Article I(h)(ii) of the Treaty. Copper Mesa was incorporated on 5 May 2004, and it acquired its Ecuadorian investments before the existence of any dispute with Ecuador and owned them (indirectly) at the time of all the impugned measures.[5] The Claimant submits that it elected to submit this dispute to arbitration on its own behalf, which it claims is permitted by the Treaty.[6] As to *ratione materiae*, the Claimant contends that its indirect interests in the project companies are "investments" in the territory of Ecuador as defined in Article I(g) of the Treaty; and, further, that indirect ownership through Ascendant Barbados (Ascendant Copper (Barbados) Corporation) is expressly permitted by this provision to qualify as an "investment".[7]

5.7.   These project companies are identified by the Claimant as Ascendant Copper Ascendcopper S.A. ("Ascendant Ecuador" or "AE"), Compañía Minera DosRíos S.A. and Compañía Minera Telimbela S.A. as the concessionaires of, respectively, the Junín, Chaucha and (subject to the option's exercise) Telimbela concessions.

---

[3] Respondent's Counter-Memorial paras 273-275.
[4] Claimant's Statement of Claim para 81; Claimant's Memorial para 244.
[5] Claimant's Statement of Claim para 82; Claimant's Memorial para 244.
[6] Claimant's Statement of Claim paras 93-94; Claimant's Memorial paras 248-250.
[7] Claimant's Statement of Claim paras 83-88; Claimant's Memorial para 244.

5.8.     It is appropriate next to break down the Respondent's jurisdictional objections and the Claimant's responses under four separate headings: Article XIII(12) of the Treaty, Continued Ownership, Illegality and Unclean Hands.

**B: Article XIII(12) of the Treaty**

5.9.     The Respondent's principal jurisdictional objection is based on Article XIII(12) of the Treaty. According to the Respondent, the Claimant is bringing a claim under Article XIII(12)(a) concerning damage to the (alleged) local subsidiaries of the Claimant in Ecuador (i.e. the three project companies), and not a claim under Article XIII(3). Therefore, according to the Respondent, the Claimant must comply with the requirements of Article XIII(12) and the local subsidiaries must separately consent to arbitration and waive any rights each may have under the local law (here Ecuadorian law) against the measures taken by the host State (here the Respondent) of which the investor (here the Claimant) complains.[8]

5.10.    In brief, the Respondent submits that Article XIII(12) is an "improved version of a fork-in-the-road clause", establishing a unity of interest between the foreign investor and its local subsidiary. If the latter chooses to initiate or continue local or other proceedings, no claim under the Treaty may be brought by the foreign investor; but if the foreign investor chooses to initiate an arbitration under the Treaty for damages caused to the subsidiary, these proceedings are considered to have been brought on behalf of the local subsidiary. Pursuant to Article XIII(12)(b) of the Treaty, the only exception to these conditions would be when the host State has unlawfully deprived the foreign investor of the control of its local subsidiary.[9] Such is not this case.

5.11.    The Respondent contends that Article XIII(12) seeks to eliminate the risk of parallel litigation as the foreign investor and the local subsidiary have separate legal personalities; and, therefore, each has the capacity to sue in its own right.[10] The Respondent further contends that: "[h]aving elected to organize its investment in Ecuador in the form of local subsidiaries which had their own legal personality and

---

[8] Respondent's Statement of Defence para 80-81; Respondent's Counter-Memorial paras 279-283, 305.
[9] Respondent's Statement of Defence para 82-83; Respondent's Counter-Memorial para 284.
[10] Respondent's Counter-Memorial paras 288-289.

could act in their own name, the Claimant is not entitled to pierce the corporate veil and claim for losses allegedly sustained by those subsidiaries".[11]

5.12.    The Respondent further contends that where a foreign investor has made and operates its investment through a local subsidiary, it may not claim for direct damage to itself under Article XIII(3) of the Treaty; and, in that sense, that Article XIII(12) is intended to be an exclusive (or exhaustive) remedy.[12] The Respondent considers that an investor may bring a claim on its own behalf in the event that it has itself incurred loss or damage as a result of an alleged breach of the Treaty (Article XIII(1) and (2)), only in situations where the foreign investor has *not* established a local subsidiary to operate the investment or where such a subsidiary has been established but the foreign investor has been deprived by the host State of control of the subsidiary, which the Respondent observes has not been claimed by the Claimant in this case.[13] Indeed, again, such is not this case.

5.13.    The Respondent notes that the Claimant could have applied for the mining concessions directly in its own name. It chose to do so indirectly through Ecuadorian legal entities. It could not obtain their consents and waivers when this arbitration began because it had sold those companies.[14] None of this is attributable to the Respondent.

5.14.    As regards Article XIII(3) of the Treaty, the Claimant contends that the claims under the Treaty belong to itself as "the investor"; and that the Treaty allows the Claimant to bring its claim on its own behalf (as it does) for the losses that it has incurred due to the diminution in the value of the shares of its Ecuadorian subsidiaries and due to its inability to recover its inter-company loans to these subsidiaries. The Claimant submits that it has expended itself nearly US$ 26.5 million on the three mining projects in Ecuador, either directly or indirectly by loans to its local subsidiaries. Further, according to the Claimant, Article XIII(12) supplements Article XIII(3) providing for

---

[11] Respondent's Rejoinder para 251.
[12] Respondent's Statement of Defence para 84, 89-91; Respondent's Counter-Memorial paras 276-278, 285-287. The Respondent relies on *Nykomb Synergetics Technology Holdings AB v. v. The Republic of Latvia,* SCC Case No. 118/2001, Award, 16 December 2003 (RLA-22) ["*Nykomb v Latvia*"] para 155 where the tribunal held that loss or damage incurred by a local subsidiary does not equate with loss or damage incurred by its foreign shareholder.
[13] Respondent's Request for Bifurcation para 21; Respondent's Counter-Memorial paras 296-297.
[14] Respondent's Counter-Memorial paras 298-299.

additional remedies that can only be awarded to the "enterprise" and does not diminish in any way the rights and remedies of the "investor" under the Treaty.[15]

5.15.   The Claimant considers that a waiver from a local subsidiary is only required where the investor asserts a remedy that can only be given to the subsidiary under Article XIII(12), such as restitution of the property owned by the subsidiary or payment to the subsidiary of 100% of its loss when the investor owns less than 100% of its shares.[16]

5.16.   The Claimant notes that Article XIII(12) of the Treaty provides that: "a claim […] may be brought by an investor of the other Contracting Party acting on behalf of an enterprise which the investor owns or controls directly or indirectly". It contends that the Respondent's interpretation would transform the permissive text of this provision from "may be brought" to a mandatory "shall be brought", which the Claimant contends was not the intention of the drafters of the Treaty.[17] The Claimant further submits that there is a *jurisprudence constante* under NAFTA, CAFTA and other treaties that include similarly worded requirements to the effect that the ordinary meaning of such provision is to provide investors with additional remedies and not to require them to submit waivers where they have made investments trough local subsidiaries.[18] According to the Claimant, rather than building on "fork-in-the-road" clauses, the Treaty adopts a distinction used in Articles 1116 and 1117 of NAFTA (concluded two years before the signature of the Treaty) between claims that an investor can make on its own behalf and additional claims that it can assert "acting on behalf of an enterprise which the investor owns or controls".[19]

5.17.   The Claimant refers to the NAFTA Chapter 11 arbitration in *UPS v. Canada* where the tribunal dismissed the objection that the claimant could not assert damage on its own behalf under Article 1116 where the impugned measures related solely to the treatment of its local subsidiary, UPS Canada.[20] The Claimant further cites another

---

[15] Claimant's Memorial paras 248-255; Claimant's Reply paras 259-260.
[16] Claimant's Observations on Respondent's Request for Bifurcation para 16; Claimant's Memorial para 254; Claimant's Reply para 262.
[17] Claimant's Memorial paras 252-253, 264.
[18] Claimant's Memorial paras 248-269; Claimant's Reply paras 259-265; Claimant's Post-Hearing Brief para 49.
[19] Claimant's Memorial paras 258-260; Claimant's Reply paras 263-264.
[20] *United Parcel Service of America Inc. v. Canada*, UNCITRAL, Award on the Merits, 24 May 2007 (CLA-4) ["*UPS v Canada*"] para 35: "UPS is the sole owner of UPS Canada. As such, it is entitled to file a claim for its losses, including losses incurred by UPS Canada […] Whether the damage is directly to UPS or directly to UPS Canada and only indirectly to UPS is irrelevant to our jurisdiction over these claims."

NAFTA Chapter 11 arbitration award in *Pope & Talbot v. Canada* where the Tribunal accepted a claim brought by the investor on its own behalf for damages to the local subsidiary that it owned and controlled.[21] It cites the decision of the ICSID annulment committee in *Azurix v. Argentina* to similar effect.[22]

5.18.   The Claimant also refers to *Railroad Development Corporation (RDC) v. Guatemala* where the tribunal awarded proportional damages to the shareholder of the local company for its claims on its own behalf, rather than insisting that the claim could only be brought on behalf of the local company, noting that it had the capacity to tailor the award to avoid double recovery through parallel litigation.[23] The Claimant distinguishes the present case from the situation where, in that case, the claimant had been pursuing local proceedings at the time when arbitration proceedings were started (which is not this case).[24]

5.19.   The Claimant further contends, in the alternative, that if the Tribunal were to find that Article XIII(12) did apply to the Claimant's claims, then Article XIII(12)(b) should also here apply as the Claimant had no choice but to allow Biotreat to take over the de facto management of the project companies in July 2009 as the Respondent's measures had deprived the Claimant of the ability to obtain any financing for the continued operation of these companies, depriving it of control of these companies.[25]

5.20.   The Respondent rejects this alternative argument of the Claimant. It contends that the alleged "loss of control" to Biotreat of the local companies was a result of a voluntary sales transaction without any causal link to measures allegedly taken by the Respondent. Therefore, so the Respondent maintains, the Claimant fails to meet the

---

[21] *Pope & Talbot Inc. v. Government of Canada,* UNCITRAL, Award on Damages, 31 May 2002 (CLA-5) ["*Pope & Talbot v Canada*"] paras 78-80: "Article 1117 is permissive, not mandatory, in its language 'may submit to arbitration' [...] claims may be brought under Article 1116 by an investor who is claiming loss or damage to its interest in the relevant enterprise, which is a juridical person that the investor owns."

[22] Claimant's Memorial paras 268-269; Decision of the Annulment Committee in *Azurix v. Argentina*: "[...] even where the foreign investor is not the actual legal owner of the assets constituting an investment, or not an actual party to the contract giving rise to the contractual rights constituting an investment, that foreign investor may nonetheless have a financial or other interest in that investment. [...] The Committee sees no reason in principle why an investment protection treaty cannot protect such an interest of a foreign investor, and enable the foreign investor to bring arbitration proceedings in respect of alleged violations of the treaty with respect to that interest."

[23] Claimant's Reply para 265. CLA-68 paras 265-266.

[24] Claimant's Post-Hearing Brief para 51.

[25] Claimant's Memorial paras 270-273.

requirements of Article XIII(12) and therefore no valid arbitration agreement exists pursuant to Article XIII(5) of the Treaty.[26]

5.21.   In the event that the Tribunal agrees with the Respondent and finds that the Claimant's claims may be brought only under Article XIII(12), the Claimant presented with its Reply (i.e. after the commencement of this arbitration) the written consents and waivers of each of the project companies ostensibly effective as of the date of the commencement of the arbitration. The Claimant submitted that these waivers were being filed (with its Reply) without prejudice to its primary argument that they are "completely unnecessary". However, the Claimant acknowledges that they do not completely eliminate any remaining risk of parallel litigation, as invoked by the Respondent.[27]

5.22.   The Respondent replies in turn that the Tribunal still lacks jurisdiction *ratione personae,* as (so it maintains) it is a well-established rule under international law that jurisdiction must exist on the date when the arbitration is commenced; and so the Claimant cannot cure at the moment of presenting its Reply the jurisdictional defect that existed when the arbitration was commenced.[28] The Claimant submits, in turn, that cases under the Treaty have allowed valid consents and waivers from a claimant to be filed subsequent to its notice of arbitration.[29]

**C: Continued Ownership**

5.23.   As to the second principal objection by the Respondent to this Tribunal's jurisdiction, relating to the existence of the Claimant's "investment" protected under the Treaty, the Respondent contends that the Claimant's case is based entirely on measures claimed to have affected its alleged local subsidiaries that owned the three mining

---

[26] Respondent's Counter-Memorial paras 311-315.

[27] Claimant's Reply para 266; Claimant's Post-Hearing Brief para 50.

[28] Respondent's Rejoinder paras 253-255. *Railroad Development Corporation (RDC) v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Award, 29 June 2012 (CLA-68) ["*RDC v Guatemala*"]; *Commerce Group Corp. et al v. The Republic of El Salvador*, ICSID Case No. ARB/09/17, Award, 14 March 2011 (RLA-132) ["*Commerce Group et al v El Salvador*"]; and other cases cited in footnote 512 of Respondent's Rejoinder.

[29] Claimant's Post-Hearing Brief para 51; *EnCana Corporation v. Republic of Ecuador*, LCIA Case No. UN3481, UNCITRAL, Partial Award on Jurisdiction, 27 February 2004 (CLA-3) ["*Encana Corporation v. Ecuador*"] para 19.

concessions in dispute. The Respondent contends that the Claimant does not dispute that Biotreat has controlled these subsidiaries since at least July 2009.[30]

5.24.   In brief, according to the Respondent, the Claimant has not proven ownership of any of the assets alleged by the Claimant as constituting its investments in Ecuador on the relevant dates, including the shares indirectly owned by the Claimant (under its present or previous name) in Ascendant Ecuador, DosRios and Telimbela as the project companies.[31] The Respondent submits that the Claimant sold its subsidiaries to Biotreat in January 2010, and accordingly, that only Biotreat may claim thereafter on behalf of these three companies and not the Claimant.[32] Further, the Respondent challenged the acquisition of Ascendant Barbados by the Claimant (which owned the project companies).[33] As to the three concessions, the Claimant never owned them directly, but only indirectly through Ascendant Barbados and the local project companies.[34]

5.25.   In brief, the Claimant contends that the Respondent seeks to impose a non-existent jurisdictional requirement of continuous ownership of the investment beyond the date of the impugned measures and up to the date of submission of the claim in this arbitration. The Claimant refers to the plain text of Article I(h) of the Treaty defining the term "investor" as including a Canadian enterprise "who *makes* the investment in the territory of the Republic of Ecuador". The Claimant contends that the Respondent's interpretation would be substituting the word "makes" with "holds" or "owns".[35] The Claimant further cites the Tribunal in *Encana v. Ecuador* deciding that "[p]rovided loss or damage is caused to an investor by a breach of the Treaty, the cause of action is complete at that point; retention of the subsidiary […] serves no purpose as a jurisdictional requirement […]"[36] and "[t]o require the claimant to maintain a continuing status as an investor under the law of the host State at the time the

---

[30] Respondent's Statement of Defence paras 85-86; Respondent's Counter-Memorial para 307.
[31] Respondent's Statement of Defence para 92-103.
[32] Respondent's Counter-Memorial paras 306-310.
[33] Respondent's Counter-Memorial paras 319-323.
[34] Respondent's Counter-Memorial para 298.
[35] Claimant's Memorial paras 274-276.
[36] Claimant's Memorial para 277; CLA-11 para 131.

arbitration is commenced would tend to frustrate the very purpose of the BIT".[37] The Claimant also refers to *GEA v. Ukraine* and related doctrine in support of its case.[38]

5.26.   Further, the Claimant submits that it has provided evidence of its indirect ownership of the project companies at the relevant times, prior to the Nullification Resolutions in January 2008 up to the termination of the Nortec transaction in June 2009. It relies upon the share certificates and the share register of Ascendant Barbados, as well as the legal opinion on Barbadian law of Ascendant Barbados' counsel, the share certificates of the project companies, mandatory filings in Ecuador, shareholders' resolutions and legal opinions issued prior to the Nullification Resolutions and the termination of the Nortec transaction.[39]

5.27.   In the alternative, should the Tribunal require continuous ownership of the project companies up to the date of the submission to arbitration, the Claimant submits that it has proven that Ascendant Barbados' sale to Biotreat was never completed. And in the further alternative, should the Tribunal find that such sale was completed, the Claimant insists that it would nevertheless have a residual interest with respect to the amounts still owed to it by Biotreat under such sale.[40] Similarly, should the Tribunal decide that Article XIII(12) creates a requirement of continuous ownership to the date of the submission to arbitration, the Claimant presented with its Reply the addendum to the share purchase agreement between the Claimant and Biotreat dated 11 February 2013,[41] whereby Biotreat formally acknowledged that it did *not* obtain ownership of Ascendant Barbados prior to the date of this arbitration. The Claimant also refers to the formal declarations by the general managers of the project companies confirming that prior assertions of a transfer of ownership to Biotreat in 2010 were invalid.[42] In addition, the Claimant disagrees with the Respondent's argument that the signing of the share purchase agreement instantly transferred title to the shares in Ascendant Barbados and the project companies. According to the Claimant, the share purchase agreement creates the right to acquire and the corresponding obligation to transfer the

---

[37] Claimant's Memorial paras 278; CLA-11 para 132.
[38] Claimant's Memorial paras 279-280.
[39] Claimant's Memorial paras 281-283.
[40] Claimant's Memorial paras 285-286.
[41] Exhibit C-334.
[42] Claimant's Reply para 268.

shares; however, only the delivery of the shares produces the effective transfer of the right to the assets; and such transfer never occurred.[43]

5.28.  The Respondent contends that this agreement of 11 February 2013 between the Claimant and Biotreat is only a later "addendum" to the share purchase agreement and cannot change the historical fact that the agreement to transfer Ascendant Barbados' legal and beneficial interest in the three Ecuadorian subsidiaries to Biotreat was concluded on 30 October 2009. The Respondent submits that pursuant to the share purchase agreement, the Ecuadorian subsidiaries were under Biotreat's effective control; and that, accordingly, the Claimant lost control and title to these subsidiaries on 28 January 2010, before the commencement of this arbitration.[44]

### D: Legality of Ownership

5.29.  The Respondent's third jurisdictional objection raises the issue of illegality. In brief, the Respondent submits that, even assuming that the Claimant had made investments in Ecuador, those investments are tainted by illegality under both Ecuadorian law and public international law, arguing that the concessions were acquired on the basis of illegally obtained information and that they were illegally awarded and illegally transferred to the Claimant. Moreover, the conduct of the Claimant's alleged subsidiaries, as well as that of its agents and employees, amounts, so the Respondent submits, to severe breaches of legal principles governing corporate social responsibility and is contrary to international public policy, including the UN Global Compact, the OECD Guidelines and the Voluntary Principles.[45] The Respondent contends that according to Article I(g) of the Treaty, only lawful investments are protected under the Treaty.[46]

5.30.  The Respondent submits that the Treaty only protects investments "owned or controlled either directly, or indirectly through an investor of a third State, by an investor of one Contracting Party in the territory of the other Contracting Party *in accordance with the latter's laws*".[47] The Respondent contends that the Claimant's investment relating to the Junín concessions were made in a manner not in accordance

---

[43] Claimant's Reply paras 269-274; Tobar Report paras 14, 17, 55.
[44] Respondent's Rejoinder para 255.
[45] Respondent's Request for Bifurcation para 43; Respondent's Counter-Memorial paras 324-341.
[46] Respondent's Request for Bifurcation para 42.
[47] Respondent's Counter-Memorial paras 342-346.

with the laws of Ecuador, as the Claimant was fully aware that these concessions were obtained under a "rigged" tender process. The Respondent further contends that these concessions were also not operated in accordance with Ecuadorian law as the Claimant engaged in a series of unlawful activities violating Ecuadorian law and international law, as well as international public policy.[48]

5.31.   In brief, the Claimant contends that Article I(g) of the Treaty requires that the ownership or control of the investment made by the claimant must be determined in accordance with the law of the host State;[49] but that the Treaty does not require compliance with local laws during the "management, conduct or operation" of that investment, which is the language is used in Article IV(1) of the Treaty. Hence, so the Claimant submits, these different words must be given different meanings.[50] Had the Contracting Parties to the Treaty intended the broader meaning alleged by the Respondent, they would have specifically used the word "operated", at least, rather than the word "controlled".[51]

5.32.   The Claimant also contends that the Respondent's broad interpretation would lead to absurd results where any breach of the host State's laws at any point during the entire period of the management, conduct or operation of a long-term investment (as were the concessions) would preclude the investor from obtaining any relief under the Treaty, even if the single breach of the host State's laws was wholly unrelated to the merits of the claim. The Claimant concludes that "very few businesses that operate in a country for a long period of time will have such a pristine legal record".[52]

5.33.   The Respondent submits that the Claimant's submission is contrary to the general rule of treaty interpretation as set out in Article 31 of the Vienna Convention on the Law

---

[48] Respondent's Counter-Memorial paras 347-348.
[49] Claimant's Post-Hearing Brief para 67.
[50] Claimant's Post-Hearing Brief para 68.
[51] Claimant's Reply paras 289-294; Claimant's Post-Hearing Brief paras 70-71. The Claimant also refers to *Vannessa Ventures Ltd v. Venezuela*, ICSID Case No. ARB(AF)/04/6, Award, 16 January 2013 (CLA-69) ["*Vannessa Ventures v Venezuela*"] where applying a treaty using similar language as in this case, the tribunal held that "the jurisdictional significance of the 'legality requirement' in the definition of an investment [...] is exhausted once the investment has been made" (para 167); and to *Alasdair Ross Anderson et al. v. Costa Rica*, ICSID Case No. ARB(AF)/07/3, Award, 19 May 2010 (RLA-44) ["*Anderson et al. v. Costa Rica*"] where again applying a treaty using similar language, the tribunal merely found that "the transaction by which the Claimant obtained ownership of their assets" violated Costa Rican law, without considering the conduct by the claimants after the initial transaction was concluded (para 57).
[52] Claimant's Reply para 299.

of the Treaties. That requires treaties to be interpreted "in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of its object and purpose".[53] According to the Respondent, the legality requirement under Article I(g) of the Treaty covers investment "owned or controlled" and not only "made" in accordance with the law of the host State.[54] The Respondent submits that it has "identified a long list of actions taken by the Claimant that were in breach of the applicable Ecuadorian law".[55]

5.34.    In support of its interpretation, the Respondent relies on *Inceysa v. El Salvador* where the tribunal denied jurisdiction on the basis that the investor had obtained a concession fraudulently,[56] and on *Fraport v. Philippines I* where the tribunal decided that it lacked jurisdiction because the investment had not been accepted in accordance with the laws of the host State.[57] The Respondent also relies on the principle *nemo auditur propiam turpitudinem allegans* ("no one may be heard to benefit from their own wrong") and submits that the investor cannot seek to benefit from an investment effectuated by means of illegal acts and also enjoy the protection granted by the host State.[58]

5.35.    The Claimant contends that the cases cited by the Respondent apply this principle only at the time of the acquisition of the investment and not to the operation of the investment subsequent to its acquisition by the investor.[59] Further, the Claimant submits that the Respondent has not identified with any precision the provisions of Ecuadorian law that the Claimant or its subsidiaries has contravened, either of Ecuador's Criminal Code or its other legislation.[60]

---

[53] Respondent's Rejoinder paras 257-258.
[54] Respondent's Rejoinder paras 259-264.
[55] Respondent's Rejoinder paras 266-268; Respondent's Counter-Memorial paras 325-326.
[56] Respondent's Counter-Memorial para 349; *Inceysa v El Salvador* paras 101-128.
[57] Respondent's Counter-Memorial paras 354; *Fraport AG Frankfurt Airport Services Worldwide v. Philippines*, ICSID Case No. ARB/03/25, Award and Dissenting Opinion of Mr. Bernardo M. Cremades, 16 August 2007 (Exhibit CLA-25) ["*Fraport v Philippines I*"] para 281 (this part of the tribunal's award was not materially queried by the subsequent proceedings in *Fraport v Philippines II*.). The Respondent also cites *Anderson et al. v. Costa Rica* para 55, and *Gustav F W Hamester GmbH & Co KG v. Republic of Ghana*, ICISD Case No. ARB/07/24, Award, 18 June 2010 (RLA-45) ["*Hamester v Ghana*"] paras 126-127, holding similar decisions.
[58] Respondent's Counter-Memorial paras 350-351; RLA-5 paras 240, 242, 244; Respondent's Rejoinder paras 269-271
[59] Claimant's Reply paras 301-302.
[60] Claimant's Post-Hearing Brief paras 72-76.

*E: Unclean Hands*

5.36.   According to the Respondent, the Claimant's claims are inadmissible *ratione materiae* as the Claimant approaches the Tribunal with "unclean hands" having failed to comply with applicable Ecuadorian and international laws. [61] This fourth jurisdictional objection relates only to the Junín concessions. In its post-hearing brief, the Respondent re-confirmed that its case on "unclean hands" only applies to the Claimant's claims concerning the Junín concessions and not to the Chaucha and Telimbela concessions. [62]

5.37.   In brief, according to the Claimant, the Respondent is estopped from raising any case based on "unclean hands", because it failed at the material time to investigate any "unclean hands" committed by the Claimant. [63] The Claimant submits that no contemporary statement was ever made by the Respondent or its officials regarding any alleged violations of human rights by the Claimant prior to this arbitration. [64]

5.38.   Further, the Claimant contends that the "scope of this doctrine is limited to cases where the claimant is seeking a remedy of an equitable nature but is involved in on-going conduct that is precisely similar in fact and law as the conduct it seeks to prevent". [65]

5.39.   In brief, the Respondent contends that the Claimant's narrow interpretation of the doctrine of "unclean hands" would limit the doctrine to cases where equitable relief was sought, which, so the Respondent contends, is wrong as a matter of international

---

[61] Respondent's Counter-Memorial paras 361-376.

[62] Claimant's Post-Hearing Brief para 48; Transcript, Day 6, 1241:22-1243:7.

[63] Claimant's Post-Hearing Brief paras 52-53; *Wena Hotels Limited. v. Arab Republic of Egypt,* Award, 8 December 2000 (CLA-32) ["*Wena Hotels v Egypt*"] paras 111-117; *Niko Resources (Bangladesh) Ltd. v. Bangladesh Petroleum Exploration & Production Company Limited ("Bapex") and Bangladesh Oil Gas and Mineral Corporation ("Petrobangla")*, ICSID Case Nos. ARB/10/11 and ARB/10/18, Decision on Jurisdiction, 19 August 2013 (CLA-88) ["*Niko Resources v Bangladesh*"] para 484.

[64] Claimant's Post-Hearing Brief paras 55-66, 125-126. According to the Claimant, the letter from the Ministry of Mining of June 2006 and the four letters of 2007 cited by the Respondent in its Rejoinder do not contain allegations of violations of human rights; nor do the Suspension, Nullification and Termination Resolutions do not do so either. The Claimant also contends that Ms. Ruiz testified that she did not make any written complaints regarding human rights violations by the Claimant to the relevant Ecuadorian authorities (Transcript, Day 4, 683:13-25), ████ ████████████████████████████ The Claimant further contends that it has "met the test that even Professor Murphy argues is applicable for a company to 'respect' human rights. It did not knowingly become complicit in any use of force, [it] investigated the complaints of human rights abuses [and] took remedial actions to avoid any further confrontation by terminating both Falericorp and H&L after the incident became known to it." (Mr. Davis' testimony, Reply paras 93, 96-112; Transcript, Day 2, 530:13).

[65] Claimant's Reply para 307.

law.[66] The Respondent submits that the doctrine also applies in at least two other situations, namely, (i) "where the respondent's allegedly unlawful conduct is a consequence of, or has been prompted by, the claimant's own unlawful conduct"; and (ii) "where the claimant's claim arises out of actions or circumstances that are tainted by the claimant's own international illegality or conduct that is incompatible with international public policy".[67] The Respondent submits that the latter is the present situation; and that, in any case, it is well-established under international law that the scope of application of the relevant legal principle ("unclean hands", *nemo auditur, ex injuria non oritur*, etc.) is not limited to the making of the investment.[68]

5.40.   In response, the Claimant contends that none of these doctrines can be used to expand the scope of the relevant inquiry to cover all aspects of the conduct of a claimant or its investment, as a matter of jurisdiction under international law.[69] According to the Claimant, however broad the doctrine, the Respondent is now estopped from denying the validity of the Junín concessions.[70]

5.41.   The Claimant contends that not all actions relating to these concessions' acquisition or operation can be relevant. It would require a substantial non-compliance with the host State's laws and regulations, which the Claimant contends is not the present case and

---

[66] Respondent's Rejoinder paras 272-274.

[67] Respondent's Rejoinder paras 275-276.

[68] Respondent's Rejoinder paras 276-291. *Mr X, Buenos Aires v. Company A*, ICC Case No. 1110, Award, 1963; *SAUR International S.A. v. Argentina, ICSID Case No. ARB/04/4*, Decision on Jurisdiction and Liability (RLA-141) ["*SAUR International v Argentina*"]; *World Duty Free Company Limited v. Kenya*, ICSID Case No. ARB/00/7, Award, 25 September 2006 (RLA-37) ["*World Duty Free v Kenya*"]; *Plama Consortium Limited v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Decision on Jurisdiction, 8 February 2005 (RLA-82) ["*Plama v. Bulgaria*"]; Mr Cremades' Dissenting Opinion in *Fraport v Philippines I*; *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan,* ICSID Case No. ARB/05/16, Award, 29 July 2008 (CLA-23) ["*Rumeli v Kazakhstan*"]; International Law Commission, "Second Report on State Responsibility by James Crawfor, Special Rapporteur", 3 May-23 July 1999, A/CN.4/498/Add.2 (RLA-73) ["ILC Second Report"] paras 314-334; James Crawford, THE INTERNATIONAL LAW COMMISION'S ARTICLES ON STATE RESPONSIBILITY, INTRODUCTION, TEXT AND COMMENTARIES (Cambridge Univ. Press 2002) (RLA-103, RLA-142) ["Crawford ILC Commentary"] pp 160-162. See also Professor Murphy's Second Report paras 7, 13, 15-18, 20-21, and the cases there cited, including *Rumeli v Kazakhstan* para 340 and *SAUR v. Argentina* para 310.

[69] Claimant's Reply para 300; Claimant's Post-Hearing Brief paras 77-85; *Teinver SA et al. v. Argentine Republic,* ICSID Case No. ARB/09/1, Decision on Jurisdiction, 21 December 2012 (CLA-70) ["*Teinver v Argentina*"] para 330; *Archer Daniels Midland Company and Tate & Lyle Ingredients Americas, Inc. v. The United Mexican States,* ICSID Case No. ARB (AF)/04/5 (NAFTA), Award (Redacted Version), 21 November 2007 (CLA-43) ["*ADM v. Mexico*"] paras 168-180; *Niko Resources v Bangladesh* para 484.

[70] Claimant's Memorial paras 287-291; *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary, ICSID Case No. ARB/03/16,* Award, 2 October 2006 (CLA-19) ["*ADC v Hungary*"] para 475; *Ioannis Kardassopoulos and Ron Fuchs v. The Republic of Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, 6 July 2007 (CLA-20) ["*Kardassopoulos v Georgia*"] para 194; Claimant's Reply para 329.

which the Respondent has not proven.[71] The Claimant further contends that the alleged tender "rigging" in the Respondent's original grant of the Junín concessions is based purely on speculation by the Respondent; and, furthermore, that the Respondent nonetheless decided at the time to grant the concessions, instead of cancelling the tender.[72]

5.42.  The Respondent replies that it does not contend that "any breach" of the law is relevant and that "a trivial violation of the law that is unrelated to the merits would not be relevant". However, the Respondent contends that such is not the case here. The Respondent submits that the Claimant and its subsidiary, Ascendant Ecuador, "have committed flagrant breaches of Ecuadorian and international human rights law and international public policy" in circumstances that are not "unrelated to the merits of the claim", rather "the Claimant's claim arise directly out of the circumstances in which the breaches were committed and thus form the very subject matter of the dispute before this Tribunal".[73] Further, the Respondent contends that it is not estopped from challenging the Claimant's claims on the basis of illegality.[74]

### F: The Tribunal's Analyses and Decisions

5.43.  The Treaty was signed on 29 April 1996; and it came into force on 6 June 1997. The Claimant was a legal person organised under Canadian law on 5 May 2004. As further explained below, the Claimant owned, indirectly, the three project companies from July 2004 onwards, up to and including the Termination Resolutions (12 November 2008) in regard to the Junín concessions and also the events of June 2009 regarding "a cloud on title" in regard to the Chaucha concession (with the Telimbela concession). Accordingly, the Claimant made its alleged investments in Ecuador in July 2004 onwards, through its intermediary subsidiary (Ascendant Barbados), a legal person formed under Bajun law.

5.44.  The Claimant's investments thus took place before the alleged measures taken by the Respondent in 2008 and 2009 allegedly in breach of the Treaty, allegedly causing legal harm to the Claimant. They also took place long before the Claimant's Notice of Dispute of 20 July 2010 and the commencement of this arbitration on 21 January 2011.

---

[71] Claimant's Reply para 333.
[72] Claimant's Memorial paras 293-302.
[73] Respondent's Rejoinder paras 296-297. See also Professor Murphy's Second Report para 44.
[74] Respondent's Rejoinder paras 303-310.

Further, the Tribunal accepts the Claimant's case that, *de jure*, the Claimant's transactions with Biotreat in 2009 did not deprive the Claimant of its investments before this arbitration's commencement. Hence, the Tribunal finds there was continuous legal ownership by the Claimant of its investments from 2004 up to 21 January 2011.

5.45.   There remains an issue as to exactly when Ascendant Copper (Barbados) Corporation was formed in Barbados. The Respondent at first submitted that it was formed *after* the date of its "acquisition" by the Claimant in May 2004 and, hence, that such acquisition was a legal impossibility. The Respondent then pointed (in particular) to the Bajun company's certificate of incorporation dated 28 September 2004.[75] That jurisdictional objection was then modified following the Claimant's filing of the legal opinion of Ms Hyde Porchetta on Bajun company law.

5.46.   The Tribunal notes first that this issue was first raised by the Respondent in this arbitration. In all its previous dealings with the Claimant, the Respondent had never sought to challenge the Claimant's indirect ownership and control of its Ecuadorian project companies. Moreover, it would be fair to describe the Respondent's modified objection as, at best, purely technical: there can be no suggestion of bad faith or manipulation by the Claimant of the corporate structures by which it held its investments in Ecuador. Yet, even a technical objection as to jurisdiction requires the Tribunal's consideration.

5.47.   This issue of the Claimant's direct ownership of Ascendant Barbados, with the Claimant's indirect ownership (through the Bajun company) of the Ecuadorian project companies, is a long and complicated story. The details are not here important. Ultimately, it arrrives, subject to the precise date in 2004 of the Claimant's completed acquisition of the Bajun company (itself immaterial to this case), at the same result: the Claimant indirectly owned and controlled the Ecuadorian project companies from at least the end of 2004 up to at least the dates of the measures in 2008 and 2009 impugned by the Claimant and, further, up to the date of this arbitration's commencement in January 2011, as a matter of Canadian, Bajun and Ecuadorian laws, as applicable to the Claimant, Ascendant Barbados and the project companies. The

---

[75] R-35.

Tribunal concludes such ownership continued, *de jure*, up to the date of this arbitration's commencement.

5.48.   Accordingly, subject only to what follows, the Tribunal decides that the Claimant has met the jurisdictional requirements of the Treaty, as regards *ratione temporis*, *ratione personae* and *ratione materiae*. The Tribunal next addresses the distinct jurisdictional objections made the Respondent, under three separate headings: Article XII of the Treaty; Illegalities; and Unclean Hands.

5.49.   *Article XIII:* The Tribunal considers that the Claimant has complied with the formal requirements of Article XIII(3) & (4)(c) of the Treaty, with the UNCITRAL Arbitration Rules, for commencing this arbitration against the Respondent. Moreover, the Tribunal does not understand the Respondent to contend otherwise.

5.50.   The Tribunal considers that the Claimant is entitled, as a matter of jurisdiction and admissibility, to advance its own claims against the Respondent, in respect of its own investments in Ecuador pursuant to Article XIII(1) and (2) of the Treaty. The Tribunal also considers that is what the Claimant has done in this arbitration for its primary claims: it has not there sought to advance or espouse any claim in the name of any its subsidiaries; and it is only claiming compensation for harm which it has itself suffered and not any harm suffered by its subsidiaries. That was re-confirmed, unambiguously, by the Claimant in its post-hearing brief.[76] Although, in case its primary claim failed, the Claimant also advanced an alternative claim under Article XIII(12) of the Treaty, that alternative subsidiary claim was made only in response to the Respondent's jurisdictional objection to its primary claims. In the circumstances, this alternative claim is otiose and need not here be considered further by the Tribunal.

5.51.   It is nonetheless correct that, during these arbitration proceedings, many of those subsidiaries' names have often been used by the Parties interchangeably with the successive names of the Claimant. Yet, that shorthand, made for ease of reference only to avoid unnecessary confusion, cannot change the formal status of the Claimant's pleaded claims against the Respondent under Article XIII(1) and (2) of the Treaty. In the Tribunal's view, these are all claims pleaded against the Respondent by the Claimant alone, in its own right and on its own behalf for its own harm to its own

---

[76] Claimant's Post-Hearing Brief para 49.

investments. For that purpose, as a matter of jurisdiction, the Claimant does not advance any claim on behalf of any of the project companies; and it does not need to place any reliance upon Article XIII(12) of the Treaty.

5.52.   In this regard, the Tribunal notes, with approval, the important distinction drawn by the NAFTA tribunal in *UPS v Canada* between Articles 1116 and 1117 of NAFTA, on wording broadly similar to Article XIII(2) and Article XIII(12) of the Treaty. In that NAFTA award, that tribunal there decided:[77]

> "[34]. UPS argues that Canada's objection is not well taken. UPS asserts that it has properly brought its claims under article 1116, that it is entitled to claim for losses incurred by a wholly owned subsidiary, that this has been recognized by other NAFTA tribunals, and that it should be allowed the election between claims under article 1116 and article 1117. UPS joins issue with Canada respecting the decisions of other NAFTA tribunals, directly contradicting Canada's reading of NAFTA tribunal decisions in the *Mondev* case and in *Pope & Talbot Inc v Canada,* Award in Respect of Damages (31 May 2002). If this Tribunal does not accept its contentions respecting the construction of article 1116, UPS asks that it be permitted to modify its claim as a claim under article 1117.

> [35]. We agree with UPS that the claims here are properly brought under article 1116 and agree as well that the distinction between claiming under article 1116 or article 1117, in the context of this dispute at least, is an almost entirely formal one, without any significant implication for the substance of the claims or the rights of the parties. UPS is the sole owner of UPS Canada. As such, it is entitled to file a claim for its losses, including losses incurred by UPS Canada. If there were multiple owners and divided ownership shares for UPS Canada, the question of how much of UPS Canada's losses flow through to UPS – the question posed by Canada here – may have a very different purchase. As it is, there is no reason to ask that question in the instant proceeding. Whether the damage is directly to UPS or directly to UPS Canada and only indirectly to UPS

---

[77] *UPS v Canada* paras 34-35.

is irrelevant to our jurisdiction over these claims. That is clearly the same position taken by the tribunal in the *Pope & Talbot* proceeding …"

The Tribunal considers it unnecessary to add a list of further decisions comprising, on this point, an effective *jurisprudence constante* to like effect.

5.53. In these circumstances, no question can arise here as to any requirement imposed by Articles XIII(1) and (2) of the Treaty upon the Claimant to obtain the consents or waivers of its subsidiaries in commencing this arbitration against the Respondent. In the Tribunal's view, the requirements of Article XII(12)(a) of the Treaty are simply not applicable to the Claimant's case under Articles XIII(1) and (2). It is therefore unnecessary to consider further the Respondent's submission that Article XII(12) operates as an improved or exclusive 'fork-in-the-road' provision.

5.54. *Illegalities:* As regards violations of Ecuadorian law, in the Tribunal's view, the wording of the Treaty is confined, at most, to a jurisdictional bar applying to the time when the Claimant first made its investment. That was in 2004. The wording of Article 1(g) of the Treaty is clear: the phrase "in accordance with the latter's laws" qualifies the earlier concept of the investment's ownership and control when made; and it does not extend to the subsequent operation, management or conduct of an investment.

5.55. Not only is any such wording significantly absent from Article 1(g), but it would take clear wording to produce such an important jurisdictional bar. It would effectively deprive an investor from exercising any arbitral remedy under the Treaty if the investor (or its agents or employees) ever committed a breach of the host State's laws during the life of its investment. That would be a stark and potentially harsh result, severely limiting the legal autonomy of the arbitration agreement between an investor and a host State resulting from Article XIII(4) of the Treaty.

5.56. The Respondent, of course, readily accepts that no jurisdictional bar could arise from a minor breach of the local law; and that concession was necessarily made. For example, an employee of the investor cycling to work in the dark without a rear light (in contravention of local traffic laws) should not deprive that investor forever of its arbitral remedy under the Treaty. However, the Respondent's broad interpretation, however tailored, would still leave a significant lack of clarity as to the exact dividing-line between minor and non-minor violations of the local law. It would also produce

much room for debate in activities that are almost inevitably litigious, such as mining. Where illegal conduct remains relevant to the merits of an investor's claim under the Treaty, without clear language, there is here no discernable object or purpose in elevating such a defence into a jurisdictional bar. The Tribunal notes that the same interpretation, on similar wording in the Canada-Venezuela BIT, was reached by the ICSID tribunal in *Vannessa Ventures v Venezuela.* It there decided that the jurisdictional significance of the requirement of legality was exhausted once the investment was made.[78]

5.57.   Accordingly, with the Tribunal's interpretation based on the wording used in the Treaty, interpreted with its ordinary meaning under Article 31 of the Vienna Convention on the Law of Treaties, the Respondent's case is limited to the time of the Claimant's original investment in acquiring the Junín concessions. There seems to be, as already noted, no similar case advanced by the Respondent in regard to the Chaucha and Telimbela concessions.

5.58.   As recited in Part 4 above, as to the facts, the Tribunal rejects the Respondent's submissions that the Claimant acquired the Junín concessions in violation of Ecuadorian law, assessed at the time when the Claimant made its initial investment in 2004. It also accepts the testimony of the Claimant's expert witness on Ecuadorian law, Dr Zumarraga, to the effect that the Junín concessions were validly granted by the Respondent.[79]

5.59.   On all these matters, the Respondent bore the legal burden of proving its positive allegations. At most, it could only allege that something was possibly awry with the original tender and grant of the Junín concessions to Dr Bustamante in 2003. That allegation was not proven on the evidence adduced before this Tribunal. Moreover, there was no cogent evidence linking Dr Bustamante's actions in 2003, even assuming them to be somehow unlawful or collusive, with Ascendex, any other of the project companies or (still less) the Claimant in 2004. The Tribunal does not accept, on the evidence, that the acquisition of the Junín concessions was made otherwise than in

---

[78] *Vannessa Ventures v Venezuela* para 167.
[79] See Dr Zamarraga's First Report of 13 June 2013 paras 54ff.

good faith and at arm's length by Ascendex; and it accepts the testimony of Mr Jurika to such effect.[80]

5.60.   *Unclean Hands:* The Tribunal does not consider that the Claimant was guilty of any wrongdoing, whether it amounted to "unclean hands" or any other like impropriety, at the time when it acquired the Junín concessions in 2004. The Tribunal does not understand the Respondent's case on "unclean hands" to extend to the Chaucha and Telimbela concessions. Accordingly, the Respondent's case on unclean hands is limited to the alleged misconduct of the Claimant (by itself, its agents and employees) after its indirect acquisition of the Junín concessions in 2004.

5.61.   The Respondent has adduced an impressive amount of expert testimony and materials relating to the legal doctrine of unclean hands under international law, including the obligations of foreign investors on human rights in the broadest sense.[81] The Tribunal has studied this testimony and materials, including (in particular) the expert testimony of Professor Murphy. Nevertheless, this is not the place to address these materials in detail, for two cumulative reasons.

5.62.   First, the Tribunal considers that the Respondent's case on unclean hands is not a jurisdictional objection, but rather an objection to the admissibility of the Claimant's claims based upon its alleged post-acquisition misconduct. In regard to the latter, if correct, the Tribunal would have jurisdiction, but it could not exercise that jurisdiction in favour of the Claimant's claim. An objection as to admissibility necessarily assumes that a tribunal has jurisdiction.

5.63.   Second, the Respondent's case involves grave allegations against the Claimant of violations of international law, particularly during the post-acquisition period from 2005 to 2007. All, or almost all, of such alleged conduct took place in Ecuador, openly and in view of the Respondent's governmental authorities both in the Junín area and in Quito. Yet, as regards international law, international public policy and human rights, not a single complaint was made by the Respondent against the Claimant at the time. Such a complaint surfaced for the first time after the commencement of this arbitration.

---

[80] Jurika WS 1 paras 31-37.
[81] The Tribunal's reference to "human rights" includes civil and political rights and economic, social and cultural rights.

5.64.   In these circumstances, the Tribunal considers that it is far too late for the Respondent to raise such objections to the Tribunal's exercise of jurisdiction in this arbitration. Given the Respondent's obligation of good faith under the Treaty in regard to arbitration, the Tribunal decides that the Respondent is precluded from raising this objection as to admissibility. (This decision does not apply to other wrongdoings under Ecuadorian law by the Claimant and its agents).

5.65.   The Tribunal has decided to join what remains of the Respondent's case on admissibility to the merits of the Claimant's claims in regard the Junín concessions. As will appear below, the Tribunal there prefers to take into account the Claimant's case not in the form of the doctrine of unclean hands as such, but rather under analogous doctrines of causation and contributory fault applying to the merits of the Claimant's claims arising from events subsequent to the acquisition of its investment. That result, based on the Respondent's case on the merits, strikes the Tribunal as more legally appropriate to this case than an outright dismissal of the Claimant's claims (in regard to the Junín concessions) on the ground of inadmissibility.

5.66.   The Tribunal also notes that this is is not a case where an essential part of the Claimant's claim is necessarily founded upon its own illegal acts or omissions, regardless of any defence by the Respondent. In other words, this case is materially different from cases such as *World Duty Free v Kenya* or (more recently) *Al-Warraq v Indonesia* where the claim, as a cause of action, was directly based from the beginning upon the claimant's own illegal act.[82]

5.67.   *Summary:* For these several reasons, the Tribunal dismisses the Respondent's objections to the Tribunal's jurisdiction and (as regards the Junín concessions) the admissibility of the Claimant's claims. Accordingly, the Tribunal has here also decided, in substance, the principal issues listed in Part 2 above, under Paragraphs 2.3 to 2.10.

---

[82] *World Duty Free v Kenya*; *Hesham Talaat M. Al-Warraq v. Republic of Indonesia*, UNCITRAL, Final Award, 15 December 2014 ["*Al-Warraq v Indonesia*"] (where the tribunal awarded no damages).

## PART 6 – LIABILITY AND CAUSATION

### A: Introduction

6.1.    In brief, the Claimant contends that the Respondent has violated its obligations under the Treaty, including its obligations to pay compensation upon the direct or indirect expropriation of the Claimant's investments, to provide fair and equitable treatment and full protection and security to the Claimant and its investments (the FET and FPS standards), and to provide national treatment in regard to the Claimant's investments in Ecuador, thereby breaching Articles II, IV and VIII of the Treaty.[1]

6.2.    In brief, the Respondent rejects these claims, contending that the Junín concessions were revoked as part of a legitimate reform of the Respondent's mining regime, that the Chaucha and Telimbela concessions have never been expropriated, and that ENAMI was not granted more favourable treatment by the Respondent.[2]

6.3.    It will be necessary to summarise the Parties' respective submissions before setting out the Tribunal's analyses and decisions. For that purpose, it is appropriate to take each of the Parties principal claims and defences in turn. In so doing, the Tribunal notes that the Claimant bears the legal burden of establishing its positive case against the Respondent in respect of each claim. As for the Respondent, it bears the legal burden of proving its positive defences. For both Parties, the standard of proof for their factual allegations requires the Tribunal to be satisfied on a balance of probabilities: it is not sufficient at this stage of the proceedings to prove only a prima facie case.

6.4.    For ease of reference below, the names of Ascendant Copper and the Claimant (Copper Mesa) as concessionaires are used interchangeably, given their common legal entity: as already indicated, the name-change took place in July 2008.

### B: Unlawful Expropriation

6.5.    The Claimant submits that it owned "real property" as investments in Ecuador within the meaning of the Treaty, namely its three mining concessions, which had been

---

[1] Claimant's Statement of Claim paras 95.
[2] Respondent's Counter-Memorial para 378.

validly granted by the Respondent for thirty-year terms and were subject only to one condition, that of paying the annual conservation patent fees, which (as is not disputed by the Respondent) were paid on time.[3]

6.6.    The Claimant contends that the Respondent however: (i) directly expropriated the Junín concessions by formally extinguishing title to the Golden 1 and Golden 2 concessions (with Magdalena) via the Nullification Resolutions and the Termination Resolutions applying the Mining Mandate, (ii) indirectly expropriated the Claimant's interest in Ascendant Ecuador ("AE") by taking all its material assets, thereby destroying the entire value of its shares and (iii) indirectly expropriated the Chaucha and Telimbela concessions by disclosing their inclusion on the list of projects to be directly expropriated by the Respondent (without compensation) under Article 24 of the 2009 Mining Law, thereby also creating a "serious title defect" to the Chaucha concession.[4]

6.7.    The Claimant contends that these were unlawful expropriations under the Treaty as no compensation was paid, they were not taken for a public purpose, they were not carried out according to due process of law, and they singled out the Claimant's investments in a discriminatory manner. The Claimant further contends that the Respondent violated Article VIII of the Treaty, which required prompt, adequate and effective compensation to be paid by the Respondent to the Claimant for both direct and indirect expropriation.[5]

*C: The Junín Concessions*

6.8.    With respect to the Junín concessions, the Claimant contends that it is well established that the revocation by the host State of a concession (or a license) needed to carry on a business activity constitutes an expropriation of the investment. The Claimant further contends that such a revocation, by depriving the subsidiary of its ability to carry on the business for which it was created, has effect equivalent to its nationalisation. It submits that this is all the more so in this case where the mining concessions constituted the only material assets of the Claimant's project companies, without which they became worthless empty shells.[6] The Claimant relies on several decisions

---

[3] Claimant's Post-Hearing Brief paras 86-87; Transcript, Day 1, 11:07-21; Exhibit C-16, Art. 3 & 9.
[4] Claimant's Statement of Claim paras 97-102; Transcript, Day 1, 12:03-12:25; 15:23-16:21.
[5] Claimant's Statement of Claim paras 97-102.
[6] Claimant's Memorial paras 304-306.

to such effect made by arbitration tribunals: *Goetz v. Burundi*, *Middle East Cement v. Egypt*, *Tecmed v. Mexico* and *CME v. Czech Republic*.

6.9.    The Respondent for its part contends that it is well established under international law that a non-discriminatory regulation, adopted for a public purpose and enacted in accordance with due process, does not amount to expropriation, and even less, to unfair and inequitable treatment.[7] The Respondent relies on the award in *Methanex v. USA* where the tribunal stated that: "as a matter of general international law, a non-discriminatory regulation for a public purpose, which is enacted in accordance with due process and, which affects, inter alios, a foreign investor or investment is not deemed expropriatory and compensable unless specific commitments had been given by the regulating government to the then putative foreign investor contemplating investment that the government would refrain from such regulation".[8]

6.10.   Likewise, the Respondent cites the decision in *Chemtura Corporation v. Canada*, where the tribunal stated that: "the Tribunal considers in any event that the measures challenged by the Claimant constituted a valid exercise of the Respondent's police powers. […] the PMRA took measures within its mandate, in a non-discriminatory manner, motivated by the increasing awareness of the dangers presented by lindane for human health and the environment. A measure adopted under such circumstances is a valid exercise of the State's police powers and, as a result, does not constitute an expropriation".[9] The Respondent further refers to other decisions following the same reasoning by several other tribunals: *Saluka Investments BV v. Czech Republic, Tecmed v. Mexico, Feldman v. Mexico,* and *Suez Sociedad General de Aguas Barcelona SA and InterAgua Servicios Integrales del Agua SA v. Argentina.*[10]

6.11.   The Respondent contends that the 2008 Mining Mandate and the 2009 Mining Law are measures issued by the State in the exercise of its legitimate regulatory authority and police powers, responding to a compelling public policy consideration (the need to consult the affected local population), seeking to address the many social, economic and environmental issues that remained unsolved (which could not be addressed

---

[7] Respondent's Counter-Memorial para 380.
[8] Respondent's Counter-Memorial para 388; RLA-86 para 7.
[9] Respondent's Counter-Memorial para 390; RLA-87 para 266.
[10] Respondent's Counter-Memorial para 391.

effectively under the earlier legal regime) and to establish a more stable and efficient regulatory regime.[11] The Respondent further submits that the Mining Mandate was enacted in accordance with due process by a Constituent Assembly elected on the basis of a national referendum; and that it was non-discriminatory. The Respondent records that, apart from the Junín concessions, 1,334 other concessions were terminated by the Mining Mandate and a total of over 1,026 concessions were terminated under Article 1 of the Mining Mandate.[12]

6.12.   The Respondent denies that the Nullification Resolutions amounted to expropriation, as they were overturned upon appeal. As to the Termination Resolutions, the Respondent contends that they were made in a valid application of both Ecuadorian law and international law as a result of the concessionaire's failure to submit a valid EIS.[13] In addition, as measures taken pursuant to the Mining Mandate, the Termination Resolutions were also legitimate public policy measures.[14] Therefore, so the Respondent concludes, these measures do not amount to expropriation under the Treaty.

6.13.   The Claimant submits that none of the measures challenged by the Claimant fall within the 'police powers' exception that is recognised by international law[15] and that the Mining Mandate was not enacted for a 'public purpose'.[16] In turn, the Respondent rejects the allegation that it has abused its police powers and submits, there being nothing on the face of the Mining Mandate or measures that could support this, that is the end of the matter as regards the Treaty. The Respondent further claims that the Claimant has not produced any credible evidence to support its argument that the Respondent abused its regulatory authority towards the Claimant. The Respondent contends that the public policy goal of the Mining Mandate is clear, as set out in its preamble.[17]

6.14.   The Respondent contends that even if this Tribunal were to find that the 2008 Mining Mandate, the 2009 Mining Law and the Termination Resolutions were in their effects

---

[11] Respondent's Counter-Memorial paras 379-380, 384-386; Respondent's Rejoinder paras 313-320.
[12] Respondent's Counter-Memorial para 389.
[13] Respondent's Statement of Defence para 105.
[14] Respondent's Counter-Memorial para 381.
[15] Claimant's Reply para 356.
[16] Claimant's Reply para 359.
[17] Respondent's Rejoinder paras 321-324.

expropriatory, they do not qualify as breaches of the Treaty because they fall under the general exception provided by Article XVII(3) of the Treaty[18].

6.15.   Article XVII(3) provides as follows:

> "Article XVII. Application and General Exceptions
>
> […]
>
> 3. Provided that such measures are not applied in an arbitrary or unjustifiable manner, or do not constitute a disguised restriction on international trade or investment, nothing in this Agreement shall be construed to prevent a Contracting Party from adopting or maintaining measures, including environmental measures:
>
> (a)   necessary to ensure compliance with laws and regulations that are not inconsistent with the provisions of this Agreement;
>
> (b)   necessary to protect human, animal or plant life or health; or
>
> (c)   relating to the conservation of living or non-living exhaustible natural resources."

6.16.   According to the Respondent, the Mining Mandate was adopted for the legitimate public policy purposes of protecting public health and the environment where the requirement to consult the local population on the basis of an EIS was specifically intended to protect the residents and local communities and to reduce the environmental impacts of mining activities. The Termination Resolutions were necessary to implement the Mining Mandate. These measures were not, according to the Respondent, arbitrary, unjustifiable or inconsistent with the Treaty. Therefore, so the Respondent submits, these measures cannot amount to breaches of the Treaty, by virtue of Article XVII(3).[19]

6.17.   The Claimant contends, however, that the Nullification Resolutions were applied in an arbitrary and unjustifiable manner towards the Claimant, and that the Mining Mandate and the Termination Resolutions were also arbitrary, as they were both exempt from

---

[18] Respondent's Counter-Memorial paras 381-383, 403-409.
[19] Respondent's Counter-Memorial paras 403-409.

any form of judicial review and were measures taken outside the normal rule of law in Ecuador.[20] Hence, so the Claimant concludes, Article XVII(3) is inapplicable to its claims for expropriation.

6.18.   The Respondent contends that the Nullification Resolutions however never took effect, as they were suspended following an appeal and were subsequently overturned; that the Mining Mandate was issued by a competent body, duly constituted by the Constituent Assembly and that the Termination Resolutions were subject to a variety of legal recourses.[21] The Respondent further contends that it is not the Tribunal's task to second-guess an assessment of the need for the Mining Mandate, absent any evidence of abuse of the host State's regulatory authority, and that these measures fall under the exceptions in Article XVII(3) of the Treaty.[22]

6.19.   The Claimant contends that even if these measures were taken for legitimate policy objectives (as the Respondent contends), its liability is not excused under the Treaty where lawful expropriations must be for a public purpose and must be accompanied by the appropriate payment of compensation.[23] Similarly, the expropriation of other mining concessions under these laws does not excuse the taking of the Claimant's investments.[24] The Claimant contends that this is not a case about the economic impact of *bona fide* regulatory measures, but rather a case about an actual taking targeting the Claimant's investments.[25]

### D: The Chaucha and Telimbela Concessions

6.20.   With respect to the Chaucha and Telimbela concessions, the Claimant contends that they were indirectly expropriated by the Respondent because, even if their title was not taken or formally extinguished, the measures taken by the Respondent left them without any value for the Claimant.[26] According to the Claimant, even if the "cloud

---

[20] Claimant's Reply para 387.
[21] Respondent's Rejoinder paras 333-334.
[22] Respondent's Rejoinder para 338.
[23] Claimant's Memorial para 313; *Santa Elena* (CLA-34) para 71.
[24] Claimant's Memorial para 314. The Claimant cites *Continental Casualty Company v. The Argentine Republic,* ICSID Case No.ARB/03/9, Decision on Jurisdiction, 22 February 2006 (CLA-36) ["*Continental Casualty v Argentina*"] para 72, on the irrelevance of distinguishing between nationalization or expropriation with respect to the requirement to pay compensation in either case.
[25] Claimant's Memorial para 316.
[26] Claimant's Memorial paras 307-308. The Claimant cites the decision of the Iran-US Claims Tribunal *Starrett Housing Corp. v. Iran,* 4 Iran-US C.T.R. 122 (1983) (CLA-29) ["*Starrett Housing Corp. v Iran*"] p 154, where the

on the title" of these concessions were to have been subsequently lifted (it was not), the duration of the Respondent's conduct amounted to their indirect expropriation.[27]

6.21.   The Respondent denies the existence of a "list of projects" under Article 24 of the 2009 Mining Law and contends that such a list (as alleged by the Claimant) was merely an internal and confidential technical report that cannot and does not amount to expropriation under the Treaty.[28]

6.22.   The Respondent further contends that no measures were actually taken under Article 24 against the Chaucha or Telimbela concessions.[29] Moreover, the Respondent contends that if the Claimant truly believed that the draft memorandum prepared by the National Geological Services (but never published) created a 'cloud' on its title, it could and should have requested a clarification from the Government, which it did not.[30] According to the Respondent, no breach of the Treaty can be claimed if the investor has failed to seek reasonable redress before the local authorities before turning to investment protection under the Treaty.[31] The Claimant contends that any such efforts would have been "futile" in the circumstances.[32]

6.23.   The Claimant contends that international law does not require legal formalities such as the formal extinction of legal title of these concessions under Article 24. There was

---

tribunal explained that "it is recognized by international law that measures taken by a State can interfere with property rights to such an extent that these rights are rendered so useless that they must be deemed to have been expropriated, even though the State does not purport to have expropriated them and the legal title to the property formally remains with the original owner." The Claimant also relies on the decision in *Metalclad v. Mexico* (CLA-30) para 103.

[27] Claimant's Memorial paras 309-312. The Claimant cites *S.D. Myers Inc. v. Government of Canada,* UNCITRAL, First Partial Award, 13 November 2000 (CLA-31) ["*SD Myers v. Canada*"] para 283; *Wena Hotels v Egypt* para 99; *James M. Saghi and others v. The Islamic Republic of Iran and others,* Iran-US Case No. 298 (544-298-2) 29 Iran-US C.T.R. 20, Award, 22 January 1993 (CLA-33) ["*Saghi v Iran*"] para 75; Rudolf Dolzer and Christoph Schreuer, PRINCIPLES OF INTERNATIONAL INVESTMENT LAW (Oxford Univ. Press 2008) (CLA-6) ["Dolzer/Schereuer"] p 112.

[28] Respondent's Statement of Defence para 112-113; Respondent's Rejoinder para 376.

[29] Respondent's Statement of Defence para 116; Respondent's Counter-Memorial paras 424, 441.

[30] Respondent's Counter-Memorial para 424.

[31] Respondent's Counter-Memorial paras 425-426. The Respondent cites the award in *Generation Ukraine, Inc. v. Ukraine,* ICSID Case No. ARB/00/9, Award 16 September 2003 (RLA-91) ["*Generation Ukraine v Ukraine*"] paras 20.30, 20.33, where the tribunal explained that "an international tribunal may deem that a failure to seek redress from national authorities disqualifies the international claim, not because there is a requirement of *exhaustion* of local remedies but because the very reality of conduct tantamount to expropriation is doubtful in the absence of a *reasonable* – not necessarily exhaustive – effort by the investor to obtain correction." The Respondent also relies on similar reasoning by the tribunal in *M.C.I. Power Group L.C and New Turbine Inc. v. Republic of Ecuador,* ICSID Case No. ARB/03/6, Award, 31 July 2007 (RLA-95) ["*MCI Power v Ecuador*"] paras 297-305 and *Marvin Feldman v. Mexico,* ICSID Case No. ARB(AF)/99/1, Award, 16 December 2002 (CLA-45) ["*Feldman v Mexico*"] para 134.

[32] Respondent's Rejoinder para 367.

here, so the Claimant contends, an indirect expropriation or a violation of the Respondent's obligation to provide fair and equitable treatment under the Treaty. The enactment of Article 24 of the 2009 Mining Law, combined with the Respondent's repeated public declarations that Article 24 would be used to revert legal title to the Chaucha and Telimbela projects, is sufficient to allow the Claimant to claim for the lost opportunity to sell these projects at their fair market value, as it wished.[33]

6.24.    The Respondent also contends that there can be no expropriation where the investor maintains overall control over its investment.[34] The Respondent submits that this test is not met in this case as the Chaucha concession has been renewed and is currently being exploited, while the Telimbela concession has been relinquished by its concessionaire.[35]

### E: The FET and FPS Standards

6.25.    The Claimant contends that the Respondent failed to give to the Claimant's investments in Ecuador fair and equitable treatment in accordance with principles of international law, and full protection and security, thereby violating Article II of the Treaty, by the following acts:

(i)      revoking the legal framework that applied to the mining concessions that were the fundamental basis of the Claimant's investments by adopting the Nullification Resolutions, the Termination Resolutions and Article 24 of the 2009 Mining Law;

(ii)     through these same measures, acting contrary to specific representations contained in the concessions (confirmed on numerous occasions) to the effect that the Claimant's subsidiaries had a right of exploration and development within the concession areas;

---

[33] Claimant's Reply para 10.
[34] Respondent's Counter-Memorial paras 428-431. The Respondent cites the interim award in *Pope & Talbot v Canada* (RLA-96) para 100, where the tribunal rejected an indirect expropriation claim on this basis. The Respondent also refers to *El Paso Energy International Company v. The Argentine Republic*, ICSID Case No ARB/03/15, Award, 31 October 2011 (CLA-59) ["*El Paso v Argentina*"] para 248, that it argues follows a similar reasoning. The Respondent lists various cases that it contends follows the control test (see footnote 609 of the Respondent's Counter-Memorial).
[35] Respondent's Statement of Defence para 111-113; Respondent's Rejoinder para 246.

(iii)     acting on the basis of a "mandate" from the Constituent Assembly rather than on the basis of a valid law passed by Congress and signed by the President;

(iv)     citing a purported failure to conduct a referendum process when there were no legitimate grounds to do so and where the Respondent itself was responsible for any such failure;

(v)     denying the concessionaire at Junín (Ascendant Ecuador) any right to independent review of the Termination Resolutions; and

(vi)     denying the concessionaires at Chaucha and Telimbela (DosRios and Telimbela) the right to review the designation of their projects for reversion to the Respondent under Article 24.[36]

6.26.   According to the Claimant, the FET standard also protected its legitimate expectations and guaranteed its investments transparency, due process and freedom from arbitrary or discriminatory conduct. It contends that the Respondent breached this FET standard in regard to all its concessions.[37]

6.27.   The Respondent denies any breach of the FET and FPS standards.

## F: The Junín Concessions

6.28.   With respect to the Junín concessions, the Claimant contends that the Termination Resolutions were an arbitrary denial of Ascendant Ecuador's right to due process; and that they were discriminatory.[38] According to the Claimant, these Resolutions extinguished legal title for failure to meet a new condition of ownership, without payment of any compensation and also precluding any legal challenge, thereby

---

[36] Claimant's Statement of Claim paras 103-105.

[37] Claimant's Memorial paras 318, 320-327. The Claimant relies on this standard as explained by the tribunals in: *Técnicas Medioambientales TECMED SA v. The United Mexican States,* ICSID Case No ARB(AF)/00/2, Award, 29 May 2003 (Exhibit CLA-28) ["*Tecmed v. Mexico*"] para 154; *CME Czech Republic B.V. v. Czech Republic,* UNCITRAL, Partial Award, 13 September 2001 (CLA-37) ["*CME v Czech Republic*"] para 611; *Siemens A.G. v. The Argentine Republic,* ICSID Case No. ARB/02/8, Award, 6 February 2007 (CLA-38) ["*Siemens v Argentina*"] para 299; *LESI S.p.A. et ASTALDI S.p.A. v. République Algérienne Démocratique et Populaire,* ICSID Case No. ARB/05/3, Award, 12 November 2008 (CLA-39) ["*LESI v Algeria*"] para 151; *Rumeli v Kazakhstan* para 609; *Waste Management, Inc. v. The United Mexican States,* ICSID Case No. ARB(AF)/00/03, Award, 30 April 2004 (CLA-40) ["*Waste Management II*"] para 98; *Mohammad Ammar Al-Bahloul v. Republic of Tajikistan,* SCC Case No. V 064/2008, Partial Award on Jurisdiction and Liability, 2 September 2009 (Exhibit CLA-41) ["*Al-Bahloul v Tajikistan*"] para 221; *Elettronica Sicula S.p.A. (Elsi) (United States v. Italy),* Judgment of 20 July 1989, I.C.J. Reports 1989, p. 15 (Exhibit CLA-42) ["*ELSI Case*"] para 128.

[38] Claimant's Reply para 47.

constituting a denial of due process. The Claimant submits that it relied on the 2000 Mining Law and the security of tenure of the mining concessions for thirty years provided under that legislation. It further claims that, according to the 2000 Mining Law, there was no deadline for obtaining the approval of an EIS;[39] and that delays in the approval process would not jeopardise the mining rights granted by the concessions.[40] The Claimant adds that, from a legal perspective, local opposition to mining and local political opposition are not valid grounds for terminating valid mining concessions.[41] The Claimant contends that the EIS was the only legal requirement that Ascendant Ecuador needed to begin mining operations, and that a "social license" was not a legal requirement; if it was "soft law", then by definition, it was a voluntary undertaking and not a legal obligation imposed upon Ascendant Ecuador.[42]

6.29.    According to the Claimant, these legal guarantees were revoked by the 2008 Mining Mandate, which was not based on any recognisable rule of law, but rather on the basis of a non-legal, political exercise of powers by the Respondent.[43] The Claimant submits that the Termination Resolutions were issued in a manner that violated due process, as they were issued without giving to the Claimant or the concessionaire any opportunity to comply with the Mining Mandate, and without providing for any recourse against the Termination Resolutions.[44]

6.30.    The Respondent rejects these claims. The Respondent contends that the Termination Resolutions with respect to the Junín concessions were taken following the failure of Ascendant Ecuador to respect and comply with a legal framework in place since

---

[39] Claimant's Post-Hearing Brief paras 8, 89, 135, referring to Dra. Fabara's expert testimony (Transcript, Day 4, 801:12-19, 803:11-22, 856:4-23). The Claimant also refers to Mr. Davis' testimony on the repeated legal due diligence engaged to confirm that the Junín concessions were valid and did not depend on the approval of an EIS by any point in time (see Claimant's Post-Hearing Brief para 87; Transcript, Day 2, 301:7-303:10, 303:16-25). See also C-87, C-118, and C-206.

[40] The Claimant mentions the approval following a rejection of the Mirador EIS as evidence that a rejection of the EIS is by no means permanent (Claimant's Post-Hearing Brief para 135; Ms. Ruiz's testimony: Transcript, Day 4, 471:4-722:11).

[41] Claimant's Post-Hearing Brief para 93. See also Mr. Zumarraga's First Expert Report para 31, and his Supplemental Opinion paras 56-61. The Claimant submits that "[a] right to local consultations regarding environmental impacts is not a right of veto over the development of a mining project – if so, no mining project could be developed as it is impossible to obtain unanimous support for a project" (Claimant's Post-Hearing Brief para 140).

[42] Claimant's Post-Hearing Brief para 133. See also Transcript, Day 6, 1223:22.

[43] Claimant's Memorial paras 329-332.

[44] Claimant's Memorial para 337.

2000.[45] The Respondent submits that the EIS was already required under existing legislation, from the 1991 Mining Law onwards. Likewise, the obligation to carry out local consultation and the right of the Respondent to annul a concession if this obligation was not complied with had been included since at least 1997 in Article 29(d) of the Environmental Regulation for Mining Activities (Reglamento Ambiental para las Actividades Mineras, or "RAAM"), adopted in September 1997, and, since 1999, in Article 28 of the Environmental Management Law (*Ley de Gestión Ambiental*, or "LGA" or "EMA"), adopted in July 1999.[46]

6.31.   The Claimant contends that the Article 28 of the EMA applies to contracts and not to concessions, providing in relevant part that "non-compliance with the consultation procedure referred to in Article 88 of the [Constitution] renders unenforceable the activity to which it refers and renders null the respective contracts".[47] According to the Respondent, this reference to "contracts" stems from the concept in the EMA of concessions as a form of administrative contract under Article 26 of the EMA.[48] The Respondent contends that every mining concession included the requirement to comply with environmental laws, in particular the EMA; and that the application of Article 28 of the EMA to mining concessions was uncontested when Ascendant Ecuador appealed against the Termination Resolutions.[49]

6.32.   The Respondent contends that the local consultation and EIS requirements existed before the 2008 Mining Mandate. The Respondent submits that the Mining Mandate's only novelty was that instead of the Government having a discretion as to whether or not to revoke the concession in a case of failure to carry out the consultation process, the revocation became mandatory in such a case.[50] The Respondent contends that before the Mining Mandate, in practice, the State's power to terminate mining concessions was not exercised, which resulted in an unsustainable situation. Therefore, the State, through Ministerial Orders No. 062 and 076, implemented measures to oblige concessionaires to comply with the obligation to consult without terminating mining concessions. However, ultimately, the mandatory revocation under Article 1

---

[45] Respondent's Statement of Defence paras 107-109.
[46] Respondent's Counter-Memorial paras 387, 400, 412.
[47] Claimant's Reply para 32.
[48] Respondent's Rejoinder paras 197-198.
[49] Respondent's Rejoinder paras 199-200; Exhibits C-163, C-16, and C-17.
[50] Respondent's Counter-Memorial para 396; Respondent's Rejoinder paras 205, 345, 351.

of the Mining Mandate was necessary when all efforts to bring concessionaires into compliance with the obligation to consult had failed.[51]

6.33.   The Respondent submits that no concessionaire could have reasonably expected that the Respondent would never terminate mining concessions that were in breach of the applicable law and in respect of which the exercise of the fundamental right of prior consultation had been denied to the affected local population.[52] Furthermore, the Respondent contends that Ascendant Ecuador had more than reasonable notice of the impending legal reforms, that it failed to bring itself into compliance with the applicable laws by obtaining the necessary consents from the local communities, and that such failure is entirely the Claimant's own fault (with Ascendant Ecuador).[53]

6.34.   In addition, the Respondent contends that there is nothing in the terms of the concessions that precludes subsequent legal reform such as the one brought about by the Mining Mandate. The Respondent submits such legal reform is fully consistent with international standards, and, contrary to the Claimant's arguments, was passed by a Constitutional Assembly in accordance with its mandate.[54] According to the Respondent, a State can exercise its legitimate regulatory authority and the investor cannot complain of any frustration of its expectations, absent a specific commitment by the State not to modify the relevant laws and regulations.[55]

---

[51] Respondent's Rejoinder paras 206-211.
[52] Respondent's Rejoinder para 210.
[53] Respondent's Statement of Defence paras 107-109; Respondent's Counter-Memorial paras 394-396. According to the Respondent, the Mining Mandate was issued in April 2008, but the Termination Resolutions implementing the Mining Mandate vis-à-vis Ascendant Ecuador were issued only in November 2008, giving the Claimant some seven months during which it could bring itself in compliance with the consultation obligation, but failed to do so.
[54] Respondent's Statement of Defence paras 107-109; Respondent's Rejoinder paras 329-330.
[55] Respondent's Counter-Memorial paras 410-416. The Respondent relies on the Final Award in *Methanex Corporation v. United States of America*, UNCITRAL, Final Award on Jurisdiction and Merits, 3 August 2005 (RLA-86) ["*Methanex v USA*"] paras 8-10; *Generation Ukraine v Ukraine* para 20.37; *El Paso v Argentina* para 371, where the tribunal stated that "a foreign investor can expect that the rules will not be changed without justification of an economic, social or other nature. Conversely, it is unthinkable that a State could make a general commitment to all foreign investors never to change its legislation whatever the circumstances, and it would be unreasonable for an investor to rely on such a freeze," and *Parkerings-Compagniet AS v. Republic of Lithuania*, ICSID Case No. ARB/05/8, Award, 11 September 2007 (RLA-92) ["*Parkerings v Lithuania*"] para 332, where the tribunal stated "[i]t is each State's undeniable right and privilege to exercise its sovereign legislative power. A State has the right to enact, modify or cancel a law at its own discretion. Save for the existence of an agreement […] there is nothing objectionable about the amendment brought to the regulatory framework existing at the time an investor made its investment."

6.35.   The Respondent denies having made such commitment to the Claimant.[56] It contends that Ecuadorian law, having been subject to frequent changes,[57] the Claimant cannot legitimately claim to have expected that there would be no change in the field of mining law.[58] The Respondent contends that the circumstances of the host State are to be taken into account by a tribunal.[59] The Respondent submits that, in the circumstances of the present case, it is important to keep in mind that the determination of whether the investor's alleged expectations existed, or were indeed legitimate, is not limited in terms of time to the making of the investment; and that the investor has a duty to conduct its business in a reasonable manner and in good faith, in order to be able to claim protection under the FET standard. It submits that the Claimant's operation of its investments in Junín failed to meet the requirements of good faith and reasonableness.[60]

6.36.   The Respondent also denies that the Termination Resolutions were adopted for "political" reasons or as a result of political lobbying. The Respondent insists that they were legitimate measures taken to implement the Mining Mandate, which served legitimate public policy purposes and addressed issues of serious public concern. The Respondent contends that the Mining Mandate did not target the Junín concessions.[61]

6.37.   The Claimant submits that the Termination Resolutions were discriminatory, because only the Junín concessions were cancelled, whereas approval of an EIS was not required for other concession holders to maintain their titles.[62] The Respondent submits that the Mining Mandate and the Termination Resolutions were non-discriminatory as (as already indicated), and that, apart from the Junín concessions, more than 1,000 other concessions were terminated pursuant to the Mining Mandate. The failure to submit an EIS or want of consultation under Article 1 of the Mining

---

[56] Respondent's Counter-Memorial para 411; Respondent's Rejoinder paras 341, 353. The Respondent further contends that the concessions specifically stated that they were subject to the applicable laws and regulations and did not exclude the possibility of changes.
[57] Respondent's Counter-Memorial para 417.
[58] Respondent's Counter-Memorial para 421; Respondent's Rejoinder paras 342, 344.
[59] Respondent's Rejoinder para 348.
[60] Respondent's Rejoinder para 354.
[61] Respondent's Rejoinder para 356.
[62] Claimant's Memorial para 338.

Mandate was the cause of termination in many of these cases.[63] The Respondent submits that the termination procedure was in each case the same and was no different for the termination of the Junín concessions.[64] Moreover, the Respondent denies that other concessionaires were not required to submit an EIS.[65]

6.38.   The Respondent also denies that the Mining Mandate or the Termination Resolutions violated due process and that Ascendant Ecuador did not have any right to independent review of the Termination Resolutions. Ascendant Ecuador, although unsuccessful, filed claims for extraordinary constitutional relief.[66] The Respondent further contends that there were multiple forms of recourse available to Ascendant Ecuador to challenge the Termination Resolutions; namely: recurso de reposición, recurso de apelación, recurso extraordinario de revisión, recurso subjetivo o de plena jurisdicción, recurso de casación, acción extraordinaria de protección and acción de protección.[67] The Respondent contends that Ascendant Ecuador could have filed appeals as late as three years after the date of the Termination Resolutions. It failed to do so.[68]

6.39.   The Claimant contends that the Respondent itself prevented Ascendant Ecuador from complying with the Respondent's demands to supplement the local consultation required for the EIS.[69] The Respondent denies that it prevented Ascendant Ecuador's

---

[63] Respondent's Counter-Memorial para 389; Respondent's Rejoinder paras 212-213; see footnote 443 of the Respondent's Rejoinder for examples of mining concessions terminated for failure to consult or submit an EIS prior to the Junín concessions.

[64] Respondent's Rejoinder paras 214-215.

[65] Respondent's Rejoinder paras 216-219. The Respondent contends in this sense that the Ministry of Mines did not allow the submission of a further EIS after the termination of the Junín concessions. On 7 November 2008, the Ministry published a table describing the status as at 17 April 2008 of all mining concession holders with respect to the submission of an EIS. Given the very large number of concessions and the possibility of errors, the Ministry issued three public announcements informing potentially affected concession holders that they could challenge the assessment made by filing supporting document within five days. The Respondent denies that this means that the Ministry would accept the submission of a new EIS prepared within five days, which was impossible.

[66] Respondent's Statement of Defence para 110; Respondent's Counter-Memorial para 397; Respondent's Rejoinder paras 220-223, 226.

[67] Respondent's Rejoinder para 224. Guerrero Second Expert Opinion paras 72, 91-93.

[68] Respondent's Rejoinder para 225.

[69] Claimant's Memorial para 338. Mr. Stonehouse testified that he found the list of technical deficiencies of the EIS he was given to be "remarkably short" and that they could have remedied these over time if Ascendant Ecuador could have obtained access to the areas in Junín where the work needed to be performed. He added that this work needed to be done before any deficiencies in the consultation process could be addressed as, without an updated EIS, there was nothing to consult about (Claimant's Post-Hearing Brief para 132; Transcript, Day 1, 158-159, 228:17).

obligation to consult the local population, but "merely required that it ceased its highly provocative strategy of intimidation and violence".[70]

6.40.    The Respondent contends that, even assuming that the Claimant had proven its case as regards liability, according to the well-established principle of contributory fault, the Claimant should not be awarded any compensation with respect to the Junín concessions.[71] The Respondent submits that the Claimant's own actions, including its fraudulent acquisition of the concessions and other unlawful actions creating social conflict in the area that delayed and ultimately prevented the completion of the consultation process, contributed to the termination of these concessions by increasing the risks associated with mining projects in Junín, an area with strong resistance to mining.[72]

6.41.    The Claimant contends that, while the principle of contributory fault is recognized in international law, arbitral practice supports a restrictive application of this principle. In particular, the Claimant cites *Occidental v. Ecuador* where the tribunal held that: "it is not any contribution by the injured party to the damage which it has suffered which will trigger a finding of contributory negligence. The contribution must be material and significant". The Claimant contends that such is not this case.[73]

## G: The Chaucha and Telimbela Concessions

6.42.    With respect to the Chaucha and Telimbela concessions, the Claimant contends that their designation for reversion to the State under Article 24 of the Mining Law constituted an indirect expropriation of these concessions, having the same effect as formal extinction of legal title; and that Article 24's application amounted to the

---

[70] Respondent's Counter-Memorial para 401.
[71] Respondent's Counter-Memorial paras 453-462. Draft ILC Articles of Responsibility of States for Intentionally Wrongful Acts, with commentaries, 2001 (CLA-49) ["ILC Articles"] Article 39; *Delagoa Bay Railway Arbitration (Etats-Unis d'Amérique, Grande Bretagne, Portugal)*, Award, 29 March 1900 in H. Lafontaine, *Pasicrisie Internationale 1794-1900 – Histoire documentaire des arbitrages internationaux*, p. 397 (RLA-104); Moore, *International Arbitrations*, Vol II, p. 1865 ["*Delagoa Bay Railway Arbitration*"]; *LaGrand (Germany v. United States of America)*, ICJ, Merits, Judgement, 27 June 2001, ICJ Reports 2001 (RLA-107) ["*LaGrand*"], *Occidental Petroleum Corp, Occidental Exploration and Production Company v. Ecuador*, ICSID Case No. ARB/06/11, Award, 5 October 2012 (Fortier, Williams and Stern, dissenting in part) (CLA-87, RLA-108) ["*Occidental v Ecuador*"] (materially unaffected by the annulment decision *Occidental Petroleum Corp, Occidental Exploration and Production Company v. Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 Noveber 2015), *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, 25 May 2004 (CLA-60) ["*MTD v Chile*"]. Respondent's Rejoinder paras 392-396.
[72] Respondent's Counter-Memorial paras 453, 462.
[73] Claimant's Reply paras 417-421.

revocation of the security of tenure relied upon by the Claimant to make its investments. The Claimant also contends that the Respondent confirmed that these concessions were free and clear of prior interests and that the rights could be enjoyed for a thirty-year term. Therefore, so the Claimant submits, the Respondent's conduct amounted to unfair and inequitable treatment in breach of the Treaty's FET standard.[74]

6.43.    The Respondent contends, as noted above, that Article 24 was never applied to these concessions, and that, if the Claimant believed that the draft memorandum that it had obtained through Nortec (unlawfully) created a cloud on its legal title over the Chaucha concession, it should have sought to clarify the Respondent's position.[75] It did not do so. The Respondent further contends that there is no evidence that the Claimant has been treated in any way in an unfair or unjust manner.[76] It makes the same submission with respect to the Telimbela concession.[77]

### H: The FPS Standard

6.44.    According to the Claimant, the FPS standard in the Treaty required the Respondent to exercise due diligence to protect the physical and legal security of the Claimant's investments against attacks by private persons.[78] The Claimant contends that the Respondent failed to provide the Claimant's investments with both the physical and the legal security required by Article II(b) of the Treaty, given that the Respondent terminated the Junín concessions on the grounds that Ascendant Ecuador had not completed the consultation process. That failure, so the Claimant alleges, was solely attributable to the Respondent's failure to act with due diligence to guarantee the physical security of Ascendant Ecuador's employees and its subsequent suspension of any further activity by Ascendant Ecuador in the Junín area.[79]

6.45.    The Respondent disagrees. It contends that the Claimant has not established that the Respondent failed to ensure the physical security of the Claimant's investments, and that the Claimant's own paramilitary forces provoked the violent confrontations with

---

[74] Claimant's Memorial paras 340-344; Claimant's Reply para 227.
[75] Respondent's Counter-Memorial paras 433-434; Respondent's Rejoinder para 373.
[76] Respondent's Counter-Memorial para 435.
[77] Respondent's Counter-Memorial para 440.
[78] Claimant's Memorial para 319.
[79] Claimant's Statement of Claim para 105.

the local communities.[80] The Respondent submits that pursuant to the tripartite agreements, its police forces were effectively deployed; but that it was Ascendant Ecuador that failed to implement the tripartite agreements.[81] According to the Respondent, in these circumstances, there is no basis whatsoever to argue that the Respondent in any way failed to comply with any obligation to ensure full protection and security of the Claimant's concessions in Junín in breach of the Treaty's FPS standard.[82]

6.46.   The Respondent notes (in its Rejoinder) that whilst the Claimant asserts breach of the FET standard with respect to the Junín, Chaucha and Telimbela concessions, the Claimant only asserts a failure to provide full protection and security with respect to the Junín concessions.[83]

*I: National Treatment*

6.47.   The Claimant next contends that the Respondent violated Article IV of the Treaty granting more favourable treatment to the investments of one of its own investors, ENAMI, with respect to the expansion, management, conduct and operation of the Junín, Chaucha and Telimbela concessions, than it granted to the Claimant.[84]

6.48.   The Claimant submits that the national treatment standard requires a three-prong test: (i) identification of relevant subjects of comparison; (ii) consideration of the treatment each comparator receives; and (iii) consideration of any factors that may justify the differential treatment.[85] The Claimant identifies ENAMI as operating in the same business sector as the Claimant and its Ecuadorian subsidiaries. It submits that ENAMI was granted *de jure* more favourable treatment by being granted a preferential right of first refusal on the mining projects by virtue of Article 20 of the General Regulations to the 2009 Mining Law. According to the Claimant, this difference in treatment was not justified and existed only to unjustly enrich the Respondent.[86]

---

[80] Respondent's Statement of Defence para 110; Respondent's Rejoinder paras 358-365.
[81] Respondent's Rejoinder paras 361-362.
[82] Respondent's Rejoinder para 365.
[83] Respondent's Rejoinder para 311.
[84] Claimant's Statement of Claim para 107; Claimant's Memorial para 355.
[85] Claimant's Memorial para 347; see CLA-43 para 196.
[86] Claimant's Memorial paras 348-358.

6.49.    According to the Respondent, the Claimant's claim appears to be based on the argument that the fact that the mere existence of the preferential right qualifies as a breach of the Treaty, whether or not any of its three mining projects were in fact granted to ENAMI, and whether or not the Claimant itself has applied for renewal of the concession.[87] The Respondent submits that this claim fails because: (i) the General Regulations to the 2009 Mining Law establishing ENAMI's preferential rights were only issued on 4 November 2009, (ii) the Claimant's theory would imply that the Respondent could have breached the Treaty after the Claimant had already lost or disposed of its investments, and (iii) the concessions have not been granted to ENAMI (nor has ENAMI applied for them), although the Respondent agrees that ENAMI has been granted a concession that partially overlaps with the area of the Junín concessions (i.e. the Llurimagua concession).[88]

6.50.    The Respondent also submits that the Claimant failed to re-apply for the concessions and, therefore, even if ENAMI held all three concessions in dispute, it could not amount to any discriminatory treatment.[89] In any case, ENAMI did not use its preferential right under the 2009 Mining Law to obtain the Llurimagua concession.[90] Furthermore, as ENAMI's preferential rights are based on its status as a State-owned national mining company and not its Ecuadorian nationality, and no other Ecuadorian investor enjoys the same right, this could not amount to unlawful discrimination on the basis of nationality under the Treaty.[91]

### J: The Tribunal's Analyses and Decisions

6.51.    It is convenient consider separately the Junín, Chaucha and Telimbela concessions in regard to each of the claims made by the Claimant for unlawful expropriation and violations of the FET, FPS and National Treatment standards in the Treaty.

---

[87] Respondent's Counter-Memorial para 444.
[88] Respondent's Statement of Defence paras 111-113; Respondent's Counter-Memorial paras 445-447.
[89] Respondent's Counter-Memorial para 448.
[90] Respondent's Rejoinder para 384.
[91] Respondent's Counter-Memorial para 448; Respondent's Rejoinder paras 381, 388.

*K: The Junín Concessions*

6.52. As regards the Junín concessions, it is appropriate in this case to start backwards in time, beginning with the Termination Resolutions of 12 November 2008 made under Article 1 of the Mining Mandate: see the factual chronology recited in Part 4 above.

6.53. *The Termination Resolutions:* It will be recalled that Article 1 of the Mining Mandate, promulgated on 18 April 2008, provided for the termination, without economic compensation, for certain defined mining concessions; namely those "without any investment in project development having been made to their exploration stage by 31 December 2007 or without their environmental impact study [EIS] having been submitted or without a prior referendum process having been conducted …" (see the full text recited in Part 3 above, with the original Spanish text in Part 4 above).

6.54. In October 2008, the Under-Secretary of Mines established that the Junín concessions fell within such definition and ordered the Regional Mining Director of Pichincha to terminate the Junín concessions without any compensation on the grounds that: (i) consultations had not been carried out by the concessionaire.

6.55. On 12 November 2008, pursuant to such order and Article 1 of the Mining Mandate, the regional mining director terminated the Junín concessions without any economic compensation, with no prior notice to the concessionaire and no prior opportunity for the concessionaire to make any representations in its defence. Although the Claimant subsequently sought to appeal to the National Mining Director from the Termination Resolutions on 18 November 2008, it was informed by the Ministry of Mines on 1 December 2008 that no appeal was possible on the basis of Article 12 of the Mining Mandate. Indeed, no effective appeal was possible, despite further attempts to do so by the Claimant in 2009 and 2010.

6.56. Accordingly, the Termination Resolutions were implemented, without payment of any compensation to the Claimant and without any effective opportunity for the Claimant to appeal against such uncompensated termination (including the amount of compensation) before any administrative or judicial organ competent to hear and decide such an appeal on its merits within the Ecuadorian legal system.

6.57. In these circumstances, the first issue is whether there was any expropriation of the Junín concessions within the meaning of the Treaty, as a matter of international law.

6.58.    As regards a measure amounting to a direct expropriation under the Treaty, the Tribunal considers that its constituent legal parts requires: (i) that the measure deprive the investor of its investment permanently; (ii) that the resulting deprivation finds no justification as the legitimate exercise of the Respondent's police or regulatory powers and (iii) the non-application of Article XVII(3) of the Treaty. The primary issues here concern the second and third requirements: a revocation can amount to a permanent deprivation, as did the Termination Resolutions; but the Respondent seeks to justify that revocation as a legitimate response to a social and political problem confronting the nation as a whole, for which international law provides no remedy and in respect of which Article XVII(3) separately provides an express exception. In the present case, as explained below, the second and third requirements turn on the same factors.

6.59.    As to deprivation, the test under the Treaty and international law is the substantial deprivation or the complete or near complete deprivation of an investment.[92] As was decided by the ICSID tribunal in *CMS v Argentina*, the question turns on whether the enjoyment of the investment "has been effectively neutralized".[93] The Tribunal decides that the effect of the Termination Resolutions was effectively to neutralize the Claimant's investment in the Junín concession amounting to substantial deprivation.

6.60.    As to justification, the Tribunal notes Paragraph 712 of the American Law Institute's Third Restatement of Foreign Relations Law: "A State is not responsible for loss of property or for other economic disadvantage resulting from *bona fide* general taxation, regulation, forfeiture for crime, or other action of the kind that is commonly accepted as within the police power of States, if it is not discriminatory …".[94] It also notes the statement in *Methanex v USA*: "As a matter of general international law, a non-discriminatory regulation for a public purpose, which is enacted in accordance with due process and, which affects, *inter alios*, a foreign investor or investment is not deemed expropriatory and compensable unless specific commitments had been given by the regulating government to the then putative foreign investor contemplating

---

[92] *Enron Corporation and Ponderosa Assets, LP v. The Argentine Republic*, ICSID Case No. ARB/01/3, Award, 22 May 2007 (RLA-99) ["*Enron v Argentina*"] para 245; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. The Argentine Republic*, Award, 20 August 2007 (CLA-51) ["*Vivendi v Argentina*"] para 7.5.11.
[93] *CMS Gas Transmission Co v. The Argentine Republic*, ICSID Case No. ARB/01/8, Award, 12 May 2005 (RLA-97) ["*CMS v Argentina*"] para 262.
[94] Restatement (Third) of Foreign Relations Law (1986) para 712 (g).

investment that the government would refrain from such regulation."[95] It likewise notes the statement in *Tecmed v Mexico*: "The principle that the State's exercise of its sovereign powers within the framework of its police power may cause economic damage to those subject to its powers as administrator without entitling them to any compensation whatsoever is undisputable."[96]

6.61.   In the Tribunal's view, as a general matter, the Claimant took the risk of changes in the legal and regulatory regime upon making its long-term investments in Ecuador. There were in the present case no specific commitments, representations or assurances to the Claimant that the Respondent would refrain from such regulation. The Tribunal acknowledges that a specific commitment, assurance or representation is not always necessary to a claim advanced under an FET standard. However, even in their absence, the investor must still establish a relevant expectation based upon reasonable grounds. The Tribunal decides that the Claimant has not established, on the evidence, any legitimate expectation to prevent the application of such general changes adversely affecting its investments.

6.62.   As was stated in *AES v Hungary*: "… any reasonably informed business person or investor knows that laws can evolve in accordance with the perceived political or policy dictates of the times"; and "the fact that an issue becomes a political matter, … does not mean that the existence of a rational policy is erased." [97] The Tribunal refers to the several decisions to the same effect cited by the Respondent, as recorded above. It would be possible to add many similar statements from other decisions made by investment arbitration tribunals. It is unnecessary to do so here.

6.63.   In the Tribunal's view, the applicable legal standards under international law are not here in doubt. The primary issue is whether, in the circumstances, the Termination Resolutions were made in accordance with due process and not in arbitrary manner.

6.64.   The Tribunal emphasises that its inquiry stems from the Termination Resolutions. It is no part of this Tribunal's function under the Treaty to decide for itself what was or was not in the national interests of the Respondent, its citizens or the local population. It is not a regulator. The Tribunal therefore defers to the Respondent's sovereign right,

---

[95] *Methanex v USA* Part IV, Chapter D, para 7.
[96] *Tecmed v. Mexico* para 119.
[97] *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Award, 23 September 2010 ["*AES v Hungary*"] paras 9.3.34 & 10.3.23.

as regulator, to determine what lies within its national interest. Nor is the Tribunal, as regards expropriation, competent to decide upon the revocations of other concessions, said to exceed 1,000 in number, made by the Respondent pursuant to the same national interest. Further, the Tribunal does not here question the national policies, or public purposes, which led to the 2008 Mining Mandate and 2009 Mining Law. It is possible that the Respondent could have expropriated the Junín concessions lawfully under both its domestic law and international law; but it could not do so unlawfully inconsistently with its obligations under the Treaty.

6.65.   The Tribunal also emphasises that its decision regarding the Termination Resolutions cannot be taken in the abstract, but, rather, must take into account the relevant circumstances, including the preceding events of 2007 and 2008. The Termination Resolutions did not come out of a clear blue sky on 12 November 2008: they formed part of a history that marks their legal character. It is this history that, in the Tribunal's view, is ultimately decisive for the present case.

6.66.   The Tribunal decides that the Termination Resolutions, as implemented, are attributable to the Respondent under international law. That much is not apparently in dispute. Given the circumstances, explained below, the Tribunal also decides that the Termination Resolutions were no mere regulatory measures, because, in the circumstances, these Resolutions were made in an arbitrary manner and without due process.

6.67.   Accordingly, given its introductory proviso, Article XV(II)(3) of the Treaty is inapplicable; and the permanent taking of the Claimant's Junín concessions, was an expropriation under Article VIII of the Treaty. Further, given the absence of any compensation and due process upon such expropriation, the Tribunal decides that it was an unlawful expropriation in breach of Article VII of the Treaty, as well a breach of the FET standard in Article II(2)(a) of the Treaty.

6.68.   As regards unlawful expropriation, it is indisputable that the Termination Resolutions were not made or implemented "against prompt, adequate and effective compensation" as required by Article VIII(1) of the Treaty. Further, they were made and implemented without any "prompt review by a judicial or other independent authority" of the Respondent within the meaning of Articles VIII(1) and (2) of the Treaty.

6.69.    Despite its best efforts, the Claimant had no effective remedies under Ecuadorian law to challenge the Termination Resolutions, the absence of due process or the non-payment of any compensation. It is no answer for the Respondent to assert that no such compensation, legal remedy or administrative review were permitted, in theory, under the Mining Mandate or otherwise under its national laws: the Treaty, to which the Respondent had voluntarily agreed, imposed higher standards as a matter of international law; and it does not require an investor to pursue ineffective legal remedies when its goose is well and truly cooked.

6.70.    As regards the breach of the FET standard in Article II(2)(a) of the Treaty, the Termination Resolutions lie at the end of a history of arbitrary conduct taken against the Claimant in the Respondent's name, as described separately below.

6.71.    The Tribunal does not consider, on the evidence, that a separate breach has been established by the Claimant under Article IV of the Treaty in regard to national treatment. The Tribunal acknowledges that this standard does not require the Claimant to prove that the Respondent's conduct was motivated by the Claimant's foreign nationality.[98] Yet, there must be proof of a materially different treatment of another in like circumstances at a relevant time. The evidence regarding ENAMI (by itself or with the Chilean state mining company) comes too late (after the Termination Resolutions) and is in any event too equivocal. Moreover, even if there were such a breach, it would add nothing to the unlawful expropriation of the Junín concessions, as regards liability, causation and quantum. Hence, for present purposes, this claim can be rejected summarily.

6.72.    *The Nullification Resolutions:* Proceeding backwards in time, the Tribunal does not consider, on the evidence, that the Respondent violated Articles II(2)(a), IV or VIII of the Treaty in regard to the Nullification Resolutions of 25 January 2008. The Claimant appealed from these resolutions; and, as a result of its successful appeal, they were revoked by order of the Ministry of Mining's National Director on 15 September 2008: see the chronology recited in Part 4 above.

6.73.    Whilst the Claimant was, in theory, temporarily deprived during the intervening period from 25 January to 15 September 2008 of its full rights of use and enjoyment of the

---

[98] See *Pope & Talbot v Canada*, Award on the Merits of Phase 2 (CLA-44) para 79; *Marvin Feldman v Mexico* para 183.

Junín concessions within the Junín area, it is not apparent from the evidence that the Claimant was then in fact exercising such rights. Even before January 2008, the Claimant had confirmed to the Under-Secretary of Mines by letter dated 24 October 2007 that it was not maintaining any activity in the Junín area: see Part 4 above. Moreover, even if, in practice, the Claimant was deprived of its full rights, such deprivation did not amount to the substantial deprivation or the complete or near complete deprivation of its investment required by the Treaty and international law, given its successful appeal.

6.74.   Accordingly, the Tribunal decides that no liability arises from the Nullification Resolutions under the Treaty, as alleged by the Claimant. However, as a factual matter, the Tribunal notes that the Nullification Resolutions, having failed to achieve their intended purpose with the Claimant's successful appeal, were followed within a month by the Termination Resolutions. It also notes that the Claimant's inactivity in the Junín area during 2008 resulted from (inter alia) earlier interventions by the Ministry itself. Hence, it is next necessary to turn to these earlier historical events, including (in particular) those earlier interventions.

6.75.   *The Ministry's Earlier Interventions:* The Tribunal has set out at length the factual evidence, as it sees it, relevant to the difficult situation confronting both the Ministry of Energy and Mines ("MEM") and the Claimant in 2006 and 2007: see the chronology above in Part 4. It is unnecessary to repeat the details here and only necessary to state the Tribunal's conclusions relevant to this analysis.

6.76.   In brief, under the Treaty, the Tribunal cannot fault the Ministry or, more broadly, the Respondent, for the Claimant's increasing difficulties up to March 2007, including the Claimant's physical access to the Junín concessions. These difficulties did not constitute by themselves violations of the Treaty. Moreover, they were caused by third persons (whose conduct is not attributable to the Respondent) and, particularly from the summer of 2006 onwards, many were materially self-inflicted by the Claimant itself. However, it is necessary to examine more closely the Respondent's conduct from March 2007 onwards.

6.77.   On 29 March 2007, the tripartite agreements were successfully brokered by the MEM's Under-Secretary. This was an exercise in good government; and the Respondent's initiatives did not, in the Tribunal's view, attract any liability under the

Treaty. To the contrary, the MEM's interventions in December 2006 onwards up to 29 March 2007 probably saved the Claimant's Junín concessions from suffering the same fate as befell Bishimetal in May 1997. However, those agreements were not successfully implemented by both sides, albeit without fault attributable to the Respondent under the Treaty. By that stage, the mutual hostilities between anti-miners and pro-miners, the latter actively supported by the Claimant, had gone far too far for any easy remedy, including a successful intervention from the Government in Quito.

6.78.   By letter dated 12 July 2007, the Ministry tried to appease the anti-miners by restricting the Claimant's farming and community activities. Given the subterfuge and other methods previously used by the Claimant and those it supported locally, these non-mining activities were seen as socially divisive and exacerbating tensions within the affected communities. At that stage, the Ministry did not attempt to stop the Claimant's activities as concessionaire in regard to the EIS, including consultation. Those attempts began with the meeting on 8 August 2007 (albeit framed as a request made by the Ministry); and they culminated on 25 September 2007 with an instruction that the Claimant suspend all activities in the Junín concessions in the form of a resolution by the Pichincha Regional Mining Director.

6.79.   That resolution effectively made it legally impossible for the Claimant to complete the EIS, quite apart from the illegal roadblocks and other impediments vigorously maintained by the anti-miners. Although the Claimant sought to appeal against that resolution, it was compelled by letter dated 24 October 2007 to the Under-Secretary of Mines to confirm that it was no longer maintaining any activity in the Junín area. Accordingly, the Claimant could not proceed to complete its EIS, by deliberate act of the Respondent, from late September 2007 onwards to 12 November 2008 when the Termination Resolutions were issued by the Respondent. Without a completed EIS, the Termination Resolutions were an inevitable consequence.

6.80.   The Tribunal therefore rejects the Claimant's allegations of any breach of the Treaty by the Respondent before 24 September 2007. For the subsequent 14-month period from 24 September 2007 to 13 November 2008, the question arises whether the Respondent was in breach of Article II of the Treaty, whether under its FET standard or its FPS standard.

6.81.   Neither standard as expressed in the Treaty imposes an absolute obligation on the host State. Under this FET standard, there is a balancing exercise permitted to the host State, weighing the legitimate interests of the foreign investor with the legitimate interests of the host State and others, including (especially) its own citizens and local residents.[99] Under the FPS standard, the obligation of the host State does not attract strict liability but imposes a lesser duty more akin to the exercise of due diligence.[100] Both standards can require active, and not merely passive, conduct by the host State that may go beyond the mere abstention from prejudicial conduct.[101]

6.82.   For present purposes, although the FET and FPS standards impose legally distinct obligations under the Treaty, it is not necessary to distinguish between them. The issue is much the same: should the Respondent have imposed its will on the anti-miners, acting with all the powers and forces available to a sovereign State, so as to ensure that the Claimant, as the concessionaire under concessions granted by the Respondent, could gain access to the Junín concessions in order to carry out the required consultations and other activities required for its EIS?

6.83.   It will be recalled from the Tribunal's factual findings in Part 4 above that the risk from anti-miners in the Junín area was both real, long standing and well-known even before the Claimant's Junín concessions; and that the State's presence in the Junín area, including its police, was invariably weak, intermittent and ineffective. Yet, the Tribunal decides that there was a breach by the Respondent of the FET and FPS standards by September 2007. At that point, rather than giving legal force to the factual effect of the anti-miners' physical blockade of the Junín concessions, the Respondent should have attempted something to assist the Claimant in completing its consultations and other requirements for the EIS. It is of course difficult to say now what it should have done to resolve all the Claimant' difficulties and, still more so, whether what anything it could have done would have changed the Claimant's position for the better.

---

[99] *Saluka Investments BV v The Czech Republic*, Partial Award, 17 March 2006 (Watts, Fortier and Behrens) (RLA-88) ["*Saluka v Czech Republic*"] paras 304-308; *Franck Charles Arif v. Republic of Moldova*, ICSID Case No. ARB/11/23, Award, 8 April 2013 (Knieper, Cremades, Hanotiau) (RLA-162) ["*Arif v Moldova*"] para 537.
[100] *Asian Agricultural Products Ltd (AAPL) v Sri Lanka*, ICSID Case No ARB/87/3, Award, 27 June 1990 (CLA-84) ["*AAPL v Sri Lanka*"]; *American Manufacturing & Trading Inc (AMT) v Zaire*, ICSID Case No ARB/93/1, Award, 21 February 1997 ["*AMT v Zaire*"]; *Wena Hotels v Egypt*.
[101] *MTD v Chile* para 113; *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Award, 14 July 2006 (CLA-61) ["*Azurix v Argentina*"] para 372.

Plainly, the Government in Quito could hardly have declared war on its own people. Yet, in the Tribunal's view, it could not do nothing.

6.84.   In any event, what it could not do under the Treaty, so the Tribunal decides, was to make the situation even worse, by making it legally impossible, under threat of criminal penalties, for the Claimant to complete its EIS as the concessionaire. Yet that is what the Respondent did on 25 September 2007 with the resolution by the Pichincha Regional Mining Director. In the Tribunal's view, in the circumstances, the Respondent's conduct was arbitrary, in the sense that it was unreasonable and disproportionate at that time to side so completely with the anti-miners as to make it impossible, both legally and physically, for the Claimant to complete its EIS, with inevitable consequences.

6.85.   Accordingly, as explained above, the Tribunal concludes that Respondent's unlawful conduct under the FET and FPS standards, from September 2007 to November 2008, materially contributed to the characterization of the Termination Resolutions of 13 November 2008 as an unlawful expropriation and a further breach of the FET standard.

6.86.   *Causation*: The Tribunal next addresses all issues however broadly related to causation under this single heading, although the Parties have addressed them under several different headings, including causation itself, contributory fault and unclean hands, materially affecting issues of both causation and compensation.

6.87.   As to causation, the Tribunal bears primarily in mind Article 31 of the ILC's Articles on State Responsibility for Internationally Wrongful Acts. It provides, as to reparation:

> "[31.1] The responsible State is under an obligation to make full reparation caused by the internationally wrongful act of a State.
>
> [31.2] Injury includes any damage, whether material or moral, caused by the internationally wrongful act of a State."

6.88.   As to the Claimant's injury allegedly caused by the Respondent's unlawful expropriation, within the meaning of Article 31 and also Article VIII(1) of the Treaty, the issue arises as to what loss was caused by the Respondent's unlawful expropriation to the "genuine value" of the Claimant's investments immediately before the

Termination Resolutions of 13 November 2008. The Claimant must discharge the burden of proving that its injury was caused solely by the Respondent's wrong. The Respondent must discharge the burden of proving that the Claimant materially contributed to its injury.

6.89.    It should be recalled that the Junín concessions remained immediately before 13 November 2008 in their early stages: there was no active mine or ongoing mining business by the Claimant. By November 2008, the global economic crisis had already begun, with a severely depressing effect on the value of the concessions and, indirectly, the Claimant's investments. The Tribunal here takes full account of the effect of the Respondent's earlier breaches of the FET and FPS standards in Article II (2)(a) & (b) of the Treaty: these predated the beginning of the full blown global crisis; but those treaty breaches did not amount to an expropriation. Nonetheless, it is appropriate to take those breaches by the Respondent into account, beginning at September 2007.

6.90.    By September 2007, with the events of mid-2006 to late-2006, the Tribunal decides that, even if the EIS had later been successfully completed and accepted by the Ministry, the prospects of the Junín concessions being successfully developed by the Claimant were uncertain or even unlikely (albeit not impossible). These events of 2006 therefore assume a crucial importance for the issues of causation arising from "contributory fault" or "unclean hands". Given its decision above (in Part 5) to the effect that the concessions were not unlawfully or improperly acquired, it is not here relevant to consider the Claimant's conduct before 2006, as alleged by the Respondent.

6.91.    *Contributory Fault*: As to "contributory fault", the Tribunal refers to Article 39 of the ILC Articles on State Responsibility, entitled "Contribution to the Injury" as being declaratory of international law. It provides: "In the determination of reparation, account shall be taken of the contribution to the injury by wilful or negligent action or omission of the injured State or any person or entity in relation to whom reparation is sought." In the ILC Commentary (paragraph 1), Article 39 is described as dealing "with the situation where damage has been caused by an intentionally wrongful act of a State, which is accordingly responsible for the damage in accordance with Articles 1 and 28, but where … the individual victim of the breach has materially contributed to the damage by some willful or negligent act or omission. Its focus is on situations

which in national law systems are referred to as 'contributory negligence', 'comparative fault', 'faute de la victime' etc."

6.92.   The ILC Commentary also explains what is meant by wilful or negligent action or omission (paragraph 5): "Not every action or omission which contributes to the damage suffered is relevant for this purpose. Rather article 39 allows to be taken into account only those actions or omissions which can be considered as wilful or negligent, i.e., which manifests a lack of due care on the part of the victim of the breach for his or her own property or rights [footnote omitted]. While the notion of a negligent action or omission is not qualified, e.g., by a requirement that the negligence should have reached the level of being 'serious' or 'gross', the relevance of any negligence to reparation will depend upon the degree to which is has contributed to the damage as well as the other circumstances of the case. The phrase 'account shall be taken' indicates that the article deals with factors that are capable of affecting the form or reducing the amount of reparation in an appropriate case." The ILC Commentary cites (inter alia) the decisions in *LaGrand, Delagoa Bay Railway* and *The Wimbledon*.[102]

6.93.   *Unclean Hands:* As to the Respondent's remaining case on "unclean hands", the Tribunal refers to the ECT tribunal's three awards in the *Yukos* cases of 18 July 2014. These awards add nothing new to the state of international law; and the Tribunal cites them only as a useful illustration of existing legal principles. The *Yukos* tribunal there concluded (in similar terms for each award): "In the view of the Tribunal, Claimants should pay a price for their abuse … which contributed in a material way to the prejudice which they subsequently suffered at the hands of the Russian Federation."[103] The *Yukos* tribunal cited Article 39 of the ILC Articles on State Responsibility, *MTD v Chile* and *Occidental v Ecuador* (as did the Respondent in this case).[104]

---

[102] *LaGrand* paras 57 & 116; *Delagoa Bay Railway Arbitration*; *The SS "Wimbledon"*, 1923, PCIJ, Judgment, Series A, No. 1, p. 31 ["*SS Wimbledon*"].
[103] *Hulley Enterprises Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 226, UNCITRAL, Final Award of 18 July 2014 (Fortier, Poncet, Schwebel) para 1634; *Yukos Universal Limited (Isle of Man) v. The Russian Federation*, PCA Case No. AA 227, UNCITRAL, Final Award of 18 July 2014 (Fortier, Poncet, Schwebel) para 1634; *Veteran Petroleum Limited (Cyprus) v. The Russian Federation*, PCA Case No. AA 228, UNCITRAL, Final Award of 18 July 2014 (Fortier, Poncet, Schwebel) para 1634 ["*Yukos v Russia*"].
[104] *MTD v Chile* paras 242ff; *Occidental v Ecuador* paras 659ff.

6.94.    The *Yukos* tribunal also stated:

> "[1636]. The Tribunal agrees with the ICSID Annulment Committee in the *MTD v. Chile* case that 'the role of the two parties contributing to the loss [is] […] only with difficulty commensurable and the Tribunal [has] a corresponding margin of estimation' [footnote omitted]. However, the Tribunal, as other tribunals have done, must reach a decision and it has done so on the basis of all the evidence which it has reviewed."

The *Yukos* tribunal then decided that the claimants had contributed to the extent of 25 percent to the prejudice which they had suffered as a result of the respondent State's destruction of their investments.

6.95.    The Tribunal notes that the committee and tribunal in *MTD v Chile* and *Occidental v Ecuador,* respectively, also applied Article 39 of the ILC Articles on State Responsibility.[105] In *Occidental*, the tribunal cited part of a doctoral thesis by Professor Brigitte Stern, pre-dating the ILC Articles, as follows:[106]

> "[674] Both parties, in support of their respective positions, have quoted extensively to extracts of the 1974 seminal thesis of Professor Brigitte Stern, a member of this Tribunal, entitled 'Le préjudice dans la théorie de la responsabilité internationale.' The Tribunal agrees that Professor Stern's thesis, particularly Chapter II entitled 'Application nuancé des règles normales de la causalité,' is very instructive to and informs its decision on this issue.
>
> [675] In a section of this chapter of her thesis entitled 'Acte de la victime justifiant partiellement l'acte de l'État,' Professor Stern refers to the cases of *Delagoa Bay Railway* and *Lillie Kling v. Mexico*,[107] as authorities for the following proposition: 'Il y a enfin un certain nombre de circonstances dans lesquelles l'acte de la victime ne justifie que partiellement l'acte de l'État et où il faut donc considérer qu'aussi bien l'un que l'autre sont intervenus de façon complémentaire dans la production du dommage' [Translation: Finally, there are

---

[105] *MTD v Chile*, Decision on Annulment para 99; *Occidental v Ecuador* paras 665-687.
[106] Brigitte Bollecker-Stern, *Le préjudice dans la théorie de la responabilité international* (Paris, Pedone, 1973) ["Stern"].
[107] *Delogoa Bay Railway Arbitration*; *Lillie S. Kling (USA) v. Mexico*, Award. 8 October 1930, reprinted in Reports of International Arbitral Awards (2006), Vol IV, 575 ["*Lillie Kling v Mexico*"].

a certain number of circumstances in which the act of the victim only partially justifies the State action, and in which as a result it must be concluded that both the former and the latter operated in a complementary fashion to produce the damage.]

[676]. The words of the Tribunal in *Delagoa Bay Railway* are particularly pertinent to the present case: 'Toutes ces circonstances qui peuvent être alléguées à la charge de la compagnie concessionnaire et à la décharge du gouvernement portugais atténuent la responsabilité de ce dernier et justifient […] une réduction de la réparation à allouer' [Translation: All these circumstances that can be put forward against the concessionaire and to the credit of the Portuguese government lessen the responsibility of the latter and *justify […] a reduction* in the damages to be granted] (Emphasis added by tribunal).

[677]. In *Lillie Kling*, the presiding commissioner opined that 'it is impossible not to consider that the action of the [Mexican] soldiers [the shooting and killing of an American] was caused by the shots fired in the air […] in a very imprudent manner' by some of the victim's companions. This "imprudence" was thus taken into consideration by the Commission to reduce the amount of the indemnity.

[678] The Tribunal agrees that an award of damages may be reduced if the claiming party also committed a fault which contributed to the prejudice it suffered and for which the trier of facts, in the exercise of its discretion, considers the claiming party should bear some responsibility."

The Tribunal notes that, in *MTD v Chile*, the reduction was 50% of the damages; and in *Occidental*, 25% of the claimants' prejudice.

6.96.  As was cited by the *Yukos* tribunal, the *MTD* committee held that the role of the two parties contributing to the loss was only with difficulty commensurable; and that the tribunal had "a corresponding margin of estimation" (paragraph 101). The *Occidental* tribunal decided likewise that it had "a wide margin of discretion in apportioning fault." (paragraph 670). The Tribunal does not discount the difficulty in estimating a contribution by way of percentage contribution; but it prefers to interpret these

references to "margin" and "discretion" as requiring the same exercise for any issue of causation. In the present case, that issue is essentially factual.

6.97.  For present purposes, the Tribunal considers that the general approach taken in all these decisions, whether treated as causation, contributory fault (based on wilful or negligent act or omission) or unclean hands, is materially the same, deriving from a consistent line of international legal materials. The Tribunal decides to apply that general approach in this case. As further explained below, it decides that the Claimant's injury was caused both by the Respondent's unlawful expropriation and also by the Claimant's own contributory negligent acts and omissions and unclean hands. Given that the Tribunal draws no distinction between these different concepts for this case, it prefers to refer only to Article 39 of the ILC Articles.

6.98.  In the Tribunal's view, Article 39 requires a factual assessment as regards the Claimant's conduct from mid-2006 to late-2006. Given all the events leading up to November 2008, the issue is whether and, if so, to what extent, the Claimant's worsening situation as the concessionaire in the Junín area was caused (in whole or in part) by its own acts or omissions. Much of the detailed factual evidence has already been described in Part 4 above; and what follows should be read with those findings of fact.

6.99.  By December 2006, by the acts of its agents in Ecuador, the Claimant had substantially reduced its chances of turning its Junín concessions into a commercial success. In short, a foreign investor, by its local agents, whatever the illegal provocations by local residents in the form of road-blocks, violence, arson and other impediments, should not resort to recruiting and using armed men, firing guns and spraying mace at civilians, not as an accidental or isolated incident but as part of premeditated, disguised and well-funded plans to take the law into its own hands. Yet, this is what happened. The Claimant's decisions to do so from mid-July to December 2006 remain both unexplained and inexplicable to the Tribunal, save as a sustained act of folly. It was bound to fail and to make the situation far worse for the Claimant; and it did.

6.100. In the Tribunal's view, the evidence establishes that several of the Claimant's senior personnel in Quito were guilty of directing violent acts committed on its behalf, in violation of Ecuadorian criminal law. Their resort to subterfuge and mendacity aggravated those acts. The consequences could have led to serious injury and loss of

life. The adverse response from members of the local communities, already hostile, was inevitable. That is not to say that the Claimant's senior management in Canada was fully privy to the planning and execution of these acts. On the evidence, the Tribunal prefers to base its decision on the Claimant's negligence, rather than the wilful conduct of its Canadian senior management. If it were based on the latter's own wilful conduct as the Claimant's alter ego, the result, as regards Article 39, would be much graver for the Claimant's case.

6.101.   By 13 November 2008, almost a year later than these critical events, the Claimant's situation had not improved in the Junín area. Indeed, the Claimant had by then acquired a pariah-like status in the local community and in Quito – hence, doubtless, its change of corporate name in July 2008, to no avail.

6.102.   Taking all these factors into account, including the provocations by certain anti-miners, the Tribunal assesses the Claimant's contribution to its own injury as at November 2008, for the purpose of applying Article 39 of the ILC Articles, at 30 per cent. On the facts of this case, it could not be less.

## L: The Chaucha Concession

6.103.   *The Claimant:* The Claimant's claim in regard to the Chaucha concession is based upon an alleged indirect expropriation by the Respondent in violation of Article VIII(1) of the Treaty; namely that the concession was "subject to measures having an effect equivalent to … expropriation." The claim is also advanced as a breach of the FET standard in Article II(2) of the Treaty. The Claimant relies, in particular upon the following principal matters.

6.104.   On 31 January 2008, the Under-Secretary of the MEM publicly declared that both the Junín and Chaucha concessions would be covered by a new mining law providing for the reversion of properties to the State, without compensation. This declaration was to impede the Respondent from disposing of its interest in the Chaucha concession for over a year.

6.105.   On 12 November 2008, the Respondent unlawfully expropriated the Junín concessions, with the Termination Resolutions.

6.106.   On 29 January 2009, the Respondent enacted Article 24 of the 2009 Mining Law. Article 1 provided for the return to the State of certain defined concessions.

6.107.   On 30 March 2009, an agreement was made between the Claimant and Nortec for (inter alia) Nortec's indirect acquisition of the Chaucha concession. It was, according to the Claimant, a forced sale, later repudiated, which eventually came to nothing.[108]

6.108.   On 30 April 2009, the MEM issued a Ministerial Order identifying the concessions that would revert to the State under Article 24 of the Mining Law.

6.109.   On 30 May 2009, the MEM confirmed that the Chaucha concession would revert to the State under Article 24 of the Mining Law.

6.110.   By letters dated 18 and 23 June 2009, Nortec informed the Claimant that it had obtained a copy of the MEM's official memorandum designating the Chaucha concession for reversion under Article 24 of the Mining Law. Nortec also provided Copper Mesa with a legal opinion from an ex-Minister of Mines confirming that this was the official policy of the Respondent.[109] The Claimant's own counsel could not provide a legal opinion confirming the Claimant's indirect title (via DosRios) in the Chaucha concession.

6.111.   On 23 July 2009, the MEM issued a ministerial order declaring that formal resolutions extinguishing title in affected concessions would be issued following a final review by the MEM Under-Secretary and that no compensation would be paid to concessionaires.[110]

6.112.   On 10 September 2009, the Chaucha concession was again listed by the Respondent as amongst the strategic mining projects that would be nationalised by the Respondent.[111]

6.113.   According to the Claimant, the result of this chronology substantially deprived its interest in the Chaucha concession of any material value, hence amounting to an indirect expropriation in breach of the Treaty and a violation of the Treaty's FET standard. The Claimant also contends that the Claimant (with its subsidiary, DosRios)

---

[108] Mr Davis WS 1 para 105s.
[109] Letters from Nortec to the Claimant dated 18 and 23 June 2009 (C-371 & C-65).
[110] Ministry of Mining Instruction 74 dated 23 July 2009 (R-5).
[111] *El Comercio* article dated 10 September 2009 entitled "Correa Analyzes A Nationalization Plan" (C-283).

had no realistic or effective prospect, by legal or administrative proceedings within Ecuador, to lift the cloud-on-title so adversely affecting the Chaucha concession. If it had existed, the Claimant would have used it.

6.114.   *The Respondent:* The Respondent denies any liability in respect the Claimant's claim. In brief, it relies in particular upon the following principal matters.

6.115.   There never was any cloud-on-title in regard to the Chaucha concession. The newspaper reports and other materials on which the Claimant relies do not demonstrate, according to the Respondent, that the Respondent intended to expropriate the Chaucha concession. Specifically, the MEM's draft internal memorandum was clearly a draft, as can be seen from the comparison with the final document. It cannot have been obtained legitimately by Nortec. Accordingly, the Claimant cannot here rely up on it, as unlawfully obtained material. As for the ministerial order of 23 July 2009, it was overturned on 27 August 2009 and substituted by another ministerial order on the same date. That order provided for an internal deadline of 180 days to prepare and review a report on the mining areas in which there had been investigation by the State, including the Chaucha concession.

6.116.   The Claimant never sought any clarification from the Respondent as to whether it had in fact taken a decision to revert the Chaucha concession. The Claimant could have requested a meeting with MEM for clarification; or it could easily have written to the MEM; but it did neither.

6.117.   As from 8 January 2010, any "cloud" would have disappeared. DosRíos (as the Claimant's subsidiary and concessionaire) then received a written request from the MEM to renew the Chaucha concession pursuant to the 2009 Mining Law. This request showed that the Respondent had not taken any decision to revert the Chaucha concession. Further, the renewal of the Chaucha concession on 23 April 2010 further confirmed that there was no cloud-on-title.

6.118.   *The Claimant's Response*: As regards the newspaper reports, the Claimant submits that these referred, both prior to and after the passage of Article 24 of the 2009 Mining Law, to the Chaucha concession as one of the targets for reversion. As for the MEM internal memorandum provided by Nortec, it was neither a draft nor confidential. According to the Claimant, its existence was mentioned in a public ministerial order;

it was signed; and there is no evidence that it was not voluntarily disclosed by the Respondent to Nortec during the course of the ordinary due diligence that any purchaser (such as Nortec) would undertake in the circumstances.

6.119.  As regards the Ministerial Order of 23 July 2009, it provides a complete answer to the Respondent's case that a meeting with or a letter to MEM would have clarified any cloud-on-title. It declared the Respondent's official policy of the State; and MEM could not have contradicted that policy in any correspondence or meetings with the Claimant. The subsequent Ministerial Order 84 did not reverse that policy, but merely extended the deadline for implementing it by 180 days. It therefore simply continued the cloud-on-title that prevented any disposal by sale of the Claimant's interest in the Chaucha concession.

6.120.  By January 2010, when Biotreat controlled the Chaucha concession (de facto) and was offered a substitute concession by the Respondent (albeit without any guarantee that this new concession itself would not be subject to Article 24), the cloud-on-title to the Chaucha concession had persisted for more than two years.

6.121.  *The Tribunal's Analysis and Decision*: The Tribunal notes that the Claimant pleads its case primarily as an alleged substantial deprivation of its interest in the Chaucha concession, amounting to an indirect expropriation. Its allegations of a cloud-on-title, affecting the disposal of its interest by sale, are advanced as factual manifestations of such deprivation, being more form than substance. The Tribunal prefers, as explained below, to address the issue of substantial deprivation.

6.122.  There is no question that indirect expropriation is covered by Article VIII(1) of the Treaty and international law. Unlawful expropriation is not limited to direct expropriation, confined to the overt taking of physical property or the formal transfer of title to movable or immovable property. As many tribunals have decided on similar wording, measures other than an actual taking or a formal transfer may amount to "measures having an effect equivalent to … expropriation", in the words of Article VIII(1) of the Treaty.[112] However, it is clear that indirect expropriation requires a

---

[112] For example, see *Tecmed v Mexico* paras 113-114.

substantial deprivation of the economic use and benefit of the investment, including its disposal.[113]

6.123.   In the Tribunal's view, by July 2009, there was a substantial deprivation amounting to an indirect expropriation in breach of Article VIII(1) of the Treaty by July 2009. The Tribunal notes that the MEM's Under-Secretary's announcement on 31 January 2008 of the pending reversion of the Chaucha concession immediately followed the Nullification Resolutions of 25 January 2008 in regard to the Junín concessions. Although these Nullification Resolutions made no reference to the Chaucha concession, the policy behind these resolutions (pre-dating the Mining Mandate and the Mining Law's Article 24) could equally have been applied to the Chaucha concession. The same applies to the Termination Resolutions of 12 November 2008.

6.124.   It is impossible to ignore the fact that the Claimant was the interested party for these concessions; and that, by November 2008, it had long acquired in Quito a pariah-like status, as recorded elsewhere. It could not, by then, have reasonably been expected that the Chaucha concession could long escape the fate of the Junín concessions. It was only a question of time.

6.125.   With the enactment of Article 24 of the Mining Law on 29 January 2009, the result was inevitable and imminent. In all but form, it came by July 2009. By then, the Claimant's subsidiary was the concessionaire of the Chaucha concession in name only. The Claimant could not use, enjoy or dispose of the economic benefit if its interest in the Chaucha concession, as was confirmed by its failed sale to Nortec in June 2009. The fact that a different beneficial owner (other than the Claimant) was requested by the Respondent in 2010 to renew and did renew the Chaucha concession proves nothing, other than the fact the Respondent viewed that third party (Biotreat) very differently from the Claimant.

6.126.   The Tribunal does not identify the Claimant as a wrongdoer in receiving and acting upon the information procured by Nortec for its own purposes, namely the exercise of due diligence before closing a significant closing transaction. Moreover, the Tribunal

---

[113] For example, see *Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No ARB/08/5, 14 December 2012, Decision on Liability (RLA-160) ["*Burlington v Ecuador*"] paras 471-473.

does not accept as proven that Nortec itself committed any legal wrong in procuring the list or draft list of affected concessions originating within the MEM.

6.127.    Further, the Tribunal does not accept that the Claimant (or DosRios) had any effective remedy, legal or administrative, to mitigate or extinguish the effect of the Respondent's conduct towards the Chaucha concession. Any formal or informal inquiry to MEM could not have resulted in any satisfactory solution for the Claimant by July 2009 or, indeed, at any later time.

6.128.    In the circumstances, the Tribunal thinks it unnecessary to address the Claimant's further claim under the FET standard in Article II(2) of the Treaty. That claim can add nothing to its claim for indirect expropriation under Article VIII(1) of the Treaty. The Tribunal notes that the Claimant did receive from Biotreat all or part of US$50,000 for its interest in the Chaucha concession in October 2009 under a forced sale, which sum will be taken into account in regard to quantum below.

### M: The Telimbela Concession

6.129.    The Claimant never held any interest in a concession over Telimbela: the concession was held by Ecuadorgold as the concessionaire, with the Claimant having only an option to acquire the concession for the Telimbela concession. This claim was not pressed by the Claimant at the Hearing or in its subsequent post-hearing submissions. In the circumstances, although the Tribunal does not treat it as having been abandoned, the Tribunal considers that it can decide this claim summarily, as follows.

6.130.    In short, there is no cogent evidence that any measure taken by the Respondent caused the Claimant (by itself or others) to allow the lapse of the option to acquire the Telimbela concession. Although inconclusive, the evidence suggests that the decision to allow the option to lapse was caused by the lack of sufficient funds to do otherwise, both by the Claimant and Biotreat.

6.131.    Accordingly, the Tribunal dismisses this claim.

### N: Summary

6.132.    As regards liability, for the reasons set out above, the Tribunal decides that the Respondent is liable under the Treaty for the Claimant's claim regarding the Junín and

Chaucha concessions. It dismisses the Claimant's claim regarding the Telimbela concession.

6.133.   As regards causation, for the reasons also set out above, owing to the Claimant's contributory negligence under international law, the Tribunal assesses the Claimant's contribution to its own injury at 30 per cent regarding the Junín concessions. It makes no such assessment regarding the Chaucha concession (where the Respondent makes no equivalent allegation).

6.134.   Accordingly, the Tribunal has here decided, in substance, the principal issues listed in Part 2 above, under Paragraphs 2.11 to 2.43.

## PART 7 – COMPENSATION

### A: Introduction

7.1.    It is likewise necessary to summarise the Parties' respective submissions on compensation before setting out the Tribunal's analyses and decisions.

7.2.    *The Claimant:* In brief, the Claimant submits that the Respondent, having violated its obligations under the Treaty in regard to the Junín and Chaucha concessions, must make full reparation to re-establish the situation existing before the violations took place or the situation that would have existed had the violations not occurred.[1] The Claimant contends that the reparation should take the form of monetary compensation sufficient to wipe out the consequences of the Respondent's illegal acts.[2] According to the Claimant, the compensation should amount to the difference in the value of the Claimant's investments had the measures complained of not taken place, and the lesser value of these investments in light of those measures.[3]

7.3.    The Claimant submits that, under customary international law, compensation reflecting the capital value of property taken or destroyed is generally assessed on the basis of "fair market value of the property lost". The Claimant presents three approaches to calculate that fair market value in this case: (i) income-based, (ii) market-based and (iii) cost-based.[4] The Claimant adduces the expert report of FTI Consulting Inc. in support of the compensation it seeks.[5] The Claimant cites the CIMVAL Guidelines to note that income-based approaches are not suitable for properties at an exploration stage, as in this case.[6]

7.4.    As its primary case on quantum, the Claimant presents a market-based quantification of damages with the high figure at US$72.8 million and the low figure at US$44.8 million. The Claimant claims the mid-point of the range, of US$69.7 million, together

---

[1] Claimant's Memorial para 363; *Case concerning the Factory at Chorzów (Germany v. Poland)*, Judgment on the Merits, 13 September 1928, PCIJ Reports, Series A, No. 17 (CLA-48) ["*Chorzów Factory*"].
[2] Claimant's Memorial para 359.
[3] Claimant's Memorial para 364.
[4] Claimant's Memorial paras 366-367.
[5] Claimant's Memorial paras 360-361.
[6] Claimant's Memorial para 369.

with interest from the appropriate valuation date. The Claimant selects the date of 24 January 2008 as the appropriate valuation date, as it is the date immediately before the Nullification Resolutions in respect of the Junín concessions.[7] The same date is proposed for use with respect to the Chaucha concession considering that the Nullification and Termination Resolutions would have also depressed the value of the Claimant's investments in general, despite being directed only at the Junín concessions.[8]

7.5.    As to quantification, the Claimant adopts the weighted average of three different market approaches to determine the fair market value of the Claimant's concessions: 40% to the market transactions involving mineral assets that are similar to the Claimant's concessions; 40% to the Claimant's share price in the thirty days prior to the valuation date; and 20% to the public offering of the Claimant's shares that occurred six months prior to the valuation date.[9]

7.6.    In the alternative, the Claimant presents the cost-based approach of quantification amounting to US$ 26.5 million in costs incurred by the Claimant related to the Junín, Chaucha and Telimbela concessions, as confirmed by its audited financial statements. This is a subsidiary alternative, only advanced if the Tribunal rejects its primary case on quantum. The Claimant contends that this is not the appropriate measure of damages, as it does not reflect future cash flows or expected investment returns.[10]

7.7.    *The Respondent:* The Respondent disagrees with the Claimant's quantification methodologies in that its selected valuation date is not only unjustified, but also misguided and misleading. Moreover, so the Respondent contends, the weightings attached to each valuation method are not justifiable and arbitrary.[11] In support of its case, the Respondent adduces the expert testimony on quantum of The Brattle Group.

7.8.    The Respondent claims that the valuation date of 24 January 2008 selected by the Claimant is unsupported by the facts and the Claimant's own legal case.[12] The Respondent contends that, under international law, the appropriate valuation date in

---

[7] Claimant's Memorial para 375.
[8] Claimant's Memorial para 377.
[9] Claimant's Memorial paras 379, 399.
[10] Claimant's Memorial paras 380, 403-406.
[11] Respondent's Counter-Memorial paras 463-468.
[12] Respondent's Counter-Memorial para 469.

case of direct expropriation is the date immediately before the expropriation date, or the date on which the decision to expropriate became publicly known, if earlier.[13] In the case of an indirect expropriation, the valuation date should be the date when the acts or omissions in question have ripened into an irreversible taking of the asset.[14]

7.9.   Therefore, according to the Respondent, the valuation date for the Junín concessions should be 12 November 2008, the date of their termination under the Termination Resolutions.[15] As to the Chaucha concession, it was alleged by the Claimant to have been expropriated as a result of a series of events that culminated on 23 June 2009, when Nortec became aware of the draft memorandum of the National Geological Survey. Accordingly, so the Respondent contends, this date should be selected as the valuation date for the Chaucha concession.[16] The Respondent contends that the earlier valuation date selected by the Claimant, falling before the 2008 global financial crisis, grossly overstates its loss;[17] and the Claimant thereby seeks compensation for the decline in asset values caused by that crisis, not caused by the Respondent at all.[18]

7.10.  *Further Submissions:* The Claimant contends that the Respondent gave specific instructions to its expert witness on quantum regarding the valuation dates it considered to be applicable, while the Claimant allowed its expert witness to come to his own conclusions. Hence, according to the Claimant, the evidence from the Respondent's quantum expert can have little or no value.

7.11.  The Claimant's expert, FTI, concluded that the proper valuation date was 25 January 2008, as the date on which the Junín concessions were nullified under the Nullification Resolutions, taking into account the language of the Treaty, Article VIII(1), that: "[c]ompensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier".[19] The Claimant indicates that the Nullification Resolutions constituted the actions whereby the

---

[13] Respondent's Counter-Memorial para 473.
[14] Respondent's Counter-Memorial para 475.
[15] Respondent's Counter-Memorial para 470.
[16] Respondent's Counter-Memorial paras 471 & 476.
[17] Respondent's Counter-Memorial para 472.
[18] Respondent's Counter-Memorial para 478.
[19] Claimant's Reply paras 426-428.

proposed expropriation became public knowledge, and therefore the valuation date it used is appropriate.[20]

7.12. The Respondent disagrees. It contends that the determination of the valuation date is a matter of treaty interpretation, international law and fact; and that, therefore, a valuation expert lacks competence to decide these matters.[21] The Respondent contends that the valuation date selected by the Claimant is inconsistent with its legal case that the expropriation of the Junín concessions took place with the Termination Resolutions, and not with the Nullification Resolutions. The Respondent contends that the Claimant seems to be arguing a case of "creeping expropriation" when selecting the valuation date, rather than the case of "direct expropriation", as it alleges with respect to its pleaded claim of expropriation. The Respondent contends that in cases of creeping expropriation, as a composite act, the valuation date would be the date when the steps taken resulted in an irreversible taking.

7.13. As regards the Junín concessions, the Respondent submits that such a date would be the date of the Termination Resolutions because the Nullification Resolutions had only a temporary effect and were subsequently annulled.[22] As regards the Chaucha concession, the Respondent submits that there is no basis to use the date of the Nullification Resolutions as their valuation date at all: the relevant date is the date when the expropriation becomes irreversible, not the date when the first instance of the Respondent's alleged wrongdoing occurs. Therefore, so the Respondent submits, the proper date for their valuation is 23 June 2009, when Nortec became aware of the internal draft memorandum of the National Geological Survey identifying Chaucha as among the areas on which the Respondent had carried out investigation, prospecting, exploration and/or exploitation.[23]

7.14. The Respondent, based on the expert report of The Brattle Group, contends that it is unnecessary and inappropriate to refer to market transactions involving mineral assets that are allegedly comparable to the Claimant's concessions and to allocate a weight of 40% to this method. The Respondent contends that the Claimant's own share value

---

[20] Claimant's Reply para 431.
[21] Respondent's Rejoinder paras 399-400.
[22] Respondent's Rejoinder paras 401-413.
[23] Respondent's Rejoinder paras 414-416.

should have been used instead. The Respondent alleges that the comparability of projects depends on their economics and not only upon their geological character; similar geological characteristics often have significantly different economics due to various factors. [24] Therefore, zero weight should be attached to comparable transactions. [25] According to the Respondent, the Claimant's quantum experts have also erred with respect to cut-off selection, time adjustments and purchase price allocations. [26]

7.15.   The Respondent contends that the use of traded share data, when available (which it is here), should be the primary and generally the only basis for valuing the assets of a company. [27] However, the Respondent alleges that the Claimant allocates a low weight to it and uses arbitrary dates in its stock price analysis, therefore substantially overstating the value of its claim. [28] The Respondent contends that the Claimant's chosen dates for valuing its stock prices are illogical. [29] The Respondent also disagrees with the use of a premium for an acquirer purchasing the totality of the shares, considering that although it may arise in the context of specific transactions where the acquirer is paying for unique value being transferred from the seller, they are not an inherent part of the fair market value of the asset. The Respondent concludes that the Claimant cannot be worth more than its traded market value. [30]

7.16.   The Claimant in turn rejects the Respondent's arguments. The Claimant contends that sound valuation methodology recognises that no one approach to valuation is necessarily accurate. Therefore, it is widely accepted that valuers should use multiple methods, examine the results and either choose a single method as being the most reliable or ascribe different weights to the outcomes of each methodology, depending on the factual circumstances of the case. [31] The Claimant also contends that the use of comparable properties is the primary and preferred valuation method; and that its quantum expert witnesses used this method according to best industry standards. [32]

---

[24] Respondent's Counter-Memorial paras 482-484.
[25] Respondent's Counter-Memorial para 488.
[26] Respondent's Counter-Memorial para 487.
[27] Respondent's Counter-Memorial para 489.
[28] Respondent's Counter-Memorial para 491, 499.
[29] Respondent's Counter-Memorial paras 492-493.
[30] Respondent's Counter-Memorial para 494.
[31] Claimant's Reply paras 432-438; CIMVAL C-244, s.7.2; SAMVAL s.24; American Institute of Certified Public Accountants' Statement on Standards for Valuation Services C-244.
[32] Claimant's Reply paras 439-446.

7.17.   The Claimant contends that FTI took into account market capitalisation as a factor. However, it concluded that the Claimant's share price did not reflect fair market value; and it therefore gave that method less weight when determining fair market value. Its reasons included the fact that the Respondent had taken numerous steps before the valuation date which could be expected to depress the value of the Claimant's shares, information imbalances that would not have reflected the Claimant's fair market value in its share price in the stock exchange, and the exclusion of a control premium in the traded price.[33] The Claimant further contends that should the Tribunal take into account the Claimant's share price alone to determine value, it should do so at a more current date and not at the Respondent's valuation date at the bottom of the stock market decline of 2008, when more recently as in October 2012, comparable companies have recovered almost all of the share value they had lost.[34]

7.18.   The Respondent disagrees that a mix of valuation methods is required, and insists that the market capitalisation is the appropriate valuation method, also disagreeing with the Claimant's reasons for criticizing this method.[35] As to the alternative date proposed by the Claimant for valuation using the market capitalisation, the Respondent contends that it is also inappropriate considering that, even more recently, in July 2013, the value of the same comparable companies had fallen substantially below the levels of the valuation date of 24 January 2008 initially proposed by the Claimant.[36]

7.19.   The Respondent also contends that the proper approach in accordance with standard valuation practice would have been to compare the fair market value of the Claimant's investments before and after the dates of their alleged taking.[37] According to the Respondent, an event study analysis shows a value of US$ 2.5 million as of 12 November 2008 for the Junín concessions.[38] As for the Chaucha (and Telimbela) concessions, the Respondent contends that the best evidence comes from the Nortec offer, and therefore, the value of US$ 5 million as at 23 June 2009 reflects the market evidence.[39]

---

[33] Claimant's Reply paras 449-462.
[34] Claimant's Reply paras 463-464.
[35] Respondent's Rejoinder paras 417-429.
[36] Respondent's Rejoinder paras 437-439.
[37] Respondent's Counter-Memorial para 500; Respondent's Rejoinder para 433.
[38] Respondent's Counter-Memorial para 503.
[39] Respondent's Counter-Memorial para 503.

7.20.   The Claimant objects to the determination of value using event studies arguing, *inter alia*, that share prices do not reflect fair market value and therefore an event study is inappropriate, and that event studies require an efficient trading market that is not the case when stocks are not liquid as in the case of the Claimant's shares.[40] The Respondent disagrees. According to the Respondent, it is the standard method to account for the effects of multiple events causing change in firm value, and the level of market efficiency in this case is sufficient for an event study.[41]

7.21.   As to the cost-based method of valuation, the Respondent rejects its application stating that this method ignores sharp declines in value suffered as a result of the global financial crisis.[42] The Respondent claims that a detailed accounting of the costs being allocated by the Claimant would be needed in order to understand the damage amount claimed by the Claimant using this valuation method.[43] The Claimant submits that this approach was presented as an alternative method against to which to compare other methods, and is one of the generally accepted approaches to valuation.[44]

### B: The Tribunal's Analyses and Decisions

7.22.   *Legal Burden of Proof*: The Tribunal starts with the general principle under international law that it is for the Claimant to prove the extent of its injury within the meaning of Articles VIII(1) of the Treaty as regards the expropriation of its Junín and Chaucha concessions. Given the Tribunal' decision dismissing, as to liability, the Claimant's claim regarding the Telimbela concession, it can be disregarded for present purposes.

7.23.   *Valuation Date:* As regards the dates of direct and indirect expropriation under Article VIII(1) of the Treaty, the Tribunal decides upon: (i) 3 November 2008 for the Junín concessions and (ii) 30 June 2009 for the Chaucha concession. However, as will appear below, these different dates are not directly material to the Tribunal's decisions on compensation.

---

[40] Claimant's Reply para 465.
[41] Respondent's Rejoinder paras 430-436.
[42] Respondent's Counter-Memorial para 504.
[43] Respondent's Counter-Memorial para 506.
[44] Claimant's Reply para 447.

7.24.    *The Parties' Quantum Experts:* Save for one method, the Tribunal decides not to accept the several valuation methodologies advanced by the Parties' respective expert witnesses. In the Tribunal's view, applied in this case, those methodologies are too uncertain, subjective and dependent upon contingencies, which cannot fairly be assessed by the Tribunal. For example, wholly extraneous factors significantly affect the different figures resulting from the Parties' different methodologies. These huge differences, with insufficient explanations, suggest that extreme caution is required in assessing compensation in this case. This is hardly surprising, given that the Claimant's concessions remained in an early exploratory stage with no actual mining activities, still less any track record as an actual mining business; and, particularly as regards the Junín concessions, that the Claimant's chances of moving beyond an exploratory stage were, by December 2006, slender.

7.25.    The Tribunal has therefore experienced difficulties in assessing compensation in this case. These difficulties cannot, however, preclude the Tribunal from making such an assessment on the relevant evidence adduced in this arbitration.

7.26.    The Tribunal has no doubt that the Claimant has itself suffered some legal harm. That much is certain. What is uncertain is the proven extent of that legal harm, quantified as compensation payable by the Respondent. As the tribunal held in its award in *Vivendi v. Argentina,* faced with similar difficulties on the issue of quantifying loss: "Nevertheless, there is useful evidence on the record; and it is well settled that the fact that damages cannot be fixed with certainty is no reason not to award damages when a loss has been incurred. In such cases, approximations are inevitable; the settling of damages is not an exact science."[45] Other arbitral decisions confirm this pragmatic approach, precluding a claim's dismissal for want of certainty or difficulty in its assessment.[46] For this reason, rather than seeking to value an elusive loss of a chance to the extent permissible under international law, the Tribunal here prefers to select the Claimant's alternative valuation method of proven expenditure. As may now also be understood, the date of valuation is not material to this approach on compensation.

---

[45] *Vivendi v Argentina* para 8.3.3.
[46] For example, see *Southern Pacific Properties (Middle East) Ltd. v. The Arab Republic of Egypt*, ICSID Case No ARB/84/3, Award, 20 May 1992 ["*SPP v Egypt*"] para 215; *Rumeli v Kazakhstan*, Decision of the Ad Hoc Committee para 144.

7.27.    *Expenditure:* In the Tribunal's view, the most reliable, objective and fair method in this case for valuing the Claimant's investments in November 2008 and June 2009 is to take the Claimant's proven expenditure incurred in relation to its Junín and Chaucha concessions.

7.28.    As stated in its audited consolidated financial statements as adjusted downwards by FTI in the form of its Revised Schedule 10, this figure is US\$ 25,764,500.[47] From this figure, it is necessary to deduct US\$ 1,473,607 in respect of the Telimbela concession. It is also necessary to separate out the expenditure for the Junín concessions and the Chaucha concession: these are respectively US\$ 15,977,994 and US\$ 8,312,899. The Tribunal finds that such expenditure on the Claimant's activities and its lawful "social programs" was not unreasonable, as regards both the Junín concessions and the Chaucha concession.[48] Moreover, at the relevant time, it was all being spent by the Claimant from its own pocket, with no recoverable claim against the Respondent in mind.

7.29.    That expenditure in regard to the Junín concessions and the Chaucha concession now lies wasted and is therefore totally lost for the Claimant. For present purposes, the Tribunal makes no distinction between direct and indirect expropriation as regards the Claimant's concessions. In selecting this approach, the Tribunal intends to restore the Claimant to the *status quo ante*, where it would have never been an investor in the Junín and Chaucha concessions. Anything more would be mere speculation. Anything less could not compensate the Claimant for the loss of its investments under Article VIII(1) of the Treaty or amount to the reparation required under the general principle enunciated in the *Chorzów* case, as here applied by the Tribunal.[49]

7.30.    For the Junín concessions this approach produces the figure of US\$ 15,977,994. It is however subject to the Claimant's contributory negligence under Article 39 of the ILC Articles. It therefore falls to be reduced by 30 per cent. Accordingly, that figure becomes US\$ 11,184,595.80 (a reduction of US\$ 4,793,398.20). The Tribunal had considered removing from this figure all costs howsoever connected with the Claimant's negligent fault under Article 39 of the ILC Articles; but it decides not to

---

[47] FTI Report para 7.90ff; Revised Schedule 10: "Revised Summary of Costs Incurred", for the period from inception to 30 September 2009, with Notes citing (inter alia) C-219.
[48] Transcript Day 5, p 1002 (Mr Rosen).
[49] *Chorzów Factory*.

do so to avoid subjecting the Claimant to a double penalty. It is confident that this reduced amount does not include any reimbursement of costs incurred by the Claimant in regard to its unlawful activities in the Junín area.

7.31.   For the Chaucha concession, this approach produces a figure of US$ 8,262,899 (being US$8,312,899 less US$50,000 received from Biotreat).

7.32.   *Conclusion:* As decided, the starting-point is the Claimant's figure, accepted as proven by the Tribunal for lost expenditure actually incurred for the Junín and Chaucha concessions. As regards the Junín concessions, the Claimant's figure falls to be reduced for the Claimant's contributory negligence by 30 per cent, producing the final amount of US$ 11,184,595.80. As regards the Chaucha concession, it produces the final amount of US$ 8,262,899. The total principal amount of compensation amounts to US$ 19,447,494.80. Accordingly, the Tribunal has here also decided, in substance and to the extent relevant, the principal issues listed in Part 2 above, under Paragraphs 2.44 to 2.54.

**PART 8 – INTEREST**

*A: Introduction*

8.1.    It is necessary briefly to summarise the Parties' respective submissions before setting out the Tribunal's analyses and decisions.

8.2.    *The Claimant:* In brief, as to the interest rate, the Claimant contends that the rate for six-month US Treasury bills should apply, plus a risk premium of 3% to 5% for sovereign debt in Ecuador and in emerging markets generally, from the valuation date onwards.[1] The Claimant further contends that recent investment treaty 'jurisprudence' points to compound interest as suitable for full reparation as the investor forgoes investment opportunities that would have included compounding effects.[2]

8.3.    *The Respondent:* The Respondent disagrees. In brief, according to the Respondent, the Claimant is not entitled to claim compound interest, simple interest still being the prevailing rule in international arbitration and most domestic legal systems.[3] Moreover, Ecuadorian law prohibits compound interest as it is against Ecuadorian public policy.[4] Since the Claimant's investments were made in Ecuador, Ecuadorian law must be considered dispositive of the issue.[5]

8.4.    The Respondent further contends that according to Article VIII of the Treaty, compensation for expropriation "shall be payable from the date of expropriation with interest at a normal commercial rate". Therefore, as to the Junín concessions, from 12 November 2008 (being the date of the Termination Resolutions), and as to the Chaucha concession, from 23 June 2009 (being the date of the alleged indirect expropriation of these concessions).[6]

---

[1] Claimant's Memorial paras 410-411.
[2] Claimant's Memorial paras 412-414.
[3] Respondent's Counter-Memorial paras 507-508 and authorities cited therein.
[4] Respondent's Counter-Memorial para 509; Ecuadorian Constitution, Article 308, and Civil Code, Articles 1575.3 and 2113.
[5] Respondent's Counter-Memorial para 509.
[6] Respondent's Counter-Memorial paras 510-512.

8.5.    The Respondent also disagrees that the Claimant is entitled to any risk premium. The Respondent contends that liability is determined at the time of the award and therefore pre-award interest should be at a risk-free rate.[7] Therefore, interest, if any is awarded, should be awarded on a simple, risk-free rate, as required by the Treaty ("at a normal commercial rate") and the prevailing international arbitral practice (e.g. see the ICSID decision in *Arif v. Moldova*).[8]

8.6.    The Claimant, for its part, submits that domestic law prohibitions on payment of interest or compound interest are not applicable to claims under investment treaties that are governed by international law, and that compound interest as opposed to simple interest is the international law standard in expropriation cases.[9] The Claimant refers to the decision in *Occidental v. Ecuador* where the tribunal reviewed recent trends in relation to interest in ICSID awards. It concluded that most recent awards provide for compound interest; and it found that this practice accords with the *Chorzów* principle. That tribunal also distinguished the decision in *Duke Energy v. Ecuador* (not an expropriation case) where damages were awarded only under domestic law and not under international law.[10]

8.7.    In addition, the Claimant contends that the "normal commercial rate" pursuant to the Treaty is not a risk-free rate. The Claimant, noting that its valuation expert's initial report tool "a highly conservative approach to a 'normal commercial rate'", suggests that a more accurate rate would be the Claimant's debt rate or the T-bill rate plus Ecuador's average sovereign debt premium.[11]

## B: The Tribunal's Analyses and Decisions

8.8.    The Tribunal begins with the wording of Article VIII(1) of the Treaty and international law, as the applicable law. It provides, in the case of lawful expropriation, compensation with interest "at a normal commercial rate" from the relevant date of expropriation (as there defined). As regards the rate of interest, the French wording states: "au taux d'intérêt en vigueur dans le commerce"; and the Spanish wording

---

[7] Respondent's Counter-Memorial paras 513-514.
[8] Respondent's Rejoinder paras 440-443.
[9] Claimant's Reply paras 467-468. *Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt,* ICSID Case No. ARB/99/6, Award, 12 April 2002 (CLA-27) paras 174-175.
[10] Claimant's Reply paras 471-472.
[11] Claimant's Reply paras 473-478.

reads: "a la tasa de interés comercial normal".[12] All three languages in the Treaty are equally authentic.

8.9.   The Tribunal notes that these wordings appear in a treaty signed almost twenty years ago, in 1996. At that time, it may be questioned whether these phrases necessarily included compound, as distinct from simple, rates of interest. However, there is no doubt that normal commercial rates include compound rates of interest. These wordings remain, however, equivocal.

8.10.  It is not necessary for the Tribunal to base its decision on any equivocal interpretation. This case concerns compensation for unlawful and not lawful expropriations. For an unlawful expropriation (whether direct or indirect), the Tribunal also applies the general principle established by the *Chorzów* case. It provides for full reparation, in the well-known passage already cited in Part 7 above.

8.11.  Accordingly, the Tribunal decides that full reparation in this case is not limited to simple interest under Article VIII(1) of the Treaty. Applying the *Chorzów* principle, with Article VIII(1), the Tribunal considers it appropriate in this case to award compound interest and not simple interest.

8.12.  As to the rate of compound interest, the Tribunal decides upon the rate for 26-weeks US Treasury bills (as published in the Wall Street Journal, New York edition, available at: wsj.com), plus three per cent as a normal commercial premium. It rejects the Claimant's claim for an additional country risk premium. Such an approach is inappropriate to an arbitration award made in the Netherlands under the UNCITRAL Arbitration Rules, subject to recognition and enforcement under Dutch law and the UN New York Convention of 1958. The Tribunal decides upon six-monthly rests. As for the starting date, the Tribunal fixes, as regards the Junín concessions, 3 November 2008 and, as regards the Chaucha concession, 30 June 2009, as the respective dates of their direct and indirect expropriations, until payment. Accordingly, the Tribunal has here also decided, in substance and to the extent relevant, the principal issues listed in Part 2 above, under Paragraph 2.55.

---

[12] C-1, C-3 & C-2.

## PART 9 – COSTS

### A: Introduction

9.1.    It is necessary briefly to summarise the Parties' respective submissions before setting out the Tribunal's analyses and decisions regarding legal and arbitration costs claimed under Articles 40(1) and 40(2) of the UNCITRAL Arbitration Rules forming part of the Parties' arbitration agreement derided from Article XIII of the Treaty.

9.2.    *The Claimant:* In brief, the Claimant seeks to have the Respondent bear all the costs of arbitration. The Claimant refers to the Tribunal's discretionary power to award costs under the UNCITRAL Rules, in particular, to Article 40(1) and (2) whereby "in principle" the cost of arbitration is to be borne by the unsuccessful party and the cost of legal representation and assistance shall be apportioned "taking into consideration the circumstances of the case".[1]

9.3.    *The Respondent:* In brief, the Respondent, for its part, seeks an award of all its costs of this arbitration from the Claimant, including attorney's fees and all other fees and expenses incurred from its participation in this arbitration, including internal costs.[2]

### B: The Tribunal's Analyses and Decisions

9.4.    *Legal Costs:* The relevant amounts of legal costs claimed by the Parties respectively are as follows:

> *(i) The Claimant*: US$ 3,079,264.20 (including US$ 440,000 as "arbitration costs")

The Tribunal refers to the Claimant's letter dated 31 January 2014, with the affidavit of Ms Nancy Chave.

> *(ii) The Respondent:* US$ 4,503,097.50 and US$ 1,201,082.42 (not including US$ 450,000 as "arbitration costs")

---

[1] Claimant's Memorial para 415, Claimant's PHB para 223(e); Claimant's letter dated 31 January 2014.
[2] Respondent's Statement of Defence para 119; Respondent's Counter-Memorial para 516; Respondent's Rejoinder para 444; Respondent's Costs Submissions dated 31 January 2014.

The Tribunal refers to the Respondent's Costs Submissions dated 31 January 2014.

9.5.     *Arbitration Costs:* The relevant amounts of arbitration costs are as follows:

>    *Dr Bernardo Cremades:*
>    Fees: US$ 286,575.00
>    Expenses: US$ 20,239.31
>
>    *Judge Bruno Simma:*
>    Fees: US$ 218,738.64
>    VAT: US$ 23,878.32
>    Expenses: US$ 6,503.98
>
>    *V.V. Veeder:*
>    Fees: US$ 243,675.00
>    Expenses: US$ 13,416.13
>
>    *PCA:*
>    Fees: US$ 117,228.35
>    Expenses: US$ 5,964.93
>
>    *Other Tribunal Expenses*: US$ 127,295.39
>
>    *Total for Arbitration Costs:* US$ 1,063,515.05

9.6.     The Parties have each deposited with the PCA US$ 531,757.50 as deposits towards arbitration costs, totalling US$ 1,063,515.00.The costs of the arbitration disbursed by the PCA total US$ 1,063,515.05, leaving no unexpended balance on hand with the PCA. These costs include all those costs detailed in Article 40(2)(a), (b), (c), (d) and (f) of the UNCITRAL Rules.

9.7.     In the Tribunal's view, there is no clearly "successful party" in this arbitration. It is true that the Claimant has succeeded, as regards jurisdiction, admissibility and liability, in its subsidiary claim for compensation in regard to two of its three concessions, including its principal concessions at Junín. On the other hand, the Claimant had claimed a substantially greater amount in its main claim for all its concessions, which was not accepted by the Tribunal (as to 70% of such claim). Moreover, the Respondent largely succeeded on its defence on causation and compensation based on the Claimant's contributory fault for its loss in regard to the Junín concessions. Those issues took up most of the time and effort in this arbitration, both for the Parties and the Tribunal. Their end-result significantly reduced the total amount of the Claimant's claims for compensation against the Respondent.

9.8.    The Tribunal does not attach material weight to either Party's procedural complaints against the other. The Claimant complains at the Respondent's attempt to bifurcate this proceeding (which the Tribunal rejected). It also complains at the Respondent making allegations that were later withdrawn or not pursued, such as the ownership of the Claimant's project companies and the acquisition or transfer of the concessions. In turn, the Respondent complains at the Claimant's deficiencies on document production (such as a complete and accurate list of its employees in Ecuador) and non-disclosures regarding the eventual sale of the Claimant's subsidiaries to Biotreat, ███████ ████████████████████████████████ and its initial opposition to the admission of film footage, including the documentary film "Under Rich Earth".

9.9.    In the Tribunal's view, none of these complaints are decisive factors in regard to the Tribunal's discretion to allocate between the Parties legal and arbitration costs. The overriding factor lies in the factual complexities of the Parties' dispute: the volume of evidence was extensive; and much of it was contradictory. In a dispute raising such controversies between pro-miners and anti-miners, this was always a complicated and difficult arbitration. Indeed, it is a tribute to the Parties' Counsel that so many of these difficulties were overcome. The Tribunal sees no good reason to criticise either Party or any Counsel for the conduct of its case in this arbitration.

9.10.   *Conclusion:* Taking all the circumstances into account, the Tribunal decides that the fairest decision on legal costs would be to let them lie where they fell: i.e. to make no order regarding legal costs, thereby rejecting both Parties' claims for legal costs. As regards arbitration costs, applying the same approach, the Tribunal decides that the Parties, as between themselves, shall bear the costs of the arbitration equally. Accordingly, the Tribunal has here also decided, in substance and to the extent relevant, the principal issues listed in Part 2 above under Paragraph 2.56.

## PART 10 - SUMMARY OF THE TRIBUNAL'S DECISIONS

10.1.    *The Claimant:* As noted above in Part 1 of this Award, the Claimant requested that the Tribunal make an award in its favour:

> *"(a)    dismissing Ecuador's preliminary objections;*
>
> *(b)    declaring that it has jurisdiction to hear Copper Mesa's claim under the Treaty;*
>
> *(c)    declaring that Ecuador breached its obligations under the Treaty;*
>
> *(d)    ordering Ecuador to pay monetary compensation to Copper Mesa in an amount of US$69.7 million plus compound interest thereon from April 30, 2013; and*
>
> *(e)    granting Copper Mesa its costs of this arbitration and costs of legal representation and assistance in an amount to be determined in a final award".*[1]

10.2.    *The Respondent:* As also noted in Part 1 above, the Respondent requested that the Tribunal dismiss the Claimant's claims for lack of jurisdiction, or in the alternative, dismiss the claims as inadmissible, or in the further alternative, dismiss the claims as unfounded, and award the costs of this arbitration, including attorney's fees and all other fees and expenses incurred in participating in this arbitration, including internal costs.[2]

10.3.    *The Tribunal's Summary:* As set out above in this Award, in summary, the Tribunal has decided:

10.4.    As regard the Respondent's objections to jurisdiction and admissibility, the Tribunal has decided to reject them and declares that it has jurisdiction to hear and decide on their factual and legal merits the Parties' dispute, including the Claimant's claims, under Article XIII of the Treaty.. The Tribunal's reasons are contained in Part 5 of this Award. Accordingly, the Tribunal accepts the Claimant's pleaded claims in paragraphs

---

[1] Claimant's Statement of Claim para 110; Claimant's Memorial para 419; Claimant's Reply para 480.
[2] Respondent's Statement of Defence para 119; Respondent's Counter-Memorial para 516; Respondent's Rejoinder para 444.

(a) and (b) above; and the Tribunal rejects the Respondent's pleaded objections to jurisdiction and admissibility.

10.5.    As regards the Claimant's claims that the Respondent breached its international obligations under the Treaty, the Tribunal has decided that the Respondent breached such obligations in regard to the Junín and Chaucha concessions (but not in regard to the option for the Telimbela concession) under Articles II(2) and VIII(1) of the Treaty. The Tribunal's reasons are contained in Part 6 of this Award. Accordingly, to this extent, the Tribunal accepts the Claimant's pleaded claims in paragraph (c) above as regards the Junín and Chaucha concessions; and it rejects the Respondent's pleaded defence that the Claimant's said claims are unfounded.

10.6.    As regards the Claimant's claim that the Respondent breached its international obligations under the Treaty in regard to the option for the Telimbela concession, the Tribunal has decided to reject that claim. The Tribunal's reasons are contained in Part 6 of this Award. Accordingly, as regards Telimbela, the Tribunal rejects the Claimant's pleaded claim in paragraph (c) above; and the Tribunal accepts the Respondent's pleaded defence that the Claimant's said claim is unfounded.

10.7.    As regards the Claimant's claims for compensation for breaches of the Treaty in regard to the Junín concessions (as decided by the Tribunal), the Tribunal decides that the Respondent contributed to 30 per cent of its loss by negligent acts and omissions committed by its own senior management in Canada. The Tribunal decides that the Claimant's net loss (after deduction of such 30 per cent) amounts to US$ 11,184,595.80. The Tribunal's reasons are contained in Parts 6 and 7 of this Award. Accordingly, to this extent only, the Tribunal accepts the Claimant's pleaded claim in paragraph (d) above; and the Tribunal rejects the Respondent's pleaded defence that the Claimant's said claim is unfounded.

10.8.    As regards the Claimant's claims for compensation for breaches of the Treaty in regard to the Chaucha concession (as found by the Tribunal), the Tribunal decides that the Claimant's loss amounts to US$ 8,262,899. The Tribunal's reasons are contained in Part 7 of this Award. Accordingly, to this extent only, the Tribunal accepts the Claimant's pleaded claim in paragraph (d) above; and the Tribunal rejects the Respondent's pleaded defence that the Claimant's said claim is unfounded.

10.9.    Accordingly, as regards the total principal sum of compensation payable by the Respondent to the Claimant under the Treaty in regard to the Junín and Chaucha concessions, that sum is US$ 19,447,494.80, as decided by the Tribunal.

10.10.   As regards interest under the Treaty accruing upon such principal sums for both the Junín and Chaucha concessions, the Tribunal has decided to order compound interest, with six-monthly rests, at the rate of 26-weeks US Treasury Bills, plus three per cent as a normal commercial premium, starting as regards the Junín concessions on 3 November 2008 and as regards the Chaucha concession on 30 June 2009, until payment. The Tribunal's reasons are contained in Part 8 of this Award. Accordingly, to this extent only, the Tribunal accepts the Claimant's pleaded claim in paragraph (d) above; and the Tribunal rejects the Respondent's pleaded defence that the Claimant's said claim is unfounded.

10.11.   As regards the Parties' respective claims for legal costs, it orders each of the Parties to bear its own legal costs in full, without recourse to the other Party. Accordingly, the Tribunal dismisses the Parties' respective claims for legal costs. As regards the Parties' respective claims for arbitration costs (not being their own legal costs), the Tribunal orders each Party, as between themselves, to bear equally such costs, again without recourse to the other Party. The Tribunal's reasons are contained in Part 9 of this Award. Accordingly, the Tribunal rejects both the Claimant's pleaded claim in paragraph (e) above; and the Tribunal also rejects the Respondent's pleaded claim that it be granted its full costs of this arbitration, including its legal costs.

## PART 11 – THE OPERATIVE PART

**11.1.**   **For the reasons set out above, the Tribunal awards as follows:**

**11.2.**   *Jurisdiction*: **The Tribunal decides and declares that it has jurisdiction to decide the Parties' dispute under Article XIII of the Treaty, as pleaded in this arbitration.**

**11.3.**   *Admissibility*: **The Tribunal decides that the Claimant's pleaded claims are admissible and may be decided by the Tribunal in this arbitration on their factual and legal merits under the Treaty.**

**11.4.**   *Liability*: **The Respondent is liable to the Claimant for breach of Articles II(2) and VIII(1) of the Treaty in regard to the Junín concessions, subject to a contribution by the Claimant to its own injury of thirty per cent; the Respondent is liable to the Claimant for breach of Article VIII(1) of the Treaty in regard to the Chaucha concession; and the Respondent is not liable to the Claimant under the Treaty in regard to the option for the Telimbela concession.**

**11.5.**   *Compensation*: **The Respondent is liable under the Treaty to pay compensation to the Claimant in the principal sum of US$ 11,184,595.80 as regards its liability for the Junín concessions and the principal sum of USS 8,262,899 as regards its liability for the Chaucha concession.**

**11.6.**   *Interest*: **The Respondent is liable to pay compound interest on the said compensation at the rate of six-month US Treasury Bills (as published in the Wall Street Journal – New York edition) plus three per cent, with three-monthly rests, from 3 November 2008 (as regards the Junín concessions) and 30 June 2009 (as regards the Chaucha concession).**

**11.7.**   *Legal Costs*: **Each Party shall bear its own legal costs, without recourse to the other Party.**

**11.8.**   *Arbitration Costs*: **Each Party, as between themselves, shall bear equally the costs of the arbitration, without recourse to the other Party.**

11.9.    Save as set out in the preceding sub-paragraphs, the Tribunal rejects all other claims, objections, defences and relief advanced by both Parties in this arbitration.


Date: 15 March 2016

Place (Seat) of Arbitration: The Hague, The Netherlands

Made by the Tribunal:

Dr. Bernardo Cremades

Judge Bruno Simma

V.V. Veeder (President)